HDM:BDM/TBM
F. #2021R00164

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                Plaintiff,

  - against -

ANY AND ALL SHARES OF 21 EAST 61 STREET APARTMENT CORP. HELD IN THE NAME OF LOVITAS, INC., TOGETHER WITH THE APPURTENANT PROPRIETARY LEASE FOR COOPERATIVE UNIT 12E WITHIN THE REAL PROPERTY AND PREMISES LOCATED AT 21 EAST 61ST STREET, NEW YORK, NEW YORK 10065, AND ALL PROCEEDS TRACEABLE THERETO, and

CONDOMINIUM UNIT 58D, TOGETHER WITH ITS RESPECTIVE APPURTENANCES, IMPROVEMENTS, FIXTURES, ATTACHMENTS, EASEMENTS AND FURNISHINGS, LOCATED AT 230 WEST 56TH STREET, NEW YORK, NEW YORK 10019, AND ALL PROCEEDS TRACEABLE THERETO,

                Defendants In Rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

VERIFIED COMPLAINT
IN REM

Civil Action No. 24-2147

## INTRODUCTION

        Plaintiff United States of America, by its attorney, BREON PEACE, United States Attorney for the Eastern District of New York, alleges the following upon information and belief:

**PRELIMINARY STATEMENT**

1. This is a civil action in rem to forfeit and condemn to the use of the United States the above-captioned defendant properties, in accordance with (a) 18 U.S.C. § 981(a)(1)(C), as property, real or personal, constituting or derived from proceeds obtained as a result of, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official; (b) 18 U.S.C. § 981(a)(1)(B), as property, real or personal, within the United States, constituting, derived from or traceable to proceeds from, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official; and (c) 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in money laundering activity, or property traceable to such property.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395, in that certain acts and omissions giving rise to the forfeiture occurred in the Eastern District of New York.

**THE DEFENDANTS IN REM**

4. The above-captioned defendants in rem consist of:

   a. Any and all shares of 21 East 61 Street Apartment Corp. held in the name of Lovitas, Inc., together with the appurtenant proprietary lease for Cooperative Unit

12E within the real property and premises located at 21 East 61st Street, New York, New York 10065, and all proceeds traceable thereto (the "Carlton House Property"); and

    b.  Condominium Unit 58D, together with its respective appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 230 West 56th Street, New York, New York 10019, and all proceeds traceable thereto (the "Park Imperial Property" and, together with the Carlton House Property, the "Defendant Properties").

  5.  According to cooperative housing records, including a recent lease assignment, Lovitas, Inc. is the owner of the Carlton House Property. In addition, the agreement for the purchase of the Carlton House Property was signed on behalf of Lovitas, Inc.

  6.  According to property records, the sole titleholder of the Park Imperial Property is Baloas, Inc.

## STATUTORY FRAMEWORK

  7.  In Mongolia, corruption is addressed by the Anti-Corruption Law which, as applicable here, was revised in July 2006 and went into effect on November 1, 2006. Pursuant to Article 4, the Anti-Corruption Law applies to persons holding a political, administrative or special office of the state. Article 7 makes it illegal for such persons to, among other things, abuse official power and office, obtain property and preferential right through abuse of office, and engage in illicit enrichment.

  8.  The Mongolian Criminal Code, as revised in 2002, likewise outlaws corruption and abuse of office. In particular, Article 263 criminalizes the abuse of power or office by a state official for lucrative or personal interests that has caused damage to the rights and interests of Mongolian citizens, which is punishable by imprisonment of up to five years.

9. Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense, or a conspiracy to commit such an offense, which constitutes "specified unlawful activity," as defined in Title 18, United States Code, Section 1956(c)(7).

10. Title 18, United States Code, Section 1956(c)(7)(B)(iv) defines "specified unlawful activity" to include, "with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving-- . . . bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official."

11. Title 18, United States Code, Section 981(a)(1)(B) provides for the forfeiture of any property, real or personal, within the jurisdiction of the United States, which constitutes, is derived from or is traceable to proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, where the offense involves conduct described in Title 18, United States Code, Section 1956(c)(7)(B), would be punishable within the jurisdiction of the foreign nation by imprisonment of a term exceeding one year, and would be punishable under the laws of the United States by imprisonment of a term exceeding one year if that offense had occurred within the jurisdiction of the United States.

12. Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits any person from engaging in financial transactions involving the proceeds of "specified unlawful activity," knowing that the proceeds represent proceeds of unlawful activity and knowing that the

transaction is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

13.  Title 18, United States Code, Section 1956(a)(2)(B)(i) prohibits any person from attempting to or in fact transporting, transmitting or transferring funds from a place in the United States to or through a place outside the United States, or from a place outside the United States to or through a place in the United States, knowing that the funds involved represent proceeds of unlawful activity, and knowing that the transportation, transmission or transfer is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

14.  Title 18, United States Code, Section 1957(d)(1) prohibits any person from engaging in a financial transaction in the United States, knowing that the proceeds represent proceeds of unlawful activity, and in fact involving property derived from "specified unlawful activity" of a value greater than $10,000.

15.  Title 18, United States Code, Section 1956(h) prohibits any person from conspiring to commit a violation under Sections 1956 or 1957.

16.  Title 18, United States Code, Section 981(a)(1)(A) provides that all property, real or personal, involved in a money laundering transaction or attempted money laundering transaction in violation of Title 18, United States Code, Section 1956, or property traceable to such property, is subject to forfeiture to the United States.

17.  Title 18, United States Code, Section 981(a)(1)(A) further provides that all property, real or personal, involved in a transaction or attempted transaction in violation of

Title 18, United States Code, Section 1957, or property traceable to such property, is subject to forfeiture to the United States.

## SUKHBAATAR BATBOLD

18. Sukhbaatar Batbold ("Batbold") is a Mongolian citizen who served as Mongolia's Prime Minister from 2009 to 2012, and who is a current sitting member of the Mongolian parliament.[1]  As Prime Minister, Batbold had effective control of the country's natural resources.

19. Batbold's eldest son is Battushig Batbold ("Battushig").  Battushig attended Harvard Business School in Massachusetts between 2012 and 2014, and was a summer associate at an investment management firm in New York in 2014.

## ERDENET MINE

20. The Erdenet mine ("Erdenet") is one of the largest copper and molybdenum mines in the world.  Erdenet is located near the Mongolian-Russian border and was previously operated pursuant to a joint venture between the Mongolian and Russian governments.  Prior to 2018, Mongolia maintained a majority interest in the mine through Erdenet Mining Corporation, a Mongolian state-owned mining company, which in turn was governed by the Mongolian State Property Committee, a governmental committee.  Under Mongolian law, the Chairman of the State Property Committee reported directly to the Prime Minister, who had ultimate responsibility for and authority over Mongolian state property.  In January 2018, Erdenet became wholly owned by Mongolia.

---

[1] Unless otherwise stated, all dates and figures are approximations, and all conversations are recounted in sum and substance.

21. Historically, Erdenet Mining Corporation sold its copper concentrates to established commodities trading firms, which arranged for financing with commercial banks, shipped and stored the copper concentrates, and then resold the copper concentrates on the market. Ocean Partners U.K. Ltd. ("Ocean Partners") is one of many trading firms that contracted directly with Erdenet Mining Corporation. As described further below, during Batbold's term as Prime Minister, Erdenet Mining Corporation inserted a middleman with ties to Batbold into the relationship with Ocean Partners, allowing Batbold to siphon off millions of dollars for his personal use and benefit, which included the purchase of the Defendant Properties.

### CATRISON LIMITED & THE DIVERTED MINING CONTRACTS

22. Catrison Limited ("Catrison") is a Hong Kong-registered company incorporated on February 8, 2011. South Korean national Hak Seon Kim ("Kim"), a former linguistics teacher and known associate of Batbold, was listed as its sole member. A second South Korean national was listed as its sole director. Neither had a background or expertise in commodities trading or mining. Kim's husband, Chooyoung (Nicholas) Cheong ("Cheong"), was likewise involved in Catrison and had known ties to Batbold.

23. Despite having no operational history, on February 14, 2011, six days after it was incorporated, and while Batbold was Prime Minister, Catrison received a $68 million contract from Erdenet Mining Corporation to purchase copper concentrates. Catrison then entered into subcontracts to sell the copper concentrates to Ocean Partners. Notwithstanding the insertion of Catrison, Ocean Partners continued to provide the financing, banking relationships and infrastructure to complete the sales. In other words, Ocean Partners performed the same role in its contracts with Catrison as it did in prior contracts entered into directly with Erdenet Mining

Corporation. Consistent with this arrangement, in internal correspondence, Ocean Partners' Director of Finance described the Catrison purchases as simply "a flow through from Erdenet."

24. Moreover, in its contracts with Catrison, Ocean Partners performed all of the work associated with the contracts, but received significantly reduced profits as compared to when it contracted directly with Erdenet Mining Corporation. The first contract between Catrison and Ocean Partners provided for a sale of 45,000 wet metric tons of copper flotation concentrates ("WMT") in 2011 and 50,000 WMT in both 2012 and 2013. Ocean Partners was required to pay not only the exact price Erdenet Mining Corporation charged to Catrison for the copper concentrates, but also a "profit sharing fee" to Catrison of 70% of the net profits from the shipments. The following year, the profit-sharing fee paid to Catrison was increased for shipments in excess of 50,000 WMT to 75% of the net profit on any excess tonnage.

25. Ocean Partners understood that Catrison was tied to Batbold. During the arrangement, in email correspondence, Ocean Partners alluded on numerous occasions to Batbold having directed the diverted contracts.

a. For example, on July 19, 2011, Kim's husband, Cheong, emailed Ocean Partners querying whether $5 million had been remitted to Catrison and indicating that Catrison was "in [a] hurry." Internally, Ocean Partners' Director of Finance emailed the head of trading for Ocean Partners in Mongolia and advised, "[I]t's not going to be immediate. . . . Is that a problem?" The head of trading replied, "We discussed it and it's a problem for me. I'm trying to have a meeting with PM and push big loan issue. PM is the one who makes final decision now." The head of trading feared the delay in payment to Catrison would create difficulty in negotiations with Batbold, given Batbold's connection to Catrison.

    b.  Similarly, on March 19, 2012, the Chairman and Managing Director of Ocean Partners emailed the Chief Financial Officer, "We need to be careful when we get towards the end of the contract as I don't completely trust Choong [sic], or more to the point, his benefactor."

    c.  Likewise, on March 30, 2017, in an instant messaging chat between Cheong and the head of trading for Ocean Partners in Mongolia regarding, among other things, Erdenet Mining Corporation claim disputes, Cheong advised: "I talk with B…he suggests that Cat[rison] send claim letter to mine [a/k/a Erdenet]…then OP [Ocean Partners] try to help EMC [Erdenet Mining Corporation]…by buying CAT[rison] contract…in cheaper money…and settle with EMC [Erdenet Mining Corporation] with s[u]pport of B?  He says it is more better to show he to help OP [Ocean Partners]…not CAT[rison]."[2]  In other words, Cheong understood from his conversation with Batbold that Batbold did not want to be seen as helping Catrison.

  26.  Pursuant to the resale contracts between Catrison and Ocean Partners, on or around March 2011, Ocean Partners began making wire transfers into one of Catrison's London-based bank accounts held at Rabobank International so that Catrison could make payments to Erdenet Mining Corporation as required under the terms of the contract between Catrison and Erdenet Mining Corporation.  From May 2011 to December 2013, Ocean Partners made at least 25 wire transfers totaling over $50 million.  On multiple occasions, after receiving a wire payment from Ocean Partners, Catrison would then wire the exact, or virtually the exact same, dollar amount to Erdenet Mining Corporation in connection with the commodities contracts.

---

[2] All ellipses in original.

27. Catrison maintained a second bank account at Rabobank International. While the first bank account was used to deposit funds from Ocean Partners to be used by Catrison to pay Erdenet Mining Corporation, funds deposited by Ocean Partners into the second Catrison account were used almost exclusively to pay dividends to Catrison's sole member and Batbold affiliate, Kim. Between March 2012 and June 2013, Ocean Partners made 7 deposits into the second Catrison account totaling $9.3 million. Of this amount, over $9.2 million was transferred to Kim in entries labeled "Loan to Shareholder" or "Dividend to Shareholder."

### THE PURCHASE OF THE PARK IMPERIAL PROPERTY

28. By October 2012, Catrison had received over $46 million from Ocean Partners, of which Catrison diverted at least $5,237,953 to HSBC bank account number xxxxxxxx7833 in Hong Kong held in the name of Kim ("Kim Account-1"). As described below, a portion of these funds were used to purchase the Park Imperial Property for $3.9 million using two shell companies: (i) Baloas Limited, a British Virgin Island company whose president was Kim, and (ii) Baloas, Inc., a company incorporated in New York on May 14, 2012, with Kim listed as its sole director.

29. On May 31, 2012, October 5, 2012 and October 19, 2012, three wire transfers were made from Catrison's bank account at Rabobank in London to Kim Account-1 in the amounts $487,953, $2,650,000 and $1,500,000, respectively. The funds transferred by Catrison to Kim Account-1 are traceable to payments made by Ocean Partners to Catrison related to the Erdenet Mining Corporation contracts.

30. On August 30, 2012, a real estate agent with Douglas Elliman advised Battushig by email, "[t]his morning upon your request I submitted your offer of $3.1M" for the

Park Imperial Property, but the offer was rejected.  Cheong, who was in fact the recipient of the email, forwarded it to Battushig.

33. Between September 12, 2012 and October 24, 2012, $4,005,000 was wire transferred from Kim Account-1 to an HSBC bank account in Hong Kong held in the name of Baloas Limited (the "Baloas Ltd. Account").

32. On September 12, 2012 and October 24, 2012, $400,000 and $3,630,000, respectively, were wire transferred from the Baloas Ltd. Account to a Citibank account in the United States held in the name of Baloas, Inc. (the "Baloas, Inc. Account").

33. On November 7, 2012, Baloas, Inc. purchased the Park Imperial Property for $3,900,000 using funds in the Baloas Inc. Account.

34. One year later, on November 29, 2013, Battushig opened a U.S. bank account at TD Bank in New York and listed the Park Imperial Property as his mailing address.

35. On May 16, 2016, Battushig reported to building maintenance that the washer and dryer in the Park Imperial Property were not functioning properly.  The manager of the Park Imperial Property engaged a technician to address the issue and sent an invoice to Battushig via email.  On May 30, 2016, Battushig responded, "[w]ill get this taken care of this week."  Cheong, who was copied on the email, requested that the invoice be paid from the "Baloas ac [account] by cheque."

### THE PURCHASE OF THE CARLTON HOUSE PROPERTY

36. In a manner similar to the acquisition of the Park Imperial Property by Baloas, Inc., a second luxury apartment, the Carlton House Property, was purchased for $9.9 million on March 10, 2015, with funds transferred from accounts held by Kim, including Kim

- 11 -

Account-1, which received funds derived from Erdenet Mining Corporation contracts as discussed in paragraph 28 above.

37. Beginning on April 4, 2013, $2,000,000 was wired from HSBC account number xxxxxxx6221 in Singapore held by Kim ("Kim Account-2") to an escrow account in the United States, as an initial downpayment towards the purchase of the Carlton House Property.

38. On October 4, 2013, $495,000 was wired from Kim Account-1 to an escrow account in the United States, as a second downpayment towards the purchase of the Carlton House Property. As discussed in paragraph 28 above, funds derived from Erdenet Mining Corporation contracts were received into Kim Account-1. Moreover, on December 12, 2013, $150,000 was wired from Catrison's bank account at Rabobank in London to Kim Account-1.

39. In addition, millions of dollars were transferred into Kim Account-1 in connection with the purchase of the Carlton House Property. Specifically, on February 18, 2015, a transfer of $7,000,000 was made into Kim Account-1. On February 25, 2015, February 27, 2015 and March 3, 2015, further transfers of a total of $1,000,000 were made into Kim Account-1 from an HSBC bank account in Singapore held in the name of Verusator Limited, a shell company with no apparent business purpose.

40. Subsequently, on February 18, 2015 and March 3, 2015, $7,000,000 and $1,100,000, respectively, were transferred from Kim Account-1 to the Baloas, Inc. Account in the United States.

41. One week later, on March 10, 2015, the Carlton House Property was purchased for $9,900,000 using funds in the Baloas, Inc. Account. The Carlton House Property

was purchased in the name of Lovitas, Inc.  Like Baloas, Inc., Lovitas, Inc. was incorporated in New York on May 14, 2012 with Kim as its sole director.

42. Records from the management company of the Carlton House Property reveal that Battushig is listed as a "co-owner" of the unit, alongside Kim and her husband Cheong, who are both listed as "owners."

## DIVERTING ADDITIONAL MINING CONTRACTS TO GENETRADE LIMITED

43. Bank and incorporation records further demonstrate Batbold and his family's use of state-owned mining contracts to funnel funds through shell companies for their personal use, consistent with the scheme used to purchase the Defendant Properties.

44. Genetrade Limited ("Genetrade") is a British Virgin Islands company founded on November 19, 2010.  Grandcastle Assets, Inc. ("Grandcastle") is a British Virgin Island company wholly owned by Battushig, Batbold's eldest son.  Sometime between Genetrade's inception and March 12, 2012, Grandcastle became the sole owner of Genetrade.

45. On December 24, 2010, despite having no operational history, Genetrade received a commodities contract worth $30 million from Erdenet Mining Corporation, which allowed Genetrade to purchase valuable natural resources and resell them on the secondary markets.  A year later, in December 2011, Genetrade was awarded a second commodities contract from Erdenet Mining Corporation worth $30 million.

46. Between January 2011 and March 2012, the time period during which the above-mentioned contracts were in effect, nine wire transfers totaling $325,350 were sent from HSBC account number xxxxxxxx1838 in Hong Kong held by Grandcastle to Citibank account number xxxxx7067 in the United States held by Battushig ("Battushig Account-1").

Notes accompanying the wire transfers included references such as "car payment," "trips and travel," "school payment" and "interior designer payment."

47. Similarly, between November 14, 2011 and December 19, 2012, when the Genetrade mining contracts were in effect, 16 wire transfers totaling $457,586 were sent from HSBC account number xxxxxxxx8833 held by Cheong in Hong Kong to Battushig Account-1.

48. As noted above, in 2012 Battushig was a business school student.

## FIRST CLAIM FOR RELIEF

49. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 as if set forth fully herein.

50. The Defendant Properties constitute and/or are derived from proceeds obtained as a result of and/or traceable to, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official.

51. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

52. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 as if set forth fully herein.

53. The Defendant Properties constitute, are derived from and/or are traceable to proceeds from, with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official.

54. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(B).

### THIRD CLAIM FOR RELIEF

55. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 as if set forth fully herein.

56. The Defendant Properties constitute and/or are derived from property involved in a financial transaction, in violation of Title 18, United States Code, Section 1956(a)(1), or a conspiracy to conduct a financial transaction, in violation of Title 18, United States Code, Section 1956(h), involving the proceeds of specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transaction was entered into with the knowledge that it was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.

57. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**FOURTH CLAIM FOR RELIEF**

58.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 as if set forth fully herein.

59.     The Defendant Properties constitute and/or are derived from property involved in the transportation, transmission or transferal of funds from a place outside the United States to or through a place inside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i), or a conspiracy to do so, in violation of Title 18, United States Code, Section 1956(h), involving the proceeds of specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transportation, transmission or transferal was done with the knowledge that it was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

60.     By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**FIFTH CLAIM FOR RELIEF**

61.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 48 as if set forth fully herein.

62.     The Defendant Properties constitute and/or are derived from property involved in a monetary transaction, in violation of Title 18, United States Code, Section 1957(a), or a conspiracy to conduct a monetary transaction, in violation of Title 18, United States Code, Section 1956(h), involving criminally derived property that is of a value greater than $10,000

and that is derived from specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transaction was entered into with the knowledge that it involved criminally derived property.

63. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

WHEREFORE, plaintiff United States of America requests that, pursuant to Title 18, United States Code, Sections 983 and 985, notice of this Verified Complaint be issued as to the Defendant Properties; that due notice of these proceedings be given to all interested persons; that after further proceedings, the Defendant Properties be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and

disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated:    Brooklyn, New York
             March 25, 2024

                        BREON PEACE
                        United States Attorney
                        Eastern District of New York
                        Attorney for Plaintiff
                        271A Cadman Plaza East
                        Brooklyn, New York 11201

By:   */s/ Tara McGrath*
       Tara McGrath
       Brian Morris
       Assistant United States Attorneys
       (718) 254-7000

       MARGARET A. MOESER
       Acting Chief
       Money Laundering & Asset Recovery Section
       Criminal Division, U.S. Department of Justice

       Adam J. Schwartz, Deputy Chief
       (Of Counsel)

## VERIFICATION

1. I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and, as such, have knowledge of the facts underlying this action.

2. I have read the within verified complaint in rem and know the contents thereof.

3. The matters contained in the within verified complaint in rem are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are, among other things, my personal knowledge, information provided by other law enforcement officers and witnesses, bank records, electronic communications, and the official files and records of the FBI and other federal, state and local agencies.

I, declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: March 25, 2024

TIMOTHY PAK
Special Agent
Federal Bureau of Investigation