*United States v. Shares of 21 East 61st Street Apartment Corp., et al.*

Civil Docket No. 24-2147 (RPK) (JAM)

# Exhibit A

JPL:SMF/TBM
F. #2021R00164

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                Plaintiff,

    - against -

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP. HELD IN THE
NAME OF LOVITAS, INC., TOGETHER
WITH THE APPURTENANT PROPRIETARY
LEASE FOR COOPERATIVE UNIT 12E
WITHIN THE REAL PROPERTY AND
PREMISES LOCATED AT 21 EAST 61ST
STREET, NEW YORK, NEW YORK 10065,
AND ALL PROCEEDS TRACEABLE
THERETO, and

CONDOMINIUM UNIT 58D, TOGETHER
WITH ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES,
ATTACHMENTS, EASEMENTS AND
FURNISHINGS, LOCATED AT 230 WEST
56TH STREET, NEW YORK, NEW YORK
10019, AND ALL PROCEEDS TRACEABLE
THERETO,

              Defendants In Rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

VERIFIED FIRST
AMENDED COMPLAINT
IN REM

Civil Action No. 24-2147

## **INTRODUCTION**

        Plaintiff United States of America, by its attorney, JOSEPH NOCELLA, JR.,

United States Attorney for the Eastern District of New York, alleges the following upon

information and belief:

## PRELIMINARY STATEMENT

1.      This is a civil action <u>in</u> <u>rem</u> to forfeit and condemn to the use of the United States the above-captioned defendant properties, in accordance with (a) 18 U.S.C. § 981(a)(1)(C), as property, real or personal, constituting or derived from proceeds traceable to an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official or a conspiracy to commit such offense; (b) 18 U.S.C. § 981(a)(1)(B), as property, real or personal, within the jurisdiction of the United States, constituting, derived from or traceable to proceeds obtained directly or indirectly from an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official, or property used to facilitate such an offense; and (c) 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in money laundering activity, or property traceable to such property.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395, in that certain acts and omissions giving rise to the forfeiture occurred in the Eastern District of New York.

## THE DEFENDANTS IN REM

4.      The above-captioned defendants <u>in</u> <u>rem</u> consist of:

      a.      Any and all shares of 21 East 61 Street Apartment Corp. held in the name of Lovitas, Inc., together with the appurtenant proprietary lease for Cooperative Unit

12E within the real property and premises located at 21 East 61st Street, New York, New York 10065, and all proceeds traceable thereto (the "Carlton House Property"); and

      b.      Condominium Unit 58D, together with its respective appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 230 West 56th Street, New York, New York 10019, and all proceeds traceable thereto (the "Park Imperial Property" and, together with the Carlton House Property, the "Defendant Properties").

5.      According to cooperative housing records, including a recent lease assignment, Lovitas, Inc. is a registered shareholder of the Carlton House Property. In addition, the agreement for the purchase of the Carlton House Property was signed on behalf of Lovitas, Inc.

6.      According to property records, the sole titleholder of the Park Imperial Property is Baloas, Inc.

<b><u>STATUTORY FRAMEWORK</u></b>

7.      In Mongolia, corruption is addressed by the Anti-Corruption Law which, as applicable here, was revised in July 2006 and went into effect on November 1, 2006. Under Article 3 of the Anti-Corruption Law, "corruption" encompasses abuse of official power to afford a preference to others and a violation that enables a person or entity to benefit from such preferences, "benefit" includes material or non-material benefits gained personally or by others for preferences through the abuse of office, "abuse of official power" includes taking or refraining from taking action to use delegated official power against official interests or for personal interest, and "preference" encompasses any material or non-material benefit to an individual or legal person who caused the abuse of official power. Pursuant to Article 4, the

- 3 -

Anti-Corruption Law applies to persons holding a political, administrative or special office of the state. Article 7 makes it illegal for such persons to, among other things, abuse official power and office, obtain property and preferential right through abuse of office, and engage in illicit enrichment.

8. The Mongolian Criminal Code, as revised in 2002, likewise outlaws corruption, bribery, and abuse of office. Relevant provisions of the Mongolian Criminal Code include, among others:

a. Article 263, which criminalizes the abuse of power or office by a state official for lucrative or personal interests that has caused damage to the rights and interests of Mongolian citizens. Violations of Article 263 are punishable by imprisonment of up to five years if the offense is committed repeatedly and causes a large amount of damage or serious harm.

b. Article 268, which makes it a crime for a public official, when acting in the interests of a bribe payer, to demand or accept a bribe, directly or through others, in return for the performance of his official duties, or in order to perform or do something that should not be done. A violation of Article 268 is punishable by a term of imprisonment of up to five years.

c. Article 269, which prohibits giving a bribe to an official personally or through an intermediary. A violation of Article 269 is punishable by a term of imprisonment of up to three years. If committed repeatedly by a person previously sentenced of the offense or by an organized group or criminal organization, a violation of Article 269 is punishable by a term of imprisonment of five to eight years.

d. Article 270, which prohibits intermediation in bribery. A violation of Article 270 is punishable by a term of imprisonment of 1 to 3 months. If committed repeatedly by a person previously sentenced for bribery or by way of using one's official position, a violation of Article 270 is punishable by a term of imprisonment of up to five years.

9. Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense, or a conspiracy to commit such an offense, which constitutes "specified unlawful activity," as defined in Title 18, United States Code, Section 1956(c)(7).

10. Title 18, United States Code, Section 1956(c)(7)(B)(iv) defines "specified unlawful activity" to include "an offense against a foreign nation involving . . . bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official."

11. Title 18, United States Code, Section 981(a)(1)(B) provides for the forfeiture of any property, real or personal, within the jurisdiction of the United States, which constitutes, is derived from or is traceable to proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, where the offense involves conduct described in Title 18, United States Code, Section 1956(c)(7)(B), would be punishable within the jurisdiction of the foreign nation by imprisonment of a term exceeding one year, and would be punishable under the laws of the United States by imprisonment of a term exceeding one year if that offense had occurred within the jurisdiction of the United States.

12. Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits any person from attempting to or in fact engaging in financial transactions involving the proceeds of "specified unlawful activity," knowing that the property involved in the transaction represents proceeds of some form of unlawful activity and knowing that the transaction is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

13. Title 18, United States Code, Section 1956(a)(2)(B)(i) prohibits any person from attempting to or in fact transporting, transmitting or transferring funds from a place in the United States to or through a place outside the United States, or from a place outside the United States to or through a place in the United States, knowing that the funds involved represent proceeds of some form of unlawful activity, and knowing that the transportation, transmission or transfer is designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

14. Title 18, United States Code, Section 1957(a) prohibits any person from attempting to or in fact engaging in a financial transaction in the United States, knowing that the property involved in the transaction represents proceeds of unlawful activity, and in fact involved property derived from "specified unlawful activity" of a value greater than $10,000.

15. Title 18, United States Code, Section 1956(h) prohibits any person from conspiring to commit a violation under Sections 1956 or 1957.

16. Title 18, United States Code, Section 981(a)(1)(A) provides that all property, real or personal, involved in a money laundering transaction or attempted money

laundering transaction in violation of Title 18, United States Code, Sections 1956, or property traceable to such property, is subject to forfeiture to the United States.

17.     Title 18, United States Code, Section 981(a)(1)(A) further provides that all property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or property traceable to such property, is subject to forfeiture to the United States.

### SUKHBAATAR BATBOLD

18.     Sukhbaatar Batbold ("Batbold") is a Mongolian citizen who served as Mongolia's Prime Minister from 2009 to 2012.[1]  As Prime Minister, Batbold had effective control of the country's natural resources.  Batbold was a member of the Mongolian parliament from 2004 to 2024, held positions as Minister of Foreign Affairs from 2008 to 2009, Minister of Trade and Industry from 2004 to 2006, and Deputy Minister of Foreign Affairs from 2000 to 2004.

19.     Batbold's eldest son is Battushig Batbold ("Battushig").  Battushig attended Harvard Business School in Cambridge, Massachusetts from which he graduated in 2014.  He was a summer associate at an investment management firm in New York, New York in 2014.

### ERDENET MINE

20.     The Erdenet mine ("Erdenet") is one of the largest copper and molybdenum mines in the world.  Erdenet is located near the Mongolian-Russian border and was previously operated pursuant to a joint venture between the Mongolian and Russian

---

[1]     Unless otherwise stated, all dates and figures are approximations, and all conversations are recounted in sum and substance.

governments.  Prior to 2018, Mongolia maintained a majority interest in the mine through Erdenet Mining Corporation, a Mongolian state-owned mining company, which in turn was governed by the Mongolian State Property Committee, a governmental committee.  Under Mongolian law, the Chairman of the State Property Committee reported directly to the Prime Minister, who had ultimate responsibility for and authority over Mongolian state property.  In January 2018, Erdenet became wholly owned by Mongolia.

21.	Historically, Erdenet Mining Corporation sold its copper concentrates to established commodities trading firms, which arranged for financing with commercial banks, shipped and stored the copper concentrates, and then resold the copper concentrates on the market.  Ocean Partners U.K. Ltd. ("Ocean Partners") is one of many trading firms that contracted directly with Erdenet Mining Corporation.  As described further below, during Batbold's term as Prime Minister, Erdenet Mining Corporation inserted a middleman with ties to Batbold into the relationship with Ocean Partners, allowing Batbold to siphon off millions of dollars for his personal use and benefit, which included the purchase of the Defendant Properties.

## CATRISON LIMITED & THE DIVERTED MINING CONTRACTS

22.	Catrison Limited ("Catrison") is a Hong Kong-registered company incorporated on February 8, 2011.  South Korean national Hak Seon Kim ("Kim"), a former linguistics teacher and known associate of Batbold, was listed as its sole member.  A second South Korean national was listed as its sole director.  However, Kim's husband, Chooyoung

(Nicholas) Cheong ("Cheong"), operated as the de facto principal of Catrison and had known ties to Batbold.

23. Despite having no operational history, on February 14, 2011, six days after it was incorporated, and while Batbold was Prime Minister, Catrison received a $68 million contract from Erdenet Mining Corporation to purchase copper concentrates (the "Catrison Contract"). Shortly thereafter, on March 2, 2011, Catrison entered into a subcontract to sell the copper concentrates to Ocean Partners (the "Catrison-Ocean Partners Contract"). Notwithstanding the insertion of Catrison, Ocean Partners continued to provide the financing, banking relationships and infrastructure to complete the sales. In other words, Ocean Partners performed the same role in its contracts with Catrison as it did in prior contracts entered into directly with Erdenet Mining Corporation. Consistent with this arrangement, in internal correspondence, Ocean Partners' Director of Finance described the Catrison purchases as simply "a flow through from Erdenet."

24. On December 14, 2011, Catrison and Erdenet Mining Corporation entered into a second contract, permitting Catrison to purchase more copper concentrates (the "Second Catrison Contract"). In turn, Catrison also entered into amendments to the Catrison-Ocean Partners Contract, agreeing to sell to Ocean Partners the copper concentrates from the Second Catrison Contract.

25. Ocean Partners performed most, if not all, of the work associated with the contracts and subcontract with Catrison referenced above but received significantly reduced profits as compared to when it contracted directly with Erdenet Mining Corporation. The first contract between Catrison and Ocean Partners provided for a sale of 45,000 wet metric tons of

copper flotation concentrates ("WMT") in 2011 and 50,000 WMT in both 2012 and 2013. Ocean Partners was required to pay not only the exact price Erdenet Mining Corporation charged to Catrison for the copper concentrates, but also a "profit sharing fee" to Catrison of 70% of the net profits from the shipments. The following year, the profit-sharing fee paid to Catrison was increased for shipments in excess of 50,000 WMT to 75% of the net profit on any excess tonnage.

26. According to Ocean Partners employees familiar with the Catrison-Ocean Partners Contract, Ocean Partners performed most of Catrison's obligations under Catrison's contracts with Erdenet Mining Corporation because Catrison lacked the capacity to do so itself. According to one Ocean Partners official, Cheong and Catrison did not have the business capacity to execute the terms of its contracts with Erdenet Mining Corporation and required a business partner like Ocean Partners to successfully execute those contracts.

27. Similarly, according to another former Ocean Partners official, Catrison lacked the ability to transfer the copper concentrates it purchased from Erdenet Mining Corporation from the mine in Mongolia to China on its own, and it was by partnering with Ocean Partners that Catrison was able to fulfill that term of its contracts with Erdenet Mining Corporation.

28. It was also the opinion of Rabobank International, which provided financing to Ocean Partners to support its various contracts with Erdenet Mining Corporation, that Catrison was essentially a pass-through in the relationship between Ocean Partners and Erdenet Mining Corporation. According to a June 2012 opinion of Rabobank's credit committee concerning its approval of a loan facility to Ocean Partners, the Catrison-Ocean Partners

Contract "[i]n practice […] means that [Ocean Partners] effectively have two contracts from Erdenet." The credit committee also opined that "Catrison has no financial substance" or ability to execute the contract itself: "Catrison does not have the infrastructure / bank lines to finance the purchase and sale of the concentrates, so instead uses [Ocean Partners] to do this on its behalf. This is achieved via a profit sharing agreement and the export contract between Catrison and [Ocean Partners] that mirrors Catrison's export contract with Erdenet [Mining Corporation]. [Ocean Partners] deals with the documentation and day to day running of the Erdenet [Mining Corporation] / Catrison export contract (Catrison's role is passive), and is therefore the effective off-taker under this contract."

29. Ocean Partners understood that Catrison was tied to Batbold. In email and instant message correspondence, Ocean Partners alluded on numerous occasions to Batbold having directed the diverted contracts.

a. For example, on July 19, 2011, Kim's husband, Cheong, emailed Ocean Partners querying whether $5 million had been remitted to Catrison and indicating that Catrison was "in [a] hurry." Internally, Ocean Partners' Director of Finance emailed the head of trading for Ocean Partners in Mongolia and advised, "[I]t's not going to be immediate. . . . Is that a problem?" The head of trading replied, "We discussed it and it's a problem for me. I'm trying to have a meeting with PM and push big loan issue. PM is the one who makes final decision now." The head of trading feared the delay in payment to Catrison would create difficulty in negotiations with Batbold, given Batbold's connection to Catrison.

b. Similarly, on March 19, 2012, the Chairman and Managing Director of Ocean Partners emailed the Chief Financial Officer, "We need to be careful when we

get towards the end of the contract as I don't completely trust Choong [sic], or more to the point, his benefactor."

    c.    Likewise, on March 30, 2017, in an instant messaging chat between Cheong and the head of trading for Ocean Partners in Mongolia regarding, among other things, Erdenet Mining Corporation claim disputes, Cheong advised: "I talk with B…he suggests that Cat[rison] send claim letter to mine [a/k/a Erdenet]…then OP [Ocean Partners] try to help EMC [Erdenet Mining Corporation]…by buying CAT[rison] contract…in cheaper money…and settle with EMC [Erdenet Mining Corporation] with s[u]pport of B?  He says it is more better to show he to help OP [Ocean Partners]…not CAT[rison]."[2]  In other words, Cheong understood from his conversation with Batbold that Batbold did not want to be seen as helping Catrison.

    30.    In or around March 2011, Ocean Partners began making wire transfers into one of Catrison's London-based bank accounts held at Rabobank International so that Catrison could make payments to Erdenet Mining Corporation as required under the terms of the contract between Catrison and Erdenet Mining Corporation.  From May 2011 to December 2013, Ocean Partners made at least 25 wire transfers totaling over $50 million.  On multiple occasions, after receiving a wire payment from Ocean Partners, Catrison would then wire the exact, or virtually the exact same, dollar amount to Erdenet Mining Corporation in connection with the commodities contracts.

    31.    Catrison maintained a second bank account at Rabobank International. While the first bank account was used to deposit funds from Ocean Partners to be used by Catrison to pay Erdenet Mining Corporation, funds deposited by Ocean Partners into the second

---

[2]    All ellipses in original.

- 12 -

Catrison account were used almost exclusively to pay dividends to Catrison's sole member and Batbold affiliate, Kim. Between March 2012 and June 2013, Ocean Partners made 7 deposits into the second Catrison account totaling $9.3 million. Of this amount, over $9.2 million was transferred to Kim in entries labeled "Loan to Shareholder" or "Dividend to Shareholder."

**CHEONG SERVED AS A PERSONAL ASSISTANT AND
PROPERTY MANAGER FOR BATBOLD**

32.     Since at least the time when the Defendant Properties were purchased, Cheong has functioned as a personal assistant to Batbold and his family in numerous capacities, including as a manager of Batbold's real property interests, as a liaison and financial manager for Batbold's children, and by arranging various other personal matters for Batbold, such as foreign travel, doctor appointments, and other private matters.

33.     On March 13, 2017, Cheong sent an email to himself with the subject line: "business long term plan." Attached to that email was an Excel spreadsheet that summarized information concerning various properties. This included two properties that correspond to the Defendant Properties: under "NY1", there is a reference to "Baloas inc," the titleholder of the Park Imperial Property, and under "NY2", there is a reference to "Lovitas inc," a registered shareholder of the Carlton House Property. The spreadsheet also included coded references which, upon information and belief, appear to be references to properties in London and Hong Kong, and contained notations referring to plans to "sell" certain properties and "remit to UB." In particular, notations under "NY2," which corresponds to the Carlton House Property, reflected a plan to "sell" that property and "remit to UB" between 2017 – 2018. Upon information and belief, "UB" is a reference to Ulaanbaatar, the capital and seat of government of Mongolia.

34.     During the relevant time period, Mongolian law required public officials, including the Prime Minister, to file annual asset declarations publicly disclosing ownership of, *inter alia*, real property owned by them domestically and abroad.  In April 2017, Mongolia's Law on the Regulation of Public and Private Interests and Prevention of Conflict of Interest in Public Service was amended to include Article 101, which outright banned public officials from holding foreign property and foreign bank accounts in their own name.  That law remains in effect to this day.

35.     In his annual filings following the purchase of the Defendant Properties in 2012 and 2015, Batbold has never reported ownership of the Defendant Properties.

36.     During the summer of 2012, shortly before the purchase of the Park Imperial Property, Battushig described Cheong as a "family assistant" and Cheong described himself as a "PA," or "personal assistant," to the Batbold family.

37.     The description of Cheong as a "family assistant" and "PA" is consistent with the services Cheong performed for Batbold and his family.  For instance, among other things, Cheong arranged hotel bookings for Batbold and his wife's foreign travels, organized meetings with interior designers for Batbold's residences, scheduled doctors and banking appointments for Batbold, made significant bank transfers on Batbold's behalf, and handled other administrative logistics for Batbold.  For example:

a.     In August 2012, Cheong corresponded with an employee in the Private Wealth Management division at Deutsche Bank in Hong Kong about Batbold's trip to Hong Kong in September 2012.  Cheong asked the employee to arrange Batbold's meeting with the bank and lodging in Hong Kong, writing: "I remember that DB has contract with Shangri-La

Kowloon only, not hk island, right? Mr. B comes to hk on Sep 7th for 2-3 days, so wants to have meeting with DB. Are you and Patric available?" A few days later, the employee provided a booking confirmation for a stay by "Batbold Sukhbaatar" at the Shangri-La hotel in Hong Kong from September 6-9, 2012. In response, Cheong instructed her to confirm the arrangements would accommodate Batbold's wife: "Also, he comes with his wife. So, King size bed will be required."

b. In July and August 2012, Cheong apparently communicated with the managing director of a property development company in Phuket, Thailand about hiring an interior designer for Batbold's home in Ulaanbaatar, Mongolia. Cheong relayed instructions to the managing director about the selection of the designer ("He says that 1. He chose Wilson. 2. Start immediately. 3. He plan to move at September"), and from the managing director about the requested timeline being unrealistic ("I will let him know this fact"). On August 20, 2012, Cheong asked the managing director to arrange a meeting with Batbold and a designer in Hong Kong ("Mr. B comes on Sep 6th, and would like to meet her to discuss on Zaisan villa") and for Batbold to see the Phuket villa ("Mr. B comes to Phuket on Sep 3rd to 5th, he want to see the villa site for check, can you arrange ?"). A few days later, on August 24, 2012, the managing director emailed another designer, explaining "[o]ne of our [Phuket] villa buyers is looking for an interior designer for his town house in Ulaanbaatar" and asking her to communicate directly with Cheong, who he described as "our buyer's representative." On information and belief, Cheong conducted these communications with the managing director on behalf of Batbold.

38.	Cheong also helped manage personal financial matters for Batbold and his family, ranging from payment of his children's school tuition to Batbold's personal medical expenses and payments owed on various of Batbold's properties.

**THE PURCHASE OF THE PARK IMPERIAL PROPERTY**

39.	In 2012, Cheong arranged the purchase of the Park Imperial Property, which was held through a shell company, Baloas Limited, of which his wife Kim was listed as a director.  Although Baloas Limited was the purported owner of the Park Imperial Property, its purchase benefitted the Batbold family.

40.	In the summer of 2012, Battushig conducted a search for an apartment in New York City.  Email correspondence reflects that Battushig worked with agents at multiple brokerages to view different properties in August 2012.  Although Battushig was arranging the showings himself and leading the discussions with the brokers, he represented that the purchaser was his "family friend," Cheong.

41.	For example, in early August 2012, Battushig toured multiple properties in New York with one real estate agent.  On August 19, 2012, Battushig told her that he was "keen in seeing" a unit at the Park Imperial building, as well as the Park Imperial Property itself, when he returned to New York later that month.

42.	On August 30, 2012, a real estate agent with Douglas Elliman advised Battushig by email, "[t]his morning upon your request I submitted your offer of $3.1M" for the Park Imperial Property, but the offer was rejected.  Cheong, who was in fact the recipient of the email, forwarded it to Battushig.

43.     Over the following weeks, the Douglas Elliman real estate agent made multiple offers and counter-offers for the Park Imperial Property.  While that real estate agent told Cheong that such offers were "on behalf of your wife, Dr. Kim," it is apparent from the email correspondence that Battushig was in fact driving the decision-making process.  While that real estate agent directly emailed Cheong on numerous occasions with updates about the negotiations, Cheong repeatedly forwarded those emails to Battushig before replying to the real estate agent.

44.     In addition, despite emailing about the negotiations directly with Cheong, the real estate agent also spoke with Battushig directly about the purchase.  On August 31, 2012, the real estate agent told Cheong: "I just got off the phone with B.  Can we increase the offer to $3.6M?"  Cheong responded, "Ok. Confirm to offer 3.6m" and then moments later followed up, asking her to wait ("One moment, just 10 minute, please") and then later, "Ok, please go ahead[.]" Similarly, a few days later, the real estate agent told Cheong: "We received a counter offer of $3,895,000 from the owner.  B had asked me to research historic sales data on other D lines."

45.     The real estate agent, Battushig, and Cheong also openly discussed intentions for Battushig to move into the property as soon as possible.  On September 6, 2012, the real estate agent told Cheong: "By the way; the owner will allow B to move in right after the lease is signed as a tenant."  Cheong forwarded that email, as well, to Battushig.

46.     In addition to assuming the benefits of the Park Imperial Property, Battushig also directed Cheong about the language to use in negotiating its purchase.   On September 6, 2012, Cheong forwarded Battushig an email from the real estate agent asking

- 17 -

whether he wanted to purchase window treatments or furniture from the seller.  Battushig responded: "We don't really need the furniture …"  Cheong then asked: "So, I say [to her] that I don't need it."  Battushig replied: "No tell her what I just said. 'We don't really need the furniture.[…]'" Cheong promptly followed Battushig's instruction and sent the real estate agent the precise language Battushig had supplied.

47.    Likewise, on September 11, 2012, after their offer had been accepted, Battushig told the real estate agent that he wanted the contract finished on Wednesday, instructing her: "Prepare everything today and give first thing in the morning. Because Wednesday-Thursday is a good day in the horoscope. I don't need to see the apartment till this weekend, no problem."  Battushig later followed up: "Will coordinate the move-in date to be a Wednesday or Thursday of some week..."

48.    A week later, Battushig and the real estate agent continued to discuss his intent to move into the Park Imperial Property.  On September 16, 2012, the real estate agent told Battushig: "Potentially you can move in in 2-3 weeks […] I will email Cheong to push the attorney to facilitate the paperwork."  Battushig confirmed the plan "sounds good" and advised the real estate agent that "if possible to move-in the October 12th weekend, that would be great" and asked her to "keep me posted when Cheong does the deposit?"  The real estate agent responded that Cheong "already put 10% down last Friday. The remaining 90% is due at the closing."  Battushig replied to confirm his move-in options, writing: "Yes, but other question about move-in. You had mentioned I can move in as tenant no? Or it should be done by Oct. 12th?"  This discussion thus treats Cheong not as the genuine owner but as the person operating the transaction, with Battushig as its beneficiary.

49.     In sum, these exchanges reflect that – notwithstanding that the Park Imperial Property was formally titled in the name of Baloas Limited, and purportedly purchased by Kim – it was Battushig who managed the selection process, gave direct instructions to the relevant real estate agent, issued directions to Cheong on what to say to the real estate agent, and intended to actually occupy the property.  Although the parties nominally treated Cheong and Kim as the buyers, Cheong's communications about the purchase flowed through Battushig, who in fact became the tenant of the property.

50.     By October 2012, Catrison had received over $46 million from Ocean Partners, of which Catrison diverted at least $5,237,953 to HSBC bank account number xxxxxxxx7833 in Hong Kong held in the name of Kim ("Kim Account-1").  As described below, a portion of these funds were used to purchase the Park Imperial Property for $3.9 million using two shell companies: (i) Baloas Limited, a British Virgin Island company whose president was Kim, and (ii) Baloas, Inc., a company incorporated in New York on May 14, 2012, with Kim listed as its sole director.

51.     On May 31, 2012, October 5, 2012 and October 19, 2012, three wire transfers were made from Catrison's bank account at Rabobank in London to Kim Account-1 in the amounts $487,953, $2,650,000 and $1,500,000, respectively.  The funds transferred by Catrison to Kim Account-1 are traceable to payments made by Ocean Partners to Catrison related to the Erdenet Mining Corporation contracts.

52.     Between September 12, 2012 and October 24, 2012, $4,005,000 was wire transferred from Kim Account-1 to an HSBC bank account in Hong Kong held in the name of Baloas Limited (the "Baloas Ltd. Account").

53.     On September 12, 2012 and October 24, 2012, $400,000 and $3,630,000, respectively, were wire transferred from the Baloas Ltd. Account to a Citibank account in the United States held in the name of Baloas, Inc. (the "Baloas, Inc. Account").

54.     On November 7, 2012, Baloas, Inc. purchased the Park Imperial Property for $3,900,000 using funds in the Baloas Inc. Account.

55.     One year later, on November 29, 2013, Battushig opened a U.S. bank account at TD Bank in New York and listed the Park Imperial Property as his mailing address.

56.     On May 16, 2016, Battushig reported to building maintenance that the washer and dryer in the Park Imperial Property were not functioning properly.  The manager of the Park Imperial Property engaged a technician to address the issue and sent an invoice to Battushig via email.  On May 30, 2016, Battushig responded, "[w]ill get this taken care of this week."  Cheong, who was copied on the email, requested that the invoice be paid from the "Baloas ac [account] by cheque."

### THE PURCHASE OF THE CARLTON HOUSE PROPERTY

57.     In a manner similar to the acquisition of the Park Imperial Property by Baloas, Inc., a second luxury apartment, the Carlton House Property, was purchased for $9.9 million on March 10, 2015, with funds transferred from accounts held by Kim, including Kim Account-1, which received funds derived from Erdenet Mining Corporation contracts as discussed in paragraphs 50 and 51 above.

58.     Beginning on April 4, 2013, $2,000,000 was wired from HSBC account number xxxxxxx6221 in Singapore held by Kim ("Kim Account-2") to an escrow account in the United States, as an initial downpayment towards the purchase of the Carlton House Property.

59.     On October 4, 2013, $495,000 was wired from Kim Account-1 to an escrow account in the United States, as a second downpayment towards the purchase of the Carlton House Property.  As discussed in paragraphs 50 and 51 above, funds derived from Erdenet Mining Corporation contracts were received into Kim Account-1.  Moreover, on December 12, 2013, $150,000 was wired from Catrison's bank account at Rabobank in London to Kim Account-1.

60.     In addition, millions of dollars were transferred into Kim Account-1 in connection with the purchase of the Carlton House Property.  Specifically, on February 18, 2015, a transfer of $7,000,000 was made into Kim Account-1.  On February 25, 2015, February 27, 2015 and March 3, 2015, further transfers of a total of $1,000,000 were made into Kim Account-1 from an HSBC bank account in Singapore held in the name of Verusator Limited, a shell company with no apparent business purpose.

61.     Subsequently, on February 18, 2015 and March 3, 2015, $7,000,000 and $1,100,000, respectively, were transferred from Kim Account-1 to the Baloas, Inc. Account in the United States.

62.     One week later, on March 10, 2015, the Carlton House Property was purchased for $9,900,000 using funds in the Baloas, Inc. Account.  The Carlton House Property was purchased in the name of Lovitas, Inc.  Like Baloas, Inc., Lovitas, Inc. was incorporated in New York on May 14, 2012 with Kim as its sole director.

63.     Records from the management company of the Carlton House Property reveal that Battushig is listed as a "co-owner" of the unit, alongside Kim and her husband Cheong, who are both listed as "owners."

## DIVERTING ADDITIONAL MINING CONTRACTS TO GENETRADE LIMITED

64.     Bank and incorporation records further demonstrate Batbold and his family's use of state-owned mining contracts to funnel funds through shell companies for their personal use, consistent with the scheme used to purchase the Defendant Properties.

65.     Genetrade Limited ("Genetrade") is a British Virgin Islands company founded on November 19, 2010.  Grandcastle Assets, Inc. ("Grandcastle") is a British Virgin Island company wholly owned by Battushig, Batbold's eldest son.  Sometime between Genetrade's inception and March 12, 2012, Grandcastle became the sole owner of Genetrade.

66.     On December 24, 2010, despite having no operational history, Genetrade received a commodities contract worth $30 million from Erdenet Mining Corporation, which allowed Genetrade to purchase valuable natural resources and resell them on the secondary markets.  A year later, in December 2011, Genetrade was awarded a second commodities contract from Erdenet Mining Corporation worth $30 million.

67.     Between January 2011 and March 2012, the time period during which the above-mentioned contracts were in effect, nine wire transfers totaling $325,350 were sent from HSBC account number xxxxxxxx1838 in Hong Kong held by Grandcastle to Citibank account number xxxxx7067 in the United States held by Battushig ("Battushig Account-1"). Notes accompanying the wire transfers included references such as "car payment," "trips and travel," "school payment" and "interior designer payment."

68.     Similarly, between November 14, 2011 and December 19, 2012, when the Genetrade mining contracts were in effect, 16 wire transfers totaling $457,586 were sent

from HSBC account number xxxxxxxx8833 held by Cheong in Hong Kong to Battushig Account-1.

**FIRST CLAIM FOR RELIEF**

69.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

70.     The Defendant Properties constitute and/or are derived from proceeds obtained as a result of and/or traceable to an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official, or a conspiracy to commit such offense.

71.     By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**

72.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

73.     The Defendant Properties constitute, are derived from and/or are traceable to proceeds from or property used to facilitate an offense against a foreign nation involving bribery of a public official, or the misappropriation, theft or embezzlement of public funds by or for the benefit of a public official, which offense would be punishable by imprisonment for a term exceeding one year within the jurisdiction of the foreign nation and also under the laws of the United States, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.

74. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(B).

**THIRD CLAIM FOR RELIEF**

75. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

76. The Defendant Properties constitute and/or are derived from property involved in a financial transaction, in violation of Title 18, United States Code, Section 1956(a)(1), or a conspiracy to conduct a financial transaction, in violation of Title 18, United States Code, Section 1956(h), involving the proceeds of specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transaction was entered into with the knowledge that it was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.

77. By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**FOURTH CLAIM FOR RELIEF**

78. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

79. The Defendant Properties constitute and/or are derived from property involved in the transportation, transmission or transferal of funds from a place outside the United States to or through a place inside the United States, in violation of Title 18, United States Code,

- 24 -

Section 1956(a)(2)(B)(i), or a conspiracy to do so, in violation of Title 18, United States Code, Section 1956(h), involving the proceeds of specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transportation, transmission or transferal was done with the knowledge that it was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

80.     By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

### FIFTH CLAIM FOR RELIEF

81.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

82.     The Defendant Properties constitute and/or are derived from property involved in a monetary transaction, in violation of Title 18, United States Code, Section 1957(a), or a conspiracy to conduct a monetary transaction, in violation of Title 18, United States Code, Section 1956(h), involving criminally derived property that is of a value greater than $10,000 and that is derived from specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7), which transaction was entered into with the knowledge that it involved criminally derived property.

83.     By reason of the foregoing, the Defendant Properties are liable to condemnation and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

WHEREFORE, plaintiff United States of America requests that, pursuant to Title 18, United States Code, Sections 983 and 985, notice of this Verified First Amended Complaint be issued as to the Defendant Properties; that due notice of these proceedings be given to all interested persons; that after further proceedings, the Defendant Properties be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated:     Brooklyn, New York
          April 2, 2026

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
Attorney for Plaintiff
271A Cadman Plaza East
Brooklyn, New York 11201

By:     /s/
       Tara B. McGrath
       Sean M. Fern
       Assistant United States Attorneys
       (718) 254-7000

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture Section
Criminal Division, U.S. Department of Justice

By:     /s/
       Rachel Goldstein
       Trial Attorney

<u>**VERIFICATION**</u>

1.      I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and, as such, have knowledge of the facts underlying this action.

2.      I have read the within verified first amended complaint <u>in rem</u> and know the contents thereof.

3.      The matters contained in the within verified first amended complaint <u>in rem</u> are true and accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are, among other things, my personal knowledge, information provided by other law enforcement officers and witnesses, bank records, electronic communications, and the official files and records of the FBI and other federal, state and local agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: April ___, 2026

MONIQUE BONAPARTE

Digitally signed by MONIQUE BONAPARTE
Date: 2026.04.02 18:48:53 -04'00'

_____

Monique Bonaparte
Special Agent
Federal Bureau of Investigation