# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                          Plaintiff,

            v.

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP., *et al.*,

                    Defendants *in rem*.

---

Case No. 24-cv-2147 (RPK) (JAM)

Oral Argument Requested

## MEMORANDUM OF LAW IN SUPPORT OF SUKHBAATAR BATBOLD'S MOTION TO INTERVENE PURSUANT TO FEDERAL RULE 24

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 5

    I.    Sukhbaatar Batbold has been one of Mongolia's leading statesmen and public servants for close to four decades. ................................................. 5

    II.    Between 2020 and 2023, Mr. Batbold's political opponents orchestrate a global litigation campaign falsely accusing him of corruption. .......................... 6

    III.    The litigation campaign against Mr. Batbold is exposed as a sham, and the lawsuits quickly fall apart one-by-one. ..................................................... 8

    IV.    The SDNY grants Mr. Batbold discovery from K2 that proves the litigations against him were a sham covertly instigated by his political opponents. ................................................................................................. 9

    V.    A Mongolian court holds the allegations against Mr. Batbold are "not true." ......................................................................................................... 11

    VI.    In 2024, the government brings this action premised on the same theory the Mongolian court rejected, and Mr. Batbold attempts to engage with and fully cooperate with the government to resolve this case. ........................... 12

    VII.    The government abandons its ill-fated effort to strike Claimants' demand after Claimants produce reams of discovery establishing their ownership; delays in opposing Claimants' motion to dismiss; and on the day its opposition brief to that motion is due proposes a feckless and futile amended complaint. ........................................................................................ 14

LEGAL STANDARD ........................................................................................................ 16

ARGUMENT ..................................................................................................................... 17

    I.    Mr. Batbold is entitled to intervene under Rule 24(a)(2). ................................. 17

        A.    The motion is timely. ............................................................................ 18

        B.    Mr. Batbold has material interests in this action. .................................. 19

        C.    Mr. Batbold's interests are not adequately represented. .......................... 21

    II.    Mr. Batbold should be permitted to intervene under Rule 24(b)(1). .................... 22

    III.    Rule 24 governs this motion, not Supplemental Rule G. ..................................... 24

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*,
   2025 WL 2238226 (E.D.N.Y. Aug. 6, 2025)..............................................................................17

*ACORN (The New York Ass'n of Cmty. Organizations for Reform Now) v. County of Nassau*,
   270 F.R.D. 123 (E.D.N.Y. 2010) ...............................................................................................17

*Agency for Pol'y Coordination on State Prop. v. Batbold*,
   No. 656507/2020 (N.Y. Sup. Ct.) ..............................................................................................13

*Agency for Pol'y Coordination on State Prop. v. JPMorgan Chase Bank, N.A.*,
   No. 1:21-mc-178 (S.D.N.Y.) ......................................................................................................13

*In re Batbold*,
   No. 1:21-mc-218 (S.D.N.Y.) ......................................................................................................13

*Brennan v. NYC Bd. of Educ.*,
   260 F.3d 123 (2d Cir. 2001)......................................................................... 16, 17, 19, 21, 22

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
   2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020) ..........................................................................16

*Citizens for an Orderly Energy Pol'y v. Suffolk County*, 101 F.R.D. 497
   (E.D.N.Y. 1984).........................................................................................................................18

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
   170 F.R.D. 93 (E.D.N.Y. 1996)............................................................................................17, 23

*L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of NYC*,
   2018 WL 1782709 (E.D.N.Y. Apr. 12, 2018) ...........................................................................20

*Martell Strategic Funding, LLC v. Am. Hosp. Acad.*,
   2013 WL 12562179 (S.D.N.Y. Sept. 4, 2013)...........................................................................18

*Miller v. Silbermann*,
   832 F. Supp. 663 (S.D.N.Y. 1993)........................................................................................17, 23

*N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*,
   2015 WL 777248 (E.D.N.Y. Feb. 13, 2015), *R&R adopted*, 2015 WL
   1345814 (E.D.N.Y. Mar. 25, 2015) ....................................................................................22-23

*N.Y. News, Inc. v. Kheel*,
   972 F.2d 482 (2d Cir. 1992)......................................................................................................23

*N.Y. Pub. Int. Rsch. Group, Inc. v. Regents of Univ. of State of N.Y.*,
   516 F.2d 350 (2d Cir. 1975)..................................................................................................20, 22

*NAACP v. New York*,
    413 U.S. 345 (1973)..............................................................................................18

*In re New York City Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) .........................................................16, 19, 20, 21

*New York v. United States Dep't of Health & Hum. Servs.*,
    2019 WL 3531960 (S.D.N.Y. Aug. 2, 2019).....................................................24

*Nunley v. Pioneer Pleasant Vale School District No. 56*,
    149 F. Supp. 2d 1283 (W.D. Okla. 2001).........................................................19

*Oneida Indian Nation of Wis. v. New York*,
    732 F.2d 261 (2d Cir. 1984)..............................................................................20

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
    663 F.2d 371 (2d Cir. 1981)........................................................................19, 20

*Sackman v. Liggett Group, Inc.*,
    167 F.R.D. 6 (E.D.N.Y. 1996)......................................................................19, 20

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)......................................................................................16, 21

*In re Trib. Co. Fraudulent Conv. Litig.*,
    291 F.R.D. 38 (S.D.N.Y. 2013).........................................................................18

*Turkmen v. Ashcroft*,
    2010 WL 3398965 (E.D.N.Y. June 30, 2010), *report and recommendation
    adopted*, 2010 WL 3398968 (E.D.N.Y. Aug. 26, 2010)..................................18

*United States v. 8 Gilcrease Lane, Quincy Fla. 32351*,
    641 F. Supp. 2d 1 (D.D.C. 2009)......................................................................25

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
    743 F. Supp. 3d 204 (D.D.C. 2024)..................................................................25

*United States v. New York City Hous. Auth.*,
    326 F.R.D. 411 (S.D.N.Y. 2018) ................................................................17, 23

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank
    Acct. L7N01967*,
    731 F.3d 189 (2d Cir. 2013)..............................................................................22

**Statutes**

18 U.S.C. § 981...............................................................................................21, 22

18 U.S.C. § 983.....................................................................................................22

18 U.S.C. § 1956.............................................................................................21, 22

**Rules**

Fed. R. Civ. P. 24 ................................................................................................16, 17, 19, 23, 25

Fed. R. Civ. P. Supp. R. A ......................................................................................................24

Fed. R. Civ. P. Supp. R. G .................................................................................................. 24-25

**INTRODUCTION**

In this civil forfeiture action, filed in 2024, the government asks this Court to strip two Manhattan apartments (the "NY Apartments") from their rightful owners, the Claimants in this action. What the government does not tell this Court is that the factual allegations underlying that request originate from a discredited dossier created by the private investigative firm K2 Integrity (the "Kroll Dossier") secretly commissioned by foreign political operatives for a malicious purpose: to destroy the 2021 presidential candidacy of former Prime Minister of Mongolia Sukhbaatar Batbold, the proposed intervenor here.

The operative Complaint, and now the government's proposed amended complaint, also fail to disclose another critical fact: the government's central allegations have been the subject of prior litigations in courts across three continents. The government's pleadings do not mention that a three-judge Mongolian court unanimously ruled in 2022 that the central corruption theory at the heart of the government's case is "not true." And the government does not tell the Court that undersigned counsel for Mr. Batbold has voluntarily produced hundreds of contemporaneous documents, seventeen sworn witness statements, and a judicial ruling demonstrating that this case has no good-faith basis in law or fact—and that the corruption allegations at the heart of this case are simply untrue. As the centerpiece of this case, Mr. Batbold has an obvious and compelling interest in its outcome. Rule 24 intervention exists for a case like this one. *See* Fed. R. Civ. P. 24.

The government's theory is this: Mongolia's former Prime Minister allegedly steered two 2011 copper trading contracts from the Mongolian state-owned Erdenet Mining Corporation ("EMC") to Claimant Hak Seon Kim, Ph.D., and her husband Choo Young Cheong. The Complaint alleges that Dr. Kim and Mr. Cheong then used those proceeds to purchase the NY Apartments as proxies for Mr. Batbold—allegedly in violation of Mongolian law.

That theory did not originate in this case or with federal investigators. It originated years

1

ago in the Kroll Dossier and is now being recycled by the government in this action. K2 had a potent incentive to manufacture its fake dossier. By the terms of its engagement, K2 stands to receive an up-to-$50 million "success fee" in the event the NY Apartments (or other properties) are recovered. K2 is the progenitor of the operative corruption theory at the center of this case and was hired by shadowy foreign figures for the purpose of interfering in foreign democratic elections. And yet, K2 may have a significant financial interest in the outcome of this forfeiture action brought by the United States.

On the merits, the undisputed evidence—seventeen sworn statements and dozens of contemporaneous commercial, government, and judicial documents—establishes that Prime Minister Batbold did not corruptly steer contracts to anyone. The copper trading contracts were lawful and legitimate, awarded in accordance with EMC's own established standards. No Mongolian law was violated. The corruption narrative is, in its entirety, a political fabrication.

Mr. Batbold has defeated these same allegations repeatedly. In November 2020, the Kroll Dossier was deployed as the centerpiece of coordinated civil lawsuits filed against Mr. Batbold around the world purportedly on behalf of EMC and two other entities. These were not legitimate proceedings. They were a weapon. The political operatives who secretly commissioned the Kroll Dossier deliberately timed the filings to generate a media campaign designed to force Mr. Batbold from Mongolia's 2021 presidential race before any court could rule on the merits.

It worked—initially. The media coverage drove Mr. Batbold from the presidential election. But after years of litigation, the cases collapsed entirely. It emerged, in a case that undersigned counsel litigated in the New York Supreme Court, that the entities named as plaintiffs had never authorized the filings made in their names. The global law firm that had appeared as counsel for the named plaintiffs later withdrew from every proceeding. The 2020 lawsuits disintegrated.

2

To identify who had orchestrated the campaign, the undersigned counsel filed a proceeding in 2022 on behalf of Mr. Batbold in the Southern District of New York under 28 U.S.C. § 1782, seeking discovery from K2. K2 fought that discovery aggressively, refusing even to produce a privilege log. The Honorable Ona T. Wang rejected K2's stonewalling, characterizing its tactics as holding discovery "hostage." The documents the court ultimately compelled K2 to produce confirmed the Kroll Dossier and the 2020 lawsuits were funded in secret by proxies of Mr. Batbold's political opponents.

In 2022, Mr. Batbold brought a defamation action in Mongolia to disprove the corruption allegations in the Kroll Dossier on their merits. A three-judge panel unanimously held that the theory underlying the Dossier—recycled in this action—was "not true." Ex. 50 at 43. Directly in conflict with the allegations in this case, the Mongolian court found specifically that EMC's contracts with Mr. Cheong's company were awarded "in accordance with the standards established by [EMC]"; there was "no evidence" Mr. Batbold had "personally influenced [EMC] to sign the contracts with foreign companies"; and no evidence supported that he "personally gained profits, conspired with others, [or] caused damages to [EMC]." *Id.* at 50. The court ordered a Mongolian news outlet to retract its stories premised on those false allegations.

By 2024, every private lawsuit premised on the Kroll Dossier had been dismissed or withdrawn. Not a single court had accepted the corruption theory. One court expressly held it was false. That should have ended the matter.

In March 2024—weeks before upcoming Mongolian elections in which Mr. Batbold was widely expected to win reelection to his twenty-first year in Parliament—the U.S. government, without any prior notice or warning, filed this action.

Mr. Batbold's counsel contacted the government immediately after the filing. In the

3

meeting that followed, prosecutors acknowledged they had not fully reviewed the public litigation record, including the Section 1782 proceeding in the SDNY, and were unaware that the Mongolian court had ruled in Mr. Batbold's favor. Counsel reasonably assumed the government would dismiss the case once it understood this prior history and that the Complaint could not be reconciled with it.

But the government refused to withdraw the case. Instead, it is litigating an action whose factual foundation is contradicted by hundreds of private emails, official government records, contemporaneous commercial documents, interviews with senior Mongolian government officials and mining executives, seventeen sworn witness statements, and a report from a Harvard-trained expert in Mongolian politics and economics. Even now the government's proposed amended complaint fails to comply with its essential duty of candor, concealing the Kroll Dossier, the Mongolian court's ruling, and the extensive prior litigation record.

Mr. Batbold now moves to intervene in this case to protect his direct, substantial, and legally protectable interests in his reputation, professional opportunities, and avoidance of adverse precedent by opposing the government's motion for leave to amend; moving to dismiss the operative complaint; and moving for summary judgment as a matter of law. He moves to intervene as of right under Rule 24(a)(2), or alternatively, under Rule 24(b)(1). No existing party can adequately represent his interests, which are unique to him. And the government's case turns on a single proposition—that Mr. Batbold committed corruption by steering copper-trading contracts in 2011—which he is uniquely positioned to disprove. Rule 24 exists for precisely this circumstance.

This motion presents an extraordinary issue: whether the government's allegations that a former Prime Minister of a sovereign nation committed crimes halfway around the world over a

4

decade ago should proceed without ever allowing him to defend himself. The fundamental purpose of Rule 24 intervention does not permit that result. The Court should grant this motion to intervene.

## BACKGROUND

**I.    Sukhbaatar Batbold has been one of Mongolia's leading statesmen and public servants for close to four decades.**

Sukhbaatar Batbold served as Mongolia's twenty-sixth Prime Minister from 2009 to 2012 and as a member of Mongolia's Parliament from 2004 to 2024—when his party removed him from the 2024 parliamentary slate as a direct result of the government filing this lawsuit. Ex. 1; Ex. 7 ¶ 21. Throughout his career, Mr. Batbold has consistently championed democracy and transparency. As a Member of Parliament, government minister, and Prime Minister, Mr. Batbold long supported Mongolia's "Third Neighbor Policy," which emphasizes ties to the West as Mongolia's "third neighbor" to balance Mongolia's two geographic neighbors Russia and China. Ex. 2 ¶ 22; Ex. 3.

Prior to entering politics, Mr. Batbold was a successful businessman and philanthropist. After earning his MBA from Middlesex University London—one of the first MBAs ever earned by a Mongolian—Mr. Batbold returned home, where he witnessed his country's peaceful transition from communism to a free-market economy. Ex. 2 ¶¶ 49-50; Ex. 4 ¶ 2; Ex. 5 ¶ 8; Ex. 8 ¶ 9. In the 1990s, Mr. Batbold founded a series of successful companies in a variety of industries, including cashmere, tourism, mining, and telecommunications. Ex. 4 ¶¶ 2, 4; Ex. 5 ¶ 8.

In 2000, Mr. Batbold entered public service at the request of the country's leaders. *See* Ex. 2 ¶¶ 50-51; Ex. 6 ¶ 4. Over the next two decades, Mr. Batbold dedicated his career to serving the Mongolian people, becoming a member of Parliament, Minister of Trade and Industry, Minister of Foreign Affairs, and Prime Minister. Ex. 2 ¶ 51; Ex. 7 ¶¶ 4, 6. In each role, Mr. Batbold sought

5

to promote ties with the West, attract foreign investment, and encourage reform.  Ex. 6 ¶ 9; Ex. 7 ¶ 4.  He introduced Western educational reforms.  Ex. 8.  He balanced pro-business policies with initiatives to ensure equal opportunity, working to subsidize university tuition, close tax loopholes for foreign corporations, and outlaw sex discrimination.  Ex. 8; Ex. 9.

Mr. Batbold also worked tirelessly to prevent corruption from harming Mongolia's fledgling democracy.  With respect to Mongolia's booming mining industry, Mr. Batbold promoted transparency and international corporate governance and anti-corruption standards.  As Prime Minister, he introduced EU transparency, accounting, and governance standards.  Ex. 3.  During his time in public service, Mr. Batbold ceded control of his private enterprises and barred his companies from contracting with the government to avoid any possible conflicts of interest.  Ex. 6 ¶ 18; Ex. 10 ¶ 7.  He even gave up his private interest in a valuable coal mine, returning the mine to the State and allocating shares in the mine to every Mongolian citizen.  Ex. 5 ¶¶ 8-9.

## II.    Between 2020 and 2023, Mr. Batbold's political opponents orchestrate a global litigation campaign falsely accusing him of corruption.

By the end of 2020, Mongolia was facing multiple constitutional crises.  Ex. 2 ¶¶ 83-84; Ex. 11 ¶ 20.  The President then in office was Khaltmaagiin Battulga—a self-described mafia-style boss who has been implicated in corruption, financial misconduct, and even murder.  Ex. 2 ¶ 67; Ex. 12; Ex. 13; *see also* Ex. 2 ¶¶ 74-83; Ex. 14 ¶ 7.  During his tenure, Mr. Battulga attacked judicial and prosecutorial independence.  Ex. 2 ¶¶ 76-83; Ex. 15.  He tried to defy term limits that required him to leave office in 2021.  Ex. 2 ¶ 83; Ex. 16.  He even went so far as to purportedly outlaw the opposition party (Mr. Batbold's) to try to stay in power.  Ex. 2 ¶ 83; Ex. 14 ¶ 7; Ex. 17.

On the eve of Mongolia's critical May 2021 presidential election, Mr. Batbold was considered a leading candidate.  Ex. 11 ¶ 20; Ex. 7 ¶ 21.  He was seen as the type of pro-democracy statesman who could ensure Mongolia's fragile democracy survived Mr. Battulga's attacks.  But

6

in 2020, Mr. Batbold's campaign faltered after two Mongolian state-owned mining companies, including EMC, and a state agency apparently sued him in Mongolia, falsely alleging he had engaged in corruption as Prime Minister. Ex. 18. Within days of that lawsuit, a coordinated campaign of identical lawsuits commenced in jurisdictions around the globe, including in London, Jersey, Hong Kong, Singapore, and here in New York. Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23. The plaintiffs later filed another identical lawsuit in the British Virgin Islands. Ex. 52.

These lawsuits were all premised on the same theory the government later adopted in this case: that Mr. Batbold improperly diverted contracts from EMC to companies controlled by supposed proxies of Mr. Batbold—including Choo Young Cheong and his wife, Claimant Dr. Hak Seon Kim. The lawsuits alleged that these "proxies" used the proceeds from those contracts to purchase properties around the world for Mr. Batbold's benefit, including the NY Apartments. Each lawsuit relied on the Kroll Dossier, which was littered with flimsy, conclusory, and circumstantial assertions and misleading evidence purportedly supporting the plaintiffs' claims against Mr. Batbold. Ex. 24; Ex. 61.[1] The civil suit in Mongolia was particularly suspicious. It was filed under seal on behalf of the three state-owned "plaintiffs" by a low-level municipal prosecutor who did not even have the authority to initiate a civil suit. Ex. 25 ¶¶ 5, 8.

The lawsuits were designed to (and did) unleash a barrage of negative publicity against Mr. Batbold in the heat of campaign season. Several of the cases sought temporary restraining and asset freezing orders *ex parte*—before Mr. Batbold had any opportunity to defend himself. Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23. When courts issued these *ex parte* orders based on the one-sided and misleading record, Mr. Batbold's opponents (predictably) used them against him in Mongolia.

---

[1] As one example, the plaintiffs in the New York Supreme Court case attached an untranslated Mongolian-language-only letter from an EMC official as purported evidence of Mr. Batbold's wrongdoing. Yet once translated, the letter was *exculpatory*: it confirmed that the contracts between EMC and Mr. Cheong and Dr. Kim's companies were completed without issue and pursuant to industry standard terms. *Compare* Ex. 55 at 3, *with* Ex. 55 at 6.

7

Waves of news reports about rulings from the "Supreme Court" of New York and the "High Court" of London swept Mongolian airwaves and captivated the public—with Mr. Batbold's opponents telling Mongolians that these prestigious foreign courts had *already* determined that Mr. Batbold was corrupt.[2]  Ex. 2 ¶ 84; Ex. 14 ¶ 9.  Mr. Battulga himself made these cases and allegations against Mr. Batbold a central focus of his public statements during election season.  Ex. 14 ¶¶ 7, 9.

The attacks on Mr. Batbold were successful.  Although Mr. Batbold later defeated every case filed against him after years of litigation, the quick-hitting filings and press assault eliminated any opportunity he had to run for high office.  Ex. 11 ¶ 20.

### III.    The litigation campaign against Mr. Batbold is exposed as a sham, and the lawsuits quickly fall apart one-by-one.

The cases against Mr. Batbold started to collapse within days after he got the opportunity to defend himself.  Right from the start, it became apparent that none of the three named "plaintiffs" in these cases ever authorized any lawsuits against Mr. Batbold—*i.e.*, the cases were a sham.  In proceedings before the New York Supreme Court on Mr. Batbold's motion to vacate one of the *ex parte* orders entered against him, all three of the "plaintiffs"—including EMC—confirmed in writing that they never authorized any case against him.  Ex. 27; Ex. 28; Ex. 29.  When faced with the fact that its purported "clients" never approved the cases it brought against Mr. Batbold, King & Spalding—global counsel for the purported plaintiffs—shifted its story.  Without any evidence, it claimed to represent not the three named plaintiffs in whose names suit was brought, but rather the entire "State of Mongolia."  Ex. 30 at 29:6-13.  In response, Justice Barry Ostrager excoriated plaintiffs' counsel, stating:  "I understand that you're representing that but you don't come into the

---

[2] Certain judges took a closer look at the *ex parte* filings.  In Hong Kong, for example, a judge initially denied the *ex parte* asset freezing injunction application, finding that the allegations that Mr. Cheong and Dr. Kim "are the puppet of the former prime minister" based on "certain email communication and [] social occasion" were "speculati[ve]." Ex. 26 at 2-3.  The case was later transferred to a different judge who granted the *ex parte* application.

courthouse and file several feet of documents before some judge on the day before Thanksgiving acting on behalf of the State of Mongolia without even demonstrating to the Court that the State of Mongolia has authorized you to act on their behalf." *Id.* at 27:18-24. Justice Ostrager vacated an *ex parte* temporary restraining order that a duty judge had entered right before Thanksgiving and scheduled an evidentiary hearing. Ex. 31. Rather than face further judicial scrutiny of the sham litigation, King & Spalding promptly dismissed the case. Ex. 32.

After the New York Supreme Court case concluded, King & Spalding's story shifted again. Rather than claim it represented the entire Mongolian state, it next claimed that the Mongolian Office of the Prosecutor General ("OPG") was its client. Ex. 33. Mr. Batbold debunked that claim, too. The Deputy Prosecutor General rejected King & Spalding's claim, stating in writing that the OPG had *never* authorized the cases against Mr. Batbold. Ex. 34; *see also* Ex. 59. The Deputy Prosecutor General then fired the firm and directed it to terminate all cases against Mr. Batbold. *Id.* After months of correspondence between Mr. Batbold's counsel and King & Spalding, the firm finally withdrew from the global litigations against Mr. Batbold. *See, e.g.*, Ex. 35; Ex. 36; Ex. 49 ¶ 2; Ex. 63 at 5; Ex. 64. But as a parting shot, the firm defied the directive of its latest purported "client" and did not dismiss the cases against Mr. Batbold, requiring him instead to undertake the expense of filing applications around the world to have the cases thrown out—all of which were granted.

## IV. The SDNY grants Mr. Batbold discovery from K2 that proves the litigations against him were a sham covertly instigated by his political opponents.

In 2021, Mr. Batbold filed proceedings under 28 U.S.C. § 1782 against K2 in the SDNY seeking to unmask the identity of the actors behind the litigation campaign against him. Ex. 37. Judge Ona T. Wang granted his petition, and Judge Ronnie Abrams affirmed. Ex. 38; Ex. 39. After Judge Wang granted Mr. Batbold's subsequent motion to compel K2 to produce discovery,

Ex. 40—noting along the way that K2 was holding "pieces [of discovery] hostage," Ex. 41 at 37:18-22—K2 produced a privilege log and other documents, including its engagement letters, Ex. 42.

K2's compelled production undermined the entire litigation effort against Mr. Batbold. It revealed that the investigative firm had not been retained by any of the three "plaintiffs" or the Mongolian state, as King & Spalding had claimed. Rather, discovery showed that K2 had been secretly engaged and instructed by two known associates of then-President Battulga of Mongolia. Ex. 42 at 13 (Otgonjargal Moyle & Chuluunkhuu Ganbat); Ex. 45 at 2 (noting association between Moyle, Ganbat, and Battulga); Ex. 58. K2's privilege log revealed *hundreds* of emails between the firm and those individuals as they developed a coordinated campaign to destroy Mr. Batbold's public service career. Ex. 42; Ex. 43; Ex. 44. Discovery also showed that K2 was not a neutral investigator as it had told courts around the world in *ex parte* submissions. K2 secretly had been promised a massive financial stake in the accusations it peddled—entitling it to up to $50 million if the lawsuits against Mr. Batbold succeeded. Ex. 60 at 8.

By 2023, once Mr. Batbold was finally able to present his findings around the world, he won or secured dismissal of each suit filed against him. Ex. 46; Ex. 47; Ex. 48; Ex. 49; Ex. 53; Ex. 54; Ex. 57. He forced King & Spalding to withdraw from the proceedings. Ex. 35; Ex. 36. And he proved that Jules Kroll and K2 had misled courts around the world. The final case to conclude was in the Royal Court of Jersey, which discharged asset freezing injunctions and dismissed the action on jurisdictional grounds. Ex. 49. The Court emphasized the "extensive" defense record and left open the possibility of damages for the plaintiffs' lack of "full and frank disclosure" in bringing the originally fraudulent *ex parte* application. *Id.* ¶ 3. None of the cases brought against Mr. Batbold was ever re-filed and none of the dismissals was appealed.

10

## V.    A Mongolian court holds the allegations against Mr. Batbold are "not true."

Alongside Mr. Batbold's defense of the lawsuits against him, he took legal action of his own to defend his reputation.  In 2022, Mr. Batbold filed a defamation action in Mongolia against the three purported plaintiffs in the civil litigation against him—including EMC—and a media company, Blue News LLC, that published stories repeating the false corruption allegations.  Blue News had reported that Mr. Batbold had "exerted influence" on EMC so that it would "enter[] into contracts with designated companies" for Mr. Batbold's benefit—*i.e.*, the same core allegations underpinning the government's present forfeiture action.  Ex. 50 at 5.  According to Blue News, Mr. Batbold had caused EMC "to enter into valuable contracts for [the] sale of minerals with three companies" "controlled and/or substantially influenced by" Mr. Cheong and Dr. Kim.  *Id.* at 7.

Mr. Batbold prevailed on the merits in a full and fair adversarial proceeding in Mongolia, presided over by a three-judge panel, in which all parties (including EMC itself) were represented and had the opportunity to present evidence.  *Id.* at 1.  The case resulted in a thorough written opinion that unanimously granted Mr. Batbold relief, finding the corruption allegations were "not true."  *Id.* at 43.  The Mongolian court specifically held that the contracts between EMC and Mr. Cheong's companies were made "in accordance with the standards established by [EMC]."  *Id*. at 41.  It found "no evidence" to support statements that "Batbold had personally influenced [EMC] to sign the contracts with foreign companies" and that there was also "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]"  *Id.*  The Court ordered Blue News to delete the stories.  *Id.* at 50.

**VI.    In 2024, the government brings this action premised on the same theory the Mongolian court rejected, and Mr. Batbold attempts to engage with and fully cooperate with the government to resolve this case.**

By mid-2023, the cases against Mr. Batbold had ended.  He had prevailed.  With litigation behind him, Mr. Batbold turned his focus back to his public service and critical national elections in June 2024.  His new focus would be short lived.

In March 2024, the government filed this case, adopting the discredited narrative in the Kroll Dossier—a corruption theory identical to that which the Mongolian court rejected in 2023.  Like the 2020 lawsuits, the Complaint alleged that Mr. Batbold steered EMC copper contracts to "proxies" who in turn purchased the NY Apartments as kickbacks.  The NY Apartments were the exact same properties that had been the subject of the New York Supreme Court proceedings filed against Mr. Batbold four years ago—the case King & Spalding had withdrawn rather than face an evidentiary hearing on its allegations.  With its filing, the government issued a prominent press release that revived public attention on the long-since-debunked corruption allegations against Mr. Batbold.  Ex. 51.  As in 2020, the government's March 2024 filing triggered a media onslaught in Mongolia against Mr. Batbold.  Ex. 7 ¶ 21.  His opponents leveraged the government's suit for maximum political advantage.  And his party was forced reluctantly to remove him from its 2024 parliamentary slate.  Ex. 11 ¶ 21.

After seeing news of the filing, Mr. Batbold diligently took action.  His counsel contacted the EDNY USAO.  Crain Decl. ¶ 14.  Counsel informed EDNY USAO that the filing, if not withdrawn and corrected, would likely interfere with Mr. Batbold's parliamentary candidacy and the integrity of the upcoming Mongolian election—just as occurred in the 2021 presidential election.  *Id.*  Mr. Batbold's counsel told the government about the prior successful global litigation campaign and directed them to the hundreds of documents that had been filed publicly in those cases.  *Id.* ¶¶ 14-15.  In response, government prosecutors acknowledged they had not reviewed

12

the full prior public litigation record—even though hundreds of directly relevant filings, including Mr. Batbold's successful litigation against K2 and the public record that the Kroll Dossier had been created at the behest of Battulga, had been sitting on the public docket for years in multiple New York state and federal proceedings. Crain Decl. ¶ 14.[3]

During the course of the next year and a half, Mr. Batbold's counsel continued to engage with the government. Crain Decl. ¶¶ 14-21. In the weeks immediately following the filing of the Complaint, counsel for Mr. Batbold met with the EDNY USAO in Brooklyn, presenting a 128-slide presentation detailing Mr. Batbold's victories around the world and the publicly available evidence disproving the same theory of corruption set forth in the Complaint. *Id.* ¶ 15. The government never responded substantively to this submission. *Id.* ¶ 17.

Mr. Batbold's counsel even traveled to Mongolia to conduct an extensive investigation to identify for the government the witness statements and contemporaneous documents in Mongolia that should have been a part of any prosecutorial diligence effort. *Id.* ¶ 18. Mr. Batbold's counsel interviewed over 40 witnesses from government, industry, and academia—including the percipient witnesses on the ground in Mongolia in 2009-2012 who had direct participation in and knowledge of the material events; secured 17 sworn declarations; reviewed over 10,000 documents, including nonpublic EMC contracts and auditing materials; and retained a Harvard-trained economist and expert in Mongolian politics. *Id.* ¶¶ 18-19. Mr. Batbold and his counsel presented this evidence to the government in a 276-slide presentation in November 2024, producing over 150 documents totaling nearly 3,000 pages. *Id.* ¶ 19.

---

[3] *In re Batbold*, No. 1:21-mc-218 (S.D.N.Y.); *Agency for Pol'y Coordination on State Prop. v. JPMorgan Chase Bank, N.A.*, No. 1:21-mc-178 (S.D.N.Y.); *Agency for Pol'y Coordination on State Prop. v. Batbold*, No. 656507/2020 (N.Y. Sup. Ct.).

Over two years, Mr. Batbold presented the government conclusive evidence of his innocence and identified multiple obvious and material misstatements the government had made in the original Complaint. Crain Decl. ¶¶ 14-21. As one example, the Complaint had alleged that Mr. Cheong had no "background or expertise in commodities trading or mining." Compl. ¶ 22. That allegation was a lynchpin of the government's claim that Mr. Cheong's company Catrison could not have possibly procured copper-trading contracts from EMC without then-Prime Minister Batbold's corrupt interference. Compl. ¶¶ 21–23. But that allegation was an outright and material falsehood. Mr. Cheong had *decades* of experience in commodities trading and mining as Samsung's lead representative in Mongolia—including working directly with EMC on Samsung's behalf. *See* Ex. 65 ¶ 11, Ex. 5 ¶¶ 9-11

**VII. The government abandons its ill-fated effort to strike Claimants' demand after Claimants produce reams of discovery establishing their ownership; delays in opposing Claimants' motion to dismiss; and on the day its opposition brief to that motion is due proposes a feckless and futile amended complaint.**

In June 2024, the entities that own the NY Apartments and their ultimate beneficial owner Dr. Kim ("Claimants"), filed a verified claim to the NY Apartments. ECF No. 10. Between June 14, 2024 and September 10, 2025, the government served dozens of special interrogatories on Claimants to determine whether they had standing to assert ownership interests over the NY Apartments. *See* ECF Nos. 21, 41. During that time, the government repeatedly contended Claimants lacked standing and that it intended to move to strike their claim. ECF Nos. 19, 22, 26.

Over many months, Claimants provided substantial discovery. *See* ECF Nos. 21, 41 (summarizing discovery produced). Following that discovery, the government abruptly about-faced. It told the Court that it would now *not* move to strike any claimant for lack of standing— effectively conceding the robustness of the evidence Claimants had produced. ECF No. 41.

On December 19, 2025, Claimants moved to dismiss. ECF Nos. 46, 47. The government's

14

deadline to amend the Complaint as of right was January 9, 2026. *See* Fed. R. Civ. P. 15(a)(1)(B). The government did not amend but rather sought two lengthy adjournments, totaling over eight weeks, to respond to the motion. In its second extension request, the government requested a six-week adjournment to "consult[] its own Mongolian law expert to evaluate and respond to Claimants' legal arguments" and because the government was experiencing "delays in obtaining source materials from Mongolian authorities . . . ." ECF No. 88.

On April 2, 2026—the evening the government's opposition brief was due—the government instead requested a pre-motion conference to move for leave to file a Proposed First Amended Complaint ("PFAC"), which it attached as an exhibit. ECF. Nos. 49, 49-1. The PFAC does not materially change the allegations in the original complaint. It provides no new factual allegations concerning the corruption it (falsely) alleges Mr. Batbold engaged in in 2011. Instead, the Complaint abandons the materially false allegation that Mr. Cheong lacked "background or expertise in commodities trading or mining"—a belated acknowledgment that the original Complaint was filed at best with negligent or reckless disregard of the truth. Ex. 66 ¶ 22 (redline comparison). But the PFAC's core theory remains the same: Mr. Batbold as Prime Minister "had effective control of the country's resources," PFAC ¶ 18, and that Catrison could only have procured its 2011 copper contracts from EMC if Prime Minister Batbold had engaged in corruption. *See, e.g.*, PFAC ¶¶ 21, 23.

The PFAC continues to materially misstate the facts. It does not disclose to this Court that the theory underlying the government's claims originated from the Kroll Dossier. It does not disclose that K2 Integrity, the firm that authored the Dossier, was promised up to $50 million if lawsuits against Mr. Batbold succeeded—giving K2 a massive financial stake in manufacturing evidence of wrongdoing. It does not disclose that Mr. Batbold defeated every lawsuit filed against

15

him on these same allegations.  It does not disclose that a Mongolian court, after full adversarial proceedings in which EMC participated, unanimously held the corruption allegations were "not true" and found "no evidence" that then-Prime Minister Batbold influenced EMC's contracting. And it does not disclose that over the past two years, Mr. Batbold has produced to the government seventeen sworn witness statements—including from the relevant officials at EMC in 2011— which all attest that the government's allegations of corruption never happened and its theory is fundamentally improbable if not impossible.

The Court has directed Claimants to respond to the government's letter by April 10, 2026.  Other than the special interrogatories on standing, discovery has not commenced.

## LEGAL STANDARD

A court "must permit anyone to intervene" who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).  Intervention by right requires: (1) a timely application; (2) an interest in the action; (3) demonstration that the interest may be impaired by disposition of the action; and (4) that the interest is not adequately protected by the parties to the action. *Brennan v. NYC Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001).  The movant need not "identify a narrow interest amounting to a legal entitlement" to intervene as of right. *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 801 (2d Cir. 2022).  Rather, he must identify only an interest that is both "direct, substantial, and legally protectable" and sufficiently related to the subject of the underlying action. *Brennan*, 260 F.3d at 129 (cleaned up).  The burden on the movant to demonstrate interests are not adequately protected is "minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

A court has broad discretion to permit a non-party to intervene where the movant "has a

16

claim or defense that shares with the main action a common question of law or fact" and intervention would not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3); *ACORN (The New York Ass'n of Cmty. Organizations for Reform Now) v. County of Nassau*, 270 F.R.D. 123, 125 (E.D.N.Y. 2010).  Permissive intervention under Rule 24(b)(1) is more flexible than intervention as of right under Rule 24(a), and should be "liberally granted."  *Miller v. Silbermann*, 832 F. Supp. 663, 673 (S.D.N.Y. 1993).  There need only be "a single common question of law or fact" for a court to permit a non-party to intervene under Rule 24(b)(1), *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996), especially where the "addition of the intervenor[] will assist in the just and equitable adjudication of any of the issues between the parties," *United States v. New York City Hous. Auth.*, 326 F.R.D. 411, 418 (S.D.N.Y. 2018) (citations and quotation marks omitted).[4]

**ARGUMENT**

Mr. Batbold is entitled to intervene under Federal Rule of Civil Procedure 24(a)(2) to participate in all aspects of this proceeding, including to oppose amendment, move to dismiss, and move for summary judgment.  In the alternative, the Court should exercise its discretion and permit Mr. Batbold to intervene under Rule 24(b)(1).

**I.    Mr. Batbold is entitled to intervene under Rule 24(a)(2).**

A successful motion for intervention as of right requires the movant to show that: (1) his motion is timely; (2) he has an interest in the action; (3) his interest may be impaired by disposition of the action; and (4) his interest is not adequately protected by the parties to the action.  *Brennan*,

---

[4] The requirement under Rule 24(c) that a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought" is "flexibl[e]" and routinely waived. *See, e.g.*, *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2025 WL 2238226, at *7 (E.D.N.Y. Aug. 6, 2025) (cleaned up).  In any event, this motion is accompanied by Mr. Batbold's anticipated motion for summary judgment along with supporting papers—an extensive submission which more than satisfies any obligation in Rule 24(c).

260 F.3d at 128-29.  Mr. Batbold satisfies all four requirements.[5]

### A.    The motion is timely.

Courts use their "sound discretion" to determine, after consideration of "all the circumstances," whether a motion to intervene is timely.  *Turkmen v. Ashcroft,* 2010 WL 3398965, at *4 (E.D.N.Y. June 30, 2010), *report and recommendation adopted,* 2010 WL 3398968 (E.D.N.Y. Aug. 26, 2010) (*quoting NAACP v. New York,* 413 U.S. 345, 366 (1973)); *see also Martell Strategic Funding, LLC v. Am. Hosp. Acad.,* 2013 WL 12562179, at *6 (S.D.N.Y. Sept. 4, 2013).  Here, consideration of "all the circumstances" demonstrates this motion's timeliness. Since the government filed the Complaint, Mr. Batbold has taken an active role in seeking to resolve the case short of formal intervention.  For almost two years, he has engaged with the government through formal written submissions, calls, meetings, and presentations.  *See supra* at 12-13.  His extensive "good faith discussions" with the government in his case confirm that Mr. Batbold "cannot be said to have slept on [his] rights."  *In re Trib. Co. Fraudulent Conv. Litig.*, 291 F.R.D. 38, 41 (S.D.N.Y. 2013).

Having now exhausted those channels, Mr. Batbold seeks to intervene in a timely manner before the pleadings have settled, before any substantive motions have been decided or even opposed, and before service of any merits discovery.  Intervention in such circumstances is timely: untimeliness arguments "carr[y] little force when . . . discovery has yet to commence" and no motions have been decided.  *Citizens for an Orderly Energy Pol'y v. Suffolk County*, 101 F.R.D. 497, 501 (E.D.N.Y. 1984).

---

[5] Because Mr. Batbold does not request new forms of relief, he need not establish Article III standing.  *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 2020 WL 1432213, at *3 n.2 (S.D.N.Y. Mar. 24, 2020).

## B.    Mr. Batbold has material interests in this action.

In assessing mandatory intervention, courts routinely merge the second and third elements because "the same reasons" often underscore both factors. *Brennan*, 260 F.3d at 132. These elements require the movant to "identif[y] a direct, substantial, and legally protectable interest . . . that may be impaired" absent intervention. *In re New York City Policing*, 27 F.4th at 799. That interest must be sufficiently "relat[ed] to the property or transaction which is the subject of the action." *Brennan*, 260 F.3d at 130 (quoting Fed. R. Civ. P. 24(a)(2)). Here, Mr. Batbold has at least two interests at stake: (1) his reputation and related professional opportunities; and (2) avoiding potentially negative legal precedents and decisions regarding his alleged corruption.

### 1.    Mr. Batbold's reputational and professional interests

Mr. Batbold has a clear interest in this action because the government's allegations will continue to impact his reputation and professional prospects adversely unless and until the Court rejects conclusively the government's allegations on the merits. Injury to a movant's reputation, particularly his professional reputation, presents an impairment of a cognizable interest sufficient to justify intervention. For example, the Second Circuit permitted a party's lawyer to intervene on appeal to challenge an "opinion condemning his conduct as trial counsel" where the opinion "adversely affected his professional reputation." *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 373 (2d Cir. 1981). In *Sackman v. Liggett Group, Inc.*, another court in this district recognized that "injury to reputation" is "[a]mong the interests that satisfy" Rule 24's second and third requirements. 167 F.R.D. 6, 20 (E.D.N.Y. 1996). And in *Nunley v. Pioneer Pleasant Vale School District No. 56*, the district court held that a teacher was entitled to intervene in an action brought against the school district where the litigation involved allegations that the teacher had sexually assaulted a student; the litigation plainly could have impaired the teacher's employability and reputation. 149 F. Supp. 2d 1283, 1284 (W.D. Okla. 2001). Where, as here, a lawsuit

19

"tarnishe[s]" a movant's "career[]," *In re New York City Policing*, 27 F.4th at 802 (quotation omitted), or "could affect [a movant's] financial and other job-related interests" based on reputational harms, the movant "has a cognizable interest in the underlying litigation," *L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of NYC*, 2018 WL 1782709, at *3 (E.D.N.Y. Apr. 12, 2018).

As explained above, the filing of the Complaint has already harmed Mr. Batbold's reputation and professional prospects on a geopolitical scale. It caused Mr. Batbold's party to remove him from its 2024 parliamentary slate and put an immediate end to his public service career, at a moment of significant consequence for Mongolia and Asia more broadly. *Id*. The claims asserted by the government have "adversely affected" the professional reputation Mr. Batbold spent almost two and a half decades cultivating. *Penthouse Int'l*, 663 F.2d at 373. His reputational and professional interests are cognizable.

### 2.    Mr. Batbold's interest in combatting adverse precedent

Mr. Batbold also has a cognizable interest in combatting the potentially negative precedential impact of a decision in the government's favor. The "possible stare decisis effect of an adverse decision" justifies intervention. *N.Y. Pub. Int. Rsch. Group, Inc. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975); *see also Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265-66 (2d Cir. 1984). Where, as here, the movant has been involved in "other litigations regarding" the subject matter of the current suit, the movant has a cognizable interest in intervening to prevent the case from becoming negative "persuasive authority." *Sackman*, 167 F.R.D. at 21.

Mr. Batbold has defended himself against lawsuits instigated by political rivals across the globe on the same core allegations raised in the Complaint. *Supra* at 6-10. He has won every case. But those victories were not enough to prevent the government from bringing yet another action based on the debunked allegations in the Kroll Dossier. Mr. Batbold is best suited to address the

20

underlying merits of the government's faulty allegations. And if the Court denies Mr. Batbold's motion to intervene and the government ultimately proves the allegations, this case would breathe new life into a weaponized litigation campaign that Mr. Batbold previously put to rest. For that reason, too, Mr. Batbold has a protectable interest in this litigation.

### 3. Mr. Batbold's interests are sufficiently related to the action because his defenses are the "mirror image" of the government's claims.

Mr. Batbold's interests are also sufficiently related to this action to justify intervention. This standard is met when a proposed intervenor asserts interests involving claims or defenses "that are the mirror image of the claims asserted by" the existing parties. *Brennan*, 260 F.3d at 130. For example, in *NYC Policing*, the Second Circuit vacated the denial of a motion to intervene because the proposed intervenor's defenses and interests were the "mirror image[s]" of the plaintiffs' claims, giving the movant an "interest [that] justifies its intervention." 27 F.4th at 802.

Here, too, Mr. Batbold's defenses are a "mirror image" of the government's claims. To prevail, the government must establish that Mr. Batbold committed a "specified unlawful activity" that violated Mongolian law and that proceeds of that activity were used to purchase the NY Apartments. 18 U.S.C. §§ 981(a)(1)(A), (B), (C); *see also* 18 U.S.C. § 1956(c)(7). To protect his interests, Mr. Batbold's defenses hinge on the government's inability to satisfy its burden to prove he engaged in any wrongdoing in light of the undisputed material facts establishing his innocence.

### C. Mr. Batbold's interests are not adequately represented.

Finally, no present party to this suit will adequately protect Mr. Batbold's interests. This element presents only a "minimal" burden and "is satisfied if the [movant] shows that representation of his interest 'may be' inadequate." *New York City Policing*, 27 F.4th at 803 (quoting *Trbovich,* 404 U.S. at 538 n.10). An intervenor's interests are protected adequately only if an existing party's "interests [a]re so similar to those of [the proposed intervenor] that adequacy

21

of representation [i]s assured." *Brennan*, 260 F.3d at 133.

Here, although Claimants have appeared to protect their interest in the NY Apartments, "adequacy of representation" of Mr. Batbold's interests is hardly "assured." *Id.* Mr. Batbold has one goal in this case: clearing his name, as he has in all prior cases, and defending against the government's allegations on the merits. By contrast, Claimants' primary interest is maintaining Dr. Kim's ownership of apartments. To achieve that goal, Claimants may seek to "bring[] [the] litigation to an end" through "settlements" that fail to protect Mr. Batbold's interest in defeating the government's claims on the merits and clearing his name. *See id.*

Further, Claimants do not necessarily need to absolve Mr. Batbold of wrongdoing to retain the NY Apartments. The government has the burden to establish forfeitability by a preponderance of the evidence. *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 196 (2d Cir. 2013). To do so, the government is required to prove that Mr. Batbold committed a crime. 18 U.S.C. §§ 981(a)(1)(A), (B), (C); *see also* 18 U.S.C. § 1956(c)(7). Claimants, however, may choose to concede the forfeitability of the NY Apartments and instead pursue the affirmative defense that Dr. Kim is an "innocent owner." *See* 18 U.S.C. § 983(d). And even if the Claimants do contest forfeitability, Mr. Batbold would "make a more vigorous presentation" of the argument against forfeitability because he has the stronger interest in establishing that he committed no crime. *See N.Y. Pub. Int. Rsch. Group*, 516 F.2d at 352.

## II.    Mr. Batbold should be permitted to intervene under Rule 24(b)(1).

In the alternative, the Court should exercise its discretion to permit Mr. Batbold to intervene under Rule 24(b)(1). "[T]he standard for permissive intervention is more liberal than that for intervention as of right" and requires only that the proposed intervenor has "'a claim or defense that shares with the main action a common question of law or fact.'" *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 2015 WL 777248, at *24 (E.D.N.Y. Feb. 13, 2015),

*R&R adopted*, 2015 WL 1345814 (E.D.N.Y. Mar. 25, 2015) (quoting Fed. R. Civ. P. 24(b)(1)(B)). "[A] single common question of law or fact" is enough to permit intervention so long as granting intervention would not "unduly delay or prejudice the rights of the existing parties." *Commack Self-Serv. Kosher Meats*, 170 F.R.D. at 106; *New York City Hous. Auth.*, 326 F.R.D. at 418 (intervention appropriate if the addition of the intervenor would "assist in the just and equitable adjudication of . . . the issues between the parties").

Permitting Mr. Batbold to intervene would satisfy the liberal standards of Rule 24(b)(1). This case bears unique international and geopolitical consequences, and Mr. Batbold's well-investigated and established defenses in this case turn on the very same nucleus of facts and legal theories that will decide whether the government would be entitled to forfeiture. And those defenses would not "inject collateral issues into [the] existing action" which would delay or prejudice the rights of the existing parties. *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992). Rather, Mr. Batbold's intervention in this action would "assist in the just and equitable adjudication of . . . the issues between the parties" through his presentation of uncontroverted evidence that will dismantle the government's forfeiture case and protect his legally cognizable interests. *New York City Hous. Auth.*, 326 F.R.D. at 418.

Further, "considerations of fairness strongly weigh in favor" of permitting Mr. Batbold to intervene. *Miller*, 832 F. Supp. at 674. Mr. Batbold's name appears throughout the pleadings as the person who purportedly orchestrated a scheme to acquire the NY Apartments. *See* Compl. ¶¶ 18-19, 21-23, 25(a)-(c), 27, 43-44; PFAC ¶¶ 18-19, 21-23, 29(a)-(c), 32, 35, 37(a)-(b), 38-39, 64-65. The government's claims hinge on proving that Mr. Batbold committed crimes. It would be fundamentally unfair for the government to attempt to make that showing in Mr. Batbold's

absence, especially given that Mr. Batbold has succeeded in all prior actions, both offensive and defensive, involving the same core questions and issues.

The unfairness in proceeding without Mr. Batbold is particularly acute given that the government's factual allegations are derived from a tainted dossier commissioned and directed by foreign political opponents. *See supra* at 8-9. Courts across the world have dismissed those same claims premised on the Kroll Dossier and one Mongolian court—after adversarial proceedings—found the allegations of corruption against Mr. Batbold were "not true." *Supra* at 11; Ex. 50. Nevertheless, the government pressed forward with this quasi-criminal action without so much as contacting Mr. Batbold, just months before crucial parliamentary elections in Mongolia.

Mr. Batbold's participation in this action will give the Court access to critical evidence, including legal declarations from Mongolian counsel, declarations from the percipient individuals in Mongolia, nonpublic contracts, and thousands of other documents and emails. This evidence will be important to building a complete record and will assist the Court in resolving the core merits of the government's claims fairly and accurately. *New York v. United States Dep't of Health & Hum. Servs.*, 2019 WL 3531960, at *6 (S.D.N.Y. Aug. 2, 2019) (permissive intervention appropriate where intervenor "will assist the Court in resolving issues before it").

### III. Rule 24 governs this motion, not Supplemental Rule G.

To the extent the government argues that Rule 24 does not apply in civil forfeiture proceedings, the government is wrong. The Federal Rules of Civil Procedure apply to forfeiture actions arising from a federal statute "except to the extent that they are inconsistent with" the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Fed. R. Civ. P. Supp. R. A(1)(B), (2). Supplemental Rule G(5), which addresses civil forfeiture actions, provides that when the government files a complaint for forfeiture "[a] person *who asserts an interest in the defendant property* may contest the forfeiture by filing a claim in the court where

24

the action is pending." Fed. R. Civ. P. Supp. R. G(5)(a)(i) (emphasis added). In turn, the Rule establishes specific pleading requirements for intervening on that unique basis. *Id.*

Here, there is no inconsistency between Rule 24 and Supplemental Rule G(5). Supplemental Rule G(5) provides supplemental requirements and instructions for persons who "assert[] an interest in the defendant property." Mr. Batbold asserts no interest in the NY Apartments because they are not his properties;[6] rather, he seeks to defend himself against the spurious charges that those apartments were purchased for his benefit through sham transactions. Thus, Mr. Batbold has a broader interest protectable under Rule 24 "*relating* to the . . . *transaction[s]*" that are the subject of this litigation. Fed. R. Civ. P. 24(a) (emphases added). Those alleged transactions supposedly implicate Mr. Batbold in a criminal scheme to divert mining contracts for personal enrichment, launder the resulting proceeds through shell companies and international financial institutions, and conceal the origin of illicit funds used to acquire the NY Apartments. Under Rule 24, Mr. Batbold has a cognizable interest in refuting those allegations.[7]

## CONCLUSION

This Court should grant Mr. Batbold's motion to intervene pursuant to Rule 24(a)(2) or, in the alternative, pursuant to Rule 24(b)(1).

---

[6] Case in point: The PFAC alleges Mr. Batbold failed to include the NY Apartments in asset disclosures Mongolian law requires public officials to provide. PFAC ¶¶ 34-35. That is true. He did not include the apartments on his disclosures for the obvious reason that he does not own them.

[7] In *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, the court stated "[t]he only way for a third party to intervene in a civil forfeiture case is to file a claim to the property and an answer to the Government's complaint pursuant to [Supplemental] Rule G(5)." 743 F. Supp. 3d 204, 217 (D.D.C. 2024) (cleaned up). But that dicta applies only to someone who claims an actual interest in the property (i.e. a *claimant*). Such a person can intervene only as specified in Supplemental Rule G(5). *See United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 641 F. Supp. 2d 1, 4-6 (D.D.C. 2009) (putative claimants to defendant property lacked separate right to intervene under Rule 24 of the Federal Rules of Civil Procedure). But where, as here, an intervenor makes no claim to the property the government is seeking to forfeit at all—and, in fact, expressly *disclaims* any ownership in the property—Rule 24 applies.

25

Dated: April 9, 2026
      New York, New York

                                      GIBSON, DUNN & CRUTCHER LLP

                                    By:  */s/ Orin Snyder*
                                          Orin Snyder
                                          Lee R. Crain
                                          Sam Raymond
                                          Trevor Bondy Gopnik
                                          200 Park Avenue
  New York, NY 10166
  Telephone: (212) 351-2400
  osnyder@gibsondunn.com
  lcrain@gibsondunn.com
  sraymond@gibsondunn.com
  tgopnik@gibsondunn.com

  Stephanie Brooker*
  Helgi C. Walker*
  1700 M Street, N.W.
  Washington, D.C. 20036
  Telephone: (202) 887-3502
  sbrooker@gibsondunn.com
  hwalker@gibsondunn.com

  * *pro hac vice* forthcoming

  *Attorneys for Proposed Intervenor*
  *Sukhbaatar Batbold*

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANY AND ALL SHARES OF 21 EAST 61 STREET APARTMENT CORP., *et al.*, <br><br> Defendants *in rem*. | Case No. 24-cv-2147 (RPK) (JAM) |

**<u>DECLARATION OF LEE R. CRAIN</u>**

I, Lee R. Crain, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a member of the bar of this Court and a partner of the law firm of Gibson, Dunn & Crutcher LLP, counsel to Proposed Intervenor Sukhbaatar Batbold.  I am personally familiar with the facts set forth in this Declaration and if called, could testify competently thereto.

2.      I submit this declaration in support of Mr. Batbold's Memorandum of Law in Support of his Motion to Intervene Pursuant to Federal Rule of Civil Procedure 24.

**I.      Gibson Dunn represented Mr. Batbold in global litigation between 2020–2023.**

3.      Gibson Dunn began representing Mr. Batbold in 2020 when he was sued in a series of lawsuits in Mongolia, the United Kingdom, Jersey, Hong Kong, Singapore, New York, and, later, in the British Virgin Islands, purportedly by two Mongolian state-owned mining companies—the Erdenet Mining Corporation ("EMC") and Erdenes Oyu Tolgoi LLC—and the Mongolian state agency overseeing those mining companies—the Agency for Policy Coordination

1

on State Property (together the "Purported Plaintiffs").[1] *See* Ex. 18 (Mongolia); Ex. 19 (United Kingdom); Ex. 20 (Jersey); Ex. 21 (Hong Kong); Ex. 22 (Singapore); Ex. 23 (New York State Supreme Court); Ex. 52 (British Virgin Islands). King & Spalding LLP (or local counsel it instructed) served as global coordinating counsel for the Purported Plaintiffs in these lawsuits.

4.  The first lawsuit was filed in Mongolia under seal on October 14, 2020 and alleged that Mr. Batbold improperly diverted contracts from the state-owned mining companies to certain "proxies," including Claimant Dr. Hak Seon Kim and her husband Choo Young Cheong. *See* Ex. 18. That lawsuit alleged that these "proxies" used the proceeds from mining contracts for their and Mr. Batbold's benefit. *Id.* at 3-7. It demanded $250 million in damages. *Id.* at 16. The suit was filed by a low-level municipal prosecutor who did not have the authority to initiate a civil suit. Ex. 25 at ¶¶ 6, 12.

5.  Lawsuits in New York, the United Kingdom, Hong Kong, Singapore, and Jersey followed shortly thereafter, alleging the same purported corruption narrative. *See* Exs. 19- 23. Each case sought *ex parte* orders seeking to freeze and attach property around the world, purportedly to satisfy the $250 million claim in Mongolia.[2] The property to be frozen included apartments at 21 East 61st Street, Apt. 12E, New York, NY 10065 and 230 West 56th Street, Apt. 58D, New York, NY 10019 (the "NY Apartments"). The primary evidentiary support for each lawsuit was a lengthy, but conclusory, affidavit prepared by the private investigative firm K2 Intelligence and its founder, Jules Kroll (the "Kroll Dossier"). *See* Ex. 24.

---

[1] *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. 101/SHZ2020/20219 (Mongolia, Civ. Ct. First Instance); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* [2020] No. CL-2020-000757 EWHC (Comm) (Eng.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* (No. 2020/192) (Jersey, Royal Ct.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* [2020] No. 2153/2020 (Hong Kong, C.F.I.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. 1145/2020 (Singapore, High Ct.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, Index. No. 656507/2020 (N.Y. Sup. Ct. filed Nov. 23, 2020); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. BVIHCM2021/0224 (Brit. Virgin Is., E. Caribbean Sup. Ct.).

[2] The plaintiffs later filed another identical lawsuit in the British Virgin Islands. Ex. 52.

2

6.      Within days after these lawsuits were filed, the three Mongolian "plaintiffs," including EMC, confirmed in writing to Mr. Batbold that they never authorized King & Spalding (or any other firm) to bring the lawsuits against him.  Attached hereto as Exhibits 27, 28, and 29 are true and correct copies of those written statements.

7.      On December 2, 2020, I presented argument before Justice Barry Ostrager of the New York Supreme Court on Mr. Batbold's application to vacate an *ex parte* temporary restraining order that had been entered against him the day before Thanksgiving 2020.  During oral argument, I explained to the Court that Mr. Batbold had received evidence demonstrating King & Spalding's clients had not actually authorized any of the cases it or its local counsel had filed around the world.  *See* Ex. 30 at 4:25-5:6, 15:17-24.  In response, King & Spalding for the first time argued it did not directly represent the three named plaintiffs in whose name the suit was brought, but rather the entire "State of Mongolia."  *Id.* at 27:14-24, 29:6-11.  The New York court rejected this fluid narrative, vacated the *ex parte* TRO, and ordered a full evidentiary hearing.  *See* Ex. 31 at 1-2. Following that order, King & Spalding promptly withdrew the New York Supreme Court case.  *See* Ex. 32.

8.      Gibson Dunn also represented Mr. Batbold in a separate 28 U.S.C. § 1782 proceeding King & Spalding filed in the Southern District of New York.  In that proceeding, King & Spalding claimed it was authorized by the Mongolian Office of the Prosecutor General to act on behalf of the three Purported Plaintiffs.  *See In re Ex Parte Application of Agency for Pol'y Coordination on State Prop. Pursuant to 28 U.S.C. § 1782*, No. 21-mc-00178-VSB (S.D.N.Y.); *see also* Ex. 33 at 2.  Gibson Dunn debunked that claim too, presenting to the Court evidence from the Deputy Prosecutor General of Mongolia himself, who stated in writing that the Office of the Prosecutor General, like the Purported Plaintiffs, had not authorized any case against Mr. Batbold.

*See* Ex. 34.  In that correspondence, the Deputy Prosecutor General specifically stated that any authority King & Spalding thought it had was "null and void, thus invalid." *Id.* at 3.  The Deputy Prosecutor General then, for avoidance of any doubt, "terminated" King & Spalding and directed the firm to withdraw all cases against Mr. Batbold.  *Id.*

9.    King & Spalding and its local counsel ultimately withdrew from all of the remaining global litigations against Mr. Batbold.  *See* Ex. 35; Ex. 36; Ex. 49 ¶2; Ex. 63 at 5; Ex. 64; Ex. 66.  Contrary to the directives of its purported client, however, King & Spalding did not dismiss these cases against Mr. Batbold, which remained pending.

10.    In 2021, Gibson Dunn filed on Mr. Batbold's behalf a 28 U.S.C. § 1782 proceeding against K2 Intelligence in the Southern District of New York.  *In re Application of Sukhbaatar Batbold for an Ord. Pursuant to 28 U.S.C. § 1782*, No. 21-mc-218 (S.D.N.Y.); *see also* Ex. 37. Following contentious motion practice, the Court granted multiple motions to compel K2 to produce discovery. *See* Exs. 38-40.  The discovery K2 was compelled to produce revealed that K2 had been engaged and instructed by two known associates of former Mongolian President Khaltmaagiin Battulga, an autocratic political opponent of Mr. Batbold.  *See* Ex. 44 at 7-8.  Those individuals included Battulga associates Otgonjargal Moyle and Ganbat Chuluunkhuu.  Although K2 and King & Spalding had never disclosed to any court Moyle and Ganbat's involvement in the global litigation campaign against Mr. Batbold, K2's privilege log revealed hundreds of emails between K2, Moyle, and Ganbat as they developed the coordinated campaign to damage Mr. Batbold's public service career. *See* Ex. 42; Ex. 43.  Discovery also revealed that K2 had secretly been promised a financial stake in the accusations it propagated, with its contract providing a success fee entitling the firm to up to $50 million. *See* Ex. 60 at 7.

11.    By 2023, Mr. Batbold was finally able to present his findings around the world and

4

moved to dismiss each and every one of the cases against him. He won or secured dismissal of each suit, exposing that the lawsuits had never actually been authorized by those three state-owned entities named as plaintiffs and that the lawsuits had been instigated and directed by Mr. Batbold's political opponents. *See* Ex. 46 at 17 (Mongolia); Ex. 47 (S.D.N.Y.); Ex. 48 at 2-3 (Hong Kong); Ex. 49 ¶ 3 (Jersey); Ex. 53 at 2 (British Virgin Islands); Ex. 54 (Singapore).

12.    Alongside his defense of the lawsuits against him, Mr. Batbold also filed a defamation action in Mongolia to defend his reputation against the three Purported Plaintiffs in the civil litigation and a media company that published stories repeating the false corruption allegations. *See* Ex. 50 at 1, 38-41. Mr. Batbold, represented by Mongolian counsel, prevailed on the merits in a full and fair adversarial proceeding, with the court finding that the allegations of corruption against Mr. Batbold were "not true." *See id.* at 43. The court held that the contracts between EMC and Mr. Cheong's companies, including Catrison, were "in accordance with the standards established by [EMC]." *Id.* at 41. And the Court found "no evidence" that "[Mr.] Batbold had personally influenced [EMC] to sign the contracts with foreign companies"—including Catrison—and "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC]." *Id.*

**II.    Gibson Dunn engages with the government following the filing of this lawsuit.**

13.    The Department of Justice filed the complaint in the above-captioned action on March 25, 2024 (the "Complaint"), soon before Mongolia's June 28, 2024 parliamentary elections in which Mr. Batbold was planning to run for reelection to serve his twentieth year in Parliament.

14.    On March 26, 2024, the day after the Complaint was filed, Gibson Dunn contacted the prosecution team from the government on Mr. Batbold's behalf. On this call, Gibson Dunn expressed concern that the allegations in the Complaint were contradicted by the evidence already

5

adduced in the prior wave of public litigation and that the allegations would likely interfere with Mr. Batbold's candidacy for Parliament and the integrity of the upcoming Mongolian election. Gibson Dunn also expressed concern that the government had not contacted our firm before filing, given that we had publicly served as counsel of record to Mr. Batbold in New York state court, the Southern District of New York, and in multiple jurisdictions around the world and could have addressed any questions the government had before it filed its Complaint. Gibson Dunn made clear Mr. Batbold intended to fully cooperate with any questions the government had in this matter. The government attorneys indicated on this call that they had not reviewed many of the most pertinent prior public filings and rulings we raised, including those available on public dockets in New York.

15. On May 13, 2024, Gibson Dunn met with representatives of the government team in person at the U.S. Attorney's Office for the Eastern District of New York. In a 128-page slide deck, supported by 86 documents totaling over 1,200 pages, Gibson Dunn presented documentary and testimonial evidence we understood the government had not previously considered that directly contradicted and disputed the key factual allegations in the Complaint. These materials included the publicly-filed evidence accumulated in our years of litigating the very corruption theory the government asserted in the Complaint, including (i) evidence gathered as part of Mr. Batbold's Section 1782 proceeding demonstrating that Mr. Batbold's political opponents instigated and directed the global litigation campaign against him; (ii) Mongolian corporate governance documents demonstrating that the copper-trading contracts the government alleges were procured through corruption were standard and market-based; and (iii) a Mongolian court decision that found the same corruption theory in the government's own Complaint to be "not true," Ex. 50 at 43.

16.     The government again indicated at the May 13 meeting that it had not reviewed all of these publicly available documents, many of which were accessible on the dockets of New York's federal and state courts, and that it was likewise unaware that the  Mongolian court had ruled on the merits that the same corruption theory advanced in the government's Complaint was "not true."

17.     Also at the May 13 meeting, Gibson Dunn informed the government that representatives of our firm would be traveling to Mongolia to conduct an on-the-ground fact investigation.  Gibson Dunn asked the government if it had any specific requests for information or if it would otherwise like to participate in Gibson Dunn's fact-finding trip.  The government did not substantively respond.

18.     From September 16, 2024 to September 26, 2024, I, along with other Gibson Dunn attorneys, conducted an in-person investigation in Mongolia.  During that investigation,, Gibson Dunn attorneys interviewed dozens of individuals, including high-ranking current and former EMC officials, Mongolian public servants, members of Mongolia's law enforcement community, and members of Mongolia's business community.  We returned from this on-the-ground investigation with 17 sworn declarations made under penalty of perjury by critical witnesses, confirming that Mr. Batbold did not steer any of EMC's copper trading contracts, contrary to the Complaint's allegations in this case.  Gibson Dunn attorneys also reviewed over 10,000 documents.

19.     On November 25, 2024, Gibson Dunn presented the findings of its trip to the government in Washington, D.C.  Gibson Dunn's 276-page presentation was supported by over 150 documents totaling nearly 3,000 pages.  These documents included public filings from the global litigation campaign against Mr. Batbold, non-public contracts between the state-owned

7

mining company at the center of this case, the 17 sworn declarations gathered in Mongolia, and an expert report by a Harvard-trained economist specializing in economic conditions in Mongolia. This presentation and the supporting documentation was produced to the government.

20. On April 15, 2025, Gibson Dunn met with a different group of government attorneys and again presented the public record and recently gathered evidence.

21. On February 13, 2026, two days before the government was due to oppose Claimants' motion to dismiss, EDNY requested a six-week adjournment "[d]ue to delays in obtaining source materials from Mongolian authorities" and because DOJ was in "the process of consulting" its own Mongolian law expert to evaluate and respond to Claimants' legal arguments. Dkt. No. 48.

22. Gibson Dunn contacted the government again during this six-week adjournment by both phone and email and offered to cooperate further with DOJ to offer it any assistance with respect to the material it was seeking "from Mongolian authorities." Gibson Dunn also notified the government of Mr. Batbold's intent to move to intervene. DOJ declined to meet further, unless Gibson Dunn could provide "new information." DOJ again did not provide any substantive engagement on the merits of this case or what, if any, questions or concerns it has.

23. Gibson Dunn has repeatedly offered to provide additional information or answer any outstanding questions the government has. The government has asked none.

**III.    Exhibits referenced in Mr. Batbold's Motion to Intervene.**

24. Attached as **Exhibit 1** is a true and correct copy of the curriculum vitae of Sukhbaatar Batbold.

25. Attached as **Exhibit 2** is a true and correct copy of an Expert Report Declaration of William Bikales, dated January 4, 2026.

8

26.     Attached as **Exhibit 3** is a true and correct copy of an article titled *Biden Offers U.S. Support for Democratic Mongolia*, written by Jeff Mason, published by Reuters on August 22, 2011, available at https://www.reuters.com/article/world/us-politics/biden-offers-us-support-for-democratic-mongolia-idUSTRE77L1A7/.

27.     Attached as **Exhibit 4** is a true and correct copy of the Declaration of Lkhagvasuren Javzmaa, CEO of Altai Holdings LLC, dated November 4, 2024.

28.     Attached as **Exhibit 5** is a true and correct copy of the Declaration of Baz Chulunbaatar, founder, President, and Chairman of Monnis International LLC, dated October 25, 2024.

29.     Attached as **Exhibit 6** is a true and correct copy of the Declaration of Ravdan Bold, Mongolian Ambassador to the United States from 2003 to 2007, and Director of the Mongolian General Intelligence Service between 2007 to 2012, dated September 21, 2024.

30.     Attached as **Exhibit 7** is a true and correct copy of the Declaration of Zorigt Dashdorj, Mongolian Minister for Natural Resources and Energy from 2008 to 2012, dated October 22, 2024.

31.     Attached as **Exhibit 8** is a true and correct copy of an article titled *Mongolia's Quest to Balance Human Development in Its Booming Mineral-Based Economy*, written by Alicia Campi, published by Brookings on January 10, 2012, available at https://www.brookings.edu/articles/mongolias-quest-to-balance-human-development-in-its-booming-mineral-based-economy/.

32.     Attached as **Exhibit 9** is a true and correct copy of an article titled *The Struggle for Gender Equality in Mongolia*, written by Susan Bazilli, published by International Women's Rights Project on November 2, 2012.

9

33.    Attached as **Exhibit 10** is a true and correct copy of the Declaration of Genin Tumurkhuyag, CEO of Altai Holdings LLC from 2004 to 2011, dated November 8, 2024.

34.    Attached as **Exhibit 11** is a true and correct copy of the Declaration of Yondon Otgonbayar, former Ambassador of Mongolia to the United States, dated September 19, 2024.

35.    Attached as **Exhibit 12** is a true and correct copy of an article, including the original and a certified translation, titled *The Story of Genco Battulga Turning 17 Containers of Alcohol Into Water and the Shareholder of his Subsidiary Company*, published by 24Tsag.mn on April 7, 2016, available at https://www.24tsag.mn/a/132788.

36.    Attached as **Exhibit 13** is a true and correct copy of an article, including the original and a certified translation, titled *A Policeman Who Discovered the Case of 17 Containers of Alcohol Died on the Job*, published by Shuurhai.mn on June 11, 2019, available at https://shuurhai.mn/p/6545.

37.    Attached as **Exhibit 14** is a true and correct copy of the Declaration of Bat Khurts, Deputy Head of Mongolia's Independent Authority Against Corruption from 2011 to 2014, dated September 20, 2024.

38.    Attached as **Exhibit 15** is a true and correct copy of an article titled *The Country that Exiled McKinsey*, written by Ian MacDougall and Anand Tumurtogoo, published by ProPublica on May 14, 2019, available at https://www.propublica.org/article/the-country-that-exiled-mckinsey.

39.    Attached as **Exhibit 16** is a true and correct copy of an article titled *Mongolia's President Is Slicing Away Its Hard-Won Democracy*, written by Anand Tumurtogoo, published by Foreign Policy on March 29, 2019, available at https://foreignpolicy.com/2019/03/29/mongolias-president-is-slicing-away-its-hard-won-democracy/.

10

40.     Attached as **Exhibit 17** is a true and correct copy of an article titled *Mongolia's President Tries to Ban Its Ruling Party*, published by The Economist on April 24, 2021, available at https://www.economist.com/asia/2021/04/24/mongolias-president-tries-to-ban-its-ruling-party.

41.     Attached as **Exhibit 18** is a true and correct copy of a certified translation of the Claim filed in the Civil Court of First Instance in Bayanzurkh District in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 101/SHZ2020/20219, dated October 14, 2020.

42.     Attached as **Exhibit 19** is a true and correct copy of the Claim and Skeleton Argument filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated November 18 and 16, 2020, respectively.

43.     Attached as **Exhibit 20** is a true and correct copy of the Summons and Skelton Argument filed in the Royal Court of Jersey, Samedi Division, in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2020/192, dated November 24, 2020.

44.     Attached as **Exhibit 21** is a true and correct copy of the Originating Summons and Skelton Argument filed in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated November 25, 2020.

45.     Attached as **Exhibit 22** is a true and correct copy of the Claim and Skeleton Argument filed in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated November 26, 2020.

46.     Attached as **Exhibit 23** is a true and correct copy of the Summons and Complaint filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination*

11

*on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, dated November 23, 2020.

47.    Attached as **Exhibit 24** is a true and correct copy of the First Affidavit of Jules B. Kroll filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated November 15, 2020.

48.    Attached as **Exhibit 25** is a true and correct copy the Declaration of Zagdsuren Sukhbaatar, Managing Partner and CEO of the Mongol Advocates law firm, dated September 21, 2024.

49.    Attached as **Exhibit 26** is a true and correct copy of excerpts of the Transcript from a November 11, 2020 hearing in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020.

50.    Attached as **Exhibit 27** is a true and correct copy of a letter, including the original and a certified translation, from Erdenet Mining Corporation, signed KH. Badamsuren, dated November 27, 2020.

51.    Attached as **Exhibit 28** is a true and correct copy of a letter, including the original and a certified translation, from Erdenes Oyu Tolgoi LLC, signed by TS. Tumentsogt, dated November 27, 2020.

52.    Attached as **Exhibit 29** is a true and correct copy of a letter, including the original and a certified translation, from the Government Agency for Policy Coordination on State Property, signed by Chairman B. Tsengel, dated November 27, 2020.

53.    Attached as **Exhibit 30** is a true and correct copy of excerpts of the Transcript from a December 2, 2020 hearing in the Supreme Court of New York, County of New York in *Agency*

12

*for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 198.

54.    Attached as **Exhibit 31** is a true and correct copy of the Interim Decision and Order on Motion filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 179, dated December 2, 2020 and filed December 3, 2020.

55.    Attached as **Exhibit 32** is a true and correct copy of the Plaintiffs' Notice of Voluntary Discontinuance filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 181, dated December 9, 2020.

56.    Attached as **Exhibit 33** is a true and correct copy of the Letter in Opposition to Sukhbaatar Batbold's Motion to Intervene filed in the Southern District of New York in *In re Ex Parte Application of Agency for Policy Coordination on State Property Pursuant to 28 U.S.C. § 1782*, 21-mc-00178-VSB, (S.D.N.Y.), ECF No. 12, dated March 17, 2021.

57.    Attached as **Exhibit 34** is a true and correct copy of a January 31, 2022 letter with attachments, including the original and a certified translation, from Deputy Prosecutor General of Mongolia M. Chinbat, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-1, filed July 15, 2022.

58.    Attached as **Exhibit 35** is a true and correct copy of a Letter from K2 Integrity filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 118, dated July 5,

13

2022.

59.      Attached as **Exhibit 36** is a true and correct copy of the Order for a Declaration that a Solicitor Has Ceased to Act filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated July 8, 2022, filed on July 11, 2022 as an Exhibit to a Letter addressed to Magistrate Judge Ona T. Wang from Orin Snyder filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y), ECF No. 120-1.

60.      Attached as **Exhibit 37** is a true and correct copy of Sukhbaatar Batbold's Memorandum of Law in Support of his *Ex Parte* Application for Judicial Assistance to Obtain Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 2, dated March 9, 2021.

61.      Attached as **Exhibit 38** is a true and correct copy of the Order Granting Application to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW, (S.D.N.Y.), ECF No. 53, dated October 6, 2021.

62.      Attached as **Exhibit 39** is a true and correct copy of the Opinion and Order Affirming the Order Granting Application to Conduct Discovery filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 152, dated February 17, 2023.

63.      Attached as **Exhibit 40** is a true and correct copy of the Memo Endorsed Joint Letter filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for*

14

*an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 95, dated May 17, 2022 and filed May 18, 2022.

64.    Attached as **Exhibit 41** is a true and correct copy of excerpts of the Transcript from an April 26, 2022 hearing in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 86, filed April 29, 2022.

65.    Attached as **Exhibit 42** is a true and correct copy of K2's Privilege Log, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-18, dated July 15, 2022.

66.    Attached as **Exhibit 43** is a true and correct copy of a February 25, 2021 Email between Ganbat Chuluunkhuu and Jules Kroll, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-9, filed July 15, 2022.

67.    Attached as **Exhibit 44** is a true and correct copy of an October 31, 2017 Engagement Letter between K2 Intelligence, LLC, Foley Hoag LLP, and Otgonjargal Moyle, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-23, filed July 15, 2022.

68.     Attached as **Exhibit 45** is a true and correct copy of an article titled *The Mongolian Connection to Lukashenko's Money*, written by Henry St. George, published by EU Reporter on April 13, 2021, available at https://www.eureporter.co/world/mongolia/2021/04/13/the-mongolian-connection-to-lukashenkos-money/.

69.     Attached as **Exhibit 46** is a true and correct copy of the Order of Dismissal, including the original and certified translation, filed in the Civil Court of First Instance in Bayanzurkh District in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 101/SHZ2021/20096, dated November 18, 2021.

70.     Attached as **Exhibit 47** is a true and correct copy the Notice of Voluntary Dismissal Without Prejudice filed in the Southern District of New York in *In re Ex Parte Application of Agency for Policy Coordination on State Property Pursuant to 28 U.S.C. § 1782*, 21-mc-00178-VSB (S.D.N.Y.), ECF No. 32, dated April 1, 2022.

71.     Attached as **Exhibit 48** is a true and correct copy the Order Discharging Summons filed in the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated October 13, 2022.

72.     Attached as **Exhibit 49** is a true and correct copy of the Judgment filed in the Royal Court of Jersey, Samedi Division, in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2020/192, dated March 29, 2023.

73.     Attached as **Exhibit 50** is a true and correct copy of a certified translation of the Opinion and Order filed in the Civil Court of First Instance, Chingeltei District, in *Batbold v. Blue News LLC*, No. 182/SHSH2022/03018, dated October 21, 2022.

74.     Attached as **Exhibit 51** is a true and correct copy of a press release titled *United States Seeks Forfeiture of Former Mongolian Prime Minister's Luxury New York City Apartments*

*Purchased with Proceeds of Corruption Scheme*, published by the U.S. Attorney's Office for the Eastern District of New York, dated March 26, 2024, available at https://www.justice.gov/usao-edny/pr/united-states-seeks-forfeiture-former-mongolian-prime-ministers-luxury-new-york-city.

75. Attached as **Exhibit 52** is a true and correct copy of the Statement of Claim filed in the Eastern Caribbean Supreme Court, British Virgin Islands Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated December 20, 2021.

76. Attached as **Exhibit 53** is a true and correct copy of the Judgment filed in the Eastern Caribbean Supreme Court, British Virgin Islands Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated November 5, 2022 and entered November 9, 2022.

77. Attached as **Exhibit 54** is a true and correct copy of the Order of Dismissal in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated February 8, 2023.

78. Attached as **Exhibit 55** is a true and correct copy of a February 17, 2020 letter, including the original and a certified translation, from the Erdenet Mining Corporation to KH. Boldbaatar, filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 4, filed November 23, 2020.

79. Attached as **Exhibit 56** is a true and correct copy of an article titled *The World's Most Famous Private Detective Makes No Apologies*, written by Simon Shuster, published by TIME on September 10, 2021, available at https://time.com/6095957/jules-kroll-private-detective-profile/.

17

80.     Attached as **Exhibit 57** is a true and correct copy of the Judgment filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated February 24, 2023.

81.     Attached as **Exhibit 58** is a true and correct copy of an article titled *Mongolia's Presidential Election Outcome a Win for Putin*, written by Edward Cavanough, published by The Interpreter on July 12, 2017, available at https://www.lowyinstitute.org/the-interpreter/mongolia-s-presidential-election-outcome-win-putin.

82.     Attached as **Exhibit 59** is a true and correct copy of an article titled *Gibson Dunn Lobs Accusations at King & Spalding in Mongolian Corruption Cases*, written by Alison Frankel, published       by       Reuters       on       July       20,       2022,       available       at https://www.reuters.com/legal/litigation/gibson-dunn-lobs-accusations-king-spalding-mongolian-corruption-cases-2022-07-19/.

83.     Attached as **Exhibit 60** is a true and correct copy of a September 17, 2018 Engagement Letter between the General Prosecutor's Office of Mongolia and K2 Intelligence filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-5, filed July 15, 2022.

84.     Attached as **Exhibit 61** is a true and correct copy of the Affidavit of Jules B. Kroll filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, dated November 18, 2020.

85.     Attached as **Exhibit 62** is a true and correct copy of a letter from plaintiffs' counsel acknowledging their withdrawal in the High Court of the Republic of Singapore in A*gency for*

18

*Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated July 4, 2022.

86.     Attached as **Exhibit 63** is a true and correct copy of a Notice of Application filed in the Eastern Caribbean Supreme Court, British Virgin Islands Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated July 8, 2022.

87.     Attached as **Exhibit 64** is a true and correct copy of a Summons filed in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated July 11, 2022.

88.     Attached as **Exhibit 65** is a true and correct copy of the second affidavit submitted by Choo Young Cheong in the High Court of the Republic of Singapore in Agency for Policy Coordination on State Property v. Batbold Sukhbaatar, No. 1145/2020, dated January 5, 2021.

89.     Attached as **Exhibit 66** is a true and correct copy of a redline comparing the government's March 25, 2024 Complaint in this action, ECF No. 1, with its Proposed First Amended Complaint, ECF No. 49-1.

Dated:  April 9, 2026

New York, New York

                                        */s/ Lee R. Crain*
                                        Lee R. Crain

19