# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                 Plaintiff,

        v.

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP., *et al.*,

             Defendants *in rem*.

Case No. 24-cv-2147 (RPK) (JAM)

Oral Argument Requested

---

**MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR SUKHBAATAR
BATBOLD'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |
| BACKGROUND | 4 |
| I. As Prime Minister, Mr. Batbold did not have "effective control of the country's natural resources," including the Erdenet Mining Corporation's mining interests. | 5 |
| II. Catrison was run by Choo Young Cheong, an experienced metals trader who established deep relationships with EMC before Mr. Batbold became Prime Minister. | 8 |
| III. Mr. Batbold's political opponents commence a global litigation campaign against Mr. Batbold on the eve of the 2021 Mongolian presidential election—resulting in a Mongolian court holding that the allegations against Mr. Batbold are "not true." | 11 |
| IV. The government abandons its effort to oppose Claimants' standing after Claimants produce reams of discovery establishing their ownership of the NY Apartments and moves for leave to amend without identifying any evidence of corruption. | 13 |
| LEGAL STANDARD | 14 |
| ARGUMENT | 15 |
| I. The Court should grant summary judgment because the undisputed evidence establishes Mr. Batbold did not steer copper contracts in violation of Mongolian law. | 15 |
| A. The Prime Minister of Mongolia did not control EMC. | 16 |
| B. Mr. Batbold was not involved in EMC's decision to contract with Catrison. | 17 |
| C. EMC awarded Catrison two contracts in 2011 based on EMC's year's-long relationship with Mr. Cheong. | 19 |
| D. Ocean Partners' financing and profit-sharing agreements with Catrison were consistent with Ocean Partners' prior agreements with Lidex. | 21 |
| E. The government cannot prove any criminal violation of Mongolian law. | 22 |
| II. Pre-discovery summary judgment is warranted. | 23 |
| CONCLUSION | 25 |

i

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Baldwin v. EMI Feist Catalog, Inc.*,
805 F.3d 18 (2d Cir. 2015)........................................................................................14

*Duffy v. Wolle*,
123 F.3d 1026 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)................................................24

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009)................................................... 15, 24, 25

*Emigrant Residential LLC v. Pinti*,
37 F.4th 717 (1st Cir. 2022)......................................................................................24

*Feeley v. Whitman Corp.*,
65 F. Supp. 2d 164 (S.D.N.Y. 1999) ........................................................... 15, 24

*Hilton v. Guyot*,
159 U.S. 113 (1895) ...................................................................................................19

*Jaramillo v. Weyerhaeuser Co.*,
536 F.3d 140, 145 (2d Cir. 2008) ...........................................................................15

*Johnson v. UMG Recording, Inc.*,
2024 WL 5278581 (S.D.N.Y. Dec. 6, 2024), *R&R adopted*, 2025 WL 27504 (S.D.N.Y.), *and R&R adopted*, 2025 WL 282920 (S.D.N.Y. Jan. 23, 2025) .......................24

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9 (2d Cir. 1986) .........................................................................................15

*In re Marine Asbestos Cases*,
265 F.3d 861 (9th Cir. 2001).....................................................................................24

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
875 F.3d 107 (2d Cir. 2017).......................................................................................14

*Rosenberg v. Frontline Asset Strategies, LLC*,
556 F. Supp. 3d 157 (E.D.N.Y. 2021) .....................................................................24

*In re Spigel*,
260 F.3d 27 (1st Cir. 2001).........................................................................................25

*Trebor Sportswear Co. v. The Limited Stores, Inc.*,
865 F.2d 506 (2d Cir. 1989).......................................................................................15

*United States v. Garland*,
991 F.2d 328 (6th Cir. 1993).......................................................................................19

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987)..................................................................................19

**Statutes**

18 U.S.C. § 981.................................................................................................. 15, 16

18 U.S.C. § 1956............................................................................................... 16, 22

18 U.S.C. § 1957..................................................................................................16

**Rules**

Fed. R. Civ. P. 56.......................................................................................... 1, 14, 15

**INTRODUCTION**

In this civil forfeiture action, filed in 2024, the government asks this Court to strip two Manhattan apartments (the "NY Apartments") from their rightful owners, the Claimants in this action. What the government does not tell this Court is that the factual allegations underlying that request originate from a discredited dossier created by the private investigative firm K2 Integrity (the "Kroll Dossier") secretly commissioned by foreign political operatives for a malicious purpose: to destroy the 2021 presidential candidacy of former Prime Minister of Mongolia Sukhbaatar Batbold.

The operative Complaint, and now the government's proposed amended complaint, also fail to disclose another critical fact: the government's central allegations have been the subject of prior litigations in courts across three continents. The government's pleadings do not mention that a three-judge Mongolian court unanimously ruled in 2022 that the central corruption theory at the heart of the government's case is "not true." And the government does not tell the Court that undersigned counsel for Mr. Batbold has voluntarily produced hundreds of contemporaneous documents, seventeen sworn witness statements, and a judicial ruling demonstrating that this case has no good-faith basis in law or fact—and that the corruption allegations at the heart of this case are simply untrue. Given this extensive record, there is no genuine dispute of material fact, and the Court should enter judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

The government's theory is this: Mongolia's former Prime Minister allegedly steered two 2011 copper trading contracts from the Mongolian state-owned Erdenet Mining Corporation ("EMC") to Claimant Hak Seon Kim, Ph.D., and her husband Choo Young Cheong. The Complaint alleges that Dr. Kim and Mr. Cheong then used those proceeds to purchase the NY Apartments as proxies for Mr. Batbold—allegedly in violation of Mongolian law.

That theory did not originate in this case or with federal investigators. It originated years

1

ago in the Kroll Dossier and is now being recycled by the government in this action. K2 had a potent incentive to manufacture its fake dossier. By the terms of its engagement, K2 stands to receive an up-to-$50 million "success fee" in the event the NY Apartments (or other properties) are recovered. K2 is the progenitor of the operative corruption theory at the center of this case and was hired by shadowy foreign figures for the purpose of interfering in foreign democratic elections. And yet, K2 may have a significant financial interest in the outcome of this forfeiture action brought by the United States.

On the merits, the undisputed evidence—seventeen sworn statements and dozens of contemporaneous commercial, government, and judicial documents—establishes that Prime Minister Batbold did not corruptly steer contracts to anyone. The copper trading contracts were lawful and legitimate, awarded in accordance with EMC's own established standards. No Mongolian law was violated. The corruption narrative is, in its entirety, a political fabrication.

Mr. Batbold has defeated these same allegations repeatedly. In November 2020, the Kroll Dossier was deployed as the centerpiece of coordinated civil lawsuits filed against Mr. Batbold around the world purportedly on behalf of EMC and two other entities. These were not legitimate proceedings. They were a weapon. The political operatives who secretly commissioned the Kroll Dossier deliberately timed the filings to generate a media campaign designed to force Mr. Batbold from Mongolia's 2021 presidential race before any court could rule on the merits.

It worked—initially. The media coverage drove Mr. Batbold from the presidential election. But after years of litigation, the cases collapsed entirely. It emerged, in a case that undersigned counsel litigated in the New York Supreme Court, that the entities named as plaintiffs had never authorized the filings made in their names. The global law firm that had appeared as counsel for the named plaintiffs later withdrew from every proceeding. The 2020 lawsuits disintegrated.

2

To identify who had orchestrated the campaign, the undersigned counsel filed a proceeding in 2022 on behalf of Mr. Batbold in the Southern District of New York under 28 U.S.C. § 1782, seeking discovery from K2. K2 fought that discovery aggressively, refusing even to produce a privilege log. The Honorable Ona T. Wang rejected K2's stonewalling, characterizing its tactics as holding discovery "hostage." The documents the court ultimately compelled K2 to produce confirmed the Kroll Dossier and the 2020 lawsuits were funded in secret by proxies of Mr. Batbold's political opponents.

In 2022, Mr. Batbold brought a defamation action in Mongolia to disprove the corruption allegations in the Kroll Dossier on their merits. A three-judge panel unanimously held that the theory underlying the Dossier—recycled in this action—was "not true." Statement of Material Facts ("SOMF") ¶ 125.[1] Directly in conflict with the allegations in this case, the Mongolian court found specifically that EMC's contracts with Mr. Cheong's company were awarded "in accordance with the standards established by [EMC]"; there was "no evidence" Mr. Batbold had "personally influenced [EMC] to sign the contracts with foreign companies"; and no evidence supported that he "personally gained profits, conspired with others, [or] caused damages to [EMC]." SOMF ¶¶ 126-27. The court ordered a Mongolian news outlet to retract its stories premised on those false allegations. SOMF ¶ 129.

By 2024, every private lawsuit premised on the Kroll Dossier had been dismissed or withdrawn. Not a single court had accepted the corruption theory. One court expressly held it was false. That should have ended the matter.

In March 2024—weeks before upcoming Mongolian elections in which Mr. Batbold was widely expected to win reelection to his twenty-first year in Parliament—the U.S. government,

---

[1] Citations to "SOMF" refer to Mr. Batbold's Local Civil Rule 56.1 Statement of Undisputed Material Facts.

3

without any prior notice or warning, filed this action.

Mr. Batbold's counsel contacted the government immediately after the filing. In the meeting that followed, prosecutors acknowledged they had not fully reviewed the public litigation record, including the Section 1782 proceeding in the SDNY, and were unaware that the Mongolian court had ruled in Mr. Batbold's favor. Counsel reasonably assumed the government would dismiss the case once it understood this prior history and that the Complaint could not be reconciled with it.

But the government refused to withdraw the case. Instead, it is litigating an action whose factual foundation is contradicted by hundreds of private emails, official government records, contemporaneous commercial documents, interviews with senior Mongolian government officials and mining executives, seventeen sworn witness statements, and a report from a Harvard-trained expert in Mongolian politics and economics. Even now the government's proposed amended complaint fails to comply with its essential duty of candor, concealing the Kroll Dossier, the Mongolian court's ruling, and the extensive prior litigation record.

To prevail at trial, the government must prove that the NY Apartments were purchased with proceeds from copper-trading contracts that Mr. Batbold corruptly steered to Mr. Cheong's company in violation of Mongolian law. It has no admissible evidence to establish that claim, and it cannot manufacture a genuine factual dispute simply by invoking the need for further discovery after two years of litigation and engagement from Mr. Batbold in which the evidentiary record has been placed squarely before it. Summary judgment is required. This Court should grant it and put these false allegations to rest.

## BACKGROUND

Sukhbaatar Batbold served as a member of Mongolia's Parliament from 2004 to 2024 and as Mongolia's twenty-sixth Prime Minister from 2009-2012. SOMF ¶ 1; Ex. 1 ¶ 52; Ex. 29; ECF

4

No. 49-1, Proposed First Amended Complaint ("PFAC") ¶ 18.[2] Prior to entering public service in 2000, Mr. Batbold was a successful businessman. *See* Ex. 3 ¶ 2; Ex. 18 ¶¶ 6-8; Ex. 1 ¶ 50; Ex. 4 ¶ 9. As a public servant, he dedicated his career to serving the Mongolian people, becoming a Member of Parliament, Minister of Trade and Industry, Minister of Foreign Affairs, and Prime Minister. Ex. 1 ¶ 51; Ex. 29; PFAC ¶ 18. During his time in public service, Mr. Batbold ceded control of his businesses and barred his companies from contracting with the government to avoid any possible conflicts of interest. Ex. 2 ¶¶ 5-7; Ex. 4 ¶ 18; Ex. 14 ¶ 14.

Despite Prime Minister Batbold's longstanding and demonstrated history of public service, the government seeks forfeiture of the NY Apartments based on the allegation that the former Prime Minister corruptly steered mining contracts to Mr. Cheong and Dr. Kim to purchase the NY Apartments as a proxy for Mr. Batbold. No evidence supports that claim. A mountain of evidence—voluntarily produced by Mr. Batbold to the government—directly contradicts it, leaving no genuine issue of material fact.

## I.    As Prime Minister, Mr. Batbold did not have "effective control of the country's natural resources," including the Erdenet Mining Corporation's mining interests.

The government alleges that "[a]s Prime Minister, Batbold had effective control of the country's natural resources," including the Erdenet Mine and the Erdenet Mining Corporation ("EMC"), allowing him to corruptly steer copper trading contracts. Compl. ¶¶ 18, 20-21; PFAC ¶¶ 18, 20-21. The undisputed evidence establishes that the government's allegations are false and that there is no genuine dispute of material fact.

The Erdenet mine was one of Mongolia's most valuable natural resources during Mr. Batbold's tenure in office. *See* SOMF ¶ 4. But "under Mongolia's constitution, the Prime Minister does not have formal legal authority over the country's natural resources," including the Erdenet

---

[2] Citations to Ex. __ are to those attached to the Declaration of Lee R. Crain filed in support of this motion.

mine. SOMF ¶ 60.[3] Nor could the Prime Minister "wield effective control" over the country's natural resources as a matter of practical political reality because EMC—then jointly owned by Mongolia and Russia—operated the Erdenet mine independently from the Mongolian government. Compl. ¶ 20; *see also* SOMF ¶¶ 5, 7, 60-62; Ex. 1 ¶¶ 55-62.

At all relevant times, EMC was run by a joint Russian-Mongolian board of directors and a chief executive known as the General Director. SOMF ¶¶ 8, 19. Russia appointed half of the board's members. SOMF ¶ 8; Ex. 10 ¶¶ 8-9. The Mongolian State Property Committee ("SPC") appointed the other half. SOMF ¶ 8; Ex. 9 ¶¶ 5-6; Ex. 14 ¶¶ 7-9. The Chairman of the SPC was a civil servant who qualified for the role by examination, and who was prohibited by law from belonging to a political party. Ex. 7 ¶ 6; Ex. 9 ¶¶ 6, 11. In addition to appointing the Mongolian members of EMC's board, the SPC also nominated Mongolia's candidate for General Director. SOMF ¶ 20. The joint EMC Mongolian-Russian board then voted on whether to approve the nominee after, as a former General Director has explained, a mandatory and "extensive vetting . . . process." SOMF ¶ 21. The Prime Minister had no power to appoint, approve, or remove the General Director—once appointed, the General Director could only be removed by EMC's board. *See* SOMF ¶¶ 20, 22-25. The General Director's accountability to the joint Russian-Mongolian board insulated him from domestic political pressure. SOMF ¶¶ 15-16, 33.

Given EMC's importance to Mongolia's economy, EMC's operations and contracting process were monitored closely and adhered to international industry norms. *See* SOMF ¶¶ 41-42, 47-59. EMC sold its copper at the prevailing benchmark price on the independent London Metal

---

[3] The Complaint and PFAC misunderstand Mongolia's constitutional structure. Mongolia is a hybrid presidential and parliamentarian system; the Prime Minister is not all-powerful. Rather, the Prime Minister shares "operational control of the government" with Parliament, and the Prime Minister and Parliament are together responsible for certain functions "such as the budget, social services, economic development, and infrastructure development." Ex. 1 ¶ 26. Critical executive functions such as oversight of the military and law enforcement and the appointment of judges and prosecutors are constitutionally assigned to the President—the head of state—not the Prime Minister. Ex. 1 ¶¶ 34-43.

Exchange and even capped the amount of copper that could be allocated to any individual trader. SOMF ¶ 51; Ex. 10 ¶¶ 21-22; Ex. 13 ¶ 6. EMC conducted "due diligence for all buyers" with oversight from the board and negotiated contract terms that were "in [EMC's] best interest." SOMF ¶¶ 47-50. EMC's Commercial Director and General Director, alongside relevant departments at EMC reviewed all contracts before EMC executed them. SOMF ¶¶ 41-42, 53; Ex. 12 ¶¶ 3-4.

EMC was also subject to oversight and auditing by independent auditors and international accounting firms (including firms like KPMG and Ernst & Young), which reviewed EMC's books annually or semi-annually. SOMF ¶¶ 54-59. To comply with its financing obligations, EMC needed to ensure its trading partners were reliable and well-financed. *See* SOMF ¶ 93; Ex. 10 ¶ 19. As former EMC Commercial Director Dorjdamba Damba-Ochir explained under oath, "banks such as UBS, Barclays, and Goldman Sachs would conduct due diligence on EMC," including to "discern whether EMC's contracts were standard, whether shipments were delivered on time, and whether EMC and its guarantors were participating in fair contracting." SOMF ¶ 55 (citing Ex. 13 ¶¶ 2, 8).

During Mr. Batbold's tenure, EMC was operated by General Director Chimeddorj Ganzorig and Commercial Director Khorloo Oyuntsetseg. SOMF ¶¶ 19, 30, 42-43. The SPC's Chairman was Dr. Gurtaij Dulamyn Sugar. SOMF ¶ 12. Each of these officials took office before Mr. Batbold became Prime Minister, and each has confirmed that Mr. Batbold never interfered in EMC's contracting decisions or operations. SOMF ¶¶ 13, 16-18, 31-32, 37-40, 44-46.[4]

---

[4] Other officials who served in the Mongolian government during Mr. Batbold's premiership—including cabinet ministers (SOMF ¶¶ 62, 67), the head of the General Intelligence Agency (SOMF ¶¶ 68-70), a Mongolian Ambassador to the United States (SOMF ¶¶ 64-66), and a Brigadier General and head of the economic crimes division of the National Police (SOMF ¶ 71)—also confirmed that Mr. Batbold never interfered in EMC's operations or influenced its contracting decisions. *See also* Ex. 57 ¶¶ 2, 6 (leadership of Mongolia's Independent Authority Against Corruption

**II.    Catrison was run by Choo Young Cheong, an experienced metals trader who established deep relationships with EMC before Mr. Batbold became Prime Minister.**

The government alleges that "during Batbold's term as Prime Minister, [EMC] inserted" a company called Catrison as a "middleman" between EMC and one of its traditional counterparties, an entity called Ocean Partners U.K. Ltd. ("Ocean Partners"), an experienced commodities-financing and trading firm. Compl. ¶¶ 21-23; PFAC ¶¶ 21-23. The government alleges that Catrison had "no operational history" and infers its copper-trading contracts could only have been procured with corrupt influence from Prime Minister Batbold. *See* Compl. ¶ 23; PFAC ¶ 23. The undisputed evidence establishes no genuine dispute of material fact that these allegations are false: Catrison was operated by Choo Young Cheong, a man with a thirty years of experience in the Mongolian mining industry, including with EMC. He did not need (and did not get) any assistance from Prime Minister Batbold to procure copper-trading contracts, and his independently procured EMC contracts were ordinary course, commercially reasonable, and industry standard.[5]

Mr. Cheong first arrived in Mongolia in the early 1990s as part of the metals-trading team at Samsung, one of the few large multinational companies then operating in the country. *See* SOMF ¶¶ 72-73, 80. During his decades-long career at Samsung, Mr. Cheong was head of its Mongolian metals trading division and managed Samsung's interest in a copper joint venture with EMC. SOMF ¶¶ 72-74. Through his work with Samsung in Mongolia, Mr. Cheong developed a deep network and relationships in the global metals trading industry, including particularly in Mongolia with EMC. SOMF ¶¶ 75-78, 83-86, 90, 106.

---

confirming that he was "not aware of any" public corruption complaints or investigations "levied against Mr. Batbold between 2011 and 2014.")

[5] Although the government originally alleged Mr. Cheong and his wife, Dr. Kim, had no "background or expertise in commodities trading or mining," Compl. ¶ 22, the PFAC abandons that allegation. It was untrue, and the government knew or should have known so before it filed this case given any reasonable investigation would have confirmed its falsity. *See* SOMF ¶¶ 72–86; Ex. 8 ¶¶ 16–18; Ex. 10 ¶¶ 23–24.

In 2007, Mr. Cheong left Samsung and founded his own company, Lidex Ltd. SOMF ¶¶ 87-88. Lidex signed two copper contracts with EMC that year, SOMF ¶¶ 89, 97—two years *before* Mr. Batbold unexpectedly became Prime Minister when his predecessor resigned for health reasons. SOMF ¶ 2. Both of the 2007 Lidex-EMC contracts included industry- and EMC-standard terms. Ex. 8 ¶ 18; Ex. 20 (First Lidex-EMC Contract); Ex. 21 (Second Lidex-EMC Contract); Ex. 22 (Third Cheong Affidavit) ¶¶ 23-24. Mr. Cheong's Lidex contracts with EMC were financed by Ocean Partners. SOMF ¶¶ 94-96, 98. As the government acknowledges, "[h]istorically, [EMC] sold its copper concentrates to established commodities trading firms, which arranged for financing with commercial banks." Compl. ¶ 21; PFAC ¶ 21; *see also* Ex. 10 ¶ 19. This is the relationship Mr. Cheong formed with Ocean Partners. SOMF ¶¶ 94-96, 98.

On April 13, 2007, Ocean Partners agreed to finance Lidex's purchase of copper concentrate from EMC in exchange for the right to buy a portion of the contracted-for copper—functionally giving Ocean Partners a right to a portion of the profit on Lidex's contract with EMC. SOMF ¶¶ 95-96. Nine months later, Ocean Partners and Lidex entered into a new contract with a "profit-sharing" model where Ocean Partners would receive 50% of the profit on Lidex's second EMC contract. SOMF ¶ 98; Ex. 26 §§ 11, 11.2.

In 2009, Lidex commenced an arbitration against EMC related to the second Lidex-EMC contract. SOMF ¶ 99. Lidex lost the arbitration, and in 2010, after that loss, the second Lidex-EMC contract was terminated. SOMF ¶¶ 100-01. In January 2011, Mr. Cheong reinitiated his relationship with EMC and executed a third Lidex-EMC contract. SOMF ¶ 102. But after years of contentious arbitration, this third contract was never performed. *See* Ex. 63.

Instead, Mr. Cheong rebranded his business. He dropped the "Lidex" name and operated through a new entity: Catrison, Ltd. SOMF ¶¶ 104-06. General Director Ganzorig and his

9

colleagues at EMC have stated under oath that they understood at the time that Catrison was founded in "an effort by Mr. Cheong to continue his long-standing business relationship with EMC" after the Lidex arbitration, and they "viewed Catrison as a continuation of Mr. Cheong's Lidex business." SOMF ¶ 106 (citing Ex. 10 ¶¶ 25-27). In February 2011, Catrison entered into its first contract with EMC. SOMF ¶ 109; Compl. ¶ 23; PFAC ¶ 23. That contract was an continuation of Lidex's prior business. Specifically, the first Catrison-EMC contract has the same contract number as the third Lidex-EMC contract Mr. Cheong had been negotiating: "E-2011/01-Cu." SOMF ¶ 110 (*compare* Ex. 23, *with* Ex. 63). The terms of the first Catrison-EMC contract were virtually identical to those in the prior Lidex agreements. SOMF ¶¶ 111-12. Each contained market-standard terms favorable to EMC, with prices set by the London Metal Exchange. SOMF ¶¶ 113-15. On December 14, 2011, Catrison entered into a second contract with EMC. SOMF ¶ 119; PFAC ¶ 24. That contract included the same standard terms as the February 2011 contract, Ex. 24 *with* Ex. 21, which, again, favored EMC, SOMF ¶¶ 113-15.

Mr. Cheong returned to Ocean Partners to finance Catrison's contracts as he had with Lidex before Mr. Batbold became Prime Minister. SOMF ¶ 108; Compl. ¶¶ 23-24; PFAC ¶¶ 23-25. Ocean Partners again provided financing in exchange for a portion of the profits. SOMF ¶ 118; Compl. ¶ 23 (Ocean Partners "provide[d] the financing. . . to complete the sales"); PFAC ¶ 23 (same); PFAC ¶ 28 (describing the Catrison-Ocean Partners "profit sharing agreement"). The duration, quality, price, profit-sharing model, and hedging strategy that formed the core of the Ocean Partners-Catrison contract was essentially identical to the terms in the prior agreements between Ocean Partners and Lidex. *Compare* Ex. 27, *with* Ex. 25, Ex. 26. Ocean Partners and Catrison later entered into a supplemental agreement that amended their prior contract and extended it to apply to the December 2011 EMC-Catrison agreement. SOMF ¶ 120; PFAC ¶ 24.

10

**III.    Mr. Batbold's political opponents commence a global litigation campaign against Mr. Batbold on the eve of the 2021 Mongolian presidential election—resulting in a Mongolian court holding that the allegations against Mr. Batbold are "not true."**

In October 2020, a low-level Mongolian prosecutor purportedly acting on behalf of EMC, the SPC, and another Mongolian state-owned entity, sued Mr. Batbold in Mongolia. Declaration of Lee R. Crain ("Crain Decl.") ¶ 4; Ex. 67 ¶¶ 6, 12. The lawsuit commenced just months before the 2021 presidential election in which Mr. Batbold was expected to be a leading candidate. Ex. 7 ¶ 20. Within days of that lawsuit, a coordinated campaign of *ex parte* actions were filed around the globe seeking temporary restraining and asset-freezing orders against Mr. Batbold and others. Crain Decl. ¶ 5. Each case relied on and attached a copy of the Kroll Dossier, which was littered with conclusory and circumstantial assertions to substantiate the plaintiffs' claims, and each case was premised on the same contract-steering theory the government later adopted in this case. *Id.*

The cases began to collapse almost immediately. Within days, Mr. Batbold uncovered evidence that the three named plaintiffs—including EMC and the SPC—had not authorized the lawsuits. Crain Decl. ¶ 6; Ex. 36; Ex. 37; Ex. 38. When opposing counsel argued during a hearing in New York Supreme Court that the State of Mongolia—*not* the three named plaintiffs—was the true plaintiff in the suit, Justice Barry Ostrager excoriated plaintiffs' counsel, stating: "I understand that you're representing that but you don't come into the courthouse and file several feet of documents before some judge on the day before Thanksgiving acting on behalf of the State of Mongolia without even demonstrating to the Court that the State of Mongolia has authorized you to act on their behalf." Ex. 65 at 26:6-13; 27:18-24; Crain Decl. ¶ 7. Justice Ostrager vacated the *ex parte* temporary restraining order that a duty judge entered the day before Thanksgiving, and shortly thereafter the New York Supreme Court case was withdrawn. Crain Decl. ¶ 7; Ex. 68; Ex. 53. Mr. Batbold's evidence would ultimately lead opposing counsel to withdraw from all of the cases against him before their resolution. Crain Decl. ¶ 9; Ex. 47 ¶ 2; Ex. 72; Ex. 73; Ex. 74.

In 2021, Mr. Batbold commenced the SDNY Action to seek discovery from K2 as to the origins of the cases against him. Ex. 39. Discovery the Court compelled K2 to produce revealed that the investigative firm had not been retained by any of the three "plaintiffs" or the Mongolian state, as King & Spalding had claimed. Rather, K2 had been engaged and instructed by Otgonjargal Moyle and Chuluunkhuu Ganbat, known associates of the Kremlin-aligned President of Mongolia, Khaltmaagiin Battulga. Ex. 42 at 12; Ex. 43; Ex. 44; Ex. 60 at 2 (describing relationship among Moyle, Ganbat, and Battulga); Ex. 70. K2's privilege log revealed hundreds of emails between the firm and those individuals as they developed a coordinated campaign to destroy Mr. Batbold's public service career. Ex. 42; Ex. 44. Discovery also showed that K2 was not a neutral investigator as it had told courts around the world in *ex parte* submissions. Rather, K2 secretly had been promised a massive financial stake in the accusations it peddled—entitling it to up to $50 million if the lawsuits against Mr. Batbold succeeded. Ex. 43; Ex. 48 at 7.

In May 2022, Mr. Batbold filed a defamation action in Mongolia against the three plaintiffs named in the litigation campaign, including EMC and the SPC. SOMF ¶ 121. Mr. Batbold also named as a defendant a media company that published news stories accusing him of the exact wrongdoing contained in the Kroll Dossier. SOMF ¶ 122. After an in-person trial before a three-judge panel with all parties represented by counsel, Mongolia's Civil Court of First Instance issued a unanimous opinion in Mr. Batbold's favor, finding that the corruption allegations against him were "not true." SOMF ¶¶ 123-25. The court held that the contracts between EMC and Catrison were "in accordance with the standards established by [EMC]." SOMF ¶ 126. And it found "no evidence" that "[Mr.] Batbold had personally influenced [EMC] to sign the contracts with foreign companies"—including Catrison—and "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]" SOMF ¶ 127.

12

By March 2023, Mr. Batbold won or secured dismissal of each suit filed against him. Crain Decl. ¶ 11; Ex. 17; Ex. 45 at 25; Ex. 46; Ex. 47; Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53; Ex. 64; Ex. 72; Ex. 73. None was ever re-filed or appealed.

**IV.    The government abandons its effort to oppose Claimants' standing after Claimants produce reams of discovery establishing their ownership of the NY Apartments and moves for leave to amend without identifying any evidence of corruption.**

In March 2024, the government filed its original Complaint. ECF No. 1. Mr. Batbold's counsel immediately contacted the government to inform it of the prior global litigation smear campaign and the successful defamation action. Crain Decl. ¶ 14. In multiple meetings and calls, counsel identified for the government hundreds of relevant documents publicly available on dockets around the world which contradicted the allegations in the Complaint. Crain Decl. ¶¶ 14-16. The government's attorneys acknowledged they had not fully reviewed the prior litigation record, including relevant filings that had been available for years on public dockets in multiple New York state and federal proceedings, and that they were not aware of the Mongolian court's ruling rejecting the very theory alleged in the Complaint and the PFAC as "not true." *Id*. Throughout the next two years, Mr. Batbold continued to engage with the government and voluntarily produced hundreds of documents disproving the government's theory. Crain Decl. ¶¶ 15-20.

In June 2024, the entities that own the NY Apartments and their ultimate beneficial owner Dr. Kim ("Claimants"), filed a verified claim to those apartments. ECF No. 10. Over the next fifteen months, the government served dozens of special interrogatories on Claimants purportedly to determine whether they had standing to assert ownership interests over the NY Apartments, and Claimants provided substantial discovery. *See* ECF Nos. 21, 41. Upon receiving that discovery, the government told the Court it no longer disputed Claimants' standing. ECF No. 41.

On December 19, 2025, Claimants moved to dismiss. ECF Nos. 46, 47. The government's

13

deadline to amend the Complaint as of right was January 9, 2026. Fed. R. Civ. P. 15(a)(1)(B). The government did not amend but rather sought two lengthy adjournments, totaling over eight weeks. On April 2, 2026—the evening the government's opposition brief was due—the government requested a pre-motion conference to move for leave to file a Proposed First Amended Complaint ("PFAC"), which it attached as an exhibit. ECF. Nos. 48, 48-1. The PFAC does not materially change the government's allegations. Its core theory remains the same: Mr. Batbold as Prime Minister "had effective control of the country's resources," PFAC ¶ 18, and Catrison could only have procured its 2011 EMC contracts corruptly. *See, e.g.*, PFAC ¶ 23.

The PFAC continues to materially misstate the facts. It does not disclose to this Court that the theory underlying the government's claims originated from the Kroll Dossier. It does not disclose K2's up-to $50 million success fee. It does not disclose that Mr. Batbold defeated every lawsuit filed against him on these same allegations. It does not disclose the Mongolian Court's holding that the corruption allegations against Mr. Batbold were "not true." And it does not disclose that over the past two years, Mr. Batbold has produced to the government seventeen sworn witness statements—including from the relevant officials at EMC in 2011—which all confirm that the government's corruption allegations are false.

**LEGAL STANDARD**

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). The movant bears a *prima facie* burden of production, which it can satisfy either "(1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v.*

14

*Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). If the movant establishes a *prima facie* basis for summary judgment, the burden shifts to the non-moving party, who "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

A party may move for summary judgment "any time" before 30 days after discovery closes, including before discovery has commenced. Fed. R. Civ. P. 56(b); *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 346 & nn.51-53 (S.D.N.Y. 2009) (collecting cases where summary judgment granted pre-discovery). When the non-movant has "had the opportunity to discover information that is essential to [its] opposition," the court need not defer summary judgment pending additional discovery. *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, (1986)) denying more discovery when non-movant had "fully adequate opportunity for discovery"); *Feeley v. Whitman Corp.*, 65 F. Supp. 2d 164, 172 (S.D.N.Y. 1999) (granting defendant pre-discovery summary judgment because facts on which the motion "rest[ed] [wer]e clearly facts within the knowledge of plaintiff, requiring no discovery"). Nor may the non-movant "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## ARGUMENT

**I.    The Court should grant summary judgment because the undisputed evidence establishes Mr. Batbold did not steer copper contracts in violation of Mongolian law.**

To prevail in its forfeiture action, the government must prove that the NY Apartments were purchased using proceeds obtained through violations of Mongolian law.[6] But the undisputed

---

[6] Each of the government's claims as originally pleaded or amended requires proof that funds used to purchase the NY Apartments derived from criminal activity. Claim 1 requires the government to prove that the NY Apartments are traceable to proceeds of "specified unlawful activity," as defined in the money laundering statute, pursuant to 18

evidence shows there is no genuine dispute that did not occur: Mr. Batbold did not steer contracts to Mr. Cheong in violation of Mongolian law. The government's bare and conclusory allegations on that question create no genuine dispute of any material fact. Summary judgment is appropriate.

### A.      The Prime Minister of Mongolia did not control EMC.

The undisputed evidence establishes no genuine dispute that Mr. Batbold, as Prime Minister of Mongolia, did not have control or authority over EMC, SOMF ¶¶ 60, 63, 66, 68-69, contrary to the government's unsupported and conclusory allegations, Compl. ¶ 18; PFAC ¶ 18.

At all relevant times, EMC operated independently from the Mongolian government through a "layered structure" and apolitical "appointment and management process" which "insulated" it from precisely the kind of political corruption alleged by the government in this action. Ex. 7 ¶ 7; *see* SOMF ¶¶ 15, 33, 57, 64-66; *supra* at 5-7. As explained by Dr. Gurtaij Sugar, SPC Chairman from 2007-2012, the "close involvement and supervision of Russia's directors on the [EMC] board . . . insulated EMC and [e]nsured its independence from Mongolian domestic politics." SOMF ¶ 15. The Mongolian members of EMC's board were selected by the SPC, an agency whose Chairman was appointed based on an apolitical civil service examination, not the Prime Minister—further diminishing the ability of the Prime Minister to exert any supposed "control." SOMF ¶¶ 7-18. As Dr. Sugar stated, "EMC was structured such that decision-making power was shared by both governments and across several key individuals." SOMF ¶ 66 (citing Ex. 7 ¶ 17). This "created a sophisticated system of checks and balances that . . . made it highly unlikely that a Prime Minister such as Mr. Batbold could become involved in EMC's operations

---

U.S.C. § 981(a)(1)(C), while Claims 3-5 require proof that the NY Apartments are property "involved in" money laundering pursuant to 18 U.S.C. § 981(a)(1)(A), which in turn also requires proof of an underlying specified unlawful activity, *see* 18 U.S.C. §§ 1956, 1957, Complaint ¶¶ 57, 60, 63; PFAC ¶¶ 77, 80, 83; *see also* 18 U.S.C. § 1956(c)(7) (defining specified unlawful activity). Claim 2 requires proof that the NY Apartments are "proceeds obtained" "from an offense against a foreign nation" that is "punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year" pursuant to 18 U.S.C. § 981(a)(1)(B).

or contracting process, let alone exercise authority over its General Director." *Id.*

The General Director was also insulated from political interference. The General Director was appointed by the joint Russian-Mongolian board and answerable only to that board. SOMF ¶¶ 20-25, Ex. 10 ¶ 10. The Prime Minister had no role in nominating or appointing the General Director and had no power to dismiss him. SOMF ¶¶ 16-17, 20-24, 34-37.

In addition to not being beholden to the Prime Minister, General Directors were "uniquely insulated" from politics because of the outsized role EMC played in Mongolia's economy. SOMF ¶ 33. As one former General Director has explained, the General Director was considered "the fourth most powerful person" in the country "after the President, Speaker of Parliament, and Prime Minister." SOMF ¶ 28; *see also* Ex. 10 ¶ 11. EMC was considered "more of a partner of the Mongolian government, rather than a subordinate." SOMF ¶ 6. There is no genuine dispute of fact that the Prime Minister did not have actual or "effective" control over EMC.

### B.    Mr. Batbold was not involved in EMC's decision to contract with Catrison.

The undisputed evidence establishes that Mr. Batbold did not influence EMC's decision to contract with Catrison. Both General Director Ganzorig and Commercial Director Oyuntsetseg—the EMC employees who oversaw contracting decisions at EMC during Mr. Batbold's term as Prime Minister—confirmed under oath that Mr. Batbold did not in any way influence EMC's decision to contract with Catrison. SOMF ¶¶ 116-17. Mr. Ganzorig, appointed before Mr. Batbold became Prime Minister, stated that "[a]t no time" was he "asked to act corruptly or inappropriately by . . . Mr. Batbold"; that Mr. Batbold "never spoke to [him] about EMC's business at all, including its contracting"; and that Mr. Batbold never attempted to "influence" him "or EMC to grant specific contracts to anyone," including Catrison and Mr. Cheong. SOMF ¶¶ 39-40. Ms. Oyuntsetseg, EMC's Commercial Director at the relevant time, agreed, swearing that she is

17

unaware "of [any] interference whatsoever by Mr. Batbold into any of EMC's operations during the time he was Prime Minister or otherwise." SOMF ¶¶ 46, 117.

Other individuals with first-hand knowledge confirm Mr. Batbold did not interfere with EMC's operations or contracting decisions. The Chief Cabinet Secretariat during Mr. Batbold's premiership stated that "[a]t no time did Mr. Batbold exercise, seek to exercise, or even take a deep interest in the operations of EMC at any level." Ex. 14 ¶ 15; SOMF ¶ 67. Dr. Sugar—the SPC Chairman who later became a Constitutional Court Justice—also said "when Mr. Batbold was Prime Minister, he had little involvement with EMC," and would "[a]t most [] inquire[] . . . about how EMC was doing at a high level." Ex. 9 ¶ 16; SOMF ¶¶ 16-18. Dr. Sugar confirmed that Mr. Batbold never asked that he, as SPC Chairman, "take any action regarding . . . EMC." SOMF ¶ 18. Dr. Sugar stated that Mr. Batbold had "the least involvement in SPC issues of any Prime Minister [he] served with when [he] was Chair of the SPC." SOMF ¶ 17.

These accounts were confirmed by multiple other officials who occupied high office during Mr. Batbold's premiership, including ministers (SOMF ¶¶ 62-63, 67), a former head of the General Intelligence Service (SOMF ¶¶ 68-70), a former Ambassador to the United States (SOMF ¶¶ 6, 64), a former head of the National Police, (SOMF ¶ 71), and a leader of Mongolia's anti-corruption authority, Ex. 57 ¶ 6. SPC and EMC leaders confirmed repeatedly in 2023 and 2024 that there is no evidence Mr. Batbold engaged in any corruption with respect to EMC and that EMC does not believe it has any claim against him. *See* Ex. 58 ¶¶ 2, 4-6 (Executive Director of Erdenes Mongol LLC—EMC's current owner and operator); Ex. 11 ¶¶ 2, 9-10 (Head of SPC state-owned asset administration and coordination division); *see also* SOMF ¶ 113 (citing a letter from EMC Director of Export Sales to EMC Legal Director noting the Catrison contract was standard).

Consistent with this evidence, a Mongolian court has also already rejected the corruption

18

theory at the heart of this case. The Mongolian Civil Court of First Instance squarely held the allegation that Mr. Batbold influenced EMC contracts with Catrison was "not true." SOMF ¶ 125. The court found "no evidence" that "Batbold had personally influenced [EMC] to sign the contracts with foreign companies"—including Catrison—and "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]" SOMF ¶ 127. In so finding, the court cited evidence from EMC itself that confirmed "[Mr.] Batbold exerted no influence on [EMC] to have it sign contracts with [Catrison], that the contracts did not violate any laws and regulations and that [EMC] did not incur any losses as a result of these contracts." SOMF ¶ 128. This final foreign judgment is "prima facie evidence" of the facts adjudicated in that proceeding, *Hilton v. Guyot*, 159 U.S. 113, 228 (1895); *United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993), and is entitled to persuasive weight under the principles of comity, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987).

The undisputed record establishes that Mr. Batbold did not influence EMC's decision to contract with Catrison in 2011, and there is no genuine dispute of fact to the contrary.

### C. EMC awarded Catrison two contracts in 2011 based on EMC's year's-long relationship with Mr. Cheong.

The government claims Mr. Batbold steered EMC to contract with Catrison because Catrison had "no operational history" before it received its contract. Compl. ¶¶ 22-23, PFAC ¶¶ 22-23. To support that theory, the government's original complaint alleged Catrison was run by individuals—including Mr. Cheong—with no "background or expertise in commodities trading or mining." Compl. ¶ 22. The government has now abandoned that materially false allegation, Ex. 77 ¶ 22, but it still asks the Court to infer that the only way Catrison could have earned its contracts was through corruption. That is wrong, as the undisputed evidence confirms. Mr. Cheong—who the government now concedes was Catrison's principal—had a decades-long track record as a

19

commodities trader in Mongolia and needed no corrupt influence to procure his own contracts with EMC. *See supra* at 8-10; SOMF ¶¶ 72-85.

EMC's General Director between 2000 and 2007—before Mr. Batbold became Prime Minister—was Khalzkhuu Narankhuu. SOMF ¶ 26. Mr. Narankhuu described Mr. Cheong as "an established and reliable partner . . . who could procure necessary financing or funding to purchase copper from EMC." SOMF ¶ 90. The next General Director, Mr. Ganzorig, agreed that Mr. Cheong was an experienced trader with a "long-standing business relationship with EMC," and a reputation as a "reliable partner." SOMF ¶¶ 106-07. Other leading figures in the Mongolian mining industry and government, including the Chairman of a prominent mining company and multiple former EMC executives confirmed that Mr. Cheong—following years of working with EMC as Samsung's representative and then with Lidex—was an experienced commodities trader by the time he contracted with EMC through Catrison in 2011. SOMF ¶¶ 72-85.

The undisputed record also shows that, although Catrison was a new legal entity, Mr. Cheong had been contracting with EMC for years through other companies like Lidex. SOMF ¶¶ 87-103. EMC understood Mr. Cheong founded Catrison "to continue his long-standing business relationship with EMC" after the contentious Lidex-EMC arbitration and they "viewed Catrison as a continuation of Mr. Cheong's Lidex business." SOMF ¶ 106 (citing Ex. 10 ¶¶ 25-27). Catrison's contracts with EMC resulted not from corruption, but rather from that long-established relationship. SOMF ¶ 116 (citing Ex. 10 ¶ 28); *id.* ¶ 117 (citing Ex. 12 ¶ 7); *see id.* ¶ 125-28.[7]

---

[7] The government separately alleges the Batbold family improperly secured EMC-related revenue through molybdenum contracts executed in 2010 and 2011 with a company called Genetrade Limited. Compl. ¶¶ 43-46; PFAC ¶¶ 64-68. The government does not, however, tie this revenue to the NY Apartments, nor can it dispute the voluminous evidence confirming Mr. Batbold at no point interfered with any EMC contracting decisions. *See supra* 16-19. The government also misstates the corporate ownership record. According to the government, contracts between EMC and Genetrade inhered to the Batbolds' benefit because Genetrade's corporate owner—Grandcastle Asset, Inc.— was allegedly owned by Mr. Batbold's son. But Genetrade was incorporated and at all material times owned by Mr. Cheong as one of the entities that operated his global business; although Mr. Batbold's son originally incorporated

**D.      Ocean Partners' financing and profit-sharing agreements with Catrison were consistent with Ocean Partners' prior agreements with Lidex.**

The government conclusorily alleges that Catrison was "inserted" out of the blue as a "middleman" between EMC and Ocean Partners, which the government claims demonstrates corruption. Compl. ¶¶ 21, 23; PFAC ¶¶ 21, 23. That allegation is materially false and misleading. As the government knows, the undisputed evidence establishes there is no genuine dispute of fact that Catrison contracted with Ocean Partners to finance its contracts with EMC in a way that was completely consistent with Mr. Cheong's prior practice at Lidex starting in 2007 and common industry practice. *Supra* at 8-10; *see* Compl. ¶ 21.[8]

Mr. Cheong, through Lidex, began receiving financing from Ocean Partners in connection with his EMC contracts in 2007—years before Mr. Batbold became Prime Minister. SOMF ¶¶ 92, 94-98. Ocean Partners financed Lidex in exchange for a portion of its profit. SOMF ¶¶ 96, 98. Ocean Partners continued to finance Mr. Cheong in 2011 when he contracted with EMC through Catrison. SOMF ¶ 118. That relationship, as the government concedes, was a "profit sharing agreement" consistent with the "historic[]" practice of EMC's counterparties. Compl. ¶ 21; PFAC ¶¶ 5, 21, 28. It was also commercially reasonable and benefited all parties: EMC contracted with a reliable partner at market rates; Mr. Cheong secured financing to hedge his risk; and Ocean Partners obtained access to additional copper concentrate. *See supra* at 8-10. That access was

---

Grandcastle in 2007, publicly available records produced to the government show that by 2009 Battushig had transferred his shares in the company outright to Mr. Cheong. *See, e.g.*, Ex. 78. This means that by the time EMC contracted with Genetrade in 2010 and 2011, *both* Genetrade and its corporate owner were wholly owned and controlled by Mr. Cheong.

[8] To the extent the government claims its evidence shows that "Ocean Partners"—or any other third party— "understood that Catrison was tied to Batbold," its allegations are based on the raw speculation of third parties and create no dispute of material fact. *See* Compl. ¶ 25; PFAC ¶ 29. That speculation cannot rebut the sworn statements of contemporaneous eyewitnesses—nor can it rebut the undisputed transactional history between Mr. Cheong (through Samsung, Lidex, and Catrison) and EMC. Nor do the gratuitous allegations about the relationship between the Cheong and Batbold families—whether as family friends or business partners, *see* PFAC ¶¶ 32-38—have any relevance to the specific question of whether Mr. Batbold steered copper contracts to Catrison in 2011.

21

valuable to Ocean Partners because EMC capped the amount of copper it allocated to each trading company. Ex. 10 ¶ 21. As the government admits, Ocean Partners' deals with Mr. Cheong's multiple companies allowed Ocean Partners to "effectively have two contracts with" EMC— giving it access to greater copper capacity and profit. SOMF ¶ 118; PFAC ¶ 28; *see* Ex. 10 ¶ 21

### E.   The government cannot prove any criminal violation of Mongolian law.

The government invokes five Mongolian statutes that it claims justify forfeiture. Compl. ¶¶ 7-8; PFAC ¶¶ 7-8. Summary judgment is warranted on all five of those purported forfeiture predicates because each requires proof that Mr. Batbold took an official action or abused his power, and the only official action or abuse of power the government identifies—the 2011 steering of copper contracts—never happened. Ex. 54 ¶ 15 ; *see supra* Arg. Pts. A-D.

Separately, the Court can and should grant partial summary judgment as to two of the five Mongolian laws the government identifies in its pleadings—the Mongolian Anti-Corruption Law and Article 263 of the Mongolian Criminal Code. Violations of those statutes are only criminal if the prosecution establishes beyond a reasonable doubt that an abuse of power "cause[d] substantial harm to the legally protected rights of legitimate interests of a business entity, organization or citizen." Ex. 54 ¶ 25; PFAC ¶ 8.a. Because only violations of foreign criminal law, not civil violations, can support a forfeiture claim, *see* 18 U.S.C. § 1956(c)(7) (providing forfeiture is available for an "*offense* against a foreign nation" (emphasis added)), and because the government cannot establish any "substantial harm" occurred, partial summary judgment is warranted.[9]

---

[9] The government also suggests Mr. Batbold violated Mongolian law by failing to include the NY Apartments on asset disclosures required of Mongolian public officials. PFAC ¶¶ 34-35; *see* Ex. 54 ¶ 9. But Mr. Batbold did not disclose the NY Apartments as his assets because he did not own them. Regardless, a violation of asset-disclosure laws cannot result in forfeiture. The disclosure law—a civil, not criminal law whose penalty is being "subject to dismissal or resignation" from office, Ex. 54, Ex. A § 13.8.4—is not an "offense against a foreign nation involving" "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B); *see also United States v. Chi*, 936 F.3d 888, 897, *am. sub nom. United States v. Heon-Cheol Chi*, 942 F.3d 1159 (9th Cir. 2019) (explaining that a foreign statute is only a specified unlawful activity if the statute meets the "ordinary, contemporary, common meaning" of the terms in 1956(c)(7)(B)).

22

The undisputed evidence shows no genuine dispute of material fact that Catrison's contracts caused no harm to anyone—let alone Mongolia or EMC—thus rendering any violation of Article 263 or the Anti-Corruption Law only civil in nature. Former EMC General Director Ganzorig stated Catrison did not receive any "special treatment" when contracting with EMC, and the agreed-upon contracts "were profitable and beneficial to EMC." SOMF ¶ 115. SPC's and EMC's current leadership agree. *See* Ex. 58 ¶¶ 2, 4-6; Ex. 11 ¶¶ 2, 9-10; *see also* SOMF ¶ 113. And the Mongolian court already found that each of the EMC and Catrison contracts were made "in accordance with the standard established by [EMC]," SOMF ¶ 126—including terms like contract prices "at the market price set by the London Metal Exchange at the time of shipment," Ex. 13 ¶ 6; Ex. 12 ¶ 3; Ex. 10 ¶¶ 22, 27; SOMF ¶ 96. The undisputed facts therefore confirm that EMC was not (and could not have been) harmed by its contracts with Catrison, meaning there can be no criminal violation of Article 263 or the Mongolia Anti-Corruption Law and thus no forfeiture predicated on violations of those statutes.

## II.     Pre-discovery summary judgment is warranted.

To the extent the government contends this Court should delay summary judgment to afford additional time for discovery, the Court should reject that request summarily. For years, the government has had documents in its possession—or easily accessible to it on public dockets even a basic investigation would have identified—that confirm material allegations in the Complaint and PFAC are false and misleading and the inference of corruption the government has asked the Court to draw in this case is unfounded. The government should not be rewarded with additional discovery—it should be admonished. *See United States v. Sadr*, 2020 WL 3057755 (S.D.N.Y. June 9, 2020) (requiring government attorneys to answer court questions under oath to investigate how certain prosecutorial misconduct occurred).

To forestall summary judgment, the government must do more than complain that this case

23

has yet to proceed to merits discovery. "[W]here a defendant elects to seek summary judgment, even at an early stage, on the ground that the plaintiff cannot get to a jury on an essential element as to which the plaintiff would have the burden of proof at trial, the plaintiff should suffer dismissal unless it comes forward with either (1) admissible evidence sufficient to raise a genuine issue of fact for trial, or (2) a Rule 56[d] affidavit sufficient to warrant denial or deferral of the motion pending necessary discovery." *Emigra Grp. LLC*, 612 F. Supp. 2d at 347. Pre-discovery summary judgment is warranted where the motion rests on facts that are "clearly . . . within the knowledge of plaintiff, requiring no discovery," *Feeley v. Whitman Corp.*, 65 F. Supp. 2d 164, 172 (S.D.N.Y. 1999),[10] and where the non-movant's theory is flatly contradicted by evidence that cannot be reasonably disputed. *See Rosenberg v. Frontline Asset Strategies, LLC*, 556 F. Supp. 3d 157, 165 (E.D.N.Y. 2021) (pre-discovery summary judgment warranted where business records belied plaintiff's theory). This is especially true where the non-movant has had a "full and fair opportunity to obtain relevant facts." *Emigrant Residential LLC v. Pinti*, 37 F.4th 717, 726 (1st Cir. 2022).

The standard for pre-discovery summary judgment is easily met here. The government has had ample evidence available to it. Its own policy manual prohibited it from filing this case unless it actually had "evidence available *before filing*" showing that "the likely owner of the property used to facilitate or conceal the underlying criminal activity was either the perpetrator of or knowing participant in the activity."[11] Separately, Mr. Batbold voluntarily produced to the government hundreds of documents, identified relevant witnesses, produced 17 sworn statements,

---

[10] *See also In re Marine Asbestos Cases*, 265 F.3d 861, 869 (9th Cir. 2001) (upholding pre-discovery summary judgment grant when "[a]ll of the facts needed to raise a genuine issue of material fact . . . were within the control of the plaintiffs."); *Johnson v. UMG Recording, Inc.*, 2024 WL 5278581, at *8 (S.D.N.Y. Dec. 6, 2024), *R&R adopted*, 2025 WL 27504 (S.D.N.Y.), and *R&R adopted*, 2025 WL 282920 (S.D.N.Y. Jan. 23, 2025) (summary judgment appropriate where discovery would be fruitless because material facts already within plaintiff's knowledge).

[11] *See* U.S. DEP'T OF JUST., ASSET FORFEITURE POLICY MANUAL (2023) at Ch. 6, Sec. III.D.2.a, https://www.justice.gov/criminal/criminal-mlars/file/1568951/dl (last accessed Apr. 8, 2026) (emphasis added).

24

and directed prosecutors to hundreds of public court filings debunking the exact allegations at issue here—including a foreign court ruling the government had apparently been unaware of at the time of filing. Crain Decl. ¶¶ 15, 19. Mr. Batbold even sent his counsel to Mongolia to investigate and transparently present to the government the findings of that investigation in lengthy presentations and voluminous written submissions. Crain Decl. ¶¶ 18-20. Claimants also provided their own discovery—including lengthy interrogatory responses and supporting documents that completely undermine the government's allegations. ECF Nos. 21, 40-42; *supra* at 13. And the government's pleadings confirm it has had ample opportunity to procure documents from third-party witnesses like Ocean Partners. *See, e.g.*, Compl. ¶ 25; PFAC ¶ 29. If any evidence exists to create a genuine dispute of fact, the government would (and should) already have it, and must now present that evidence to the Court to defeat summary judgment. *See Emigra Grp.*, 612 F. Supp. at 348; *see also In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001).

Every material witness has confirmed there was nothing out of the ordinary with the process or substance of the copper-trading contracts the government claims Mr. Batbold steered to Catrison. *Supra* at 8-10; SOMF ¶¶ 60-71, 91, 116-17, 127. Depositions and additional discovery are not necessary. *See Duffy v. Wolle*, 123 F.3d 1026, 1039-41 (8th Cir. 1997) (affirming summary judgment where relevant witnesses signed a declaration affirming facts), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). The government cannot demand additional discovery when the underlying facts have been conclusively established.

## CONCLUSION

Mr. Batbold respectfully requests that the Court find no genuine dispute as to whether he violated Mongolian law and, accordingly, enter summary judgment and dismiss this case.

Dated: New York, New York
April 9, 2026

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Orin Snyder
      Orin Snyder
      Lee R. Crain
      Sam Raymond
      Trevor Bondy Gopnik
      200 Park Avenue
      New York, NY 10166
      Telephone: (212) 351-2400
      osnyder@gibsondunn.com
      lcrain@gibsondunn.com
      sraymond@gibsondunn.com
      tgopnik@gibsondunn.com

      Stephanie Brooker*
      Helgi C. Walker*
      1700 M Street, N.W.
      Washington, D.C. 20036
      Telephone: (202) 887-3502
      sbrooker@gibsondunn.com
      hwalker@gibsondunn.com
      * *pro hac vice* forthcoming

      *Attorneys for Intervenor*
      *Sukhbaatar Batbold*

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>ANY AND ALL SHARES OF 21 EAST 61<br>STREET APARTMENT CORP., *et al.*,<br><br>           Defendants *in rem*. | Case No. 24-cv-2147 (RPK) (JAM) |

**LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF INTERVENOR SUKHBAATAR BATBOLD'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Intervenor Sukhbaatar Batbold respectfully submits this Statement pursuant to Local Civil

Rule 56.1 in support of his Motion for Summary Judgment to set forth the material facts as to

which there is no genuine issue to be tried.

**I.    The Erdenet Mining Corporation's operation and structure while Mr. Batbold was
Prime Minister.**

1.    Sukhbaatar Batbold served as Mongolia's Prime Minister from October 2009 to

August 2012.  ECF No. 1 ("Compl.") ¶ 18; ECF No. 41 ("Proposed First Amended Complaint" or

"PFAC") ¶ 18; Ex. 1 (Bikales Decl.) ¶¶ 51-52.[1]

2.    Mr. Batbold became Prime Minister after then-Prime Minister Sanjaagiin Bayar

resigned unexpectedly due to health concerns.  Ex. 14 (Khurelbaatar Decl.) ¶¶ 3, 12

3.    During Mr. Batbold's tenure as Prime Minister, his cabinet included members of

both the Mongolian People's Party and the Democratic Party.  Ex. 7 (Otgonbayar Decl.) ¶ 10; Ex.

---

[1] Citations to Ex. __ are to those attached to the Declaration of Lee R. Crain filed in support of Intervenor Sukhbaatar Batbold's Motion for Summary Judgment.

1 (Bikales Decl.) ¶ 23; Ex. 5 (Dashdorj Decl.) ¶¶ 15-16.

4.     During Mr. Batbold's tenure as Prime Minister, the Erdenet mine was one of Asia's largest copper mines and one of Mongolia's most important natural resources.  Compl. ¶ 20; PFAC ¶ 20; Ex. 1 (Bikales Decl.) ¶¶ 6, 59; Ex. 4 (Bold Decl.) ¶ 12; Ex. 7 (Otgonbayar Decl.) ¶¶ 5, 8; Ex. 8 (Narankhuu Decl.) ¶ 5; Ex. 9 (Sugar Decl.) ¶¶ 7, 10.

5.     The Erdenet Mining Corporation ("EMC") operated the Erdenet mine from the 1970's until 2018.  Compl. ¶ 20; PFAC ¶ 20; Ex. 4 (Bold Decl.) ¶ 12; Ex. 5 (Dashdorj Decl.) ¶¶ 9-10; Ex. 10 (Ganzorig Decl.) ¶¶ 7-8.

6.     Yondon Otgonbayar—a Mongolian public servant who served as Mongolian Ambassador to the U.S.—stated that "EMC had a … degree of independence given its massive economic, foreign policy, and political influence on the country as a whole."  Ex. 7 (Otgonbayar Decl.) ¶ 8; *see also* Ex. 10 (Ganzorig Decl.) ¶ 10 (EMC was considered "more of a partner of the Mongolian government, rather than a subordinate").

**The Role of the Joint-Mongolian Russian Board and the State Property Committee**

7.     During Mr. Batbold's tenure as Prime Minister, EMC was jointly owned by Mongolia and Russia.  Compl. ¶ 20; PFAC ¶ 20; Ex. 5 (Dashdorj Decl.) ¶¶ 9-10; Ex. 10 (Ganzorig Decl.) ¶ 8.

8.     During Mr. Batbold's tenure as Prime Minister, EMC was overseen by a board of directors that was evenly divided between Russian and Mongolian appointed directors.  Ex. 9 (Sugar Decl.) ¶ 6; Ex. 10 (Ganzorig Decl.) ¶ 8; Ex. 12 (Oyuntsetseg Decl.) ¶ 2; Ex. 15 (Mongolia-Russia EMC Agr.) at 4-5; Ex. 58 (Narantsogt Decl.) ¶ 4.

9.     The Mongolian State Property Committee ("SPC") nominated the Mongolian directors of EMC's board.  Ex. 9 (Sugar Decl.) ¶¶ 4-6, 13; Ex. 14 (Khurelbaatar Decl.) ¶¶ 7-9.

2

10.    The SPC was the government agency responsible for the management of state-owned property, including Mongolia's interest in EMC.  Ex. 7 (Otgonbayar Decl.) ¶ 6; Ex. 9 (Sugar Decl.) ¶¶ 4-6; Ex. 10 (Ganzorig Decl.) ¶ 14; Ex. 11 (Bayar-Erdene Decl.) ¶ 4.

11.    The SPC was headed by a Chairman.  Ex. 7 (Otgonbayar Decl.) ¶ 6; Ex. 9 (Sugar Decl.) ¶ 2.

12.    Dr. Gurtaij Dulamyn Sugar served as Chairman of the SPC between 2007 and 2012. Ex. 9 (Sugar Decl.) ¶ 2.

13.    Mr. Batbold was not Prime Minister when Dr. Sugar became Chairman of the SPC. Ex. 9 (Sugar Decl.) ¶¶ 11, 15.

14.    Mr. Batbold had no involvement in Dr. Sugar's appointment to the SPC.  Ex. 9 (Sugar Decl.) ¶¶ 11, 15.

15.    Dr. Sugar stated that the "close involvement and supervision of Russia's directors on the board … insulated EMC and [e]nsured its independence from Mongolian domestic politics." Ex. 9 (Sugar Decl.) ¶ 10.

16.    Dr. Sugar explained that throughout Mr. Batbold's tenure as Prime Minister, EMC's "board did not report to the Prime Minister" and that Mr. Batbold "had no involvement in the semi-annual meetings of the" board.  Ex. 9 (Sugar Decl.) ¶ 8.

17.    Dr. Sugar explained that as Prime Minister, Mr. Batbold "had no input on day-to-day operations" at EMC and had "the least involvement in SPC issues of any Prime Minister [Dr. Sugar] served with when [he] was Chair of the SPC."  Ex. 9 (Sugar Decl.) ¶ 16.

18.    Dr. Sugar stated that Mr. Batbold never asked him "to appoint specific people or take any action regarding any particular state-owned company, including EMC."  Ex. 9 (Sugar Decl.) ¶ 16.

3

**The Role of EMC's General Director**

19.     EMC's chief executive was the General Director.  Ex. 7 (Otgonbayar Decl.) ¶ 12; Ex. 10 (Ganzorig Decl.) ¶ 10; Ex. 12 (Oyuntsetseg Decl.) ¶ 4.

20.     The SPC was responsible for nominating Mongolia's candidate for General Director.  Ex. 9 (Sugar Decl.) ¶ 6; Ex. 14 (Khurelbaatar Decl.) ¶ 9.

21.     Former EMC General Director Chimeddorj Ganzorig explained that "General Director nominees [] must pass an extensive vetting and approval process that involves many individuals at EMC and in the Mongolian and Russian governments."  Ex 10 (Ganzorig Decl.) ¶ 13.

22.     After this vetting process, the joint Mongolian-Russian board of directors then voted to approve the General Director nominee.  Ex. 10 (Ganzorig Decl.) ¶ 9.

23.     Because the Board was evenly split between Mongolian and Russian representatives, "both countries and their designees had to agree to all major decisions, including appointment of management."  Ex. 10 (Ganzorig Decl.) ¶ 8.

24.     "The even division of the board and agreement to appoint to management both Russian and Mongolian nationals ensured that neither country's representatives could act without the approval and oversight of the other's representatives."  Ex. 10 (Ganzorig Decl.) ¶ 9.

25.     EMC's Board also had the power to remove the General Director.  Ex. 5 (Dashdorj Decl.) ¶ 10.

26.     Khalzkhuu Narankhuu was the General Director of EMC from 2000 to 2007.  Ex. 8 (Narankhuu Decl.) ¶ 2.

27.     Mr. Narankhuu stated that "[t]he General Director was a powerful and coveted position."  Ex. 8 (Narankhuu Decl.) ¶ 12; *see also* Ex. 9 (Sugar Decl.) ¶ 7 (the General Director of EMC was "a very important person in Mongolian society").

4

28. Mr. Narankhuu stated that during his term as General Director, he was considered "the fourth most powerful person" in Mongolia "after the President, Speaker of Parliament, and Prime Minister." Ex. 8 (Narankhuu Decl.) ¶ 12.

29. Former Mongolian Minister of Natural Resources and Energy Zorigt Dashdorj stated the General Director was "as powerful or even more powerful than any politician in the country." Ex. 5 (Dashdorj Decl.) ¶ 11.

30. Chimeddorj Ganzorig served as EMC General Director from December 2007 until his retirement in 2013. Ex. 10 (Ganzorig Decl.) ¶ 1.

31. Mr. Ganzorig was appointed as EMC General Director before Mr. Batbold became Prime Minister. Ex. 10 (Ganzorig Decl.) ¶ 15.

32. Mr. Batbold had no involvement in Mr. Ganzorig's appointment as EMC General Director. Ex. 10 (Ganzorig Decl.) ¶ 15; Ex. 14 (Khurelbaatar Decl.) ¶ 11; Ex. 4 (Bold Decl.) ¶ 13.

33. Mr. Ganzorig explained that, as chief executive of EMC, the General Director was "uniquely insulated" from Mongolia's politics and able to "operate[] independently from Mongolian government and domestic politics." Ex. 10 (Ganzorig Decl.) ¶ 16; *accord* Ex. 7 (Otgonbayar Decl.) ¶ 7; Ex. 8 (Narankhuu Decl.) ¶¶ 13-15; Ex. 9 (Sugar Decl.) ¶ 8.

34. Mr. Ganzorig explained that he was nominated to become EMC General Director by the SPC in 2007 after undergoing the extensive vetting process required of General Director candidates. Ex. 10 (Ganzorig Decl.) ¶¶ 13-14.

35. Mr. Ganzorig explained that after he was nominated, EMC's "board decided that [he] was the best candidate for the role and appointed [him] as General Director for a four-year term." Ex. 10 (Ganzorig Decl.) ¶ 14.

36. Mr. Ganzorig stated that when his four-year term finished in 2011, the SPC chose

5

to re-nominate him as General Director, and the board approved his nomination by unanimous consent.  Ex. 10 (Ganzorig Decl.) ¶ 14.

37.    Mr. Ganzorig stated that Mr. Batbold "had no involvement whatsoever in [his] reappointment."  Ex. 10 (Ganzorig Decl.) ¶ 15.

38.    Dr. Sugar, the Chairman of the SPC at the time Mr. Ganzorig was reappointed, confirmed that Mr. Batbold "had no involvement in Mr. Ganzorig's reappointment."  Ex. 9 (Sugar Decl.) ¶ 15.

39.    Mr. Ganzorig, stated that "Mr. Batbold never spoke to me about EMC's business at all, including its contracting," and "did not, either himself or through anyone else, influence me or EMC to grant specific contracts to anyone."  Ex. 10 (Ganzorig Decl.) ¶ 17.

40.    Mr. Ganzorig stated that "[a]t no time was [he] asked to act corruptly or inappropriately by any Prime Minister … including Mr. Batbold."  Ex. 10 (Ganzorig Decl.) ¶ 17.

**EMC's Contracting Process**

41.    One of the responsibilities of EMC's General Director was to review and approve "all contracts" EMC signed, including copper contracts.  Ex. 8 (Narankhuu Decl.) ¶ 9.

42.    The General Director was supported by a Commercial Director, who was responsible for, among other things, negotiating copper concentrate sale agreements.  Ex. 13 (Damba-Ochir Decl.) ¶¶ 4, 6; *see also* Ex. 12 (Oyuntsetseg Decl.) ¶¶ 2-4, 6; Ex. 10 (Ganzorig Decl.) ¶ 27.

43.    The Commercial Director of EMC from 2008-2011 was Khorloo Oyuntsetseg.  Ex. 12 (Oyuntsetseg Decl.) ¶ 2.

44.    Ms. Oyuntsetseg became EMC's Commercial Director in 2008, before Mr. Batbold became Prime Minister in 2009.  Ex. 12 (Oyuntsetseg Decl.) ¶ 2; *see* Compl. ¶ 18; PFAC ¶ 18.

6

45.     Ms. Oyuntsetseg stated that during her time as Commercial Director she never received a "request either directly from Mr. Batbold or any intermediary of his in any written or oral form asking to award trading contracts to any company." Ex. 12 (Oyuntsetseg Decl.) ¶ 7.

46.     Ms. Oyuntsetseg stated she was not "aware of [any] interference whatsoever by Mr. Batbold into any of EMC's operations during the time he was Prime Minister or otherwise." Ex. 12 (Oyuntsetseg Decl.) ¶ 7.

47.     Ms. Oyuntsetseg explained that EMC "conducted due diligence for all buyers." Ex. 12 (Oyuntsetseg Decl.) ¶ 4.

48.     Mr. Ganzorig stated that "EMC vetted all new counterparties extensively when [he] was General Director." Ex. 10 (Ganzorig Decl.) ¶ 20.

49.     Ms. Oyuntsetseg stated that EMC's board "would ask about new trading partners when EMC entered into contracts with these parties to understand the diligence the company had undertaken." Ex. 12 (Oyuntsetseg Decl.) ¶ 6.

50.     Ms. Oyuntsetseg stated that EMC's contract terms were negotiated "in [EMC]'s best interest." Ex. 12 (Oyuntsetseg Decl.) ¶ 4.

51.     Ms. Oyuntsetseg stated that the price of EMC's copper was "determined by the prices set on the London Metal Exchange." Ex. 12 (Oyuntsetseg Decl.) ¶ 3.

52.     Ms. Oyuntsetseg stated that "EMC used standardized long-term copper contracts that are typical of copper mines around the world." Ex. 12 (Oyuntsetseg Decl.) ¶ 3; Ex. 10 (Ganzorig Decl.) ¶ 22.

53.     Ms. Oyuntsetseg stated that EMC contracts were reviewed by the Commercial Department, along with multiple other divisions of EMC, before they were reviewed by the General Director himself. Ex. 12 (Oyuntsetseg Decl.) ¶ 4.

54.    Ms. Oyuntsetseg also stated that EMC's contracts "underwent extensive annual auditing from international companies such as KPMG and Ernst & Young." Ex. 12 (Oyuntsetseg Decl.) ¶ 4.

55.    Dorjdamba Damba-Ochir—the head of EMC's Commercial Department from 2000-2004—stated that "banks such as UBS, Barclays, and Goldman Sachs would conduct due diligence on EMC" and as part of this process "would discern whether EMC's contracts were standard, whether shipments were delivered on time, and whether EMC and its guarantors were participating in fair contracting." Ex. 13 (Damba-Ochir Decl.) ¶¶ 2, 8.

56.    Dr. Sugar stated EMC was audited by Russian and Mongolian auditing firms twice a year. Ex. 9 (Sugar Decl.) ¶ 9.

57.    Dr. Sugar described these audits as "extensive," noting that "their purpose was to identify anything improper in the accounting to assure the Russian and Mongolian sides that the business was being well-run, transparent, and insulated from political interference." Ex. 9 (Sugar Decl.) ¶ 9.

58.    Ms. Oyuntsetseg confirmed "EMC's annual financial reports … were audited by international auditing firms as well as by Mongolian and Russian auditing firms." Ex. 12 (Oyuntsetseg Decl.) ¶ 6.

59.    Mr. Narankhuu stated that EMC's "intergovernmental auditing was [] quite comprehensive, which prevented anyone from attempting to secure a non-standard contract." Ex. 8 (Narankhuu Decl.) ¶ 19.

**The Role of Prime Minister Batbold**

60.    William Bikales—a Harvard-trained economist who has worked in Mongolia and studied in Mongolian politics and history—stated that "under Mongolia's constitution, the Prime

8

Minister does not have formal legal authority over the country's natural resources" and "no Prime Minister would have been able to wield effective control over EMC as a matter of practical political reality." Ex. 1 (Bikales Decl.) ¶¶ 5-6, 8, 56.

61. Former EMC General Director Narankhuu stated that "the Prime Minister had no role in EMC's operations." Ex. 8 (Narankhuu Decl.) ¶ 13.

62. Former Natural Resources Minister Dashdorj stated that "EMC operated independently of the Mongolian government" and under the Mongolian system the Prime Minister was "not permitted to interfere in the internal management of EMC." Ex. 5 (Dashdorj Decl.) ¶ 10.

63. Mr. Dashdorj stated the Prime Minister "did not have the power to appoint or remove the General Director or any other [EMC] officer" and had "no legal control over the day-to-day operations of EMC." Ex. 5 (Dashdorj Decl.) ¶ 10.

64. Ambassador Otgonbayar stated that "[d]ue to the layered structure of the EMC appointment and management process, EMC was insulated from day-to-day political influence … the Prime Minister did not and could not dictate the operations of EMC given both the purposeful separation of powers and independence of the General Director and given the involvement of Russian interest[s] who were monitoring and required to approve EMC's actions." Ex. 7 (Otgonbayar Decl.) ¶ 7.

65. Mr. Otgonbayar stated that "EMC and its internal decision-making processes operated without interference from the Prime Minister's office during the tenures of Prime Minister Batbold and General Director Ganzorig in their respective positions." Ex. 7 (Otgonbayar Decl.) ¶ 18.

66. Mr. Otgonbayar stated that "EMC was structured such that decision-making power was shared by both governments and across several key individuals" which "created a

9

sophisticated system of checks and balances that … made it highly unlikely that a Prime Minister such as Mr. Batbold could become involved in EMC's operations or contracting process, let alone exercise authority over its General Director." Ex. 7 (Otgonbayar Decl.) ¶ 16.

67.     Former Cabinet Secretariat Chimed Khurelbaatar—who also served as a member of Parliament, Minister of Fuel and Energy, Minister of Finance, Deputy Prime Minister, and Minster of Economics across multiple administrations—explained that "Mr. Batbold held little, if any, power over EMC during his tenure" and did not "have any political influence over EMC's management." Ex. 14 (Khurelbaatar Decl.) ¶¶ 3, 15-16; *see also* Ex. 10 (Ganzorig Decl.) ¶ 18 ("It is not a secret that Mr. Batbold and I did not have a good personal or working relationship while I served as General Director … Mr. Batbold did not and would not have asked me for any favors during my time as General Director, and I did not and would not have granted him any favors had he done so."); Ex. 4 (Bold Decl.) ¶ 14 ("Although members of the same political party, Mr. Batbold and Mr. Ganzorig belonged to different factions.  They did not have a good working relationship. They would not do each other any favors."); Ex. 5 (Dashdorj Decl.) ¶ 12 ("They had a notoriously tense relationship—at one point, Mr. Batbold even refused to allow Mr. Ganzorig to run for Parliament on the party's slate, largely ending Mr. Ganzorig's political career."); Ex. 7 (Otgonbayar Decl.) ¶ 15.

68.     Former Director of the General Intelligence Service Dr. Ravdan Bold explained that "at the time Mr. Batbold served as Mongolian Prime Minister, the Prime Minister could not control EMC." Ex. 4 (Bold Decl.) ¶¶ 3, 12.

69.     Dr. Bold explained that as Prime Minister, Mr. Batbold had neither "formal authority to control or direct EMC's actions," nor did he "have any informal influence over EMC leadership." Ex. 4 (Bold Decl.) ¶¶ 12-13.

10

70.     Dr. Bold stated that "if Mr. Batbold was meeting with Mr. Ganzorig or attempting [to] direct EMC activities, [Dr. Bold] would have known about it" given the General Intelligence Service's "close attention" to EMC.  Ex. 4 (Bold Decl.) ¶ 17.

71.     Brigadier General Rinchindorj Chingis—who served as head of the economic crimes division of the national police between 2007-2012—stated that any "rumors" that Mr. Batbold engaged in corruption related to EMC were "untrue and unsupported by any credible evidence" and that "[n]o investigation into any rumor about Mr. Batbold yielded any evidence of wrongdoing but rather confirmed that Mr. Batbold consistently acted within the requirements of the law."  Ex. 16 (Chingis Decl.) ¶¶ 6, 10.

**II.     Choo Young Cheong is an experienced metals trader who established a relationship with both EMC and Ocean Partners before Mr. Batbold became Prime Minister.**

72.     Choo Young Cheong is a South Korean businessman and metal trader.  Ex. 19 (Second Cheong Affidavit) ¶¶ 6, 12; Ex. 18 (Chulunbaatar Decl.) ¶ 10; Ex. 3 (Javzmaa Decl.) ¶ 4.

73.     From 1987 to 2007, Mr. Cheong worked at Samsung, including as the head of its metals trading team in Mongolia.  Ex. 19 ¶ 11; Ex. 8 (Narankhuu Decl.) ¶ 16; Ex. 10 (Ganzorig Decl.) ¶ 23.

74.     While working in Mongolia, Mr. Cheong managed Samsung's interest in a copper joint venture with EMC called Erdsam Co., Ltd.  Ex. 19 ¶ 11; Ex. 22 (Third Cheong Affidavit) ¶ 17; Ex. 8 (Narankhuu Decl.) ¶ 16; Ex. 10 (Ganzorig Decl.) ¶ 23.

75.     Baz Chulunbaatar is the President and Chairman of Monnis International LLC, a Mongolian conglomerate with portfolio companies in the mining sector.  Ex. 18 (Chulunbaatar Decl.) ¶ 1.

76.     Mr. Chulunbaatar stated that he first "met Mr. Cheong in or around 1998" and that at that time "Mr. Cheong already had extensive experience in the mining industry."  Ex. 18

11

(Chulunbaatar Decl.) ¶ 10.

77.     Mr. Chulunbaatar stated that his "understanding is that Mr. Cheong handled, among other things, all of Samsung's mining related work," and that given this role, "Mr. Cheong became known throughout the Mongolian mining and broader business communities."   Ex. 18 (Chulunbaatar Decl.)  ¶ 10.

78.     Mr. Chulunbaatar stated that "[i]n [his] experience, Mr. Cheong is a reliable partner with deep knowledge and experience in mining and a strong reputation as a successful businessman in Mongolia."  Ex. 18 (Chulunbaatar Decl.) ¶ 11.

79.     Genin Tumurkhuyag, the CEO of Altai Holdings LLC from 2004 to 2011, stated that he first met Mr. Cheong while working at the Mongolian Bank in the late 1990s.  Ex. 2 (Tumurkhuyag Decl.) ¶¶ 4, 8.

80.     Mr. Tumurkhuyag stated that Mr. Cheong "was a prominent foreign businessman in Mongolia—a rarity in a very nascent economy that had few foreigners investing, let alone living in, Mongolia."  Ex. 2 (Tumurkhuyag Decl.) ¶ 8.

81.     Mr. Tumurkhuyag stated that Mr. Cheong had "a reputation for being a successful, wealthy businessman" and "was well connected among government and business leadership" in Mongolia.  Ex. 2 (Tumurkhuyag Decl.) ¶ 8.

82.     Former Director of the General Intelligence Service Dr. Bold stated that Mr. Cheong was a "well-known and successful international businessman and copper trader."  Ex. 4 (Bold Decl.) ¶¶ 2, 11.

83.     Amarbat Gombosuren—head of EMC's Commercial Department in 2010—stated that "Mr. Cheong has great experience in the copper concentrate market" and "has great experience working with Erdenet in particular."  Ex. 76 (*Lidex v. EMC* Arbitration Trans.) at 3, 6-7.

12

84.     Ganbat Dangaa was EMC's Commercial Director in 2007.  *See* Ex. 75 (*Lidex v. EMC* Arbitral Award) at 3-4; Ex. 76 (*Lidex v. EMC* Arbitration Trans.) at 13-14.

85.     Mr. Dangaa stated that Mr. Cheong was "someone with great experience in the copper concentrate market." Ex. 76 (*Lidex v. EMC*, Trans. Excerpts) at 12.

86.     Mr. Cheong has affirmed that he and his wife "were never and are not proxies for [Mr.] Batbold … and do not hold any property on behalf of [Mr.] Batbold."  Ex. 19 ¶ 17.

### III.     Mr. Cheong begins contracting directly with EMC through his own metals trading firm, Lidex Ltd.

87.     In 2007, Mr. Cheong left his employment at Samsung.  Ex. 19 ¶ 11; Ex. 10 (Ganzorig Decl.) ¶ 24.

88.     In 2007, Mr. Cheong established his own metals trading firm, Lidex Ltd.  Ex. 8 (Narankhuu Decl.) ¶¶ 17-18; Ex. 10 (Ganzorig Decl.) ¶ 24.

89.     On March 22, 2007, Lidex signed its first contract with EMC.  Ex. 20  (First Lidex-EMC Contract).

90.     EMC's General Director at the time, Mr. Narankhuu, viewed Mr. Cheong "as an established and reliable partner from his prior work with Samsung and one who could procure necessary financing or funding to purchase copper from EMC."  Ex. 8 (Narankhuu Decl.) ¶ 18.

91.     Mr. Ganzorig, the General Director of EMC after Mr. Narankhuu, stated that his "understanding [is] that EMC performed the same due diligence on Lidex that it did on all other trading partners" and that "[n]o contract would have been granted to Lidex without a thorough review and confidence that Lidex could uphold its obligations." Ex. 10 (Ganzorig Decl.) ¶¶ 1, 24.

92.     General Director Ganzorig stated that "Mr. Batbold was not Prime Minister when Lidex was granted its contracts with EMC, and [Ganzorig] ha[s] no reason to believe [Batbold] had any involvement in Lidex securing contracts with EMC." Ex. 10 (Ganzorig Decl.) ¶ 24.

13

93.    Historically, Erdenet Mining Corporation sold its copper concentrates to established commodities trading firms, which arranged for financing with commercial banks, shipped and stored the copper concentrates, and then resold the copper concentrates on the market. *See* Compl. ¶ 21; PFAC ¶ 21; *see also* Ex. 10 (Ganzorig Decl.) ¶¶ 19-20.

94.    Mr. Cheong received financing for Lidex's March 2007 contract through a company called Ocean Partners U.K. Limited ("Ocean Partners").  Ex. 25 (First Lidex-Ocean Partners Contract).

95.    On April 13, 2007, Ocean Partners and Lidex signed an agreement.  Ex. 25 (First Lidex-Ocean Partners Contract).

96.    The first Lidex-Ocean Partners contract required Ocean Partners to finance the March 2007 Lidex-EMC contract in exchange for the right to purchase 5,000 Wet Metric Tons ("WMT") of copper at prices set by the London Metal Exchange.  Ex. 25 at §§ 3, 8.1.

97.    EMC signed a second contract with Lidex on November 14, 2007.  Ex. 21 (Second Lidex-EMC Contract).

98.    On January 9, 2008, Ocean Partners signed an agreement to finance Lidex's second contract with EMC.  Ex. 26 (Second Lidex-Ocean Partners Contract).

99.    Lidex commenced an arbitration against EMC related to the terms of the Second Lidex-EMC contract.  Ex. 10 (Ganzorig Decl.) ¶ 25; Ex. 75

100.    Lidex lost the arbitration in 2010.  Ex. 75  at 3.

101.    The second contract between Lidex and EMC was terminated after Lidex lost the arbitration.  *See* Ex. 10 (Ganzorig Decl.) ¶ 25.

102.    In January 2011, Lidex and EMC executed a third copper concentrate contract.  Ex. 63.

14

103.    This January 2011 contract bore the Contract Number E-2011/01-Cu.  Ex. 63 at 3.

**IV.    Mr. Cheong continues to contract with both EMC and Ocean partners through a new entity called Catrison.**

104.    In 2011, Mr. Cheong and his wife, Dr. Kim, founded a new company called Catrison, Ltd. ("Catrison").  Compl. ¶ 22; PFAC ¶ 22; Ex. 19 ¶ 13.

105.    The General Director of EMC at the time of Catrison's founding was Mr. Ganzorig. Ex. 10 (Ganzorig Decl.) ¶¶ 4, 27.

106.    Mr. Ganzorig stated that he "along with [his] colleagues at EMC, viewed Catrison as a continuation of Mr. Cheong's Lidex business" and "an effort by Mr. Cheong to continue his long-standing business relationship with EMC" following the Lidex arbitration.  Ex. 10 (Ganzorig Decl.) ¶¶ 25-27.

107.    Mr. Ganzorig stated that he and "[his] team …viewed Mr. Cheong—regardless of the name of his formal business entity—as a reliable partner," and "were therefore comfortable to continue our business relationship by granting Catrison copper contracts."  Ex. 10 (Ganzorig Decl.) ¶ 27.

108.    Mr. Ganzorig stated that EMC's "[C]ommercial [D]irector negotiated the terms of the new agreement with Mr. Cheong" which Mr. Ganzorig "reviewed and ultimately approved." Ex. 10 (Ganzorig Decl.) ¶ 27.

109.    On February 14, 2011, Catrison entered into a copper concentrate contract with EMC.  Ex. 23 (February 2011 Catrison-EMC Contract); *see also* Compl. ¶ 23; PFAC ¶ 23.

110.    This February 2011 Catrison-EMC contract was assigned the same contract number as the January 2011 Lidex-EMC contract:  E-2011/01-Cu.  *Compare* Ex. 23 at 2 *with* Ex. 63 at 3.

15

111.    And both contracts called for the same quantity of copper to be delivered under the: "150,000 WMT plus or minus 10%" with the "Seller's option." *Compare* Ex. 21 § 3, *with* Ex. 23 at § 3.1.

112.    The quantity of copper concentrate required to be delivered under the February 2011 Catrison-EMC Contract and the November 2007 Second Lidex-EMC Contract was the same: "150,000 WMT plus or minus 10%" with the "Seller's option." *Compare* Ex. 21 at § 3, *with* Ex. 23 at § 3.1.

113.    EMC's sales department has stated in writing that "[t]he commercial terms of the … contracts concluded with … Catrison Limited were the same as the terms under which concentrate was supplied to other purchasing companies during the relevant year." Ex. 55 (Letter from EMC Director of Export Sales to EMC Legal Director) at 4.

114.    Mr. Ganzorig stated that "Catrison received the same terms as other traders, and its prices were pegged to the internationally established and controlled LME rates." Ex. 10 (Ganzorig Decl.) ¶ 27.

115.    Mr. Ganzorig stated that "the terms of Catrison's contract were profitable and beneficial to EMC" and "Catrison received no special treatment from EMC." Ex. 10 (Ganzorig Decl.) ¶ 27.

116.    Mr. Ganzorig stated that "at no time was Mr. Batbold … involved in EMC's decision to grant contracts to Catrison or any other of EMC's trading partners." Ex. 10 (Ganzorig Decl.) ¶ 28.

117.    Ms. Oyuntsetseg stated she was likewise "aware of no interference whatsoever by Mr. Batbold into any of EMC's operations during the time he was Prime Minister or otherwise." Ex. 12 (Oyuntsetseg Decl.) ¶ 7.

16

118.    On March 2, 2011, Ocean Partners agreed to finance Catrison's February 2011 contract with EMC in exchange for 30% of the profits from the sale of Catrison's copper. Ex. 27 (First Catrison-Ocean Partners Contract) § 11.1; Compl. ¶ 24 (noting under this arrangement Catrison received 70% of the profits, and Ocean Partners received 30% of the profits); PFAC ¶ 23, 25 (same); PFAC ¶ 28 ("the Catrison-Ocean Partners Contract '[i]n practice […] means that [Ocean Partners] effectively have two contracts from Erdenet.'" (alterations in original)).

119.    On December 14, 2011, Catrison entered into a second copper concentrate contract with EMC. Ex. 24 (December 2011 Catrison-EMC Contract); PFAC ¶ 24.

120.    On June 21, 2012, Ocean Partners and Catrison entered into a supplemental agreement which amended the first Catrison-Ocean Partners Contract and extended it to apply to the December 2011 second Catrison-EMC Contract. *Compare* Ex. 28 (Catrison-Ocean Partners Supplemental Agreement), *with* Ex. 27; *see also* PFAC ¶ 24.

## V.    A Mongolian court determines that the allegations of corruption raised against Mr. Batbold are "not true."

121.    In May 2022, Mr. Batbold filed a defamation action in Mongolia against three entities, including EMC and the SPC, as well as a media company. Ex. 17 (Mongolian Defamation Opinion) at 2, 40-42; Ex. 67 (Z. Sukhbaatar Decl.) ¶ 14.

122.    Mr. Batbold sought a retraction of two news stories stating that he "signed contracts with … Catrison Limited" which were "not beneficial for the country" and that he made a "large amount of hidden profit." Ex. 17 at 40.

123.    An in-person trial was held before a three-judge panel on Mongolia's Civil Court Order of First Instance. Ex. 17 at 2.

124.    All parties, including EMC and the SPC, were represented by counsel and had the opportunity to put forward evidence. Ex. 17 at 3.

17

125.    At the end of the trial in October 2022, the panel issued a unanimous opinion in Mr. Batbold's favor after finding that the corruption allegations were "not true."  Ex. 17 at 42; *see* Ex. 67 (Z. Sukhbaatar Decl.) ¶ 16.

126.    The Court held that the contracts between EMC and Catrison were "in accordance with the standards established by [EMC]."  Ex. 17 at 42.

127.    The Court found "no evidence" to support statements that "Batbold had personally influenced [EMC] to sign the contracts with foreign companies"—including Catrison—and "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]"  Ex. 17 at 42; *see* Ex. 67 (Z. Sukhbaatar Decl.) ¶¶ 17, 18, 20.

128.    The Court cited a letter from EMC confirming that "[Mr.]  Batbold exerted no influence on [EMC] to have it sign contracts with [Catrison], that the contracts did not violate any laws and regulations and that [EMC] did not incur any losses as a result of these contracts."  Ex. 17 at 8 (citing Ex. 55 (Letter from EMC Director of Export Sales to EMC Legal Director)).

129.    The Court ruled in Mr. Batbold's favor and ordered the news organization to retract the false and defamatory news stories.  Ex. 17 at 51; Ex. 67 (Z. Sukhbaatar Decl.) ¶ 21.

Dated: New York, New York
    April 9, 2026

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Orin Snyder*
        Orin Snyder
        Lee R. Crain
        Sam Raymond
        Trevor Bondy Gopnik
        200 Park Avenue
        New York, NY 10166
        Telephone: (212) 351-2400
        osnyder@gibsondunn.com
        lcrain@gibsondunn.com
        sraymond@gibsondunn.com

18

tgopnik@gibsondunn.com

Stephanie Brooker*
Helgi C. Walker*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 887-3502
sbrooker@gibsondunn.com
hwalker@gibsondunn.com

* *pro hac vice* forthcoming

*Attorneys for Intervenor Sukhbaatar Batbold*

19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP., *et al.*,

               Defendants *in rem*.

---

Case No. 24-cv-2147 (RPK) (JAM)

## DECLARATION OF LEE R. CRAIN

I, Lee R. Crain, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a member of the bar of this Court and a partner of the law firm of Gibson, Dunn & Crutcher LLP, counsel to Proposed Intervenor Sukhbaatar Batbold.  I am personally familiar with the facts set forth in this Declaration and, if called, could testify competently thereto.

2.      I submit this declaration in support of Mr. Batbold's Memorandum of Law in Support of his Motion for Summary Judgment.

**I.      Gibson Dunn represented Mr. Batbold in global litigation between 2020–2023.**

3.      Gibson Dunn began representing Mr. Batbold in 2020 when he was sued in a series of lawsuits in Mongolia, the United Kingdom, Jersey, Hong Kong, Singapore, New York, and later, in the British Virgin Islands, purportedly by two Mongolian state-owned mining companies—the Erdenet Mining Corporation ("EMC") and Erdenes Oyu Tolgoi LLC—and the Mongolian state agency overseeing those mining companies—the Agency for Policy Coordination on State

1

Property (together the "Purported Plaintiffs").[1]  *See* Ex. 30 (Mongolia); Ex. 31 (United Kingdom); Ex. 32 (Jersey); Ex. 33 (Hong Kong); Ex. 34 (Singapore); Ex. 35 (New York State Supreme Court); Ex. 59 (British Virgin Islands).  King & Spalding LLP (or local counsel it instructed) served as global coordinating counsel for the Purported Plaintiffs in these lawsuits.

4.      The first lawsuit was filed in Mongolia under seal on October 14, 2020 and alleged that Mr. Batbold improperly diverted contracts from the state-owned mining companies to certain "proxies," including Claimant Dr. Hak Seon Kim and her husband Choo Young Cheong.  *See* Ex. 30.  That lawsuit alleged that these "proxies" used the proceeds from those mining contracts for their and Mr. Batbold's benefit.  *Id.* at 4-8.  It demanded $250 million in damages.  *Id.* at 17.  The suit was filed by a low-level municipal prosecutor who did not have the authority to initiate a civil suit.  Ex. 67 at ¶¶ 6, 12.

5.      Lawsuits in New York, the United Kingdom, Hong Kong, Singapore, and Jersey followed shortly thereafter, alleging the same purported corruption narrative.  *See* Exs. 31-35; *see also* Ex. 56.  Each case sought *ex parte* orders seeking to freeze and attach property around the world, purportedly to satisfy the $250 million claim in Mongolia.[2]  The property to be frozen included apartments at 21 East 61st Street, Apt. 12E, New York, NY 10065 and 230 West 56th Street, Apt. 58D, New York, NY 10019 (the "NY Apartments").  The primary evidentiary support for each lawsuit was a lengthy, but conclusory, affidavit prepared by the private investigative firm K2 Intelligence and its founder, Jules Kroll (the "Kroll Dossier").  *See* Ex. 62.

---

[1] *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. 101/SHZ2020/20219 (Mong. Civ. Ct. First Instance); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* [2020] No. CL-2020-000757 EWHC (Comm.) (Eng.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* (No. 2020/192) (Jersey, Royal Ct.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar* [2020] No. 2153/2020 (Hong Kong, C.F.I.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. 1145/2020 (Singapore, High Ct.); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, Index No. 656507/2020 (N.Y. Sup. Ct. filed Nov. 23, 2020); *Agency for Pol'y Coordination on State Prop. v. Batbold Sukhbaatar*, No. BVIHCM2021/0224, (Brit. Virgin Is., E. Caribbean Sup. Ct.).

[2] The plaintiffs later filed another identical lawsuit in the British Virgin Islands.  Ex. 59.

6.      Within days after these lawsuits were filed, the three Mongolian "plaintiffs," including EMC, confirmed in writing that they never authorized King & Spalding (or any other firm) to bring the lawsuits against Mr. Batbold.  Attached hereto as Exhibits 36, 37, and 38 are true and correct copies of those written statements.

7.      On December 2, 2020, I presented argument before Justice Barry Ostrager of the New York Supreme Court on Mr. Batbold's application to vacate an *ex parte* temporary restraining order that had been entered against him the day before Thanksgiving 2020.  During oral argument, I explained to the Court that Mr. Batbold had received evidence demonstrating King & Spalding's clients had not actually authorized any of the cases it or its local counsel had filed around the world.  *See* Ex. 65 at 4:25-5:6, 15:17-24.  In response, King & Spalding for the first time argued it did not directly represent the three named plaintiffs in whose name the suit was brought, but rather the entire "State of Mongolia."  *Id.* at 27:14-24, 29:6-11.  The New York court rejected this fluid narrative, vacated the *ex parte* TRO, and ordered a full evidentiary hearing.  *See* Ex. 68 at 2-3.  Following that order, King & Spalding promptly withdrew the New York Supreme Court case.  *See* Ex. 53.

8.      Gibson Dunn also represented Mr. Batbold in a separate 28 U.S.C. § 1782 proceeding King & Spalding filed in the Southern District of New York.  In that proceeding, King & Spalding claimed it was authorized by the Mongolian Office of the Prosecutor General to act on behalf of the three Purported Plaintiffs.  *See In re Ex Parte Application of Agency for Pol'y Coordination on State Prop. Pursuant to 28 U.S.C. § 1782*, No. 21-mc-00178 (S.D.N.Y.); *see also* Ex. 71 at 2.  Gibson Dunn debunked that claim too, presenting to the Court evidence from the Deputy Prosecutor General of Mongolia himself, who stated in writing that the Office of the Prosecutor General, like the Purported Plaintiffs, had not authorized any case against Mr. Batbold.

3

*See* Ex. 66.  In that correspondence, the Deputy Prosecutor General specifically stated that any authority King & Spalding thought it had was "null and void, thus invalid." *Id.* at 3.  The Deputy Prosecutor General then, for avoidance of any doubt, "terminated" King & Spalding and directed the firm to withdraw all cases against Mr. Batbold.  *Id.*

9.    King & Spalding and its local counsel ultimately withdrew from all of the remaining global litigations against Mr. Batbold.  *See* Ex. 47 ¶ 2; Ex. 50; Ex. 72; Ex. 73; Ex. 74.  Contrary to the directives of its purported client, however, King & Spalding did not dismiss these cases against Mr. Batbold, which remained pending.

10.    In 2021, Gibson Dunn filed on Mr. Batbold's behalf a 28 U.S.C. § 1782 proceeding against K2 Intelligence a/k/a K2 Integrity in the Southern District of New York.  *In re Application of Sukhbaatar Batbold for an Ord. Pursuant to 28 U.S.C. § 1782*, No. 21-mc-218 (S.D.N.Y.); *see also* Ex. 39.  Following contentious motion practice, the Court granted multiple motions to compel K2 to produce discovery.  *See* Exs. 40, 41, 70.  The discovery K2 was compelled to produce revealed that K2 had been engaged and instructed by known associates of former Mongolian President Khaltmaagiin Battulga, an autocratic political opponent of Mr. Batbold.  *See* Ex. 43 at 7-8.  Those individuals included Battulga associates Otgonjargal Moyle and Ganbat Chuluunkhuu. *See* Ex. 42; Ex. 44.  Although K2 and King & Spalding had never disclosed to any court Moyle and Ganbat's involvement in the global litigation campaign against Mr. Batbold, K2's privilege log revealed hundreds of emails between K2, Moyle, and Ganbat as they developed the coordinated campaign to damage Mr. Batbold's public service career.  *See e.g.* Ex. 42 at 13. Discovery also revealed that K2 had secretly been promised a financial stake in the accusations it propagated, with its contract providing a success fee entitling the firm to up to $50 million.  *See* Ex. 48 at 7.

4

11.     By 2023, Mr. Batbold was finally able to present his findings around the world.  He won or secured dismissal of each suit, exposing that the lawsuits had never actually been authorized by those three state-owned entities named as plaintiffs, and that the lawsuits had been instigated and directed by Mr. Batbold's political opponents.  *See* Ex. 45 at 17 (Mongolia); Ex. 46 at 2-3 (Hong Kong); Ex. 47 ¶ 3 (Jersey); Ex. 49 (S.D.N.Y.); Ex. 51 (Singapore); Ex. 52 at 2 (British Virgin Islands).

12.     Alongside his defense of the lawsuits against him, Mr. Batbold also filed a defamation action in Mongolia to defend his reputation against the three purported plaintiffs in the civil litigation and a media company that published stories repeating the false corruption allegations.  *See* Ex. 17 at 2, 39-42.  Mr. Batbold, represented by Mongolian counsel, prevailed on the merits in a full and fair adversarial proceeding with the court finding that the allegations of corruption against Mr. Batbold were "not true."  *See id.* at 44.  The court held that the contracts between EMC and Mr. Cheong's companies, including Catrison, were "in accordance with the standards established by [EMC]."  *Id.* at 42.  And the Court found "no evidence" that "[Mr.] Batbold had personally influenced [EMC] to sign the contracts with foreign companies"— including Catrison—and "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]"  *Id.*

**II.     Gibson Dunn engages with the government following the filing of this lawsuit.**

13.     The Department of Justice filed the complaint in the above-captioned action on March 25, 2024 (the "Complaint"), soon before Mongolia's June 28, 2024 parliamentary elections in which Mr. Batbold was planning to run for reelection to serve his twentieth year in Parliament. *See* Ex. 6.

14.     On March 26, 2024, the day after the Complaint was filed, Gibson Dunn contacted

5

the prosecution team from the government on Mr. Batbold's behalf. On this call, Gibson Dunn expressed concern that the allegations in the Complaint were contradicted by the evidence already adduced in the prior wave of public litigation and that the allegations would likely interfere with Mr. Batbold's candidacy for Parliament and the integrity of the upcoming Mongolian election. Gibson Dunn also expressed concern that the government had not contacted our firm before filing, given that we had publicly served as counsel of record to Mr. Batbold in New York state court, the Southern District of New York, and in multiple jurisdictions around the world and could have addressed any questions the government had before it filed its Complaint. Gibson Dunn made clear Mr. Batbold intended to fully cooperate with any questions the government had in this matter. The government attorneys indicated on this call that they had not reviewed many of the most pertinent prior public filings and rulings we raised, including those available on public dockets in New York.

15.     On May 13, 2024, Gibson Dunn met with representatives of the government team in-person at the U.S. Attorney's Office for the Eastern District of New York. In a 128-page slide deck, supported by 86 documents totaling over 1,200 pages, Gibson Dunn presented documentary and testimonial evidence we understood the government had not previously considered that directly contradicted and disputed the key factual allegations in the Complaint. These materials included the publicly-filed evidence accumulated in our years of litigating the very corruption theory the government asserted in the Complaint, including (i) evidence gathered as part of Mr. Batbold's Section 1782 proceeding demonstrating that Mr. Batbold's political opponents instigated and directed the global litigation campaign against him; (ii) Mongolian corporate governance documents demonstrating that the copper-trading contracts the government alleges were procured through corruption were standard and market-based; and (iii) a Mongolian court decision that

6

found the same corruption theory in the government's own Complaint to be "not true," Ex. 17 at 44.

16.     The government again indicated at the May 13 meeting that it had not reviewed all of these publicly available documents, many of which were accessible on the dockets of New York's federal and state courts, and that it was likewise unaware that the Mongolian court had ruled on the merits that the same corruption theory advanced in the government's Complaint was "not true."

17.     Also at the May 13 meeting, Gibson Dunn informed the government that representatives of our firm would be traveling to Mongolia to conduct an on-the-ground fact investigation.  Gibson Dunn asked the government if it had any specific requests for information or if it would otherwise like to participate in Gibson Dunn's fact-finding trip.  The government did not substantively respond.

18.     From September 16, 2024 to September 26, 2024, I along with other Gibson Dunn attorneys conducted an in-person investigation in Mongolia.    During that investigation, Gibson Dunn attorneys interviewed dozens of individuals, including high-ranking current and former EMC officials, Mongolian public servants, members of Mongolia's law enforcement community, and members of Mongolia's business community.  We returned from this on-the-ground investigation with 17 sworn declarations made under penalty of perjury by critical witnesses, confirming that Mr. Batbold did not steer any of EMC's copper trading contracts, contrary to the Complaint's allegations in this case.  Gibson Dunn attorneys also reviewed over 10,000 documents.

19.     On November 25, 2024, Gibson Dunn presented the findings of its trip to the government in Washington, D.C.  Gibson Dunn's 276-page presentation was supported by over

7

150 documents totaling nearly 3,000 pages.  These documents included public filings from the global litigation campaign against Mr. Batbold, non-public contracts between the state-owned mining company at the center of this case, the 17 sworn declarations gathered in Mongolia, and an expert report by a Harvard-trained economist specializing in economic conditions in Mongolia. This presentation and the supporting documentation was produced to the government.

20.    On April 15, 2025, Gibson Dunn met with a different group of government attorneys and again presented the public record and recently gathered evidence.

21.    On February 13, 2026, two days before the government was due to oppose Claimants' motion to dismiss, EDNY requested a six-week adjournment "[d]ue to delays in obtaining source materials from Mongolian authorities" and because DOJ was in "the process of consulting" its own Mongolian law expert to evaluate and respond to Claimants' legal arguments. Dkt. No. 48.

22.    Gibson Dunn contacted the government again during this six-week adjournment by both phone and email and offered to cooperate further with DOJ to offer it any assistance with respect to the material it was seeking "from Mongolian authorities."  Gibson Dunn also notified the government of Mr. Batbold's intent to move to intervene.  DOJ declined to meet further, unless Gibson Dunn could provide "new information."  DOJ again did not provide any substantive engagement on the merits of this case or what, if any, questions or concerns it has.

23.    Gibson Dunn has repeatedly offered to provide additional information or answer any outstanding questions the government has.  The government has asked none.

**III.    Exhibits referenced in Mr. Batbold's Motion for Summary Judgment.**

24.    Attached as **Exhibit 1** is a true and correct copy of an Expert Report Declaration of William Bikales, dated January 4, 2026.

8

25. Attached as **Exhibit 2** is a true and correct copy of the Declaration of Genin Tumurkhuyag, CEO of Altai Holdings LLC from 2004 to 2011, dated November 8, 2024.

26. Attached as **Exhibit 3** is a true and correct copy of the Declaration of Lkhagvasuren Javzmaa, CEO of Altai Holdings LLC, dated November 4, 2024.

27. Attached as **Exhibit 4** is a true and correct copy of the Declaration of Ravdan Bold, Mongolian Ambassador to the United States from 2003 to 2007, and Director of the Mongolian General Intelligence Service between 2007 to 2012, dated September 21, 2024.

28. Attached as **Exhibit 5** is a true and correct copy of the Declaration of Zorigt Dashdorj, Mongolian Minister for Natural Resources and Energy from 2008 to 2012, dated October 22, 2024.

29. Attached as **Exhibit 6** is a true and correct copy of an article titled *Mongolia's Political Parties Showcase Candidates for the 2024 Parliamentary Election*, written by Bolor Lkhaajav, published by The Diplomat on May 22, 2024, available at https://thediplomat.com/2024/05/mongolias-political-parties-showcase-candidates-for-the-2024-parliamentary-election/.

30. Attached as **Exhibit 7** is a true and correct copy of the Declaration of Yondon Otgonbayar, former Ambassador of Mongolia to the United States, dated September 19, 2024.

31. Attached as **Exhibit 8** is a true and correct copy of the Declaration of Khalzkhuu Narankhuu, General Director of the Erdenet Mining Corporation from 2000 to 2007, dated October 9, 2024.

32. Attached as **Exhibit 9** is a true and correct copy of the Declaration of Dr. Gurtaij Dulamyn Sugar, Chairman of the State Property Committee from 2007 to 2012 and Justice of the Constitutional Court of Mongolia from 2012 to 2018, dated September 25, 2024.

9

33.     Attached as **Exhibit 10** is a true and correct copy of the Declaration of Chimeddorj Ganzorig, General Director of the Erdenet Mining Corporation from 2007 to 2013, dated September 26, 2024.

34.     Attached as **Exhibit 11** is a true and correct copy of the Declaration of Tsenddavaa Bayar-Erdene, head of the state-owned asset administration and coordination division at the State Property Committee from 2016 to present, dated September 27, 2024.

35.     Attached as **Exhibit 12** is a true and correct copy of the Declaration of Khorloo Oyuntsetseg, Commercial Director of the Erdenet Mining Corporation from 2008 to 2011, dated October 14, 2024.

36.     Attached as **Exhibit 13** is a true and correct copy of the Declaration of Dorjdamba Damba-Ochir, head of the Erdenet Mining Corporation's Commercial Department from 2000 to 2004 and member of Mongolia's Parliament from 2004 to 2020, dated September 25, 2024.

37.     Attached as **Exhibit 14** is a true and correct copy of the Declaration of Chimed Khurelbaatar, Chief Cabinet Secretariat from 2009 to 2012, and member of the Mongolian Parliament from 2008 to 2024, dated September 19, 2024.

38.     Attached as **Exhibit 15** is a true and correct copy, including the original and a certified translation, of an Intergovernmental Agreement between Mongolia and Russia related to the operation of Erdenet Uildver LLC, executed July 1, 2003.

39.     Attached as **Exhibit 16** is a true and correct copy of the Declaration of Brigadier General Rinchindorj Chingis, Chief of Staff of the Internal Troops (Mongolia's National Guard) as of September 27, 2024, and head of the economic crimes division of the Mongolian national police from 2007 to 2012, dated September 27, 2024.

40.     Attached as **Exhibit 17** is a true and correct copy of a certified translation of the

10

Opinion and Order filed in the Civil Court Order of First Instance, Chingeltei District, in *Batbold v. Blue News LLC*, No. 182/SHSH2022/03018, dated October 21, 2022.

41. Attached as **Exhibit 18** is a true and correct copy of the Declaration of Baz Chuluunbaatar, founder, President, and Chairman of Monnis International LLC, dated October 25, 2024.

42. Attached as **Exhibit 19** is a true and correct copy of the second affidavit submitted by Choo Young Cheong in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated January 5, 2021.

43. Attached as **Exhibit 20** is a true and correct copy of Contract No. E-2007/02-Cu between Lidex Holdings Ltd. and the Erdenet Mining Corporation, dated March 22, 2007.

44. Attached as **Exhibit 21** is a true and correct copy of Contract No. E-2008/01-Cu between Lidex Holdings Ltd. and the Erdenet Mining Corporation, dated November 14, 2007.

45. Attached as **Exhibit 22** is a true and correct copy of the third affidavit submitted by Choo Young Cheong in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated February 19, 2021.

46. Attached as **Exhibit 23** is a true and correct copy of Contract No. E-2011/01-Cu between Catrison Ltd. and the Erdenet Mining Corporation, dated February 14, 2011.

47. Attached as **Exhibit 24** is a true and correct copy of Contract No. E-2012/04-Cu between Catrison Ltd. and the Erdenet Mining Corporation, dated December 14, 2011.

48. Attached as **Exhibit 25** is a true and correct copy of Contract No. LIOP2007-A between Lidex Holdings Ltd. and Ocean Partners UK Ltd., dated April 13, 2007.

49. Attached as **Exhibit 26** is a true and correct copy of Contract No. LIOP2008-A between Lidex Holdings Ltd. and Ocean Partners UK Ltd., dated January 9, 2008.

11

50.     Attached as **Exhibit 27** is a true and correct copy of Contract No. CP-10860 between Catrison Ltd. and Ocean Partners UK Ltd., dated March 2, 2011.

51.     Attached as **Exhibit 28** is a true and correct copy of a Sale and Purchase Agreement and Supplemental Agreement between Catrison Ltd. and Ocean Partners UK Ltd., dated June 21, 2012.

52.     Attached as **Exhibit 29** is a true and correct copy of the curriculum vitae of Sukhbaatar Batbold.

53.     Attached as **Exhibit 30** is a true and correct copy of a certified translation of the Claim filed in the Civil Court of First Instance in Bayanzurkh District in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 101/SHZ2020/20219, dated October 14, 2020.

54.     Attached as **Exhibit 31** is a true and correct copy of the Claim and Skeleton Argument filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated November 18 and 16, 2020, respectively.

55.     Attached as **Exhibit 32** is a true and correct copy of the Summons and Skeleton Argument filed in the Royal Court of Jersey, Samedi Division, in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2020/192, dated November 24, 2020.

56.     Attached as **Exhibit 33** is a true and correct copy of the Originating Summons and Skeleton Argument filed in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated November 23, 2020.

57.     Attached as **Exhibit 34** is a true and correct copy of the Claim and Skeleton

12

Argument filed in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated November 26, 2020.

58.    Attached as **Exhibit 35** is a true and correct copy of the Summons and Complaint filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, dated November 23, 2020.

59.    Attached as **Exhibit 36** is a true and correct copy of a letter, including the original and a certified translation, from Erdenet Mining Corporation, signed KH. Badamsuren, dated November 27, 2020.

60.    Attached as **Exhibit 37** is a true and correct copy of a letter, including the original and a certified translation, from Erdenes Oyu Tolgoi LLC, signed TS. Tumentsogt, dated November 27, 2020.

61.    Attached as **Exhibit 38** is a true and correct copy of a letter, including the original and a certified translation, from the Government Agency for Policy Coordination on State Property, signed by Chairman B. Tsengel, dated November 27, 2020.

62.    Attached as **Exhibit 39** is a true and correct copy of Sukhbaatar Batbold's Memorandum of Law in Support of his *Ex Parte* Application for Judicial Assistance to Obtain Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 2, dated March 9, 2021.

63.    Attached as **Exhibit 40** is a true and correct copy of the Order Granting Application to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 53, dated October 6, 2021.

64. Attached as **Exhibit 41** is a true and correct copy of the Opinion and Order Affirming the Order Granting Application to Conduct Discovery filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 152, dated February 17, 2023.

65. Attached as **Exhibit 42** is a true and correct copy of K2's Privilege Log, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-18, dated July 15, 2022.

66. Attached as **Exhibit 43** is a true and correct copy of an October 31, 2017 Engagement Letter between K2 Intelligence, LLC, Foley Hoag LLP, and Otgonjargal Moyle filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-23, filed July 15, 2022.

67. Attached as **Exhibit 44** is a true and correct copy of a February 25, 2021 Email between Ganbat Chuluunkhuu and Jules Kroll, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-9, filed July 15, 2022.

68. Attached as **Exhibit 45** is a true and correct copy of the Order of Dismissal, including the original and a certified translation, filed in the Civil Court of First Instance in

14

Bayanzurkh District in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 101/SH32021/20096, dated November 18, 2021.

69.     Attached as **Exhibit 46** is a true and correct copy the Order Discharging Summons filed in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated October 13, 2022.

70.     Attached as **Exhibit 47** is a true and correct copy of the Judgment filed in the Royal Court of Jersey, Samedi Division, in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2020/192, dated March 29, 2023.

71.     Attached as **Exhibit 48** is a true and correct copy of a September 17, 2018 Engagement Letter between the General Prosecutor's Office of Mongolia and K2 Intelligence, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-5, filed July 15, 2022.

72.     Attached as **Exhibit 49** is a true and correct copy the Notice of Voluntary Dismissal Without Prejudice filed in the Southern District of New York in *In re Ex Parte Application of Agency for Policy Coordination on State Property Pursuant to 28 U.S.C. § 1782*, 21-mc-00178-VSB (S.D.N.Y.), ECF No. 32, dated April 1, 2022.

73.     Attached as **Exhibit 50** is a true and correct copy of the Order for a Declaration that a Solicitor Has Ceased to Act filed in the High Court of Justice, in the Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated July 8, 2022, filed on July 11, 2022 as an Exhibit to a Letter addressed

15

to Magistrate Judge Ona T. Wang from Orin Snyder filed in the Southern District of New York in

*In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-

RA-OTW (S.D.N.Y), ECF No. 120-1.

74.     Attached as **Exhibit 51** is a true and correct copy of the Order of Dismissal in the

High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v.*

*Batbold Sukhbaatar*, No. 1145/2020, dated February 8, 2023.

75.     Attached as **Exhibit 52** is a true and correct copy of the Judgment filed in the

Eastern Caribbean Supreme Court, British Virgin Islands Commercial Court in *Agency for Policy*

*Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated November 5,

2022 and entered November 9, 2022.

76.     Attached as **Exhibit 53** is a true and correct copy of the Plaintiffs' Notice of

Voluntary Discontinuance filed in the Supreme Court of New York, County of New York in *Agency*

*for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020,

NYSCEF No. 181, dated December 9, 2020.

77.     Attached as **Exhibit 54** is a true and correct copy of the Declaration of Delgermaa

S., attorney at Mongol Advocates Law Firm in Ulaanbaatar, Mongolia, dated February 11, 2026.

78.     Attached as **Exhibit 55** is a true and correct copy of a February 17, 2020 letter,

including the original and a certified translation, from the Erdenet Mining Corporation to KH.

Boldbaatar, filed in the Supreme Court of New York, County of New York in *Agency for Policy*

*Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 4,

filed November 23, 2020.

79.     Attached as **Exhibit 56** is a true and correct copy of the first affidavit submitted by

Choo Young Cheong in the High Court of the Republic of Singapore in *Agency for Policy*

16

*Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated December 15, 2020.

80.    Attached as **Exhibit 57** is a true and correct copy of the Declaration of Bat Khurts, Deputy Head of Mongolia's Independent Authority Against Corruption from 2011 to 2014, dated September 20, 2024.

81.    Attached as **Exhibit 58** is a true and correct copy of the Declaration of Sanjaa Narantsogt, Executive Director of Erdenes Mongol LLC from 2022 to at least September 30, 2024, dated September 30, 2024.

82.    Attached as **Exhibit 59** is a true and correct copy of the Statement of Claim filed in the Eastern Caribbean Supreme Court, Virgin Islands Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated December 20, 2021.

83.    Attached as **Exhibit 60** is a true and correct copy of an article titled *The Mongolian Connection to Lukashenko's Money,* written by Henry St. George, published by EU Reporter on April 13, 2021, available at https://www.eureporter.co/world/mongolia/2021/04/13/the-mongolian-connection-to-lukashenkos-money/.

84.    Attached as **Exhibit 61** is a true and correct copy of an article titled *The World's Most Famous Private Detective Makes No Apologies*, written by Simon Shuster, published by TIME on September 10, 2021, available at https://time.com/6095957/jules-kroll-private-detective-profile/.

85.    Attached as **Exhibit 62** is a true and correct copy of the First Affidavit of Jules B. Kroll filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated November 15, 2020.

17

86.     Attached as **Exhibit 63** is a true and correct copy of Erdenet Mining Corporation's "Notes on the contract concluded with Lidex Holdings Ltd," filed as an exhibit in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYECF No. 48, on November 25, 2020.

87.     Attached as **Exhibit 64** is a true and correct copy of the Judgment filed in the High Court of Justice, Queen's Bench Division, Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. CL-2020-000757, dated February 24, 2023.

88.     Attached as **Exhibit 65** is a true and correct copy of excerpts of the Transcript from a December 2, 2020 hearing in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No. 198.

89.     Attached as **Exhibit 66** is a true and correct copy of a January 31, 2022 letter with attachments, including the original and a certified translation, from Deputy Prosecutor General of Mongolia M. Chinbat, filed as an Exhibit in Opposition to K2's Motion to Quash or for a Protective Order and in Support of Sukhbaatar Batbold's Cross-Motion to Compel filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 132-1, filed July 15, 2022.

90.     Attached as **Exhibit 67** is a true and correct copy of the Declaration of Zagdsuren Sukhbaatar, Managing Partner and CEO of the Mongol Advocates law firm, dated September 21, 2024.

91.     Attached as **Exhibit 68** is a true and correct copy of the Interim Decision and Order on Motion filed in the Supreme Court of New York, County of New York in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, Index No. 656507/2020, NYSCEF No.

18

179, dated December 2, 2020 and filed December 3, 2020.

92.     Attached as **Exhibit 69** is a true and correct copy of an article titled *Gibson Dunn Lobs Accusations at King & Spalding in Mongolian Corruption Cases*, written by Alison Frankel, published by Reuters on July 20, 2022, available at https://www.reuters.com/legal/litigation/gibson-dunn-lobs-accusations-king-spalding-mongolian-corruption-cases-2022-07-19/.

93.     Attached as **Exhibit 70** is a true and correct copy of the Memo Endorsed Joint Letter filed in the Southern District of New York in *In re Application of Sukhbaatar Batbold for an Order Pursuant to 28 U.S.C. § 1782*, 21-mc-00218-RA-OTW (S.D.N.Y.), ECF No. 95, dated May 17, 2022 and filed May 18, 2022.

94.     Attached as **Exhibit 71** is a true and correct copy of the Letter in Opposition to Sukhbaatar Batbold's Motion to Intervene filed in the Southern District of New York in *In re Ex Parte Application of Agency for Policy Coordination on State Property Pursuant to 28 U.S.C. § 1782*, 21-mc-00178-VSB (S.D.N.Y.), ECF No. 12, dated March 17, 2021.

95.     Attached as **Exhibit 72** is a true and correct copy of a letter from plaintiffs' counsel acknowledging their withdrawal in the High Court of the Republic of Singapore in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 1145/2020, dated July 4, 2022.

96.     Attached as **Exhibit 73** is a true and correct copy of a Notice of Application filed in the Eastern Caribbean Supreme Court, Virgin Islands Commercial Court in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. BVIHCM2021, dated July 8, 2022.

97.     Attached as **Exhibit 74** is a true and correct copy of a Summons filed in the High Court of the Hong Kong Special Administrative Region Court of First Instance in *Agency for Policy Coordination on State Property v. Batbold Sukhbaatar*, No. 2153/2020, dated July 11, 2022.

19

98.     Attached as **Exhibit 75** is a true and correct copy of an excerpt of the Opinion in the Arbitration *In the Matter of an Arbitration under the Rules and Regulations of the London Metal Exchange between: Lidex Holdings Limited and Mongolian-Russian Joint Venture "Erdenet" JV (aka Erdenet Mining Corporation) (aka Erdenet) (aka EMC)*, dated March 25, 2025.

99.     Attached as **Exhibit 76** is a true and correct copy of excerpts of the Transcript of a February 8–10, 2010 hearings in the Arbitration for *In the Matter of an Arbitration under the Rules and Regulations of the London Metal Exchange between: Lidex Holdings Limited and Mongolian-Russian Joint Venture "Erdenet" JV (aka Erdenet Mining Corporation) (aka Erdenet) (aka EMC)*.

100.    Attached as **Exhibit 77** is a true and correct copy of a redline comparing the government's March 25, 2024 Complaint in this action, ECF No. 1, with its Proposed First Amended Complaint, ECF No. 49-1.

101.    Attached as **Exhibit 78** is a true and correct copy of a Register of Members for Grandcastle Assets, Inc.

Dated: April 9, 2026
New York, New York

                                                            */s/ Lee R. Crain*
                                                            Lee R. Crain

20