# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

UNITED STATES OF AMERICA,

          Plaintiff,

v.

ANY AND ALL SHARES OF 21 EAST 61 STREET APARTMENT CORP. HELD IN THE NAME OF LOVITAS, INC., TOGETHER WITH THE APPURTENANT PROPRIETARY LEASE FOR COOPERATIVE UNIT 12E WITHIN THE REAL PROPERTY AND PREMISES LOCATED AT 21 EAST 61ST STREET, NEW YORK, NEW YORK 10065, AND ALL PROCEEDS TRACEABLE THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH ITS RESPECTIVE APPURTENANCES, IMPROVEMENTS, FIXTURES, ATTACHMENTS, EASEMENTS AND FURNISHINGS, LOCATED AT 230 WEST 56TH STREET, NEW YORK, NEW YORK 10019, AND ALL PROCEEDS TRACEABLE THERETO,

      Defendants In Rem.

: Civil Action No. 24-2147

**DECLARATION OF WILLIAM BIKALES**

---------------------------------------------------------------------x

I, William Bikales, hereby declare as follows:

   1.  I was retained by Gibson, Dunn & Crutcher, LLP ("Counsel") on behalf of Sukhbaatar and Battushig Batbold in connection with the above-captioned matter, to which neither is a party.  Counsel asked me to prepare an expert report on Mongolian history, government, politics, and business.  My expert report covers the following topics:

- Recent Mongolian history;

- The constitutional structure of Mongolia's government;

1

- The current Mongolian political landscape;

- The Mongolian mining industry.

2. I personally prepared this report; no additional individuals worked with me on it. I am being compensated at a rate of $1,200 per hour for my work on this engagement. The compensation I receive for my services is not dependent upon the outcome in the above-captioned matter or any other existing or potential matter.

3. A list of information relied upon is attached as Attachment A: Documents Relied Upon. Counsel provided me some of this information. Should I become aware of additional information through additional documentation, reports, or testimony relevant to my work in this matter, I may supplement or amend my findings and opinions.

4. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and private sector.

## I.    Summary of Opinions

5. I am a development economist who has spent nearly four decades studying economic conditions in developing nations, including Mongolia. From 1993-1995, I lived in Mongolia and served as Chief of Party of a team of economic advisors from the Harvard Institute for Economic Development. In this role, I worked directly and extensively with the Mongolian National Development Board, the Ministry of Finance, and the Central Bank. In 1995, I was recruited to lead a new USAID-funded technical assistance project attached to the Office of the Prime Minister of Mongolia. I served in that role for six years during which time I worked directly with several Prime Ministers, Cabinet members, Central Bank management, parliamentarians, private businesses, and others. Since 2001, I have maintained close professional and personal

relationships in Mongolia. In writing this report I have drawn on a combination of publicly available sources and my personal experience over the past nearly four decades.

6.      I have read the Complaint in the civil forfeiture case, Case No. 24-cv-02147 (the "Complaint"), as well as certain filings from the prior cases against Sukhbaatar Batbold, including those filed in New York, Singapore, and Mongolia. The Complaint and these cases rest on assumptions about Batbold's ability as Prime Minister to control the operations of the Erdenet Mining Corporation ("EMC"), one of Mongolia's largest state-owned mines. The cases accuse Batbold of acquiring certain properties around the world with funds obtained from alleged corruption in Mongolia related to EMC copper contracts. The Complaint contains assumptions about the Prime Minister's authority that, based upon my knowledge of Mongolian politics and my personal experience in the Prime Minister's Office from 1995 to 2001, are inconsistent with the structure of and practice surrounding Mongolian government and institutions, including during the period of 2009 through 2012. I make this assessment for three reasons:

- *First*, under Mongolia's constitutional structure, the Prime Minister did not, and to my knowledge today still does not, have formal legal authority to exercise control over the country's natural resources;

- *Second*, as a matter of practical politics, no Prime Minister would have been able to wield effective control over EMC's contracting during the relevant period;

- *Third*, it is particularly unlikely that Batbold had any meaningful control over EMC during his Prime Ministry, because the General Director of EMC throughout his Prime Ministry was Ch. Ganzorig, an independent figure who served a lengthy tenure as General Director under three different prime ministers, from both major Mongolian parties.

7.     Additionally, there are troubling indications that the allegations against Batbold were based on a campaign by former president Khaltmaagiin Battulga for nefarious political purposes.  Battulga has a disturbing history of persecution of political opponents.  Battulga and Batbold are political rivals, representing opposite parties in Parliament.  Litigation against former Prime Minister Batbold began being filed around the world between 2017 and 2021, during Battulga's presidency and when Batbold was widely viewed as a potential opponent to Battulga in Battulga's anticipated reelection campaign.  However, no charges of corruption were ever filed against Batbold in Mongolia.  These factors suggest that the allegations are politically motivated.

## II.     Qualifications

8.     I am a development economist who has spent nearly four decades studying and working to improve economic conditions in developing nations.  I have a B.A. in East Asian Studies from Princeton University, an M.A. from Tufts University's Fletcher School of Law and Diplomacy, and an ABD ("completed all PhD requirements except dissertation") in Economics from Harvard University.  In 1991, while working on my dissertation, I was unexpectedly invited to spend six months in Mongolia as co-leader of a team of Harvard economics and business graduate students who were providing training and advice to several newly established government organizations.  In 1991, with the fall of the Soviet Union, Mongolia began to transition to democracy and a market economy.  Following this assignment, I dedicated much of my career to Mongolia, including living in Ulaanbaatar, Mongolia's capital, for nearly ten years.  I have remained involved in Mongolian policy work to this day.

9.     From 1993-1995, I lived in Mongolia and served as Chief of Party of a team of three economic advisors from the Harvard Institute for Economic Development.  In this role, I worked directly and extensively with the Mongolian National Development Board (the former planning commission), the Ministry of Finance, and the Central Bank.  In 1995, I was recruited to

4

lead a new USAID-funded technical assistance project in Mongolia called "The Economic Policy Support Project." This project was attached to the Office of the Prime Minister of Mongolia and involved recruiting a team of Mongolian economists with whom I provided policy advice and analysis to the Prime Minister. I served in that role for six years, from 1995-2001, during which time I worked directly with several Prime Ministers and with other Cabinet members, Central Bank management, parliamentarians, private businesses, and others.

10. In June 1996, the opposition Democratic Party won a surprise victory in Parliamentary elections and formed the first government in 70 years that was not run by the ruling and dominant Mongolian People's Revolutionary Party ("MPRP"). The new Democratic Prime Minister, Mendsaikhany Enkhsaikhan, was eager to pursue ambitious economic reforms. The Democrats knew me well from the six months I spent working closely with them in 1991, and from the contacts I maintained with them after I returned in 1993. My connections at Harvard and MIT gave them access to higher quality economic resources than were otherwise available in the country at that time. Based on my prior experience, the new Prime Minister asked me and my Mongolian team to serve as his personal economic advisors. During my tenure, I helped draft the government's initial economic reform agenda, which focused particularly on addressing a looming banking sector crisis, power sector pricing reforms, housing and other quick privatization opportunities, as well as attracting new Foreign Direct Investment ("FDI"), particularly in the mining sector.

11. Between 1995 and 2001, I was an observer of, and direct participant in, some of the policy decisions that the Mongolian government confronted during the arduous decade following the collapse of the Soviet Union and the Soviet bloc economic arrangements into which Mongolia had been fully integrated. At the request of the Prime Minister and with USAID's full support,

5

our project expanded to include several key reform areas.  I was personally involved in problem bank resolution and banking sector restructuring, privatization strategy, power sector restructuring, and pension reform.  I regularly participated (on the Mongolian side) in negotiations with international aid agencies.  Our group assisted with the drafting of the 1997 Minerals Law.

12.     In 2000, the ruling DP lost the elections, and the MPRP returned to power.  Despite this change in regime, I continued to work closely with the new government.  My priorities under the new MPRP administration were the turnaround of the insolvent Agricultural Bank of Mongolia with external management recruited through my project, and the drafting and approval of a new energy sector unbundling law, a major step toward creating a market-oriented power and heat sector in Mongolia.  Both of these reforms encountered stiff resistance from more conservative interests, which we successfully overcame.

13.     Since leaving Mongolia in 2001, I have kept in close contact with former Mongolian colleagues from my project, one of whom went on to serve as a Deputy Prime Minister, one as Minister of Defense, one as Parliament Speaker, and two as Ministers of Finance, some representing the MPP, some the DP, and some smaller political parties.  Since 2001, I have served in various roles in Ukraine, the Philippines, and China, and continue to have close professional and personal relationships in Mongolia.

14.     I have since served as an expert witness in an arbitration involving the Mongolian mining sector, and have given presentations on Mongolian economic and political development at the University of Pennsylvania, the London School of Economics, and the American Center for Mongolian Studies in Ulaanbaatar.

6

15.     I have authored pieces on the Mongolian economy in the Wall Street Journal and other publications.  I am currently an Associate at the London School of Economics IDEAS Foreign Policy think tank.

16.     In writing this report I have drawn on a combination of publicly available sources and my personal experience over the past nearly four decades.  Doing online research on post-Communist developments in Mongolia is nearly impossible without firsthand knowledge of sources of news and analysis.  Due in part to the lack of reliable sources, there has sadly been a large amount of inaccurate information reported as fact in unreliable news outlets.  My experience and personal relationships with many of analysts I cite provide me with clear guidelines regarding the selection of reliable sources.

### III.     Relevant Background

#### a.  Recent Mongolian Constitutional History

17.     As of 1989, Mongolia was a Communist Party-run Soviet satellite state.  Although nominally independent, and a member of the United Nations, Mongolia's government and economy were closely connected to Moscow.  In fact, one Mongolian leader proposed to Stalin that Mongolia become the "16th Soviet Republic."[1]  As of 1989, Mongolia's "hard currency" exports to non-Counsel for Mutual Economic Assistance ("Comecon") countries were less than 1% of GDP.[2]  Between 1985 and 1989, Soviet aid to Mongolia averaged 30% of GDP per year.

18.     In 1990, following demonstrations in Ulaanbaatar, Mongolia began a peaceful transition towards democracy and a market economy.  In March of 1990, the entire politburo of the Mongolian People's Revolutionary Party ("MPRP") resigned to allow new leaders to oversee

---

[1] S. Radchenko, "Mongolian Politics in the Shadow of the Cold War". *Journal of Cold War Studies* (2005) 8 (1): 95–119, https://doi.org/10.1162/152039706775212021.

[2] "Council for Mutual Economic Assistance" or CMEA, which included the USSR and Communist party-led countries in Central and Eastern Europe.  Source of data is International Monetary Fund, 1992.

the transition.  Whatever the motivations, the peaceful ceding of power by Mongolia's communist leaders was truly remarkable considering this took place within a year of the now-infamous 1989 forceful suppression of protesters in China's Tiananmen Square.  The democratic election in July 1990 represented the first multiparty election in Mongolian history and led to the creation of a new government.[3]

19.    In 1992, the Mongolian parliament approved a new Constitution.  The new Constitution laid out the framework for Mongolia's future democracy and called for a directly elected President, a unicameral parliament with 76 members elected by a majoritarian first past the post rule,[4] and a Prime Minister.  The first parliamentary election under this constitution took place in 1992.  The MPRP won 70 out of the 76 seats, due both to its strong organization and to the division of opposition votes among a variety of newly formed opposition parties.  The non-MPRP parties formed a so-called democratic alliance, to consolidate all non-MPRP opposition votes.  This democratic alliance won the first presidential election in 1993 and the 1996 parliamentary elections.

### *b.  The Mongolian Economy*

20.    In 1991, Mongolia began its transition to a market economy.  The abrupt loss of Soviet aid, and the collapse of Soviet bloc "soft currency" trade led to a sharp decline in GDP and surge in inflation, as occurred in many post-Soviet economies.  Many Mongolian industries collapsed when access to Comecon import and export markets ended in 1991.  The search for new hard currency exports was the most urgent economic policy challenge.

---

[3] There are many accounts of these events.  I have drawn primarily on the work of Professor Thomas Ginsburg of the University of Chicago Law School, who was in Mongolia advising on legal matters as I was advising on economic. *See* Ginsburg, Enkhbaatar et al., "Assessment of the Performance of the 1992 Constitution of Mongolia," UNDP, Mongolia 2016.

[4] Under this arrangement each Member of Parliament represented a constituency and the candidate(s) who received the most votes, even if less than a majority, were elected.

21.    In the 1990s, Mongolian GDP and exports were led by the mining industry, which was dominated by Soviet era joint ventures like EMC, Mongolrostsvetmet[5] fluorspar, and a number of smaller coal mines. It was not until 1995 that GDP growth was restored, and not until 1996 that annual inflation fell below 10%. After the 1997 passage of a more-liberalized Law on Minerals, western mining companies entered Mongolia, leading eventually to the emergence of major mines at Oyu Tolgoi (copper and gold) and Tavan Tolgoi (coal), along with new tin, iron, uranium, and oil production sites. Mongolian dependence on mineral exports became greater than ever. In a dramatic change from Soviet-era trade patterns, almost all of Mongolia's mineral exports were now sold to China.

### c. *Mongolian International Relations*

22.    Mongolian foreign policy has undergone a similar transition since 1990. Mongolia shares a border with only two countries: Russia and China. Mongolian attitudes toward Russia and China are shaped by centuries of interactions.[6] Through most of the 20th century, Mongolia's primary foreign policy endeavors related to its one-sided alliance with the USSR and, after 1991, Russia. To this day, Russia is generally viewed favorably by the Mongolian people because Soviet aid played such a large role in Mongolian development in the post-WWII era and, without Soviet support for its sovereignty, it is likely that Mongolia would have been absorbed by China after the establishment of the People's Republic in 1949. Many Mongolians still speak Russian and have personal connections with Russian people. Attitudes toward China have been characterized by suspicion and even hostility. Since 1990, Mongolia has followed a new "Third Neighbor" policy that emphasizes maintaining close ties with both Russia and China, while also cultivating close ties with other countries, such as Japan, the U.S., India, South Korea, France, and others, to provide

---

[5] https://www.mongolros.mn/p/21?locale=en.
[6] *See* San Maral public opinion polls.

9

further balance. The resource sector has played a central role in attracting "third neighbors," with Australian, Canadian, Indian, French, and other foreign companies actively investing in the country. However, resource nationalism and lack of familiarity with market-based interactions with other nations have led to lingering distrust of these new partners on the part of many Mongolians.

### d. *The Domestic Political Landscape*

23.    Mongolian politics has been largely dominated by two parties for the past three decades: the Mongolian People's Party (the "MPP," the successor to the MPRP) and the Democratic Party (the "DP," comprised of the former members of the "democratic alliance"). Third parties have occasionally won a handful of seats in Parliament and have even entered as minority partners in coalition governments at times, but Mongolia, like the U.S., has still essentially a two-party system.[7]

24.    Since 1992, Mongolia has had a hybrid parliamentary system. Both Parliament and the President are elected by the voters, and the Parliament selects the Prime Minister.

25.    ***Prime Ministry.*** Parliamentary elections are held every four years in Mongolia. The party (or, in a coalition, the parties) that has a majority of seats selects a Prime Minister and the Speaker of the Parliament. Parliament selects the Prime Minister and the President approves.

26.    The Parliament and the Prime Minister it selects have overall operational control of the government. Key government functions—such as the budget, social services, economic development, and infrastructure development—fall under the Cabinet and Parliament. In Mongolia, the term "the Government" refers to the Prime Minister and his Cabinet, and this is more than a semantic idiosyncrasy.

---

[7] No leader of any third-party has ever served as either President or Prime Minister.

27.     The Speaker, or 'Chair' of the Parliament, convenes and presides over sessions of Parliament, oversees the agenda, and has administrative control over the Parliament's offices and committees.  He is one of the most powerful members of the government, and represents the Parliament in the National Security Council, in discussions with the Constitutional Court, and in international Parliamentary gatherings.

28.     The Speaker negotiates the membership and leadership of Parliamentary committees and subcommittees, where most of the actual work of the Parliament takes place.  In my time working with the Prime Minister, the chairs of the standing committees on Budget, State Structure, Social Policy, and Economic Policy were key stakeholders with considerable power over policy decisions.  Over the years, I have frequently worked with standing committee chairs, and they are directly engaged in shaping key policy-setting legislation.  For example, the pension reform that my project helped design in 1998 was prepared at the request of the Chair of the Standing Committee on Social Policy.

29.     Since the 2019 Constitutional Amendments, the powers held by these Committees vis-à-vis the Government have been slightly reduced, as one purpose of the amendments was increasing the efficiency of the Government.  The Prime Minister is nominated by the Parliament and approved by the President.  If the President rejects the nominee, the Parliament can overrule his veto by a two-thirds majority, negotiate with the President, and resubmit, or change to a different candidate.  In 1998, three different individuals nominated by the DP to replace the sitting Prime Minister, who had lost a vote of no confidence, were vetoed by President N. Bagabandi, who was from the MPRP (the predecessor of today's MPP).  This led to an extended period of political uncertainty, before the fourth candidate was finally accepted.  This was the only case to date in which the nomination of a Prime Minister was successfully vetoed by the President.

11

30.     Prime Ministers serve for up to four years, the period of one Parliamentary term. The Parliament can vote them out at any point during those four years.  When the Prime Minister is selected, a decision is also reached whether to appoint Deputy Prime Ministers, and how many. This post is not mandated by the Constitution, and the number has ranged from zero to three, which is the current number since the June 2024 parliamentary elections.  Coalition governments have frequently had Deputy PMs from different parties than the PM himself.  Occasionally, when no party has a majority, the two main parties have reached power-sharing agreements, under which Prime Ministers rotate.

31.     The Prime Minister, in consultation with his own party and, if necessary, with other parties in his coalition, forms a Cabinet of Ministers.  Prior to the Constitutional Amendments of 2019 that were meant to streamline government operations, the Prime Minister's discretion in selecting ministers was more constrained, and Parliament had the lead role in approving all members of the cabinet.  Now the Prime Minister appoints ministers, and the Parliament swears them in.

32.     The number of ministries and their responsibilities have changed repeatedly over the years, following each parliamentary election, and occasionally during the term of one set of MPs.  The location of vital government functions such as investment planning, foreign trade, mining, environment, transport infrastructure, and others, has been reassigned frequently over the years.  This instability, and the common phenomenon of large changes in ministry staff when a new minister takes over, even in the midst of one parliamentary term, has often undermined governing capacity.

33.     Notably, while the Prime Minister is the leader of the government, he does not in any sense control the actions/decisions of the Ministers in his Cabinet, nor does he have legal

12

power to make decisions regarding the work of their ministries. The Prime Minister runs the government and has the lead voice in Cabinet discussions and in shaping government policy, but the Cabinet as a whole ultimately sets the policy that ministers are then tasked with implementing. Prior to the 2019 Constitutional amendments, Ministers were appointed by the Parliament. Strong Prime Ministers have at times been able to bend their Cabinets to their will more easily, while many have ruled by consensus, and have often had difficulty controlling Ministers who had strong power bases of their own. One result of this situation is that the actual effectiveness of government rule is often weaker than it appears on the surface.

34.    *Presidency.*  Unlike the Prime Minister, the President is elected by direct popular vote. Until Constitutional Amendments took effect in December 2019, the term of the presidency was four years, and no individual could serve more than two terms. Since the amendments took effect, presidents now serve for one six-year term, with no possibility of reelection. The Presidency was designed to be an apolitical post directly representing the majority of Mongolian people, unlike Members of Parliament, who represent districts. Although nominally an apolitical post, presidents are nominated by political parties, and every president to date has been a former member of parliament. Three presidents, including the current one, have been former prime ministers, and thus took office with existing political alliances and rivalries, which (in theory) they are expected to transcend once they assume office. Although that is not an entirely realistic expectation, Mongolia has elected six presidents since 1992, and most managed to maintain popularity and rise above overt partisanship. Three of them were reelected to second terms.[8]

35.    The President has powers and responsibilities in fields pertaining to broader national interests: international representation, national defense, and oversight of the judicial

---

[8] Including the first, P. Ochirbat, whose first term began under the previous Communist regime, and who was reelected in the first post-Communist election in 1993.

13

system.  The President serves as Head of State and Commander-in-Chief of the Armed Forces, undertakes high-level state visits, and receives visiting foreign heads of state.

36.    In terms of governance, the president has broad powers to veto laws and nominations by the Prime Minister.  Controversially, the President also has the power to veto most actions of the Parliament, subject to override by a two-thirds vote.  The president is even empowered to call for the dissolution of the Parliament under certain conditions.

37.    As is most relevant to this report, the President has significant, and by international standards quite unusual, powers in appointing key officials in the judicial and policy systems.

38.    The 1992 Constitution, and the later Laws on the Courts, included measures to encourage judicial independence.  The most important measure was the creation of a General Judicial Council responsible for recommending judicial appointments and dismissals for defined causes.  However, all of the measures were primarily aimed at reducing the potential influence of parliamentarians on the court system, as the drafters believed that Parliament would be the most likely source of attempts to exert political influence.  Accordingly, the President's powers included the appointment of members of the General Judicial Council, along with the authority for actually making all judicial appointments, from the Supreme Court down to the local level, with Parliamentary review.  This arrangement worked reasonably well, but such presidential influence over the court system poses obvious risks if the President is inclined to utilize the judicial system as a tool in pursuing a private agenda.

39.    The Mongolian Constitutional Court has nine members, and the Presidency has considerable influence over its makeup.  Three members of the Court are reserved for selection by the President; three reserved for selection by the Supreme Court; three reserved for the Parliament.  Members of the Constitutional Court are appointed for terms of six years in total.  Since the

14

President has authority to select members of the Supreme Court, upon recommendation by the General Judicial Council, the sitting President could have considerably more influence on the membership of the Mongolian Constitutional Court.

40.    The President also appoints the Prosecutor General and the Director General of the Independent Authority Against Corruption.  The position of the Prosecutor General has no equivalent in the United States.  The Prosecutor General is a political appointee who is not under the jurisdiction of the Ministry of Justice, an arrangement which is intended to allow greater independence from political interference.  The Minister of Justice, like all cabinet members, is nominated by the Prime Minister and approved by Parliament and is therefore considered to be more subject to day-to-day political pressures.  The Prosecutor General has central responsibilities in the functioning of the legal system, including deciding when to prosecute criminal cases, prosecuting a case, supervising all legal proceedings and law enforcement to ensure that they are conducted in accordance with the Constitution, overseeing the penal system, and protecting human rights, among others.[9]

41.    Since 1992, the power to appoint the Prosecutor General has rested with the President.  Although Parliamentary approval is required, it is generally given automatically.  To allow a certain degree of independence from politics, the term of the Prosecutor General is six years, which historically meant that any appointment would carry over into the following presidential term.  Historically, Prosecutor Generals have never served their full terms, always being dismissed for various reasons.

42.    In 1996, Mongolia passed its first Anti-Corruption Law, which was amended in 2006, leading to the creation in 2007 of the Independent Authority Against Corruption ("IAAC").

---

[9] *See* the Mongolian "Law on the Prosecutor," first approved in 1993 and amended several times.

15

The IAAC is the government body tasked with leading the fight against corruption, "investigating, collecting asset declarations and organizing education and prevention programmes."[10]  Notably, the IAAC does not have prosecutorial powers; it can only refer cases to the office of the Prosecutor General.  The Director of the IAAC is appointed by the President, and by law has a term of office of six years.  The current incumbent, Z. Dashdavaa, appointed in 2019, seems likely to be the first to actually serve out a full six-year term.

43.    Overall, the president's power over these key governmental institutions, particularly the judicial system, gives him great power to check the actions of Prime Ministers and those of opposing parties.  As discussed in Paragraph 47, and in more detail in Paragraphs 74-82, these powers were abruptly and drastically expanded in 2019 at the initiative of then-President Kh. Battulga, who for a period wielded virtually unchecked power over appointment and dismissal of judges, the Prosecutor General, and the Director of the IAAC.

44.    ***Relationship Between Prime Minister and President.***  There is a fundamental difference in the nature of posts of President and Prime Minister.  The President, as Head of State, is directly elected by the entire population and is answerable to no one other than the courts.  In theory the President can be impeached, but Parliament cannot do so without the concurrence of the Constitutional Court, which as described above the President maintains considerable influence over.  The Prime Minister is selected by Parliament and is the leader of the government but is subject to removal at any time by a majority vote of the Parliament, with whom he is in constant negotiations.  Since 1992, Mongolia has had six presidents and 15 prime ministers.  There is thus inherent tension between the Parliament and its Prime Minister, on the one hand, and the President,

---

[10]    Transparency International, 2018, "Mongolia: Overview of Corruption and Anti-Corruption," https://knowledgehub.transparency.org/assets/uploads/kproducts/Country-Profile-Mongolia_2018.pdf.

on the other.  This is particularly true when the President and Prime Minister belong to different political parties.[11]

45.    Throughout the post-Communist era there has been healthy debate about the proper balance of power between the President and the Prime Minister/Parliament, with occasional calls for a stronger president,[12] and occasional calls for a weaker president.  There have been frequent attempts, some successful, to amend the Constitution to alter the balance of power.  The overall trend has been to ensure, and gradually reinforce, the primacy of Parliament's power in running the government.

46.    Since 1992, the principal area of constitutional contention has been the balance of power between the President and the Parliament (and the Prime Minister it selects).  Mongolia's location between Russia and China serves as a constant reminder of the dangers of allowing any one leader to accrue too much power.  As Mongolia's political system was designed to give the Parliament and its Prime Minister leading responsibility for governing the country, conflicts between the Prime Minister and the President have tended to take the form of attempts by the President to assert or acquire greater power than his office properly allows.  This has generally entailed use of his constitutional rights, especially veto power and control over the judiciary and prosecutors, to weaken the government.  Over the years, Presidents have attempted to acquire the power to appoint the head of the IAAC, the head of the intelligence service and the members of the Judicial General Council, who nominate judges for Presidential approval.[13]

---

[11] Although the Mongolian President is required to end his membership in any political party upon taking office, presidential elections feature candidates nominated by political parties, and every Mongolian president since 1992, without exception, has previously served in the Parliament as a representative of a political party.

[12] *E.g.*, a speech by former Prime Minister M. Enkhsaikhan at a Constitutional Reform workshop in 2018. https://sonin.mn/news/politics-economy/35566.

[13] *See* D. Zorigt, "Political culture and constitutional reform in Mongolia," GIS Advisory Services, Aug. 27, 2019, https://www.gisreportsonline.com/r/mongolia-constitutional-reform/.

17

47.     There have been two particularly serious instances of presidential power grabs. The first was in 1998 when MPRP President Bagabandi vetoed three consecutive DP candidates for Prime Minister, all of whom were seemingly well qualified.  The second was the 2017-2021 presidency of Kh. Battulga, when the President was able to greatly expand his already considerable controls over the judicial system to attack his political and business rivals.  In response, the Parliament has regularly approved constitutional amendments to realign presidential powers with the clear intent of the original Constitution, strengthening the role of Parliament and the Prime Minister.

48.     Based on my years of close engagement in Mongolian economics and politics, the main hope for combating authoritarianism or corruption rests in the thriving multi-party hybrid political system.  While Mongolia's democracy may not be up to Western standards, it is deeply rooted and vibrant.

### e.   S. Batbold's Career

49.     Sukhbaatar Batbold was born in 1963 in Western Mongolia, to a family of doctors, and received an elite education, including undergraduate studies at the prestigious Moscow State University School of International Relations.   After taking a position at the state-owned Mongolimpex trading company, he was one of the first Mongolians to be offered a chance to study in the UK and eventually attended and graduated from Middlesex University's London School of Business.

50.     After the collapse of Communism, Batbold established a private company, Altai Trading.  In 1994, Altai Trading attracted particular attention when it purchased at auction the half-completed Chinggis Khaan Hotel, which had been abandoned by the original owners, who ran out of funds before completion.  As an Ulaanbaatar resident at the time, I recall what an eyesore and

18

symbol of economic collapse the half-built hotel had been.  Altai Trading completed and opened the hotel in 1995 and later opened a large supermarket next to it, which was the foundation for a chain of supermarkets.  Batbold's business steadily expanded into other sectors.  By the end of the 1990s, Batbold had established himself as one of Mongolia's wealthiest individuals.  All of this predated Batbold's involvement in politics.

51.      In 2000, Batbold was appointed Deputy Minister of Foreign Affairs.  Batbold was part of a generational shift in the MPP (still called MPRP then) in response to the party's surprise defeat in the 1996 parliamentary elections.  This shift cultivated younger leaders with the ability to engage with Western organizations and nations.[14]  In 2004, Batbold was elected to Parliament and, until he was left off the slate in the 2024 elections, was reelected in every parliamentary election.  In 2008, he was appointed as Minister of Foreign Affairs.

52.      In 2009, when Prime Minister S. Bayar resigned because of poor health, Batbold was selected by the Parliament to replace him, and served as Prime Minister until 2012.  During Batbold's premiership, Mongolia's economy soared, with GDP growth peaking at 17.3% in 2011, the highest in the world, and averaging 12.3% for the three years of Batbold's term.  This was, in part, a result of the milestone Oyu Tolgoi Copper mine agreement, which led to a very large influx of FDI during Batbold's term.  That economic growth was sustained for the entirety of Batbold's term.  This first large mining agreement with a Western firm stirred a nationalistic reaction from some Mongolians, including some politicians, and Batbold was a strong proponent of openness to these new partners, consistent with Mongolia's Third Neighbor Strategy, and with attracting the FDI that Mongolia needed so urgently.  During this time, he highlighted Mongolia as a foreign

---

[14]Other examples were Deputy Minister of Justice Ts. Monkh-Orgil, who was trained at Harvard Law School and later served as both Minister of Foreign Affairs and Minister of Justice, and Ch. Khurelbaatar, who was trained in Economics in Australia and served as Minister of Finance and Minister of Economy.

investment destination [15] both abroad and internally. This welcoming approach to Western investment was reversed after a new DP-led government took office in 2012 and FDI and Mongolian economic growth quickly faltered. In addition, Batbold oversaw the start of a serious dialogue within Mongolia, and with external partners, regarding how to allow the Mongolian people to benefit from mining-driven economic growth. Several concrete steps were taken, including the creation of a Human Development Fund and steps to mitigate environmental harm caused by mining.[16]

53. My experience in Mongolia throughout this period affords me the opportunity to make some observations regarding Batbold's activities, both in business and in office. Unlike other individuals who earned great wealth, Batbold did not make money from the privatization of state-owned businesses at low prices. Instead, he identified opportunities and utilized his business skills to create new startups that have grown and lasted to this day. For example, by 1995 he had built one of the three main hotels in Ulaanbaatar. Batbold was known as a competent and serious leader, not flashy, but professional. He dealt well with internal and external challenges, both economic and political. This is likely the reason that until 2024, he was the longest-serving sitting member of Mongolia's parliament, having been reelected in every election since his first term in 2004-2008.

54. However, Batbold was not a politically strong Prime Minister. Because of the unique circumstances of his selection, he did not enter office with any electoral mandate. His Cabinet also contained multiple members of the opposition party in key ministries, and the President at the time was a member of the Democratic Party as well. Given the President's broad

---

[15] *See, e.g.*, https://www.biv.com/news/archives/mongolian-prime-minister-renews-pitch-for-resource-8228956.
[16] Alicia Campi "Mongolia's Quest to Balance Human Development in its Booming Mineral-Based Economy," *Brookings*, January 2012, https://www.brookings.edu/articles/mongolias-quest-to-balance-human-development-in-its-booming-mineral-based-economy/#_ftnref11.

powers, the President at that time would have had influence over the Office of the Prosecutor General, the national police, the IAAC, and the judiciary. That would have given the President significant power to use against Batbold—and an incentive to try to weaken him politically—had Batbold been accused of any untoward conduct.

## IV.    The Complaint Misunderstands Mongolian Government and Institutions

55.    The government's Complaint makes a series of assertions about Mongolian law and politics. Two of the primary assertions are that:

- "As Prime Minister, Batbold had effective control of the country's natural resources." Paragraph 18.

- "Under Mongolian law, the Chairman of the State Property Committee reported directly to the Prime Minister, who had ultimate responsibility for and authority over Mongolian state property." Paragraph 20.

56.    But these assertions are wrong, and I believe it is very unlikely that Batbold could have exercised any control over EMC during his tenure as Prime Minister. *First*, under Mongolia's constitution, the Prime Minister does not have formal legal authority over the country's natural resources. *Second*, no Prime Minister would have been able to wield effective control over EMC as a matter of practical political reality. *Third*, Batbold himself was particularly ill-suited to improperly steer contracts involving EMC, given that throughout his Prime Ministry, the General Director of EMC was Ch. Ganzorig, who had been appointed in January 2008, and who served during the tenures of three different prime ministers, from both major Mongolian parties.

### a.    *Mongolian Prime Ministers Do Not Have Formal Legal Authority Over the Country's Natural Resources*

57.    As described above, since 1992, Mongolian has had a hybrid parliamentary system.

58.    As mentioned above, while the Prime Minister as head of government leads Cabinet meetings and has a key voice in setting policy, he does not have complete authority or responsibility for the work done by the ministries or agencies that report to the Cabinet, such as

the State Property Committee.  Instead, as a practical matter, there are multiple layers of bureaucracy between the government in Ulaanbaatar and events on the ground across Mongolia. Based on my knowledge and experience, I am not aware of anything in the Mongolian constitution or laws that authorizes the Prime Minister to exercise direct legal authority over Mongolia's natural resources.  Therefore, the implication that the Prime Minister has some formal legal responsibility for natural resources is mistaken.

### b. *As a Matter of Political Reality, Mongolian Prime Ministers Did Not Have the Ability to Control EMC*

59.     Mongolian Prime Ministers were also constrained from controlling EMC by the political realities during the relevant period.  EMC has always been of central importance to Mongolia, and during the relevant period, Russia partially owned the corporation.  The city of Erdenet, which became the second largest in Mongolia in the 1990s, did not exist before the copper enterprise launched in 1974; it was entirely a creation of the Soviet-Mongolian joint venture, and had a unique identity.  Throughout my personal service to Mongolia's Prime Ministers, my impression was that EMC acted as a virtual independent fiefdom within Mongolia.

60.     The General Director of EMC from 1988 to 1998 is a case in point.  That General Director, Sh. Otgonbileg, was so powerful he remained in this post after the fall of Communism and the collapse of Soviet aid to Mongolia, and through the terms of four Prime Ministers.  The two Prime Ministers with whom I worked during Otgonbileg's time, Jasrai and Enkhsaikhan, had no control over him and had no access to information about Erdenet operations beyond that which Otgonbileg's advisers provided.

61.     Otgonbileg, the General Director, had so much power for two primary reasons. First, Otgonbileg's power rested, in part, on Erdenet's central importance to the otherwise shaky national economy.  In the 1990s, Erdenet's shipments of copper concentrate accounted for 30-40%

22

of Mongolian exports.[17]  Second, Erdenet was a joint venture with Russia, which still owned 49%, and who had provided the engineering and financial inputs that constructed the mine and the whole city in which the processing took place.  Otgonbileg had strong links to Russian joint venture partners and the Russian government, whose goodwill had always been one key pillar of Mongolian foreign policy.

62.      Based on my personal experience with Otgonbileg's tenure, my understanding of Mongolian politics, and the fact that Russia continued to own 49% of EMC until 2015, I believe that during the period of 2009 to 2012 prime ministers did not have the ability to control EMC or its contracting.

### c.  *Batbold in Particular Had Little Ability to Control EMC*

63.      Beyond the generally limited powers of Mongolian Prime Ministers to control EMC, Batbold in particular had less control than most.  When Batbold became Prime Minister, he inherited a Cabinet that had been selected and approved under Prime Minister Bayar and Parliament Speaker D. Demberel, and he replaced only one Cabinet Minister in the entire administration.  All other Cabinet Ministers were thus less likely to be directly accountable or loyal to him.

64.      During Batbold's term as Prime Minister, the General Director of EMC was Ch. Ganzorig.  Ganzorig had been appointed in September 2007 under Prime Minister Bayar, two years before Batbold became Prime Minister, and went on to serve for a total of six years, spanning three different prime ministers total from both parties.  Ganzorig's long tenure shows that he was independent of Batbold's direct control, and indicates how implausible the suggestion is that Batbold gained personal control over EMC by virtue of his appointment as Prime Minister.

---

[17] Author's calculations based on Mongolian trade data.

## V.      There Are Reasons to Believe that Khaltmaagiin Battulga Has Propagated the Allegations in the Complaint

65.      Based on my review of the relevant materials, there are reasons to believe that the allegations against Batbold, including those in the Complaint, were generated by Batbold's political rival, former President Khaltmaagiin Battulga, who has a long history of persecuting political opponents.  Besides this history of persecution, it is particularly notable that no charges of corruption were ever filed against Batbold in Mongolia by the Prosecutor General.

66.      ***Background on Battulga.***  Khaltmaagiin Battulga has been a public figure for more than three decades, and there are many rumors and press stories about him.  Some basic facts are clear.  He was born in Ulaanbaatar in 1963 and has a high school education.  As a student he demonstrated great talent as a wrestler, the Mongolian national sport, and in 1983 he won a gold medal in the world Sambo championships in the USSR.[18]

67.      While biographies say that Battulga originally supported himself by selling paintings to tourists, I am skeptical this was anything more than a hobby; a young champion wrestler would have had many local and international doors opened for him.  In 1991, Battulga purchased the Bayangol Hotel in Ulaanbaatar when it was privatized through the mass voucher privatization program.  Around that time, he launched his business enterprise, Genco, which he named after the corrupt, mafia-owned olive oil front company in *The Godfather*.  Genco expanded rapidly into important spheres, including taxis, foodstuffs, and tourism.

68.      In 1991, I began to hear about Battulga's active financial support of what eventually became the Democratic Party from those within the movement.  Despite this financial support, Battulga stayed in the background and did not get publicly involved in politics in that period.  I

---

[18] https://en.wikipedia.org/wiki/1983_World_Sambo_Championships.  Sambo is a martial art that was created in the USSR in the 1920s and is recognized by the United World Wrestling governing body and the International Olympic Committee, but is not an Olympic sport.

believe Battulga remained in the background because he had already developed a reputation for ruthlessness in his business activities by this time and was widely perceived as a frightening individual. After the chaotic period immediately following the collapse of the socialist era, Battulga emerged as one of Mongolia's richest individuals. In 2018 he was listed by *Forbes* as the third-richest man in the country.[19]

69.    In 2004, Battulga turned to direct engagement in politics and was elected as a Democratic Party member of Parliament. After his reelection in 2008, he was selected as Minister of Roads, Transport, Construction and Urban Development in the 'Grand Coalition' government established by the MPRP and DP. He served in that post under Prime Minister S. Bayar, until Bayar resigned for health reasons in October 2009, after which he continued to serve under Prime Minister Batbold. In that role Battulga oversaw most of the government's biggest investment projects. During this time, he was implicated and charged in one corruption scandal.[20] He also advocated for construction of rail lines to export coal from the Tavan Tolgoi mine, which lies near Mongolia's border with China, to Russia.[21] Battulga supported these exports to Russia rather than directly across the border to China, even though demand for coal was much greater in China and would have had lower shipping costs.

70.    In 2012, Battulga was named Minister of Industry and Agriculture in the new DP-led coalition government, from which the MPP was excluded and which was dominated by DP owners of large business groups, a marked change from all previous Mongolian governments.[22]

---

[19] http://www.mongolianbusinessdatabase.com/base/newsdetials?id=14555.

[20] Ian MacDougall and Anand Tumurtogoo, May 24, 2019, "The Country That Exiled McKinsey," https://www.propublica.org/article/the-country-that-exiled-mckinsey.

[21] https://www.coalspot.com/news/1186/mongolia-coal-railway-to-link-with-russia/41.

[22] "[T]he new DP-led cabinet features extremely powerful business interests—only three out of its 19 members are public servants while the rest are well-known successful business entrepreneurs." J. Mendee, "A New Mongolian Government is Finally Formed", Jamestown Foundation Eurasia Daily Monitor, 9/11/2012. https://jamestown.org/program/a-new-mongolian-government-is-finally-formed/.

He held that post from 2012-2014, during which time he continued to be a strong advocate for constructing the first Tavan Tolgoi rail lines east and north to Russia and for major investment of state funds in establishment of an industrial park in Sainshand, the hub where coal from Tavan Tolgoi would pass on the way to Russia.[23]

71.    ***2017 Presidential Election.***  In 2017, Battulga became the first and still the only wealthy businessman to be elected as Mongolia's president.  The presidential election between Battulga, MPP Parliament Speaker M. Enkhbold, and S. Ganbaatar of the MPRP was a historic election featuring three unpopular candidates, each tainted by corruption allegations.[24]  It was the only presidential election in Mongolian history in which no candidate received a majority of votes on the first ballot, forcing a runoff between Battulga and Enkhbold.  Enkhbold was weakened by a corruption scandal of his own, after a whistleblower released tapes of conversations from 2016 that suggested Enkhbold was involved in selling positions in the government.

72.    Prior to the runoff, a 'white ballot' movement—i.e., cast a vote but do not support either of the offered choices—gained momentum.  However, this movement was hindered by the election law's stipulation that no campaigning could take place for the runoff, and the white ballot movement had to be entirely informal, spread by word of mouth.  Nevertheless, 8.2% of ballots cast were blank, and Battulga won the runoff with 50.6% of the votes.  If his votes had fallen below 50%, a new election with new candidates would have been required.

73.    Battulga portrayed himself as a populist anti-corruption champion, speaking for voters who were angry about corruption in the mining sector and China.  Observers noted the irony

---

[23] I visited those never completed and gradually deteriorating facilities in 2022 in my work as team leader on a World Bank transport and logistics improvement technical assistance project.

[24] https://sg.news.yahoo.com/corruption-scandals-muddy-mongolias-presidential-vote-224551888.html.

of this posturing by a notoriously corrupt business figure; one who was just barely elected because his main opponent was also notoriously corrupt.

74.    ***Battulga's Presidency.***   Mongolian politicians and scholars have worked to build government institutions that can protect against and withstand political corruption—a problem that can threaten any developing nation.   While Mongolia has made great strides in combatting corruption, following the election of Battulga as President in 2017, the scope and the nature of sham prosecutions of leading figures were orders of magnitude greater than had ever occurred before.   Relatedly, until Battulga's time in office, the relationship between the President and the government had occasionally been tarnished by partisanship, particularly in the President's use of veto powers.   But Battulga's weaponization of his strong influence over the justice system in pursuit of rivals and his efforts to expand his control over the judicial system were unprecedented.

75.    Battulga utilized two main tools in this campaign against his rivals.   *First*, he exploited popular discontent over the perception that Mongolia's mineral resources were benefiting foreigners and Mongolian insiders, rather than the Mongolian people.   *Second*, Battulga leveraged two scandals that occurred during this period to force members of Parliament to accede to his wishes.   The first was the M. Enkhbold scandal regarding sale of government positions, already mentioned above.   Then, in 2017, it was revealed that a government fund that was meant to provide low-interest loans to small- and medium-sized enterprises had apparently been tapped by several Members of Parliament for their own businesses.   These incidents were both widely publicized and provided Battulga with sticks and carrots to use in dealing with the Parliament, allowing him to threaten prosecution of those who stood up against him and to promise the dropping of cases against those who allied with him.

27

76. During Battulga's four years as President, four former Prime Ministers were prosecuted for crimes alleged to have occurred as far back as 2009:  S. Bayar, M. Enkhsaikhan, Ch. Saikhanbileg, and J. Erdenebat.  A number of former cabinet ministers were also prosecuted, including former Finance Minister Bayartsogt.  B. Byambasaikhan and Ts. Tumentsogt, two former CEOs of the state-owned holding company Erdenes Mongol, were jailed at the same time as Bayartsogt.  The charges revolved around the 2009 Oyu Tolgoi Investment Agreement with Rio Tinto and Ivanhoe Mines, the 2015 Oyu Tolgoi Underground Mining Plan agreement with Rio Tinto, and the 2016 purchase by a private Mongolian business of Russia's 49% stake in Erdenet Copper Corporation.  However, the alleged crimes did not involve corruption as it is normally understood.  Instead, the charges broadly alleged the former political leaders entered into contracts that did not protect Mongolia's best interests.  The charges did not include any allegations that the individuals personally benefited from the contracts, as would normally be expected in a corruption case.  These are actions that for the political leaders involved would usually have been resolved at the ballot box, and for the CEOs involved may have been considered grounds for dismissal, but not crimes as the term is normally understood.  Some of the charges seemed even more unreasonable and political in nature; one extreme example was the sentencing to four years in prison of former PM Enkhsaikhan for allegedly overbilling the government 60 million Mongolian tugrik, approximately USD $30,000, for the purchase of a vehicle in 2015.[25]  At the same time, the outstanding corruption charges against Battulga from his term as Minister of Transportation were dropped when he took office as President.[26]  Despite all of these aggressive criminal prosecutions against *other* politicians, Batbold was never charged with any crimes.

---

[25] https://www.pressreader.com/mongolia/the-ub-post/20200508/281505048390378.
[26] https://www.propublica.org/article/the-country-that-exiled-mckinsey.

77.     On October 29, 2018, Battulga attempted to dissolve the Parliament,  the only time a President has taken such a step.[27]  When the Speaker rejected this proposal, Battulga threatened to go on a hunger strike.[28]  In spring 2019, there were widespread reports that Battulga was pressing the Prosecutor General to file corruption charges against his predecessor, Ts. Elbegdorj.[29]  When the Prosecutor General refused to file charges, Battulga intensified his efforts to seize control of the judicial system, leading to a constitutional crisis in Mongolia.

78.     On March 27, 2019, 'as ordered by the President,' Parliament narrowly passed after only one day of review amendments to the Law on the Legal Status of Judges, the Law of the Public Prosecutor's Office and the Anti-Corruption Law.  The main impact of these amendments was that the National Security Council, chaired by the President, was granted much greater discretion for dismissal of key figures in the judicial system without any cause other than the Council's judgment that dismissal was appropriate.  The practical impact of these amendments was that Battulga seized these powers basically for himself alone even though, on paper, the power to remove judges was granted to the National Security Council, and the Judicial General Council still had a role to play in judicial appointments and dismissals.

79.     These events provoked widespread condemnation from Mongolian and international observers.  The well-respected and scrupulously nonpartisan University of British Columbia professor Julian Dierkes and a colleague published a piece on Battulga's power grab entitled "The Beginning of the End of Democracy?"[30]  Dierkes report notes that "Mongolian

---

[27]  https://president.mn/en/2018/10/29/official-letter-sent-to-parliament-speaker-m-enkhbold-on-proposal-to-consult-on-self-dissolution-of-the-parliament/.

[28]  https://www.bloomberg.com/news/articles/2018-10-30/mongolia-president-may-go-on-hunger-strike-to-protest-parliament?sref=mcaQHNnQ.

[29]  *See* https://www.pressreader.com/mongolia/the-ub-post/20190320/281505047552814  and https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.

[30] https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.

lawyers were nearly unanimous in their condemnation of the amendments with some even calling them a soft coup."

80.    In May 2019, the United Nations Office of the High Commissioner for Human Rights Special Rapporteur on the Independence of Judges and Lawyers issued a report on these developments.[31]  I have read many such reports from Mongolia, China, and other countries.  They are generally quite diplomatic and moderate in their tone in discussing the situation in UN member states, even when the underlying messages are critical.  This particular report is quite remarkable and worth reading in full.  I will highlight selected passages:

- "[W]e are concerned that the recent amendments to national legislation on the judiciary and prosecution service fall short of international standards relating to the independence of the judiciary, the autonomy of the prosecution service and the separation of powers.  We are also worried at the wide discretionary powers that the Head of State retains in the appointment of judges, heads of the prosecution service, members and president of the Judicial General Council, and members and president of the Judicial Ethics Committee."

- "We consider that the involvement of the National Security Council in the procedure for the dismissal of judges constitutes a serious breach of the principles of independence of the judiciary and separation of powers."

- "We consider that the wide powers entrusted to the Head of State in the appointment of judges undermines the independence of the judiciary and the separation of powers."

---

[31] https://www.ohchr.org/sites/default/files/Documents/Issues/IJudiciary/Communications/OL_MNG_14.05.19_1.2019.pdf.

- "[W]e note with concern that the wide powers entrusted to the President with regard to the formal appointment of the [Judicial General] Council members risk hampering the independence of the Council and the judicial system as a whole."

81.     The report concludes with remarkably blunt recommendations, the first of which is: "Repeal the amendments to the Law on the Legal Status of Judges and the Law on the Public Prosecutor's Office, in order to eliminate any interference by the National Security Council with the independence of the judiciary and the prosecution service."

82.     These fears came to pass.  Immediately after the passage of these amendments, President Battulga fired the Chief Justice of Mongolia's Supreme Court, the Prosecutor General, the Deputy Prosecutor General, and the head of the IAAC.  He appointed his hand-picked replacements to the key positions involved in investigating and prosecuting corruption cases. Shortly thereafter, another 17 judges were suspended.[32]

83.     In the aftermath of these events, Parliament drafted, and in December 2019 approved, Constitutional amendments that created new constraints on presidential control over the justice system.  However, Battulga's handpicked judges and officials remained in place.  The length of service of the President was newly limited to a single six-year term.  This change had immediate political consequences given the looming 2021 presidential election in which Battulga had been expected to run for reelection.  In 2021, after a case was brought by Battulga's supporters, the Constitutional Court ruled that based on the amendments he could not run for reelection, a ruling which Parliament accepted.[33]  On April 18, 2021, Battulga issued a shocking decree ordering the dissolution of the MPP—his rival political party.  There was no legal basis for such a

---

[32] US Department of State Mongolia 2019 Human Rights Report https://www.state.gov/wp-content/uploads/2020/02/MONGOLIA-2019-HUMAN-RIGHTS-REPORT.pdf.
[33] One unusual feature of the Constitutional Court's authority is that Parliament must approve its rulings.

decree, and it was not obeyed: the MPP called for Mongolians to reject any such attempt to "overthrow the democratic system of parliament, seize state power by unconstitutional means and establish a dictatorship by dissolving any political party."[34]

84.     ***Battulga's Rivalry with Batbold.***  In November 2020, news sources began to report that former Prime Minister Batbold was considered a potential candidate for president for the MPP in the next year's election.[35]  It was soon thereafter, and during this period of political and constitutional tumult, that legal cases against Batbold began to be filed.  The cases against Mr. Batbold rested on accusations that he had acquired property outside Mongolia using funds in overseas accounts that had been obtained illicitly from sales of copper concentrate in 2010-2012 by EMC.

85.     These lawsuits were particularly unusual.  No criminal charges were ever filed against Batbold in Mongolia.  I understand that a Mongolian court even found that there was no evidence an investigation had even been initiated by the IAAC.  I understand that a short-lived civil suit was initially filed in Mongolia, before being quickly dismissed and never re-filed in any forum.

86.     These facts indicate to me that rather than being brought in good faith, the allegations against Batbold were potentially generated on false pretenses based on a campaign by Battulga for nefarious political purposes, as part of his systematic targeting of political rivals and potential opponents in the upcoming presidential election.

---

[34]    https://thediplomat.com/2021/04/grappling-with-parliament-limiting-his-powers-mongolian-president-moves-to-dissolve-ruling-party/.

[35]    https://www.pressreader.com/mongolia/the-ub-post/ 20201111/ 281492163842512?srsltid=AfmBOooJMK6cr02pBMIhe_y3Lq3501trKi6MiRRiOnIEy88VAhNYx09E.

32

civil suit was initially filed in Mongolia, before being quickly dismissed and never re-filed in any forum.

86.     These facts indicate to me that rather than being brought in good faith, the allegations against Batbold were potentially generated on false pretenses based on a campaign by Battulga for nefarious political purposes, as part of his systematic targeting of political rivals and potential opponents in the upcoming presidential election.

## V.     Conclusion

87.     Given my four decades of professional and personal experience in Mongolia, it is my opinion that the accusations involving Batbold are based on a fundamental misunderstanding of the Mongolian constitutional and political structure, and may have been improperly generated by his rival, former President Battulga.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2026, in Skillman, New Jersey.

_____
William Bikales

## Attachment A: Documents Relied Upon

- Asian Development Bank, 2021 "Decentralization, Local Governance, and Local Economic Development in Mongolia", https://dx.doi.org/10.22617/TCS210319-2.
- Bittner, Peter. 2019. "Mongolia's Crisis of Democracy Continues." The Diplomat. January 31. https://thediplomat.com/2019/01/mongolias-crisis-of-democracy-continues/.
- BIV Business Intelligence for British Columbia, October 11, 2010 "Mongolian prime minister renews pitch for resource opportunities amid Vancouver tour" https://www.biv.com/news/archives/mongolian-prime-minister-renews-pitch-for-resource-8228956.
- Boldsaikhan, S. and Menard, A.  "Here's How Democracy is Eroding in Mongolia", Washington          Post,          April          3,          2019 https://www.washingtonpost.com/politics/2019/04/03/heres-how-democracy-is-eroding-mongolia/.
- Campi, A. "Mongolia's Quest to Balance Human Development in its Booming Mineral-Based          Economy,"          Brookings,          January          2012, https://www.brookings.edu/articles/mongolias-quest-to-balance-human-development-in-its-booming-mineral-based-economy/#_ftnref11.
- Chimid, Enkhbaatar. 2017. 'The Development of Judicial Independence and the Birth of Administrative Review in Mongolia'. Academia Sinica Law Journal, Comparative Administrative Law in Asia, no. 21 (September): 155–219.
- Chimid, Enhbaatar, Tom Ginsburg, Amarjargal Peljid, Batchimeg Migeddorj, Davaadulam Tsegmed, Munkhsaikhan Odonkhuu, and Solongo Damdinsuren. 2016. "Assessment of the Performance of the 1992 Constitution of Mongolia." United Nations Development Programme. https://www.undp.org/mongolia/publications/assessment-performance-1992-constitution-mongolia.
- Dierkes, Julian and Boldsaikhan, S. 2019. "The Beginning of the End of Democracy?" Mongolia Focus (blog). March 27. https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.
- Ginsburg, T. (1995). Political reform in Mongolia: Between Russia and C, hina. Asian Survey, 35(5), 459–471.
- Ginsburg, T., & Gombosuren, G. (1996). Constitutionalism and Human Rights. In O. Bruun & O. Odgaard (Eds.), Mongolia in transition: Old patterns, new challenges (pp. 103–134). Routledge.
- Law on Anti-Corruption [Авлигын эсрэг хууль] (2006). https://legalinfo.mn/.
- Law on State Audit [Төрийн аудитын хууль] (2020). https://legalinfo.mn/.
- Law on the Cabinet [Засгийн газрын тухай хууль] (1993). https://legalinfo.mn/.
- Law on the Legal Status of Judges [Шүүгчийн эрх зүйн байдлын тухай хууль] (2019). https://legalinfo.mn/.

34

- Law on the Prosecution Service in Mongolia (2017) (English translation) /https://track.unodc.org/uploads/documents/BRI-legal-resources/Mongolia/24_-Law_on_Prosecution_service.pdf.

- Macdougall, Ian and Anand, Tumortogoo, "The Country That Exiled McKinsey", Propublica May 14, 2019, https://www.propublica.org/article/the-country-that-exiled-mckinsey.

- McAfee, Connor  Semi-Presidentialism: A Pathway to Democratic Backslide, 11 PENN. ST. J.L. & INT'L AFF. 184 (2023).  https://elibrary.law.psu.edu/jlia/vol11/iss2/8.

- Mendee, J. "A New Mongolian Government is Finally Formed", Jamestown Foundation Eurasia Daily Monitor, September 11, 2012  https://jamestown.org/program/a-new-mongolian-government-is-finally-formed/.

- Munkh-Erdene, L. (2010). The transformation of Mongolia's political system: From semi-parliamentary to parliamentary? Asian Survey, 50(2), 311–334.

- Radchenko, S., "Mongolian Politics in the Shadow of the Cold War".  Journal of Cold War Studies (2005) 8 (1): 95–119, https://doi.org/10.1162/1520397067775212021.

- Sonin News Service, "M. Enkhsaikhan: Proposing a Parliamentary Government with a Strong President" (in Mongolian) October 1, 2018 https://sonin.mn/news/politics-economy/35566.

- Transparency International, 2018, "Mongolia: Overview of Corruption and Anti-Corruption," https://knowledgehub.transparency.org/assets/uploads/kproducts/Country-Profile-Mongolia_2018.pdf.

- Transparency International, 2019, "Parliament of Mongolia Should Uphold the Independence of the Judiciary and Anti-Corruption Agency" https://www.transparency.org/news/pressrelease/parliament_of_mongolia_should_uphold_the_independence_of_the_judiciary.

- UNOHCR, Forst, Michel and Garcia-Sayan, Diego, Office of the High Commissioner on Human Rights, United Nations, May 14, 2019, "Amendments to the Law on the Legal Status of Judges and the Law on Public Prosecutor's Office " OL MNG 1/2019, https://www.ohchr.org/sites/default/files/Documents/Issues/IJudiciary/Communications/OL_MNG_14.05.19_1.2019.pdf.

- UNOHCR, Sattherwaite, Margaret,  Office of the High Commissioner on Human Rights, United Nations, A/HRC/56/62/Add.2: Visit to Mongolia - Report of the Special Rapporteur on the independence of judges and lawyers  https://www.ohchr.org/en/documents/country-reports/ahrc5662add2-visit-mongolia-report-special-rapporteur-independence-judges.

- VIP76 News Website, "The First Five Ministries of Mongolia Celebrated Their 100th Anniversary" 12/19/2011,  https://vip76.mn/content/12065.

- Wang, Y and Bayartsogt, Kh., "Corruption Scandals Muddy Mongolia's Presidential Vote", June 22, 2017 accessed at  https://sg.news.yahoo.com/corruption-scandals-muddy-mongolias-presidential-vote-224551888.html.

- Zorigt, D., "Political culture and constitutional reform in Mongolia," GIS Advisory Services, Aug. 27, 2019, https://www.gisreportsonline.com/r/mongolia-constitutional-reform/.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,                         :

                              Plaintiff,    :

                 v.                         :

ANY AND ALL SHARES OF 21 EAST 61 STREET          :
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE                 :
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL             :     Civil Action No. 24-2147
PROPERTY AND PREMISES LOCATED AT 21              :
EAST 61ST STREET, NEW YORK, NEW YORK             :     **DECLARATION OF**
10065, AND ALL PROCEEDS TRACEABLE                      **GENIN TUMURKHUYAG**
THERETO, and                                     :
CONDOMINIUM UNIT 58D, TOGETHER WITH              :
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS,            :
EASEMENTS AND FURNISHINGS, LOCATED               :
AT 230 WEST 56TH  STREET, NEW YORK, NEW          :
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,                               :

                   Defendants <u>In</u> <u>Rem</u>.    :

---------------------------------------------------------------x

I, Genin Tumurkhuyag, hereby declare as follows:

1.       I am a Mongolian citizen and businessman and a former colleague and associate of

Sukhbaataryn Batbold, former Prime Minister of Mongolia.

2.       Unless otherwise stated, all facts set forth in this Declaration are based upon my

personal knowledge and my years of experience working in the Mongolian government and private

sector.

### *Career with Altai Holdings*

3.       I attended the Moscow State Institute of International Relations.  After I graduated,

I worked at various Mongolian government agencies, eventually serving as the Head of the Audit

Department and as Head of Foreign Reserves at the Mongolian National Bank. In around 2000, following my time in public service, I started my own business, FX Trading. Around the same time, I was nominated to be Minister of Finance but was not confirmed to that position, with my nomination failing by just two votes.

4.     In 2004, Mr. Batbold offered me a job to work with him at his company, Altai Trading. We had met as schoolmates in Moscow and had stayed in contact over the years as he grew his business and I went into public service and economics and then started my own company. I accepted the offer and became the CEO of Altai Holdings in 2004. I left Altai in 2011. Subsequently, I joined Bodi Insurance and later the Mongolian Chambre of Commerce, working with small businesses in Mongolia to show them how to work in foreign trade and what documentation was required.

5.     When I started at Altai in 2004, Mr. Batbold's government service was in its early stages. I was brought in to facilitate Mr. Batbold taking a step back from the management of his businesses to focus more on his public service. He stayed involved only to a limited degree as a shareholder. Mr. Batbold largely approved of my management and trusted that I was running the business in the most effective way.

6.     Once Mr. Batbold became Prime Minister in 2009, his involvement with the business was even less. He was rarely available to meet about the business as a shareholder and it was my responsibility. At no time did he try to take advantage of his position to benefit his businesses. In fact, if anything, his role as Prime Minister *reduced* opportunities for the business. The most lucrative contracts available at the time were often state procurement contracts or concession agreements where parties from the public and private sector would build something together. Altai did not have any contracts like that. We avoided work with the public sector

2

entirely to ensure there was no hint of impropriety or conflict of interest. To my recollection, in fact, we received no contracts of any kind from the government during Mr. Batbold's tenure as Prime Minister.

7. In fact, Mr. Batbold went to great lengths to keep his businesses separate from his role as Prime Minister. We at Altai even forewent potentially profitable opportunities to ensure the business remained entirely separate from his public service. As one example, Mr. Batbold's government at one point offered cashmere subsidies to protect our country's vital cashmere industry from foreign competition. Mr. Batbold refused to allow Altai Cashmere to receive any subsidies and only gave his support to the legislation upon confirmation that his company would receive no support. That put our business at a competitive disadvantage. Because Mr. Batbold was Prime Minister, he did not allow us to apply for any of these subsidies, and we never received any.

### *Business Relationship with Chooyoung Cheong and Payments to Battushig Batbold*

8. I first met Chooyoung Cheong while I was working at the Mongolian Bank in the late 1990s. I believe we were introduced at the grand opening of a business where Mr. Cheong had been asked to give a speech. At that time, Mr. Cheong was a prominent foreign businessman in Mongolia—a rarity in a very nascent economy that had few foreigners investing, let alone living in, Mongolia. He had both a reputation for being a successful, wealthy businessman, and he was well connected among government and business leadership in our country.

9. When I was CEO of Altai Holdings, Altai Holdings contracted with Mr. Cheong in several capacities. Mr. Cheong, for instance, was hired as a consultant to help improve the management of the Chinggis Khaan Hotel and encourage tourism from his home country of South

3

Korea. Mr. Cheong also rented out and managed the karaoke bar at Chinggis Khaan Hotel as part of this transaction.

10.     Mr. Cheong also had a business and personal relationship with Mr. Batbold. Their kids were friends, and they got along personally. I understand that at some point, Mr. Batbold and Mr. Cheong agreed that Mr. Cheong would help Mr. Batbold send money to his first son Battushig, who was then living in the United States with his mother, who had separated from Mr. Batbold when Battushig was very young.

11.     When Battushig reached college, his monetary needs increased. Transferring money internationally out of Mongolia was difficult at that time. Just processing a payment at the bank level would take 4-5 days and additional time was required to wire funds. Given the number of business transactions Mr. Cheong and Mr. Batbold's businesses had in Mongolia and Mr. Cheong's access to capital abroad, it was easy to facilitate transfers of money from Mr. Batbold to Battushig through Mr. Cheong and to settle up the difference based on their business transactions in Mongolia. Lkhagvasuren Javzmaa, then the CFO of Altai Holdings LLC, facilitated these transactions and worked with Mr. Cheong to ensure that he was made whole for any transfers he made to Battushig on behalf of Mr. Batbold. One mechanism to effectuate these transfers was Mr. Cheong's karaoke bar rental payments. At times, Mr. Cheong would send funds to Battushig in the U.S. and the rent in Mongolia was forgiven in exchange.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 08, 2024
      Ulaanbaatar, Mongolia

_____
G. Tumurkhuyag

4

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

UNITED STATES OF AMERICA,                                :

                              Plaintiff,    :

               v.                                            :

ANY AND ALL SHARES OF 21 EAST 61 STREET  :
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE                        :
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL         :
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK         :
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and                                             :
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,                        :
IMPROVEMENTS, FIXTURES, ATTACHMENTS,     :
EASEMENTS AND FURNISHINGS, LOCATED          :
AT 230 WEST 56TH  STREET, NEW YORK, NEW  :
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,                                       :

                                         :

                    Defendants In Rem.    :

--------------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF
LKHAGVASUREN JAVZMAA**

I, Lkhagvasuren Javzmaa, hereby declare as follows:

1.      I am a Mongolian citizen and businesswoman.  I graduated from the Mongolian Institute of Commerce and Business with a BSc in Accountancy.  I then received my MBA from the Academy of Management, Government Agency of Mongolia.

2.      I began my career as an accountant, working for dozens of small businesses in the late 1990s and early 2000s.  In approximately 2004, I became an accountant at Altai Cashmere LLC, a business Sukhbaatar Batbold had founded during Mongolia's transition to a market economy in the early 1990s.  Over time, I gradually became the accountant for other companies associated with Mr. Batbold.  In 2009, I became the Chief Financial Officer of Altai Holdings,

LLC, overseeing the operations and financial management of all companies managed within the Altai Holdings portfolio. In 2011, I became the Chief Executive Officer of Altai Holdings, LLC, a role I continue to serve in today. In my capacity as CEO, I oversee Altai Holdings' portfolio companies in hospitality, telecommunications, and cashmere, among others. I also currently serve as the Chief Executive Officer of Emart Mongolia, another Altai portfolio company. Emart is the operator of one of the largest chains of shopping centers in Mongolia. We operate stores that are akin to Target or Walmart in the United States.

3.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and private sector.

*Chooyoung Cheong's Relationship with Altai Holdings*

4.      I first met Chooyoung Cheong in or around 2005. One of my responsibilities at that time was overseeing the operations of the Chinggis Khan Hotel, which Mr. Batbold purchased and developed in the 1990s. In the early 2000s, Mongolia was still in the process of adopting market economy standard business practices. There were very few people in the country that understood these practices and how to implement them back then. That meant organizations often sought out foreigners with experience outside Mongolia to help train staff and implement new management systems. Mr. Cheong was an ideal candidate to take on this role at the hotel given his longstanding business experience in Mongolia, his prior personal and business relationship with Mr. Batbold, and his business acumen and training in Korea. Mr. Cheong was also an ideal candidate to assist the hotel's business because tourism from his home country, South Korea, represented an ideal business opportunity, and he was well connected in that market as he was in our own.

2

5.    The hotel ultimately contracted with Mr. Cheong to serve as a consultant to improve and professionalize its operations. The first thing Mr. Cheong assisted with was with our books and records. At that time, our books and records were disorganized. This was in part due to the fact that the software we had purchased to manage these systems was in Korean. No similar Mongolian software existed back then. Due to the language barrier, we were not using the software to its full capacity. Mr. Cheong, a native Korean speaker, helped us set up this software to better manage our record keeping, payment, and HR. Mr. Cheong also served as a consultant advising us on best management practices and assisting us in our efforts to recruit foreign guests.

6.    Over time, Mr. Cheong's involvement in the operations of the hotel evolved. Between approximately 2007 and 2009, Mr. Cheong, through his company Midlink, paid rent to the Chinggis Khan Hotel and in exchange managed and operated a spa facility, fitness center, swimming pool, and karaoke bar in the hotel. Under this consulting agreement, Mr. Cheong's company Midlink paid rent to the Chinggis Khan Hotel and in return received income from the facilities under its management. This consulting agreement between Midlink and the hotel evolved over time until its termination in 2012.

### *Transfers from Mr. Cheong to Battushig on Behalf of Mr. Batbold*

7.    As with many families, the Batbolds have complex internal dynamics. Mr. Batbold has one child from his first marriage, Battushig. Mr. Batbold and Battushig's mother divorced when Battushig was approximately 7, at which time Battushig and Battushig's mother left Mongolia. After the divorce, Battushig attended school and primarily lived in the United States starting in the early 2000s. He remained in the U.S. through his graduation from high school, college, and eventually business school in or around 2014. While Battushig and his mother were in the U.S., Mr. Batbold remarried. His second wife, to whom he is currently married, already had

3

a son from her first marriage. She and Mr. Batbold went on to have several additional children over the course of the next several years. This meant that by the time Battushig was in college, Mr. Batbold was managing multiple relationships in a complex, blended family with offspring from his two marriages, as well as from his wife's prior marriage.

8.    This family dynamic meant that Mr. Batbold had to be sensitive not to appear to favor any of his children. He wanted to adequately support Battushig—particularly as he was the oldest child and was at that time venturing out on his own to get an exemplary education in the U.S. But he also had to navigate the fact that, had Mr. Batbold sent Battushig funds from Altai Holdings, Mr. Batbold's wife would have access to the company's books and records and might see the transfers and raise concerns about them vis-à-vis Mr. Batbold's financial support for his younger children. Because of these complex dynamics, Mr. Batbold tried to avoid directly providing monetary support to Battushig through Altia Holdings, which was often how he would support his children from his second marriage.

9.    Despite the challenges it created, Mr. Batbold was committed to supporting Battushig during his years as a student. To manage the family relationships and avoid any concerns among his relatives, Mr. Batbold provided money to Battushig without the involvement or awareness of other family members, including his second wife. I understand Mr. Batbold would provide this support through a variety of means, including making cash payments to his ex-wife and cash payments to Battushig, which Mr. Batbold would give them directly when they were visiting Mongolia or when Mr. Batbold was visiting the U.S. or elsewhere.

10.    One of the means by which Mr. Batbold facilitated transfers to Battushig was through his business partner and friend Mr. Cheong. Mr. Cheong was an ideal person to help with this type of support because he had U.S. bank accounts and because Battushig knew and was

4

familiar with Mr. Cheong.    (The access to U.S. bank accounts was particularly helpful, as transferring money abroad from Mongolian bank accounts was often cumbersome and slow.) The Cheongs and Batbolds were family friends, and Mr. Cheong when traveling abroad had done Mr. Batbold the favor of looking out for Battushig. He would even go on to do Mr. Batbold the favor of mentoring Battushig in business.    Given Mr. Cheong and Mr. Batbold's many years of friendship and business partnerships, Mr. Cheong was someone Mr. Batbold felt he could trust to help him support his eldest son and navigate the complex dynamics of his blended family.   As a consequence, Mr. Batbold and Mr. Cheong agreed that Mr. Cheong would, at times, transfer money to Battushig in the U.S., for which Cheong would receive an equal or greater value in Mongolia to settle up. Although I did not have perfect visibility into how much money was being transferred from Mr. Cheong to Battushig, it appeared to me that the payments to Mr. Cheong typically surpassed the amounts transferred to Battushig. In other words, I believe that Mr. Cheong ultimately profited from this arrangement.

11.    As the CFO and then CEO of Altai Holdings, I was personally involved with and aware of the transfers of certain funds to Mr. Cheong to facilitate monetary support to Battushig abroad. I have reviewed the records of Mr. Batbold's various companies and have identified some examples of the means by which Mr. Cheong was reimbursed for his payments to Battushig.

12.    *Rental Agreement Between Mr. Cheong and the Chinggis Khan Hotel:* As I noted previously, Mr. Cheong, through his company Midlink, entered into a consulting agreement with the Chinggis Khan Hotel. In 2009, the terms of the agreement between Mr. Cheong and the hotel were renegotiated. During these negotiations, Mr. Cheong expressed his dissatisfaction with the rental arrangement. He felt that he was paying too high of a rent in comparison to the fees he was

5

collecting from the properties under his management. Rather than fully cancelling the agreement, Mr. Batbold and I decided to update the terms.

13.    Whereas the old agreement involved rental payments on multiple facilities in the hotel, under the revised agreement Midlink was only responsible for operating and paying rent on the karaoke bar at a rate of $9,060 per month. In addition to modifying the scope of the agreement, we modified the payment structure of the agreement. Under the original agreement, rent flowed from Midlink to the Chinggis Khan Hotel. Under the new agreement, Mr. Cheong did not make regular monthly payments. Instead, Mr. Cheong provided financial support to Battushig in the U.S. Mr. Cheong and Mr. Batbold would then at a subsequent time tally up the debts and credits in their relationship, including Mr. Cheong's unpaid rent to the hotel, Mr. Cheong's transfers to Battushig, and any other outstanding business debts between Mr. Cheong and the Batbolds, and settle up accordingly. None of Mr. Batbold's family members were aware of this arrangement. This reworked arrangement enabled Mr. Batbold to discretely provide support for Battushig given the complex family dynamics he faced at home.

14.    *Proceeds of Darkhan Khan Property Sale to Mr. Cheong:* Another means by which funds were transferred to Mr. Cheong for the benefit of Battushig was through the sale of a property in Mongolia. In 2009, Mr. Batbold bought two properties that were being developed in Mongolia. One of the properties was bought for Mr. Batbold's son from his second marriage, Samadi, and the other was bought for Battushig. The property Mr. Batbold acquired for Battushig was held in trust by a Mongolian company called Darkhan Khan LLC. Dharkan Khan was a company that Mr. Batbold's father, Battushig's grandfather, established to manage certain real estate properties and to provide income to Battushig. Some of

6

that property was rented for profit, some was sold with Darkhan Khan managing the cash, and other property was held in trust to be sold at a later date.

15.    In 2013, Mr. Batbold decided to sell the roperty he had bought for Battushig and to provide Battushig with the proceeds of the sale. To facilitate this transfer of money to Battushig, Darkhan Khan sold the property to Mr. Cheong for $380,000. As with the karaoke bar rental payments, Mr. Cheong never made the payment in Mongolia. He instead transferred the agreed upon sale price directly to Battushig in the United States.

16.    I understand that around this same time, Battushig was occasionally staying at a property Mr. Cheong owned in the United States and therefore owed a certain amount of rent to Mr. Cheong. As with the karaoke rental payments, Mr. Cheong and the Batbolds would track their accumulated debts over time, including the sale price of the property, the rental payments Battushig owed Mr. Cheong, and other personal and business debts accrued between Mr. Cheong, Mr. Batbold, and their respective companies. The two families would then periodically settle the difference in their debts.

17.    *Payments to Mr. Cheong from Darkhan Khan:* Another method by which money was transferred to Mr. Cheong in Mongolia, in exchange for transfers from Mr. Cheong to Battushig in the U.S., occurred via transfers from Darkhan Khan to Mr. Cheong. By reviewing Darkhan Khan's records, I was able to identify six such transfers totaling approximately $650,000. These included transfers from Darkhan Khan to Mr. Cheong of $100,000 on September 25, 2011, $59,300 on December 21, 2011, $78,000 on June 18, 2012, $30,000 on July 30, 2012, $175,000 on January 15, 2013, and $211,800 on April 18, 2013. These transfers were made with the understanding that Mr. Cheong either already had or would in the future provide an equivalent or near equivalent sum to Battushig in the U.S.

7

18.    *Cash Payments to Mr. Cheong from Altai Holdings:*  An additional method by which Mr. Batbold provided money to Battushig through Mr. Cheong, was via informal cash payments. Given my familiarity with and involvement in the process of payments flowing to and from Mr. Cheong, it is my understanding that certain cash payments to Mr. Cheong were connected with payments to Battushig. By reviewing the company's records, I was able to identify seven such cash payments from Altai Holdings to Mr. Cheong. Those payments totaled approximately $65,000.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 4, 2024
Ulaanbaatar, Mongolia

Lkhagvasuren Javzmaa

8

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

UNITED STATES OF AMERICA,                  :
                                           :
Plaintiff,                                 :
                                           :
v.                                         :
                                           :
ANY AND ALL SHARES OF 21 EAST 61 STREET    :
APARTMENT CORP. HELD IN THE NAME OF        :
LOVITAS, INC., TOGETHER WITH THE           :
APPURTENANT PROPRIETARY LEASE FOR          :
COOPERATIVE UNIT 12E WITHIN THE REAL       : Civil Action No. 24-2147
PROPERTY AND PREMISES LOCATED AT 21        :
EAST 61ST STREET, NEW YORK, NEW YORK       : **DECLARATION OF RAVDAN BOLD**
10065, AND ALL PROCEEDS TRACEABLE          :
THERETO, and CONDOMINIUM UNIT 58D,         :
TOGETHER WITH ITS RESPECTIVE               :
APPURTENANCES, IMPROVEMENTS,               :
FIXTURES, ATTACHMENTS, EASEMENTS AND       :
FURNISHINGS, LOCATED AT 230 WEST 56TH      :
STREET, NEW YORK, NEW YORK 10019, AND      :
ALL PROCEEDS TRACEABLE THERETO,            :
                                           :
Defendants In Rem.                         :

---------------------------------------------------------------------x

I, Dr. Ravdan Bold, PhD, hereby declare as follows:

1.     I am a Mongolian citizen and public servant.  I served in the Mongolian government in foreign service, national security, and intelligence roles for approximately forty years.

2.     I attended the Military Institute in Ulaanbaatar, the Military Diplomatic School in Moscow, and the Defense Resources Management Training of Naval Postgraduate School in the United States and received a PhD in military history.

3.     I have held numerous roles in public service during my career in multiple branches of the Mongolian government.  I began my career in the 1980s in the Embassy of Mongolia to

Japan. I then served as the Executive Secretary of the Mongolian National Security Council and later, from 2003 to 2007, as Ambassador to United States. Subsequently, from 2007 to 2012, I was the Director of the Mongolian General Intelligence Service. I then served as Ambassador to Australia and to Turkey before retiring in 2021.

4.      I first met Sukhbaatar Batbold in the 1990s when he was a businessman in Mongolia's fledgling market economy. At that time, I was a research fellow at the Institute for Strategic Studies within the Ministry of Defense. When Mr. Batbold entered public service and became the Deputy Minister of Foreign Affairs, I worked with him in my capacity as Ambassador to the United States. And as the Director of the Mongolian General Intelligence Service, I reported directly to Mr. Batbold throughout his time as Prime Minister. In that role, I worked very closely with Prime Minister Batbold, reporting to him on periodically from 2009 to 2012.

5.      During that time, I came to know Mr. Batbold as a fundamentally ethical person and leader who cares deeply about his country and its democratic future. As Prime Minister, Mr. Batbold was very conscientious. He made thoughtful, balanced, and careful decisions and consistently listened to and valued the opinions of others. His leadership style was not abrasive or forceful but rather conciliatory and unifying. I have never seen him raise his voice. And in my experience, Mr. Batbold always obeyed the law. At no time did he ever ask me to abuse my power as Director of the General Intelligence Service, nor did I witness or learn of any instance in which he abused power or crossed any legal lines. I do not believe he is the kind of person that would abuse his power or pressure others to abuse theirs.

6.      I understand the Plaintiff in this case has alleged that Mr. Batbold engaged in corruption during his tenure as our Prime Minister. As fellow public servant intimately familiar with Mr. Batbold's character and experience, the constitutional structure and checks and balances

2

inherent in Mongolia's system of government, and the structure of the Erdenet Mining Corporation's ("EMC") operation, I believe Plaintiff's allegations are entirely implausible if not impossible.

7.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government.

### Mr. Batbold Was a Reformer During a Critical Time for Mongolia

8.      Mongolia began transitioning to a market-based economy in the 1990s. After a volatile transition, with a recession in the early 1990s, Mongolia entered a period of development, characterized by political and economic reform.

9.      When he entered public service in 2000, Mr. Batbold was a champion of these reforms. He was a strong supporter of civil society and vocal on issues of justice. Mr. Batbold is a pro-Western politician, who has dedicated his career to strengthening democracy in Mongolia. While serving as the Deputy Minster for Foreign Affairs during 2000-2004, he played a key role in negotiating the stationing of Mongolian peacekeepers in Iraq with then U.S Deputy Secretary of State Richard Armitage.

10.    Beginning around 2011, the Mongolian economy experienced significant growth. This is due, in part, to Mr. Batbold's contributions to Mongolia's economic development as Prime Minister. In 2012 the statistics showed the Mongolian economic growth was an unprecedented level of 17.3%, which has never been reached again since. When I served as Director of the General Intelligence Service, I was consistently impressed with his leadership and management.

### The Allegations of Corruption Levied Against Mr. Batbold are Flawed and Not Credible

3

11.    I have reviewed the allegations of corruption in this case. Respectfully, I believe they are deeply flawed. The allegations suggest that, beginning in 2011, Mr. Batbold engaged in corruption by steering contracts at EMC—one of the biggest and most important companies in Mongolia—to a friend, namely the well-known and successful international businessman and copper trader Chooyoung "Nicholas" Cheong. Based on my personal knowledge and experience, I find these allegations implausible for at least four reasons.

12.    *First*, at the time Mr. Batbold served as Mongolian Prime Minister, the Prime Minister could not control EMC. EMC was founded to operate the largest copper mine in Erdenet, Mongolia. It was a joint venture between Russia and Mongolia. The Agency for Policy Coordination on State Property, reporting to the Minister for Cabinet Secretariat, represented the Mongolian government's interest in EMC. But EMC's day-to-day operations were managed by a Board of Directors, a General Director, and a Deputy General Director and were generally insulated from domestic politics. These positions were all split between Russian and Mongolian representatives that checked and balanced each side to ensure the overall success of the business and transparency. Throughout Mr. Batbold's tenure as Prime Minister, the Mongolian representatives included appointees from both of Mongolia's primary political parties—the Mongolian People's Party (the "MPP") and the Democratic Party (the "DP"). Given these significant bipartisan checks, the Prime Minister had no formal authority to control or direct EMC's actions. EMC therefore operated independently, without interference from government ministries.

13.    *Second*, Mr. Batbold did not have any informal influence over EMC leadership. I know from three years of daily reporting to Mr. Batbold that he did not have a relationship with Chimeddorj Ganzorig, the General Director of EMC during Mr. Batbold's tenure. Mr. Batbold

did not appoint Mr. Ganzorig to this role. Mr. Ganzorig was not beholden to Mr. Batbold and had no incentive to help him.

14.    In fact, I believe it is more likely that Mr. Ganzorig would have used any requests for favors or even the appearance of impropriety to harm Mr. Batbold's political career. Although members of the same political party, Mr. Batbold and Mr. Ganzorig belonged to different factions. They did not have a good working relationship. They would not do each other any favors. For example, when Mr. Ganzorig sought the MPP's nomination to the slate of parliamentary candidates in 2012, Mr. Batbold used his powers as MPP party chairman to prevent him from running.

15.    Ts. Elbegdorj was chosen as President of Mongolia in June 2009 and Mr. Batbold was appointed Prime Minister in October 2009. In 2010, President Ts. Elbegdorj appointed then Head of the President's Office D. Dorligjav, who was also formerly the General Director of EMC, as the Prosecutor General of Mongolia.

16.    *Third*, EMC was subject to oversight and intense scrutiny, making it unlikely that Mr. Batbold could have exercised any informal authority over EMC. EMC was, and still is, the most significant source of revenue for the Mongolian government. At one time, it was the primary source of government revenue. Because Mongolia's economic security relied on EMC, it was under close observation, including by the General Intelligence Service that I led.

17.    For that reason, if Mr. Batbold was meeting with Mr. Ganzorig or attempting direct EMC activities, I would have known about it. The General Intelligence Service had a special branch in Erdenet, which reported on EMC's General Director, who he met with, and his day-to-day activities. EMC was a top strategic asset in Mongolia at the time, and our intelligence service

5

paid it close attention. For that reason, I was aware of other investigations into EMC at the time. None involved Mr. Batbold.

18. *Fourth*, Mr. Batbold is a very successful businessman with a significant net worth. He does not need to engage in corrupt behavior to line his pockets. In the 1990s, he established one of Mongolia's largest private companies during a turbulent period shortly after Mongolia transitioned to a market economy. Mr. Batbold was savvy and independent. He raised capital from various private sources and did not receive any government subsidies or funds. By the time he entered public service, Mr. Batbold had amassed a large net worth. He had no need to abuse his power or ask others for favors for his own financial benefit. And in fact, during his tenure in public service he was assiduous at keeping his business separate from politics—including, for instance, refusing to allow his companies to accept public subsidies for certain industries like cashmere, to avoid any hint of conflict of interest.

19. In sum, Mr. Batbold is an ethical, consequential, and democratic leader in my country. Given my four decades of experience in public service, diplomacy, and intelligence, I would be aware of any improprieties Mr. Batbold engaged in if he did. To my knowledge, however, he did not—and at all times he has acted in accordance with the law, ethics, and fundamental decency.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: September 2, 2024
Ulaanbaatar, Mongolia

Ravdan Bold

6

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,                                    :

                                        Plaintiff,           :

                                                             :

            v.                                               :

                                                             :

ANY AND ALL SHARES OF 21 EAST 61 STREET                      :
APARTMENT CORP. HELD IN THE NAME OF                          :
LOVITAS, INC., TOGETHER WITH THE                             :
APPURTENANT PROPRIETARY LEASE FOR                            :
COOPERATIVE UNIT 12E WITHIN THE REAL                         :   Civil Action No. 24-2147
PROPERTY AND PREMISES LOCATED AT 21                          :
EAST 61ST STREET, NEW YORK, NEW YORK                         :   **DECLARATION OF**
10065, AND ALL PROCEEDS TRACEABLE                            :   **ZORIGT DASHDORJ**
THERETO, and                                                 :
CONDOMINIUM UNIT 58D, TOGETHER WITH                          :
ITS RESPECTIVE APPURTENANCES,                                :
IMPROVEMENTS, FIXTURES, ATTACHMENTS,                         :
EASEMENTS AND FURNISHINGS, LOCATED                           :
AT 230 WEST 56TH STREET, NEW YORK, NEW                       :
YORK 10019, AND ALL PROCEEDS                                 :
TRACEABLE THERETO,                                           :

                                                             :

                                   Defendants In Rem.        :

-------------------------------------------------------------------x

I, Zorigt Dashdorj, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Mongolian citizen and public servant with extensive experience working in the government and Mongolia's mining and energy sectors. I received an M.A. in Politics from the Moscow State Institute of International Relations, an M.A. in International Relations from the Australian National University, and an LL.M. and LL.D. from Kyushu University in Japan.

2.      I have spent two decades working in public service, during which I have become intimately familiar with the structure of the Mongolian government and the fiercely divided political climate in which it all operates. I served, for instance, as the Director of the Department

of Economic Cooperation in the Ministry of Finance and then as Director of the Department of Policy Planning and Coordination in the Ministry of Industry and Trade. I also served in the Foreign Ministry, including spending two years in New York City as the First Secretary to Mongolia's Permanent Mission to the United Nations. From 2009-2012, I served in Mongolia's Parliament. Currently, I am director of New Recovery Policy Accelerator Center which acts in research and advisory role to the Government's office.

3.    I also have extensive expertise in Mongolia's mining sector. From 2008 to 2012, I served as Mongolia's Minister for Natural Resources and Energy. As Minister, I negotiated and executed multiple large-scale mining and energy projects, propelling Mongolia to become one of the fastest growing frontier economies. Prior to my appointment to that role, I was the first Chief Executive Officer of the state-owned mining company Erdenes MGL.

4.    I am also familiar with Sukhbaatar Batbold. I first met Mr. Batbold in 2003 when I came back from studies in Japan and came to know him and his family in the ensuing decades. We were, for example, both public servants in the Foreign Ministry; I served under him when he was Minister of Industry and Trade; and I was Minister for Natural Resources and Energy when he became Prime Minster. Since 2016, I have advised his businesses and have served as an officer or director of companies he owns. I also was director in companies owned by other prominent business people in Mongolia. From August 2024 I no longer work in the private sector and do not currently hold any roles at Mr. Batbold's companies.

5.    Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and the mining sector.

### *The Allegations Against Mr. Batbold are Not Credible*

2

6.    I understand the U.S. government has alleged that Mr. Batbold engaged in corruption during his tenure as our Prime Minister. As a member of the Cabinet where he served as Foreign Minister alongside myself and Prime Minister then, and as a fellow public servant deeply familiar with his character, it would truly shock me if any of the allegations were true. As I read the accusations, they assert that Mr. Batbold engaged in corruption by steering contracts from one of Mongolia's single largest and most important entities, the Erdenet Mining Company ("EMC"), to Chooyoung "Nicholas" Cheong, a well-known and highly successful international businessman.

7.    I believe these allegations are deeply flawed.   They rest on profound misunderstandings of Mongolian governance and political systems. The allegations also paint an unrecognizable picture of Mr. Batbold—who is an intrinsically generous and duty-driven man. I address each issue in turn.

### A.    The Corruption Theory Misunderstands EMC's Governance

8.    The corruption allegations levied against Mr. Batbold rely on the flawed assumption that then-Prime Minister Batbold had the authority, either formal or informal, to dictate where EMC sent its contracts. That is not correct. The government's corruption theory ignores the structure and governance of EMC during Mr. Batbold's tenure—structures that eliminate the possibility of the type of corruption alleged—and the reality of Mr. Batbold's relationship with EMC's General Director at the relevant time.

9.    Until 2019, EMC was a joint venture between Russia and Mongolia.   Both governments had equal control, with one preventing the other from unilaterally influencing EMC's operations, including directing its contracts. Its Board of Directors managed EMC's operations and supervised the company's officers. The Board was divided evenly between Russian and

3

Mongolian appointees, and the two most senior company officers—the General Director and First Deputy—were always held by one Russian and one Mongolian to ensure further accountability.

10. EMC operated independently of the Mongolian government. Government ministries, as well as the Prime Minister, were not permitted to interfere in the internal management of EMC. As an example, though I was Minister of Mineral Resources and Energy, in my recollection, I visited EMC only two times during four years of my tenure. One was on the occasion of its anniversary to deliver congratulations and second to attend a working group meeting to hear findings on the construction of copper smelter, which required broad coordination of various agencies. I never spoke to the General Director of EMC over the phone or met him besides these occasions. The Prime Minister did not have the power to appoint or remove the General Director or any other officer—rather, the company's officers and its employees were accountable to the Board. EMC's Board of Directors could remove the General Director if he, for example, entered a non-competitive contract. The General Director was a fiduciary to the company and accountable to its Board of Directors, not the Prime Minister. Accordingly, Mr. Batbold had no legal control over the day-to-day operations of EMC and could not dictate with whom EMC would or should contract.

11. The relationship between Prime Minister and General Director was also not hierarchical. The General Director was a very powerful position and did not generally kowtow to politicians, including the Prime Minister. In fact, given the Mongolian government's financial reliance on EMC as one of the main drivers of the economy and the government's budget, at that time the General Director was considered to be as powerful or even more powerful than any politician in the country. EMC was a critical institution of government and the country—and the government relied on it extensively.

4

12.     Mr. Batbold also had no informal influence or control over EMC during his premiership given his relationship with the General Director at the time.  The General Director at the time was a man named Chimeddorj Ganzorig.  He was appointed to his post in 2007—two years before Mr. Batbold became Prime Minister—and remained General Director through the end of Mr. Batbold's premiership.  Mr. Ganzorig became a senior government official in the early 1990s, long before Mr. Batbold rejoined the government, and was a prominent political figure already.  Mr. Ganzorig was not therefore directly or indirectly accountable to Mr. Batbold.  Importantly, Mr. Ganzorig and Mr. Batbold were not political allies.  Although they were formally members of the same political party, they were members of different and rival political factions within that party.  They had a notoriously tense relationship—at one point, Mr. Batbold even refused to allow Mr. Ganzorig to run for Parliament on the party's slate, largely ending Mr. Ganzorig's political career.  As a consequence, the theory that Mr. Batbold would have asked Mr. Ganzorig for a corrupt favor is absurd to anyone who knows these men.  If anything, had Mr. Batbold asked Mr. Ganzorig to do something corrupt, I believe Mr. Ganzorig would have worked to *expose* that favor to damage Mr. Batbold's political prospects, not accede to the favor.

### B.     *The Corruption Theory Misunderstands the Political Reality*

13.     The second flaw in the government's corruption theory is that it misunderstands Mr. Batbold's power as Prime Minister.  While many countries are ruled by strongmen and autocrats, Mongolia is different.  Our government is heavily divided between multiple powerful branches of government—including the Prime Minister, the Speaker of Parliament, and the President.  Importantly, unlike in many parliamentary systems around the world, our President is not a figurehead—he has real power in our system.  Consistent with the core separation of powers principles that underly our Constitution, these institutions all battle for power and influence,

5

meaning they have strong checks and balances on each other. As a consequence, our Prime Minister is hardly all powerful. And Mr. Batbold was particularly unpowerful during his tenure. To be clear, Mr. Batbold was a highly consequential Prime Minister, leading major bipartisan reforms and trailblazing economic growth. But he was politically very weak because he presided over a divided government in which his political opponents controlled key organs of government that could and would have held him accountable for any and all missteps. Given this context, it is unlikely he could have engaged in the type of corruption the U.S. government alleges in this case without accountability.

14.     From the very beginning, Mr. Batbold entered office on a weak political footing. Mr. Batbold became Prime Minister unexpectedly. In 2008, he was serving in Parliament and as Minister of Foreign Affairs. The next year, Prime Minister Bayar Sanjaa resigned abruptly due to health problems. In response, the Mongolian People's Party ("MPP"), which held the majority in Parliament, nominated Mr. Batbold to be the new Prime Minister. It was a surprise. As a consequence of the fact that he became Prime Minister not because he led an election victory but replaced the previous leader in internal election, Mr. Batbold did not enter office with any strong electoral mandate.

15.     When Mr. Batbold became Prime Minister, the government was divided. Although the party had a majority in Parliament, the President was a member of the opposition party—the Democratic Party, second largest party in Mongolia's bipartisan system. In our system, the President holds appointment power over judges, prosecutors, and at that time the Independent Anti-Corruption Agency ("IAAC"). The President at that time would have had every political incentive to wield his power over those institutions to hold Mr. Batbold accountable for any and all missteps. In fact, the President at that time appointed his own chief of staff who was formerly

6

general secretary of Democratic Party and General Director of EMC to be prosecutor general. These agencies kept a close watch on EMC and on Prime Minister Batbold.

16. Due to many political and economic factors, Mr. Batbold 's predecessor decided to form a coalition government with the Democratic Party. Accordingly, over half of his cabinet was from Mr. Batbold's party, the MPP, while the rest, almost half, including the Minister of Finance and the Deputy Prime Minister, were members of the DP. With his administration split and with core branches of government in control of the opposition party, Prime Minister Batbold lacked significant political influence. In addition, the Mongolian government is a collegial decision-making institution where the cabinet decision is official when it is signed by both the Prime Minister and the respective Minister. At that time cabinet ministers were only nominated by the Prime Minister but the power to appoint and dismiss the minister rested with the Parliament. So, even institutionally, the Prime Minister was not all powerful and lacked power over ministers. These politically and institutionally powerful ministers were represented on the governing committee of the State Property Committee which made all the decisions, and the EMC board by their State secretaries, who reported to their respective ministers.

17. In sum, as Prime Minister, Mr. Batbold was surrounded by and under the watchful eye of the opposition party, which had every incentive to capitalize on any misstep to harm his political career and improve their own electoral prospects, which they eventually did by winning the 2012 Parliamentary election. The opposition controlled the presidency, the courts, the prosecutors, and the IAAC. For that reason, Mr. Batbold had to be scrupulous and ensure he and his government made no possible missteps. The idea that Mr. Batbold's political opponents, working with Mongolia's top law enforcement and intelligence agencies, would have missed or ignored any hint of corruption by Mr. Batbold corruption is entirely implausible.

7

## C.   *The Corruption Theory Misunderstands Mr. Batbold*

18.   The next flaw in the corruption theory is that it takes no account of Mr. Batbold as a person.  Over the course of our nearly two decades working together, Mr. Batbold has always proven to me that he is ethical, honest, and fundamentally decent person.  He has a vision for our country and has striven to build balanced, good-neighborly relations with the two geographic neighbors and deep relationships with the West while protecting Mongolia's right to self-determination.  Despite significant political challenges, he was one of the most successful Prime Ministers of our young democracy and I am proud to have served in his administration.  Indeed, the accomplishments of that administration were many, including implementing groundbreaking gender equality laws in Mongolia, modernizing the stock exchange based on the London Stock Exchange standards, bringing in critical foreign investment, modernizing Mongolian education based on Cambridge education standards, and drawing attention to the global climate change crisis.  Mr. Batbold is also a very wealthy man.  He had no need to engage in a corrupt scheme— particularly while under significant scrutiny—to line his own pockets.  Although some politicians might be tempted by greed, Mr. Batbold has demonstrated his commitment to country over personal gain throughout his career.  For example, after Mongolia transitioned to a market economy, Mr. Batbold acquired the economic rights to Tavan Tolgoi, one of the largest known metallurgical coal deposits in the world.  In the early 2000s, a Russian oligarch offered Mr. Batbold $500 million for just one quarter of his license.  Rather than sell to foreign actors who would not have the Mongolian people's best interest in mind in controlling this strategic asset. This coal asset now is a state owned mine which is a backbone of Mongolia's economy exporting billions of dollars' worth of product and paying taxes and dividends to the Government which pays for roads, school, pensions, salaries etc. Mr. Batbold gave this massive asset back to the government so the

8

people could have it.  He and a consortium of businesses he led retained only a small interest in the deposit, which he sold years ago.  This is not a man who would abuse power given that he is a wealthy man and compared to what he gave back to the country.

### F. *The Corruption Theory Has Done Incalculable Harm to Mongolia*

20.     Mr. Batbold's unwavering commitment to serving the best interests of his country is at the core of his policy goals.  In addition to being a fundamentally decent person and an immensely successful public servant and businessman, Mr. Batbold is also a stalwart defender of democracy in Mongolia and fierce advocate for increased ties with the Third Neighbor. As part of multi-pillared foreign policy. The same cannot be said for certain members of the DP, including former President Khaltmaagiin Battulga, who publicly denied existence of the "Third Neighbor" policy of Mongolia legislated by the Parliament.  As a staunch believer  and promoter of Mongolia's balanced foreign policy, Mr. Batbold is a key leader of the  "Multi-Pillared" policy of his party.

21.     Regrettably, the corruption allegations have done grave damage to Mr. Batbold and his pro-democracy allies within his party and the country.  With the corruption allegations making headlines in Mongolia, Mr. Batbold's rivals succeeded in removing him from the parliamentary slate for Mongolia's June 2024 elections.  As a consequence, a critical democratic and Third Neighbor policy ally has been removed from government entirely.  This is a significant coup for forces which oppose Mongolia's balanced foreign policy. It also reflects unfortunate interference in our country's democratic elections, as before this corruption case was filed publicly, Mr. Batbold was certain to be a nominee for Parliament and was certain to be elected.  He had been even named among potential candidates from the MPP to the 2021 Presidential elections.

22.    I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: October 22, 2024
       Ulaanbaatar, Mongolia

Zorigt Dashdorj

10

# EXHIBIT 6

# THE | DIPLOMAT

**CROSSROADS ASIA** | POLITICS | EAST ASIA

# Mongolia's Political Parties Showcase Candidates for the 2024 Parliamentary Election

As Mongolia goes to its first election with an enlarged parliament and new mixed representation electoral system, parties are including more diverse and young candidates.



By **Bolor Lkhaajav**
May 22, 2024





Credit: Depositphotos

Mongolia's 2024 parliamentary election will take place on June 28, and political parties have officially released the names of their candidates. With the enlarged legislative branch – expanding from 76 to 126 seats – this year's election will be one of the most significant in modern Mongolia's history. This election also can illustrate the state of political parties and their influence on Mongolia's political life.

According to the General Election Committee of Mongolia, 23 political parties and two coalitions will run campaigns, starting on June 14 and continuing for two weeks. Based on currently available open-source information, the Democratic Party (DP), Mongolian People's Party (MPP), Khun Party, Civic Union Party, and National Coalition have released their candidates' names.

Candidates from traditional political parties such as the DP and MPP aim to gain a majority if not supermajority. The additional 50 seats will create new opportunities for parties under a mixed electoral system. The merging of electoral districts from 26 to 13 will also have an impact on new parties and new faces.

After assessing the latest candidate lists, the Khun Party and the MPP are believed to have the best chance in the upcoming election. Predictions are flying on social media platforms as political activists and ex-politicians weigh in. The DP is expecting to gain 15-20 seats in the parliament and the Khun Party expects to have more than 30 seats. Currently, Mongolia's parliament is dominated by the MPP, which holds 61 of 76 seats, followed by the DP in distant second place with 11 seats.

People with diverse professional backgrounds – such as journalists, engineers, environmentalists, rights activists, non-profit workers, education advocates, and economics and legal experts – are running campaigns. Assessing the list of all parties and coalitions, there is a broad sense of inclusivity, diversity, and youth-focused selection.

The ruling MPP – which currently holds both the president and prime minister posts – listed 126 candidates, including incumbent parliamentarians like Tsogtbaatar Damdin and Unurbolor Damdinsuren. Highly educated leaders from the younger generation are also included such as Dr. Luvsanjamts Ganzorig, an engineer and a Tokyo University graduate; Dr. Bum-Ochir Dulam, a leading anthropologist and scholar who studied at Oxford; and Batnairamdal Otgonshar, a former minister of road and transportation and a Harvard-graduate.

Notably, the MPP leadership excluded former Prime Minister Batbold Sukhbaatar from running. Batbold is currently involved in a legal battle with the U.S. Department of Justice after being accused of systemic corruption.

The Khun Party listed 78 highly electable candidates such as Dr. Otgontugs Banzragch, a human rights activist, and Munkhdul Badral, a Lee Kuan Yew School of Public Policy graduate currently serving as a Sukhbaatar District Council representative and chair of the the Human Rights Subcommittee.

Ad

Despite the emergence of a new generation of leaders and social activists, there are plenty of ex-parliamentarians seeking to return to the legislature.

The Democratic Party has re-introduced ex-parliamentarians Bayartsogt Sangajav, Narantuya Zagdkhuu, and Temuujin Khishigdemberel as more experienced politicians. The DP also included the younger generation, such as Shijir Ulziikhuu, who previously served as the press secretary to the Office of President Battulga Khaltmaa. Moreover, in a surprising move, Battulga himself will be competing for a seat in Khuvsgul, Bulgan, and Erdenet.

*Editor's note: Initially Nomingerel Khuyag, a lawyer practicing constitutional law, was on the DP party list. She claims that sometime after the DP Congress, her name was removed. Nomingerel has expressed outrage, and some younger party members have threatened to pull their party membership over her removal.*

In an effort to strengthen the DP's political influence and to gain more seats in the parliament, the Democratic Youth Union (DYU), whose members exceed 90,000, has contributed tremendously. The DYU pushed the party leadership to be more inclusive and diverse, and support new faces.

While notable parties such as the DP, MPP, and Khun Party are paying attention to up-and-coming figures in the selection of their candidates, some ex-parliamentarians who left these political parties have started new parties and coalitions to increase their chance for parliamentary seats.

A former DP member and an ex-parliamentarian, Oyungerel Tsedendamba, established her own party, the Civic Union Party. The party will run 59 candidates, including herself.

Nomtoibayar Nyamtaishir, a former MPP member and the oldest son of the founder of a major mining conglomerate, is running the National Coalition, which listed 76 candidates. In his press release, Nomtoibayar stated that "one of the National Coalition's goal is to separate businesses from politics, implementing policies that help the people to get richer, not just businesses." He also emphasized growing government spending

and tax incentives. Of the National Coalition's 76 candidates, 35 (46 percent) are women, well above the new 30 percent quota introduced in Mongolia's constitutional reform last year.

This year's parliamentary election comes amid an increasingly unstable regional order. While Mongolia's enlarged legislative branch can strengthen the government's service provision and representation, the decisions will also have an enormous effect on how Mongolia manages its natural resources. That's why former President Bagabandi Natsag stated, "I hope that the younger generation will participate in this election. I think this election will be a policy-based one."

You have read **1** of your **2 free articles** this month.

# Enjoying this article?

Subscribe today and join thousands of diplomats, analysts, policy professionals and business readers who rely on *The Diplomat* for expert Asia-Pacific coverage.

Get unlimited access to in-depth analysis you won't find anywhere else, from South China Sea tensions to ASEAN diplomacy to India-

Pakistan relations. More than 5,000 articles a year.

- ✓ Unlimited articles and expert analysis
- ✓ Weekly newsletter with exclusive insights
- ✓ 16-year archive of diplomatic coverage
- ✓ Ad-free reading on all devices
- ✓ Support independent journalism

SUBSCRIBE NOW

**VIEW SUBSCRIPTION OPTIONS**

Already have an account? Log in.

## AUTHORS

**GUEST AUTHOR**

### Bolor Lkhaajav

Bolor Lkhaajav is a researcher specializing in Mongolia, China, Russia, Japan, East Asia, and the Americas. She holds an M.A. in Asia-Pacific Studies from the University of San Francisco.

**VIEW PROFILE**



## TAGS

Crossroads Asia    Politics    East Asia    Mongolia    Khun party

Mongolia 2024 general election    Mongolia Democratic Party

Mongolia political parties    Mongolia politics    Mongolian People's Party

women quotas in Mongolia

# EXHIBIT 7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                             Plaintiff,

           v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS,
EASEMENTS AND FURNISHINGS, LOCATED
AT 230 WEST 56TH STREET, NEW YORK, NEW
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,

                   Defendants In Rem.

Civil Action No. 24-2147

**DECLARATION OF AMBASSADOR YONDON OTGONBAYAR**

--------------------------------------------------------------------x

I, Ambassador Otgonbayar Yondon, Ph.D., hereby declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a Mongolian national, diplomat, public servant, and politician. I was educated at the Moscow Institute of International Relations in Moscow, Russia, and the School of Marketing and Management in New Delhi, India. In 2005, I earned a Ph.D. from the Moscow State International Relations Institute for which my dissertation was entitled *Security Issues of Small States*.

2.     During my career I have served in numerous public service roles. I have served in Mongolia's Foreign Ministry and as the Foreign Policy Advisor to the Prime Minister; I was

Minister of Education, Culture, and Science of Mongolia, and I have been a Member of Mongolia's Parliament. I have also had the privilege of serving as the Ambassador Extraordinary and Plenipotentiary of Mongolia to the United States. I was appointed to that post by President Khaltmaagiin Battulga of the Democratic Party in 2018.

3. My public service has spanned a particularly critical time in my country, as Mongolia over the past three decades has rapidly emerged as a thriving market economy and social democracy following the collapse of the Soviet Union.

4. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience as a Mongolian public servant.

### The Erdenet Mining Corporation

5. The Erdenet Mining Corporation ("EMC") was established in 1973 to exploit the valuable minerals discovered in Mongolia's Erdenet region. These mineral resources included copper, gold, molybdenum, and steel, among others. EMC was initially founded as a joint venture between Russia (then the USSR) and Mongolia and so from the earliest days of its existence had significant national and foreign policy implications for Mongolia. The EMC charter established a board with an equal number of members appointed by the Russian and Mongolian governments. This structure ensured that all EMC decisions required the approval and confirmation of both Russian and Mongolian representatives and ensured dual oversight by both countries.

6. On the Mongolian side, the EMC board was led by the Head of the State Property Committee ("SPC") and other nominees made by the SPC. The SPC is a Mongolian government organization charged with oversight of not just EMC, but all state-owned assets and companies. The position of Head of the SPC is granted to the individual who scores the highest on a specially designed civil service exam. The individual who scores highest on the exam is then nominated by

2

the Prime Minister and approved by the Parliament. I understand that the SPC is responsible for nominating appointing a qualified candidate to serve as General Director of EMC, subject to the approval of the joint Russian-Mongolian board.

7. Due to the layered structure of the EMC appointment and management process, EMC was insulated from day-to-day political influence. The operation of the entity was left to the General Director and the joint Russian-Mongolian board. Political figures such as the Prime Minister did not and could not dictate the operations of EMC given both the purposeful separation of powers and independence of the General Director and given the involvement of Russian interest who were monitoring and required to approve EMC's actions.

8. EMC had a further degree of independence given its massive economic, foreign policy, and political influence on the country as a whole. When EMC was first founded Mongolia's mining industry was in its infancy. Over time, as the industry developed and as commodities prices increased EMC's influence on the economy also increased. During the first decades of the 2000's, EMC was the country's single largest taxpayer and constituted a significant portion of the nation's GDP and international exports. Given the dual ownership with Russia, as well as the economic trade partnership with China, EMC was also an important element of Mongolia's foreign affairs. The EMC General Director made frequent visits to foreign countries to ensure positive political and economic relations were maintained.

### Mr. Batbold's Time as Prime Minister

9. Mr. Batbold rose to become Prime Minister unexpectedly. In 2009, the sitting Prime Minister, Sanjaa Bayar, resigned abruptly due to health problems. Mr. Bayar's resignation was entirely unexpected. In the rush to find a replacement, Mr. Batbold was nominated as Prime Minister. Mr. Batbold's rise to power as the Prime Minister was not planned and was quite

3

surprising, and, as a result, it is widely understood that he wielded far less power than most Mongolian prime ministers during his tenure.

10. Due in part to the unexpected nature of his appointment and in an effort to create a durable government, Mr. Batbold maintained a unity government. His cabinet was comprised of members of his own political party (the pro-democracy MPP), as well as multiple members from the opposition party—the Democratic Party ("DP"). To name a few examples, the Minister of Finance, the Deputy Prime Minister were all Democratic Party members. Further, in 2009, the DP candidate, Tsakhiagiin Elbegdorj, won the presidential election. Mr. Elbegdorj remained in power throughout Mr. Batbold's tenure as PM. As President, Mr. Elbergdorj held the sole power to appoint both prosecutors and judges in the Mongolia judicial system.

11. The nature of this coalition government required power sharing among the parties and among the various influential politicians occupying powerful positions at the same time. Neither the Prime Minister nor the MPP (or any other political party or individual, for that matter) wielded such significant political power that they could act on their own. This arrangement required compromise across political parties and among the cabinet on nearly all decisions.

### General Director Ch. Ganzorig

12. In 2007, two years before Mr. Batbold became Prime Minister, Mr. Chimmedorj Ganzorig became General Director of EMC. The General Director of EMC functions as its chief executive, running the organization and making decisions of major importance to the company in consultation with the Board and the First Deputy General Director. Because EMC is a pillar of Mongolian economic and political life, the position of General Director of EMC carries great prestige inside and outside Mongolia. Mr. Ganzorig was appointed by the Mongolian designates of the EMC Board, and he remained General Director of EMC until 2013. His tenure spanned

4

several different administrations, with the offices of the Prime Minister, President, and key cabinet members all changing hands several times while he remained in power as the General Director.

13.     Due to their divergent political views and goals, Mr. Batbold and Mr. Ganzorig were political rivals, not allies, and their relationship was tense.   The primary divide in the relationship between Mr. Batbold and Mr. Ganzorig was that they belonged to different factions of the Mongolian People's Party ("MPP").   As with many political, parties, the MPP is made up of individuals with their own nuanced political goals and policy perspectives.   One primary division pertains to with which country or countries one believes Mongolia should be most closely aligned.   Certain elements of the MPP believe Mongolia should maintain its historical ties with Russia.   Others think the country should ally itself with China, the country's largest economic trade partner and largest market for natural resources.

14.     A third group within the MPP advocates for Mongolia to strengthen its economic and political ties with the United States and other Western democracies.   Mr. Batbold is an advocate of this pro-Western "Third Neighbor" policy.   Mr. Batbold, in particular, has been one of the leading voices pushing Mongolia to form closer ties with Western democracies, in part as a counterbalance to the historical partnerships with autocratic Russia and China.   Mr. Ganzorig was not a member of this faction and his domestic and foreign political agendas did not align with that of Mr. Batbold's.

15.     Given their relationship, Mr. Ganzorig and Mr. Batbold worked together minimally across their respective roles as General Director of EMC and Prime Minister of Mongolia and did not grant each other favors or allow each other to exert influence outside of their respective domains.   As one example of their difficult and adverse relationship, Mr. Batbold, as head of the party in 2012, refused to allow Mr. Ganzorig to run on the MPP's parliamentary slate.

5

16.     From my experience, I am aware that during the time when Mr. Batbold was Prime Minister EMC was structured such that decision-making power was shared by both governments and across several key individuals. This created a sophisticated system of checks and balances that, in my experience and understanding, made it highly unlikely that a Prime Minister such as Mr. Batbold could become involved in EMC's operations or contracting process, let alone exercise authority over its General Director.

17.     Since EMC operated independently of the Mongolian government *and* Mr. Ganzorig and Mr. Batbold did not maintain strong ties, it does not follow on either an institutional or an interpersonal level that Prime Minister Batbold could exert influence over the operations of EMC, let alone its internal decision-making or contract negotiation processes. Mr. Batbold would have been further stymied from even considering influencing EMC by the coalition government environment he operated within, which would have ensured that any attempts to influence EMC would have needed the approval of or at least would have become known to rival politicians.

18.     In summary, EMC and its internal decision-making processes operated without interference from the Prime Minister's office during the tenures of Prime Minister Batbold and General Director Ganzorig in their respective positions. In the decades I have known Mr. Batbold, I have never seen him exert political influence for personal purposes. I have certainly never seen him utilize his political position to seek or receive benefits from EMC.

### *Effect of Allegations*

19.     As explained above, Mr. Batbold and I are both members of the pro-democracy MPP. As I noted, the primary division depends upon which country or countries one believes Mongolia should be most closely aligned. Mr. Batbold and I are both advocates of the pro-Western "Third Neighbor" policy. Others strongly oppose that policy.

6

20.     Allegations that Mr. Batbold engaged in corruption when he was Prime Minister are incredibly damaging to Mr. Batbold.   In the lead up to the 2021 presidential elections, Mr. Batbold was a top candidate to lead the MPP.   But due in large part to the unproven and unsupported allegations against him in litigation filed around the world at that time, Mr. Batbold did not receive the nomination.   Again in 2024, Mr. Batbold was a top candidate to serve as a member of parliament for the MPP.   But new allegations against him in this case caused the MPP leadership to remove him from the parliamentary election slate in those critical 2024 elections.

21.     As a result, Mr. Batbold and other allies do not currently hold any official position in government, despite his decades of leadership and his commitment to Mongolian democracy.

22.     I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 19, 2024
        Ulaanbaatar, Mongolia

Hon. Yondon Otgonbayar

7

# EXHIBIT 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and CONDOMINIUM UNIT 58D,
TOGETHER WITH ITS RESPECTIVE
APPURTENANCES, IMPROVEMENTS,
FIXTURES, ATTACHMENTS, EASEMENTS AND
FURNISHINGS, LOCATED AT 230 WEST 56TH
STREET, NEW YORK, NEW YORK 10019, AND
ALL PROCEEDS TRACEABLE THERETO,

Defendants In Rem.

-------------------------------------------------------------------x

: Civil Action No. 24-2147

: **DECLARATION OF KHALZKHUU**
: **NARANKHUU**

I, Khalzkhuu Narankhuu, hereby declare as follows:

1.     I am a Mongolian citizen, public servant, and politician.  I have served in public and private roles in the Mongolian economy for more than forty years.

2.     I received a degree in international economics from Kiev State University and entered the ministry of foreign trade in 1978. I later worked for the Ministry of Trade and Industry, the main Mongolian government agency responsible for the mining sector.  I also worked as an economic counselor in Washington, D.C., including working primarily in the mining industry. This experience led to my nomination as the General Director of the Erdenet Mining Corporation ("EMC").  I served as the General Director of EMC from 2000-2007.  After my time at EMC, I

served as a member of Parliament. I was also Vice-Chair and then Chair of the Mongolian National Committee of the Pacific Economic Cooperation Council.

3.    Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and mining sector.

### *The Erdenet Mining Corporation*

4.    In the late 1960s, mineral deposits were discovered in the Erdenet area. Following extensive exploratory work in the area and feasibility studies, Russia and Mongolia eventually reached a landmark agreement in 1973 to establish Erdenet Mining Corporation, a joint venture between the two countries to exploit the valuable molybdenum and copper deposits there and establish a mine. The mine was officially inaugurated in 1978, with the city of Erdenet rapidly developing around it.

5.    EMC was operated as a joint venture until 2016, when Russia divested from the venture. Its stake was acquired by Mongolian Copper Corporation LLC, making the mine entirely a Mongolian enterprise. At one point, EMC accounted for as much as roughly 25% of GDP. It was also until recently the country's largest taxpayer.

6.    When EMC was first founded in 1973, it was governed by a charter that Russia (then the USSR) and Mongolia developed and signed. That Charter was revised and amended several times, but the fundamental governance structure remained the same during my time as General Director.

7.    The Charter established a joint board that oversaw the venture's governance. This joint board consisted of equal numbers of representatives from both countries and was vested with all decision-making powers not explicitly delegated to executive management. There were 7-9

individuals from each country on the board at any given time. The even number of voting members ensured that neither Russia nor Mongolia had total control over EMC.

8. The Mongolian side of the board was headed by the Chair of the State Property Committee (SPC). The SPC was responsible for managing privatization in Mongolia and overseeing state-owned property. The Chair of the SPC was appointed by the Government, and reported to the Chief of Cabinet Secretariat.

9. The joint board was responsible, among other things, for appointing EMC's executive management (and removing management, if desired), updating the Charter, and establishing an Audit Committee. According to internal procedures, which were reviewed and approved by the joint board, all contracts and official documents had to be signed by the General Director, first deputy, other deputies, and heads of the major divisions. These officials were both Russian and Mongolian, meaning neither side could unilaterally influence the operations of EMC.

### EMC's General Director

10. Executive management of EMC was led by the General Director, who was nominated by the SPC and approved by the joint board. The joint board retained authority to remove the General Director if desired. While the General Director could be from either Mongolia or Russia, the makeup of management was always balanced to equally represent each country. Per EMC regulations, the General Director was appointed from one of the two countries, while the first deputy of the General Director had to be from the other. Russia and Mongolia would each select a candidate for the General Director of EMC and the joint board would select the final nominee for approval. The General Director was nominated for a four-year term after which the board could decide to extend the General Director's term or to nominate a new General Director. In the early years of EMC's existence, most General Directors were Russian given that Mongolia

3

lacked experience in managing such a company. Over time, as Mongolia developed a stronger economy and presence in the mining industry, the board began approving of Mongolians as General Directors.

11.    The General Director's responsibilities included managing the mining and export operations of EMC, as well as working with municipal leaders to help run the city of Erdenet, which grew alongside the mine to become Mongolia's second largest city with a current population of over 100,000. The General Director had a diplomatic role as well, given that he was required to frequently engage with his Russian counterparts including by making regular visits to EMC's Moscow office.

12.    The General Director was a powerful and coveted position. The General Director was commonly described at the time as the fourth most powerful person at that time in the country after the President, Speaker of Parliament, and the Prime Minister. In addition to being a politically and culturally significant role, the General Director of EMC received many day-to-day benefits, including company-provided housing, medical insurance, payment for children's education, and a generous salary amounting to three times what other CEOs made at the time plus bonuses.

13.    The General Director was largely independent from politics and the government. In my experience, the Prime Minister had no role in EMC's operations. During my time as General Director, none of the four Prime Ministers who served while I was in that role—including members of both of the main parties in Mongolia the Mongolian People's Party and the Democratic Party—in any way interfered in or otherwise directed the operations at EMC. During my nearly eight years as General Director, in fact, I recall receiving calls from the Prime Minister only two times. And both of those calls were entirely unrelated to the day-to-day operations of EMC.

4

14.    In my experience, EMC operated under Charter, approved by the intergovernmental agreement, independently from Mongolia's politics.    Even national institutions, such as government ministries, did not interfere in the internal management of EMC.    For example, the national auditing offices of Mongolia and Russia traditionally did not audit EMC as they typically did with other government agencies.    Instead, a separate joint auditing commission handled this work.    That commission was comprised of independent auditors from both Russia and Mongolia. And in 2001, international auditors like KPMG and Arthur Andersen further audited EMC's business to ensure transparency and professionalism.    Later in my tenure as General Director, I also invited both the Mongolian and Russian governmental auditing bodies to inspect EMC to ensure transparency.    As a result of that auditing process, Mongolian and Russian auditing representatives would closely review the Company's books and records.    Every piece of paper would be checked by both Mongolian and Russian representatives.

15.    In my experience, at all times EMC was a well-run, apolitical business whose day-to-day operation was controlled by a highly professional engineering, financial, commercial, and legal staff from both sides.

### EMC's Business and Contracting.

16.    EMC's primary business was the mining and international trade of copper ore. Originally, EMC sold all of its copper ore to companies based in Russia.  Following the fall of the Soviet Union, internal Russian companies were no longer able to process EMC's copper shipments.  It was after the fall of the Soviet Union that EMC began working with non-Russian trading companies.  One of those trading partners in my time at EMC was Samsung.  Samsung is a well-known electronics company based in South Korea that still has a metal division that is quite specialized.  I worked with several people at Samsung Metal in my time as General Director and

5

they were an important trading partner, including a team run by Mr. Chooyeoung Cheong who I understood had previously served as a senior leader of Samsung's Mongolian metal trading division.

17.    The global community of copper trading companies was a small one, and it was highly specialized.  Every year, one or two new companies would emerge in the market. Frequently, these companies were started by leaders of large copper trading companies who would leave their companies to start their own businesses.  When that happened, they could leverage their connections in the industry, secure financing, and often succeed in securing copper trading contracts.  I understand that Mr. Cheong did exactly that when he left Samsung and subsequently started his own company, Lidex.

18.    During the time when I served as General Director, I recall meeting Mr. Cheong in Ulaanbaatar several times.  He was a prominent metal trader and influential businessman in Mongolia, well known with government and business leaders throughout the country.  I recall towards the end of my tenure as General Director in approximately 2006 or 2007 that Mr. Cheong approached EMC and sought additional business opportunities for the new Lidex company.  Mr. Cheong by that time had credibility in the industry and I saw him as an established and reliable partner from his prior work with Samsung and one who could procure necessary financing or funding to purchase copper from EMC.  I recall that EMC ultimately agreed to contract Mr. Cheong and that his contract abided by EMC's standard terms and followed its standardized process.

19.    During my time at EMC, we used a standard contract for all copper metal trading, so all contracts had largely the same structure.  In addition, all contracts were examined closely by experts and heads of relevant divisions from both countries before they were approved.  The

6

intergovernmental auditing was also quite comprehensive, which prevented anyone from attempting to secure a non-standard contract.

20.    As General Director, I had the responsibility to approve contracts and ensure that any and all commercial relationships EMC entered into were in the company's best interests. The General Director was responsible for managing EMC's portfolio of trading partners. In selecting these partners, the General Director had to be able to show that the contracts he did approve were competitive. The General Director would risk removal by the joint board if he were to start approving non-competitive contracts.

21.    Contracts were signed on an annual basis and established the total quantity a copper trader would purchase from EMC. Prices for the copper were ultimately calculated based on the London Metal Exchange ("LME") price for the copper as of the date of shipment, though EMC generally required around 90% prepayment of the contract price one month before shipment. All the copper ore sold by EMC was priced according to the LME standard pricing practices. LME provides daily prices of copper on the international exchange market. EMC contracts were pegged to the prices published by LME. EMC contracts were also priced in US dollars, despite Mongolia having a traditionally closer relationship with Russia and China, because LME prices were in US dollars.

22.    EMC's finances were closely intertwined with that of the entire country. The Mongolian government relied on EMC to contribute not only as a taxpayer, but also as a source of currency and funding for the government's budget. The ability of EMC to generate and provide cash was critical to the Mongolian government's ability to run effectively. The Mongolian government's reliance on EMC funding to support their budget gave EMC powerful sway in Mongolia. Trust and strong relationships with trading partners were critical to maintaining operations.

7

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: October 09, 2024
Ulaanbaatar, Mongolia

Khalzkhuu Narankhuu

8

# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS,
EASEMENTS AND FURNISHINGS, LOCATED
AT 230 WEST 56TH STREET, NEW YORK, NEW
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,

Defendants In Rem.

-----------------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF DR. GURTAIJ DULAMYN SUGAR**

I, Dr. Gurtaij Dulamyn Sugar, hereby declare as follows:

1.      I am a Mongolian citizen, lawyer, politician, and jurist. I have served in multiple branches of the Mongolian government throughout more than thirty-five years of public service.

2.      I graduated in 1981 with a degree in law from a university in Russia. After graduation, I worked in local government in Mongolia for five years. I then joined the Mongolian Ministry of Justice in 1989 and worked there for eight years, serving under the first deputy vice minister and state secretary. I was then an MP in the Mongolian Parliament from 2000-2007. In 2007, I became Chairman of the State Property Committee, a state agency that oversees the

management of state-owned property, and served in that role until 2012. In 2012, I became a Justice on the Constitutional Court of Mongolia until my retirement in 2018.

3.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience in public service.

**State Property Committee & the Erdenet Mining Corporation**

4.      The State Property Committee (SPC) is the government agency responsible for the management of state-owned property and privatization of state-owned companies. It is comprised of the deputies of multiple ministries in the government, such as Finance and Industry.

5.      One of the SPC's responsibilities is to appoint the directors for all state-owned companies, including the Mongolian members of the board of Erdenet Mining Corporation (EMC). Most of the directors on the EMC board did not themselves also serve on the SPC. In my tenure, only two directors on the board were also members of the SPC—myself and one of my department directors. Board members served for various lengths of time. Some were already board members when I was appointed and stayed until I left the SPC; others would change jobs and leave the board.

6.      The SPC is responsible for nominating candidates to serve as the General Director (GD) of EMC. The SPC provides Mongolian nominations to the joint Mongolian-Russian EMC board of directors, which has the ultimate authority over whether or not to approve a nominee that the Mongolian or Russian sides propose. An important quality for a GD candidate was that they could work with Russians in the Russian language. The board of directors of EMC was evenly divided between Mongolians and Russians, so the ability to work with Russian counterparts was critical. In addition, there were two chairmen of the board (one Russian and one Mongolian) who had equal rights, so for any candidate to realistically have a chance at being approved, both the

2

Russian and Mongolian directors of the board needed to be consulted and comfortable with the appointment. The Russian director in charge during my tenure was a man named Mr. Chimizorg. As chair of the State Property Committee, I was the Mongolian chairman.

7. EMC's board of directors generally held meetings twice a year. During those meetings, the board would review all the upcoming plans for exports and day-to-day operations and consider board-level decisions like management appointments. In these meetings, the board would consider and ratify the plan for how much money would be contributed from EMC into the Mongolian State budget. These contributions could comprise as much as one third of the entire budget. Because of the significance of these contributions, the Ministry of Finance had a major interest in the plans of EMC. In addition, these contributions made the GD of EMC a very important person in Mongolian society.

8. At the time I served on the SPC, the legal mechanisms in place that governed the EMC board were designed to ensure there was no outside political involvement in EMC's operations. EMC at all times was supposed to be run by its professional engineering, commercial, finance, and legal staff, under the supervision of Company management. The Prime Minister had no involvement in the semi-annual meetings of the EMC board. And the EMC board did not report to the Prime Minister.

9. To further ensure the independence of EMC, the Board of Directors appointed auditors who would audit EMC twice a year. The Russian and Mongolian sides would also each appoint their own auditors who would conduct an audit twice a year. These auditors would be introduced at the Board of Directors meetings. The audits were extensive, and their purpose was to identify anything improper in the accounting to assure the Russian and Mongolian sides that the business was being well-run, transparent, and insulated from political interference.

3

10. The close involvement and supervision of Russia's directors on the board further insulated EMC and insured its independence from Mongolian domestic politics. Russia's directors actively managed and supervised the company, as we did as well as Mongolian directors. Both sides kept a close eye on the other to ensure that nothing inappropriate occurred in EMC's business and that both country's interests were being protected.

### My Tenure as SPC Chairman

11. I served as Chairman of the SPC from 2006-2012. I did not owe my position to politics. Rather, I was appointed based on an apolitical civil service selection process because the Chairman is ultimately a politically neutral position and must surrender any party memberships upon ascending to that role. I originally applied for the position of SPC chairman in 2006. As part of my application process, I took a civil service examination administered by an independent commission that manages the applications for civil service positions. I also sat for an interview with that commission. By law, the person who scores the highest in the application process is submitted to the government as the nominee, and the government ratifies his or her appointment. When I applied, I received the highest score out of the eleven applicants. My nomination was therefore submitted, and the government ratified my appointment. I served as SPC Chairman until 2012. During that time, our country had three prime ministers, including Miyeegombyn Enkhbold, Sanjaagiin Bayar, and Mr. Batbold. Mr. Batbold had no role in my appointment.

12. When I was Chairman, the SPC had three critical responsibilities. *First*, the SPC organized and supervised the ongoing privatization efforts that occurred following the collapse of the Soviet Union. At that time, privatization was occurring at a rapid pace, and each year many state-owned companies were privatized. Significant examples are the Gobi Cashmere company,

4

the Trade and Development Bank and Savings Bank. *Second*, the SPC monitored all procurement, usage, and decommissioning of state property. That includes everything from major assets like state-owned companies to minor assets like tables and chairs in government offices. Companies would draw up their budgets, receive a commission from the SPC to purchase, buy, and use property, and then decommission the property when finished. *Third*, SPC helped local governments administer property. When I served as chairman of the SPC, it was a very powerful government agency. Large mines and mineral deposits—such as EMC, Oyu Tolgoi, and Tavan Tolgoi—all fell under its purview.

13.    As mentioned previously, a major responsibility of the SPC was to nominate EMC's GD. When I was first appointed as chairman of the SPC, the GD in charge of EMC was Khalzkhuu Narankhuu. When Mr. Narankhuu decided not to continue his term in 2007, it fell on the SPC to nominate his replacement. This required SPC to research candidates and speak with others in the government and broader public who could reflect on the qualifications of potential candidates. In deciding who to nominate, we consulted routinely with the Minister of Trade and other knowledgeable and prominent government officials. I do not remember consulting with then-Prime Minister Bayar or then-President Enkhbayar about this appointment at the time, though we may have done so. We ultimately nominated Chimeddorj Ganzorig, a prominent economist and at that time the Vice Minister of Finance, to succeed Mr. Narankhuu.

14.    During my time as Chair of the SPC and a Chair on the EMC board of directors, I paid close attention to EMC. It was my responsibility as a public servant to protect our country's interests in that critical national asset and to ensure that the business was being run as effectively as possible—and in the best interests of the Mongolian people. At all times to my knowledge

5

between 2006-2012, EMC was run by its professional staff and dedicated management team, and the operation was largely successful.

### My Relationship with Mr. Batbold

15.    When Sukhbaatar Batbold became Prime Minister in 2009, I was still the chair of the SPC, and Mr. Ganzorig was EMC's GD—a position for which he would be reappointed in 2011. Mr. Batbold had no involvement in Mr. Ganzorig's reappointment, nor did he have any involvement in my original appointment as Chair of the SPC.

16.    I recall that when Mr. Batbold was Prime Minister, he had little involvement with EMC. At most, he inquired a few times about how EMC was doing at a high level. He had no input into day-to-day operations, nor did he express any specific interest in the business. At no time did Mr. Batbold ask me to appoint specific people or take any action regarding any particular state-owned company, including EMC. On balance, I would say Mr. Batbold had the least involvement in SPC issues of any Prime Minister I served with when I was Chair of the SPC.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.


Dated: September **25**, 2024
     Ulaanbaatar, Mongolia

Dr. Gurtaj Dulamyn Sugar

6

# EXHIBIT 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP. HELD IN THE
NAME OF LOVITAS, INC., TOGETHER WITH
THE APPURTENANT PROPRIETARY LEASE
FOR COOPERATIVE UNIT 12E WITHIN THE
REAL PROPERTY AND PREMISES LOCATED
AT 21 EAST 61ST STREET, NEW YORK, NEW
YORK 10065, AND ALL PROCEEDS
TRACEABLE THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES,
ATTACHMENTS, EASEMENTS AND
FURNISHINGS, LOCATED AT 230 WEST 56TH
STREET, NEW YORK, NEW YORK 10019, AND
ALL PROCEEDS TRACEABLE THERETO,

      Defendants In Rem.

-----------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF
CHIMEDDORJ GANZORIG**

I, Chimeddorj Ganzorig, hereby declare as follows:

1.      I am a Mongolian citizen, economist, and public servant. I spent over 40 years in public service, including as the General Director of the Erdenet Mining Company ("EMC") from December 2007 through my retirement in 2013.

2.      Prior to my time as a public servant, I studied economics at the Kiev State University in Ukraine. After that, I received a master's degree from the Australian National University.

3.      With my education complete, I returned to Mongolia and began my career in public service. From 1981 onwards, I worked in a variety of roles primarily related to Mongolia's

economic development and growth.  For example, I became the Minister of Industry and Commerce in 2000, and served in the role until I was appointed the Vice Minister of Finance in 2004. I served in that role until 2007.

4.      In 2007, the State Property Committee nominated me to become the General Director of EMC and the EMC Board of Directors approved my nomination.  In 2011, I was reappointed for a second term by unanimous consent of EMC board, which was then evenly divided between Mongolian and Russian directors.  I served as General Director for roughly six years—spanning the administrations of three different Prime Ministers and two different Presidents—until I retired from public service in 2013.

5.      I submit this Declaration to provide general background on the history and operations of EMC, and to specifically discuss certain EMC contracts that arose during my time as General Director.  Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and mining sector.

### The EMC General Director

6.      I was first nominated to serve as EMC's General Director in 2007.  The role of General Director of EMC is a highly sought after and important position in Mongolia.  To understand why, it is important to appreciate the role EMC plays in Mongolia's economy.

7.      EMC was founded in the early 1970s as a joint venture between the Mongolian and Russian (then-Soviet) governments.  The goal of the venture was to utilize Russia's expertise and technological capacity to develop and access vast natural resources located in the Mongolian city of Erdenet.  EMC grew dramatically after its founding, as did the global markets for the primary metals it mines—*i.e.*, copper, molybdenum, gold, and steel.

2

8.     For much of its history, EMC's ownership was divided between the governments of Russia and Mongolia, with each appointing an even number of board members to oversee operations. Initially, EMC was owned 50/50 between the countries. In 1991, EMC's ownership was renegotiated, resulting in a 51/49 split in Mongolia's favor. Despite the 51/49 ownership, however, the EMC board of directors remained evenly divided between Mongolian and Russian directors. This ensured both countries and their designees had to agree to all major decisions, including appointment of management. Ultimately, Russia sold its stake in EMC in 2016, and in 2019, EMC was nationalized in 2019.

9.     From its inception through 2016, EMC was run by a General Director who was appointed by the joint Russian-Mongolian EMC board. Each country nominated a representative to serve as the General Director. After deliberation by the board, the candidate deemed most qualified by the joint board was appointed as General Director. The alternative nominee served as the First Deputy General Director. The even division of the board and agreement to appoint to management both Russian and Mongolian nationals ensured that neither country's representatives could act without the approval and oversight of the other's representatives.

10.    The General Director served many functions. First and foremost, the General Director served as EMC's CEO. This, alone, was a significant undertaking. During my time as General Director, EMC accounted for approximately 35% of the GDP of Mongolia. EMC's importance to the Mongolian economy is maybe best exemplified by the role it played during the 2008 financial crisis. Mongolia, like many nations, was hit hard by the global recession. During this trying time, the government took a large loan from EMC—worth tens of millions of dollars—to ensure it could continue to pay public servants and provide the people of the country with public services. Given its importance to the Mongolian economy and government, many in Mongolian

3

society—myself included—viewed EMC as being more of a partner of the Mongolian government, rather than a subordinate.

11.    In addition to managing EMC's sprawling operations, the General Director worked alongside local government officials. EMC is located near Erdenet, the second-largest city in Mongolia. Given the centrality of the mine to the operations of the city, the EMC General Director worked closely with the town's mayor to support public services and infrastructure for the city's residents.

12.    The General Director's responsibilities also included foreign relations. The General Director was required to maintain good relations with Moscow given the joint nature of the EMC venture. This required frequent international travel to, and diplomacy with, Russia and other relevant nations. The General Director was also required to maintain good relations with China given that Chinese smelters were the dominant market for EMC's copper deposits. The General Director was further responsible for creating, developing, and maintaining relationships with the buyers, traders, and bankers around the globe who helped facilitate EMC's operations. Given these demands, during my tenure in office, the General Director of EMC was a highly public figure in Mongolia and abroad and played an important role fostering and nurturing Mongolia's foreign relations.

13.    Given EMC's importance to the Mongolian economy, before even being nominated to serve as General Director, a nominee must meet certain educational and professional requirements. Based on my prior studies and my decades of work in the public sector, I met those qualifications. Even after meeting the basic qualifications, General Director nominees also must pass an extensive vetting and approval process that involves many individuals at EMC and in the Mongolian and Russian governments.

4

14.     I was initially nominated to become General Director by the State Property Committee ("SPC"). The SPC is the government agency responsible for managing Mongolia's state-owned property, including Mongolia's interest in EMC. It reports to the Minister for Cabinet Secretariat. Following my nomination, the EMC board considered my qualifications and those of the Russian nominee. Ultimately, the board decided that I was the best candidate for the role and appointed me as General Director for a four-year term. In 2011, my first four-year term finished, leaving the SPC and the evenly divided EMC board with a choice: they could re-nominate me to the role or to replace me with a Russian nominee or a new Mongolian nominee. Given the success of my first term as General Director, the SPC chose to re-nominate me. The board ultimately approved my renomination by unanimous consent.

15.     At the time the board reapproved my second term, Sukhbaatar Batbold was Mongolia's Prime Minister. He had no involvement whatsoever in my reappointment, just as he had had no involvement in my original appointment in 2007.

### EMC's and the General Director's Political Independence

16.     During my time as General Director, EMC operated independently from Mongolian government and domestic politics. In fact, the General Director is almost uniquely insulated from improper interference given the importance of the role to the functioning of the Mongolian economy and the fact the General Director was answerable to the joint Russian-Mongolian board, rather than the Mongolian government.

17.     At no time was I asked to act corruptly or inappropriately by any Prime Minister that served while I was General Director, including Mr. Batbold. In fact, Mr. Batbold never spoke to me about EMC's business at all, including its contracting. And he did not, either himself or through anyone else, influence me or EMC to grant specific contracts to anyone.

5

18.    It would have been especially unlikely for Mr. Batbold to ask me to act corruptly or inappropriately. It is not a secret that Mr. Batbold and I did not have a good personal or working relationship while I served as General Director. Although we were both members of the same political party, we belonged to different factions. This meant that during our time in government, we rarely worked together or even had occasion to speak to each other. Mr. Batbold did not and would not have asked me for any favors during my time as General Director, and I did not and would not have granted him any favors had he done so.

### EMC's Contracting Practices

19.    During my time as General Director, EMC tried to partner with reliable international companies around the world. EMC was generally focused on identifying trading partners that were known to EMC and who were able to serve as financing guarantors or provide prepayment on contracts. EMC would often obtain loans from banks to fund its operations—loans that its trading partners would guarantee and to which they would receive repayment from EMC in the form of copper shipments. It was thus important for EMC to work with partners who made EMC feel comfortable entering into contracts with and who financiers were comfortable trusting as loan guarantors. Unreliable or illegitimate partners, by contrast, would not have been able help EMC secure the funding it often required.

20.    By the time I began my General Directorship, EMC had many established partners. These included large international players like Samsung. These entities were highly reliable given their size and prominence in the market, which was important for EMC as we were focused on ensuring consistent revenues. These entities all had long-standing relationships with EMC personnel, which gave our team comfort that they would satisfy their contracts. And, given their position in the market, it was easy to receive financing with these entities as guarantors. At the

6

same time, although EMC looked for reliable partners and preferred partners with whom we had a long-standing relationship, EMC was constantly looking to expand its relationship and bring in new trading partners. EMC vetted all new counterparties extensively when I was General Director.

21.     Once we identified the companies with whom we wanted to work, we had to decide how to allocate contracts among each trader. EMC had annual production goals. When I was General Director, I tried to keep the contract quantities among EMC's existing partners consistent year-to-year. As a result, companies would have to work within the allotted quantities. Requests for more were often denied. When EMC's mines were able to produce additional resources for trading, we would consider allocating additional output to new trading partners. On occasion, too, I would allow a trader to increase its capacity to account for any unallocated production.

22.     Once we decided which partners to work with, and how much product to allocate to each trader, the contracting process was standardized. EMC copper contracts were based on templates we had procured from other mines around the world. The terms were modified to apply to EMC but overall the contracts were matched to the international standard. The terms of the contracts were also standardized, including, most notably, including standardized pricing terms set by the London Metal Exchange ("LME"). The LME is often used as an international pricing benchmark. Treatment and refining charges, also referred to as TC/RC, were also generally standardized across contracts each year, though there might be some slight variation among partners depending on their size and ability to offer better or worse pricing terms.

*Chooyoung "Nicholas" Cheong and his Companies*

23.     I am personally familiar with an international businessman and metal trader named Chooyoung "Nicholas" Cheong. I first met Mr. Cheong in the late 1990s or early 2000s when he was an employee of Samsung. Samsung began operating in Mongolia at a time when there was

7

not a significant amount of foreign investment. This meant that Samsung was an important economic and strategic partner. This partnership grew with the creation of ErdSam. ErdSam was a Samsung owned and operated entity that bought and traded copper with EMC. Mr. Cheong was the head of ErdSam. I was not working at EMC when Mr. Cheong ran ErdSam, so I cannot speak to his specific responsibilities, but it is my understanding that as head of ErdSam Mr. Cheong formed close relationships with EMC employees, earned a reputation as a reliable business partner, and headed Samsung's copper buying and trading operations.

24. By the time I became General Director of EMC, Mr. Cheong had left Samsung and begun trading copper with EMC on his own through an entity called Lidex. I did not participate in the process of granting Lidex its first contracts with EMC, but it is my understanding that EMC performed the same due diligence on Lidex that it did on all other trading partners. No contract would have been granted to Lidex without a thorough review and confidence that Lidex could uphold its obligations. Mr. Batbold was not Prime Minister when Lidex was granted its contracts with EMC, and I have no reason to believe he had any involvement in Lidex securing contracts with EMC. Given Mr. Cheong's experience metals trading at Samsung and his long-standing relationships with EMC personnel, it does not surprise me that he and his company were viewed as a reliable trading partner.

25. Though I do not remember the specific details, I generally recall that at some point Lidex arbitrated a dispute with EMC regarding the terms of its contract. I believe that this arbitration resulted in the contract between Lidex and EMC being terminated.

26. Later, while I was General Director, Mr. Cheong sought a new copper contract with EMC through a company he now called Catrison. I, along with my colleagues at EMC, viewed

8

Catrison as a continuation of Mr. Cheong's Lidex business. Catrison was, in my view, an effort by Mr. Cheong to continue his long-standing business relationship with EMC.

27. At the time Mr. Cheong approached us and asked EMC to trade with Catrison, my team and I viewed Mr. Cheong—regardless of the name of his formal business entity—as a reliable partner. We were therefore comfortable to continue our business relationship by granting Catrison copper contracts. My commercial director negotiated the terms of the new agreement with Mr. Cheong, and I then reviewed and ultimately approved those terms. To my knowledge and best recollection, Catrison received the same terms as other traders, and its prices were pegged to the internationally established and controlled LME rates. Catrison received no special treatment from EMC and the terms of Catrison's contract were profitable and beneficial to EMC.

28. At no time was Mr. Batbold or any other government or political official involved in EMC's decision to grant contracts to Catrison or any other of EMC's trading partners. All contracting decisions that occurred during my tenure as General Director followed the approved internal policies and regulations of EMC. They were consistent with the standardized contracting process EMC's professional commercial, technical, and legal staff had developed over many years.

29. I declare under penalty of perjury and the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: September 26, 2024
Ulaanbaatar, Mongolia

_____
Chimeddorj Ganzorig

9

# EXHIBIT 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                                  Plaintiff,

                 v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS,
EASEMENTS AND FURNISHINGS, LOCATED
AT 230 WEST 56TH  STREET, NEW YORK, NEW
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,

                       Defendants In Rem.

-------------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF TSENDDAVAA BAYAR-ERDENE**

I, Tsenddavaa Bayar-Erdene, hereby declare as follows:

1.       I am a Mongolian national and public servant. I received a bachelor's degree from the National University of Mongolia and a degree in business administration from Strayer University in the United States.

2.       During my career I have served in multiple public service roles. From 2016 through the present, I have served as the head of the state-owned asset administration and coordination division at the Government Agency for Policy Coordination on State Property, also referred to as the State Property Committee ("SPC"). In this role, I oversee the operations of several state-owned companies, including the Erdenet Mining Corporation ("EMC").

3.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience at the SPC.

4.      The SPC was established in 1996 under the Law on State and Local Property. The primary mission of the Agency is to use, dispose of, and privatize state assets. For much of the 20th century, Mongolia was run under communist principles. In the early 1990s, Mongolia became a democracy with a nascent market economy. Over the past several decades Mongolia's economy has continued to transition to more and more of a market economy. Despite this ongoing transition there is still a large amount of property owned by local governments. The Agency provides guidance to local governments on how to handle these property assets and coordinates between local governments and the State regarding the best ways to utilize and benefit from these state-owned assets.

5.      The SPC generally acts pursuant to resolutions passed by its nine-member governing committee. That committee is led by the Chair. Each of the nine committee members are appointed from different government ministries. Typically, they are ministry State Secretaries. State Secretaries generally are technocratic leaders of ministries, not political appointees.

6.      The SPC has investigative authority and can conduct inspections and inquiries into state-owned property, particularly related to financial assets. If there was an investigation regarding the use or misuse of state-owned assets, including EMC, I would be aware.

7.      I have held my current position at the SPC since 2016. As a consequence, I was in my role when multiple lawsuits were purportedly brought by the SPC against Sukhbaatar Batbold and others in Mongolia and numerous countries around the world. Those lawsuits related to alleged corruption regarding the Erdenet Mining Corporation ("EMC").

2

8.    I recall that when I first heard about those lawsuits, I was surprised they had been filed. My role is to oversee the very state property at issue in those cases. Yet I had never been consulted about the litigation, nor did I authorize it. As SPC made clear in the letters we submitted in November 2020 and January 2022, the SPC did not ask any prosecutor to participate in any civil proceeding against Mr. Batbold, nor did we give the Prosecutor's Office of the Capital City power of attorney to represent us. My agency also never authorized King & Spalding to act on our behalf. I understand that the civil proceeding against Mr. Batbold was dismissed and is widely acknowledged in Mongolia to have been politically motivated and untrue.

9.    I am generally aware of the allegations at issue in the current case regarding Mr. Batbold and EMC. They appear to be nearly identical to the lawsuits brought in the prior dismissed Mongolian civil suit improperly on SPC's behalf. As was the case in 2020, I can confirm that the SPC does not consider the allegations against Mr. Batbold legitimate, is not investigating these claims or any other claims of corruption against Mr. Batbold, and has not received any complaints regarding Mr. Batbold at any point during my tenure as head of the state owned asset administration and coordination division, including with regards to EMC.

10.    I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 27, 2024
Ulaanbaatar, Mongolia

Tsenddayaa Bayar-Erdene

3

# EXHIBIT 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,                        :

                              Plaintiff,   :

                  v.                         :

ANY AND ALL SHARES OF 21 EAST 61 STREET    :
APARTMENT CORP. HELD IN THE NAME OF          :
LOVITAS, INC., TOGETHER WITH THE             :
APPURTENANT PROPRIETARY LEASE FOR            :
COOPERATIVE UNIT 12E WITHIN THE REAL         :   Civil Action No. 24-2147
PROPERTY AND PREMISES LOCATED AT 21          :
EAST 61ST STREET, NEW YORK, NEW YORK         :   **DECLARATION OF**
10065, AND ALL PROCEEDS TRACEABLE            :   **KHORLOO OYUNTSETSEG**
THERETO, and                                 :
CONDOMINIUM UNIT 58D, TOGETHER WITH          :
ITS RESPECTIVE APPURTENANCES,                :
IMPROVEMENTS, FIXTURES, ATTACHMENTS,         :
EASEMENTS AND FURNISHINGS, LOCATED           :
AT 230 WEST 56TH  STREET, NEW YORK, NEW      :
YORK 10019, AND ALL PROCEEDS                 :
TRACEABLE THERETO,                           :

                         Defendants In Rem.          :

------------------------------------------------------------------x

I, Kh. Oyuntsetseg, hereby declare as follows:

1.      I am a Mongolian citizen and public servant with four decades of experience in international trade law, trade and economic diplomacy, and negotiations. During my career, I served at the Ministries of Trade and Industry, Foreign Relations, on Mongolia's National Security Council, and as a senior diplomat at Mongolia's Permanent Missions to the United Nations in Geneva and to the European Union in Brussels. I was also one of the lead negotiators for Mongolia's seven year accession process to the World Trade Organization.

2.    From 2008 to 2011, I served as the Commercial Director of the Erdenet Mining Corporation ("EMC"). EMC at that time was a joint venture between the Mongolian (51%) and Russian (49%) governments to operate a large copper mine located in the Mongolian city of Erdenet. As Commercial Director, I was responsible for exports and procurement. I also oversaw the railway and warehouse subdivisions. I reported directly to General Director Chimeddorj Ganzorig.

3.    EMC's copper exporting business was a relatively simple part of my duties. EMC's copper prices were determined by the prices set on the London Metal Exchange (the "LME"), which is a globally recognized indicator of the international market price of metals. EMC used standardized long-term copper contracts that are typical of copper mines around the world. Traders would agree with EMC to purchase a certain quantity of copper concentrate, but the ultimate price of that concentrate would be based on the LME at the time EMC shipped the concentrate. Charges for treatment and refining were also set at the annual benchmark set by world leading smelters. Therefore, I mainly concentrated on the complex business of working with numerous suppliers and manufacturers around the world to procure hundreds of thousands of machines, equipment, and goods for EMC.

4.    EMC officers and directors were fiduciaries of the company. They had the responsibility to manage risk for EMC's benefit when contracting. For that reason, when I was at EMC, the company conducted due diligence for all buyers and negotiated contract terms that were in the company's best interest. Multiple divisions of EMC reviewed these contracts, including export contracts, from the lowest levels of the Commercial Department all the way to the General Director himself, who finally signs the contract as CEO of EMC. EMC's contracts also underwent extensive annual auditing from international companies such as KPMG and Ernst & Young.

2

5.      Throughout my time at EMC, I attended meetings of EMC's board of directors as a member of the Company's management team.  EMC's board was split evenly between Russian and Mongolian directors, giving both Russian and Mongolian shareholders substantial oversight over the company's overall performance and transparency into its operations.

6.      The board typically met once or twice a year and closely reviewed EMC's annual financial reports.  Ahead of the board meeting those reports were audited by international auditing firms as well as by Mongolian and Russian auditing firms.  During board meetings, directors exercised their oversight responsibilities seriously.  Both the Russian and Mongolian directors actively participated in board meetings.  They asked pointed and specific questions of members of the Company's management team.  For instance, directors would ask about new trading partners when EMC entered into contracts with these parties to understand the diligence the company had undertaken.

7.      During part of my tenure as EMC's Commercial Director, the Prime Minister of Mongolia was Sukhbaatar Batbold.  During Mr. Batbold's premiership I, as Commercial Director of EMC, never received a phone call or request either directly from Mr. Batbold or any intermediary of his in any written or oral form asking to award trading contracts to any company. I am aware of no interference whatsoever by Mr. Batbold into any of EMC's operations during the time he was Prime Minister or otherwise.

8.      My tenure at EMC confirmed to me that EMC was a professional company run by dedicated, high level technical, commercial, and legal professionals who recognized the critical

3

importance of EMC to Mongolia and at all times took efforts to run the company professionally, ethically, and consistent with commercial standards.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 14, 2024
      Ulaanbaatar, Mongolia

                                         Khorloo Oyuntsetseg

4

# EXHIBIT 13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,      :
                               :
Plaintiff,                     :
                               :
v.                             :
                               :
ANY AND ALL SHARES OF 21 EAST 61 STREET   :
APARTMENT CORP. HELD IN THE NAME OF        :
LOVITAS, INC., TOGETHER WITH THE           :
APPURTENANT PROPRIETARY LEASE FOR          : Civil Action No. 24-2147
COOPERATIVE UNIT 12E WITHIN THE REAL       :
PROPERTY AND PREMISES LOCATED AT 21        : **DECLARATION OF DORJDAMBA**
EAST 61ST STREET, NEW YORK, NEW YORK       : **DAMBA-OCHIR**
10065, AND ALL PROCEEDS TRACEABLE          :
THERETO, and CONDOMINIUM UNIT 58D,         :
TOGETHER WITH ITS RESPECTIVE               :
APPURTENANCES, IMPROVEMENTS,               :
FIXTURES, ATTACHMENTS, EASEMENTS AND       :
FURNISHINGS, LOCATED AT 230 WEST 56TH      :
STREET, NEW YORK, NEW YORK 10019, AND      :
ALL PROCEEDS TRACEABLE THERETO,            :
                                           :
Defendants In Rem.                         :

-----------------------------------------------------------------x

I, Dorjdamba Damba-Ochir, hereby declare as follows:

1.      I am a Mongolian citizen, engineer, and public servant. I have served in numerous roles in the Mongolian government over the past four decades.

2.      I received a degree in electrical engineering in 1986 and have worked at Erdenet Mining Corporation ("EMC") since then. Early in my career, I was the senior engineer at the heat station built at EMC in Erdenet City. From 2000-2004, I was the head of EMC's Commercial Department. Subsequently, I became a member of Parliament and served in that role until 2020.

3.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and mining sector.

### *Director of Commercial at Erdenet Mining Corporation*

4.  EMC is a large-scale mining operation in Mongolia and provides significant revenue for the government including in the form of taxes and dividends. From 2000-2004, I was the Director of the Commercial Department of EMC. In that role, I reported directly to EMC's General Director Khalzkhuu Narankhuu. As Director of the Commercial Department, I was responsible for contracting around sales and exports of copper concentrates (among other natural resources) as well as procurement of equipment.

5.  By the time I became the Director of the Commercial Department in 2000, there were seven to eight major commercial players involved in copper contracting with EMC, including Samsung. Given my experience working with Samsung, I am familiar with Chooyeong "Nicholas" Cheong through his role leading the joint venture between EMC and Samsung called ERDsam. The joint venture was largely a tool for Samsung and Mr. Cheong to access copper concentrates from EMC.

6.  In my role as Commercial Director, I would talk to different contractors about what costs would be included in a given year and come to an agreement on final pricing. EMC's contracts were modeled on international industry standard contracts and terms. I actually helped develop EMC's standardized contracts during my time in the Commercial Department. When I became the Commercial Director, I visited a mine in Chile and spoke with its managers about their contracting procedures and international standards. I was able to use that mine's contracts as a template for EMC's own contracting procedures. Consistent with international standards, EMC's contracts generally specified that a trader was purchasing a certain quantity of copper concentrate—not a specific purchase price. Instead, the copper would be sold at the market price set by the London Metal Exchange at the time of shipment. While the London Metal Exchange

2

generally dictated pricing and was a reference used at EMC, treatment and refining charges, also referred to as TC/RC, were also generally standardized across contracts each year.

### EMC Loans

7.     During my time as Commercial Director, EMC had a great reputation for repaying loans to banks. It was often said that EMC's credit rating was better than that of the sovereign nation of Mongolia. I often traveled to London to negotiate loans for EMC with different European banks that specialized in various metals such as coal, copper, and gold. Loans were disbursed for the day-to-day operations of EMC such as salaries, the railway, and logistics payments.

8.     As part of the loan operation and disbursement, banks such as UBS, Barclays, and Goldman Sachs would conduct due diligence on EMC. In this diligence process, banks would discern whether EMC's contracts were standard, whether shipments were delivered on time, and whether EMC and its guarantors were participating in fair contracting.

9.     In 2003, we started engaging with Ocean Partners due to a loan arrangement. While I do not recall working with the company on a specific occasion, I would have been the one to negotiate with Ocean Partners since my main job as Director of Commercial was to find new sources of funding to continue EMC's operations.

I declare under penalty of perjury and the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.


Dated: September 25, 2024
       Ulaanbaatar, Mongolia


_____
Dorjdamba Damba-Ochir

3

# EXHIBIT 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and CONDOMINIUM UNIT 58D,
TOGETHER WITH ITS RESPECTIVE
APPURTENANCES, IMPROVEMENTS,
FIXTURES, ATTACHMENTS, EASEMENTS AND
FURNISHINGS, LOCATED AT 230 WEST 56TH
STREET, NEW YORK, NEW YORK 10019, AND
ALL PROCEEDS TRACEABLE THERETO,

        Defendants In Rem.

----------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF CHIMED KHURELBAATAR**

I, Chimed Khurelbaatar, hereby declare as follows:

1.     I am a Mongolian citizen, politician, and public servant. I have served in public and private roles in Mongolia for over two decades.

2.     I received a degree in economics from the Finance and Economics Institute of Leningrad. Subsequently, I taught at the National University of Mongolia's school of economics and later went on to receive a masters degree in economics from the University of Sydney. In 1998, following the democratic revolution in Mongolia, I began working as a Senior Economist with the United States Agency for International Development (USAID).

3.      After I left USAID, I entered public service. I was an economic advisor to Prime Minister Nambaryn Enkhbayar and subsequently served as State Secretary in the Ministry of Finance and Economy until 2007. At that time, I became Minister of Fuel and Energy under Prime Minister Sanjaagiin Bayar. In 2008, I became a member of Parliament, where I served until 2024. During my tenure in Parliament, I frequently served on the Standing Committee on Budget and was its chairman for many years. I later served as Chief Cabinet Secretariat under Prime Minister Sükhbaataryn Batbold, Minister of Finance under Prime Minister Ukhnaagiin Khürelsükh, and Deputy Prime Minister, Minister of Economics under Prime Minister Oyun-Erdene Luvsannamsrain.

4.      I submit this Declaration to provide background on Mongolia's political landscape from 2000 through the present and particularly regarding my time as Cabinet Secretariat between 2009-2012. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government.

### *Background on the Mongolian Government*

5.      The executive branch of the Mongolian government is headed by the Prime Minster. The President is Mongolia's head of state. The President and Prime Minister have their own spheres of influence in the Mongolia government. In my experience, the President has the most power, followed by the Speaker of Parliament and Prime Minister in that order. The State Great Khural comprises the legislative branch and is run by the Speaker. The judicial branch is separate and independent from the executive and

2

legislative branch, though the President retains the power to appoint judges and prosecutors.

6.      I served as Cabinet Secretariat from October 2009-2012 under then-Prime Minister Batbold.  The Cabinet Secretariat was an integral position in the government. In the role, I coordinated all the activities of the various ministries and local governments, set the agenda for cabinet meetings, and set priorities for different cabinet members and ministries.  In this way, I was a primary gatekeeper within the Prime Minister's office, functioning along the lines of a formal chief of staff of the entire Mongolian government.

7.      One of the many agencies under my purview was the State Property Committee ("SPC").  The SPC was responsible for managing state-owned property assets.  While the SPC nominally reports to the government, the SPC in practice reported to me as Cabinet Secretariat.  These interactions with agencies were a core function of my role given that the Prime Minister was busy and interacting more with ministers than with agency heads like the SPC Chairman.

### The General Director of EMC

8.      One of the state assets under the State Property Committee's purview was Erdenet Mining Corporation ("EMC"), a joint venture between Russia and Mongolia. The EMC was the largest state-owned asset at that time.  EMC was led by the General Director.  In my experience, the General Director had significant power and prestige.

9.      When I became Cabinet Secretariat, the General Director of EMC was Chimmeddorj Ganzorig.  He had been appointed in 2007—nearly two years before Mr. Batbold became Prime Minister. Mr. Ganzorig had been nominated by the SPC to serve

3

in that role.   The joint Mongolian-Russian EMC board of directors subsequently approved him for that position.   In addition to his qualifications, the Mongolian government favored his selection.   I have personal knowledge of how Mr. Ganzorig came to become the government's favored candidate—and it had nothing whatsoever to do with Mr. Batbold.

10.     In December 2007, Prime Minister Bayar submitted my name and Ganzorig's name to Parliament for ministerial positions.   At the time, Nambaryn Enkhbayar was the president.   We were all members of the same party, the Mongolian People's Party (the "MPP")—the country's most prominent pro-democracy party.   Mongolia's second major party at the time, the Democratic Party, opposed our nominations.   To avoid a protracted nomination process, Prime Minister Bayar negotiated with the opposition to come to a broader agreement in ministerial nominations.

11.     Following that negotiation, I was called to President Enkhbayar's office to attend a meeting with President Enkhbayar and Prime Minister Bayar.   Mr. Ganzoirg was there, too.   President Enkhbayar told us that as a result of his negotiations either myself or Mr. Ganzorig would be nominated to the minister position while the other would become the government's favored choice for General Director of EMC.   I asked Mr. Ganzorig which position he would prefer, but he deferred to me.   I selected the Minister's position, and, in turn, Mr. Ganzorig received support for the General Director nomination.   Ultimately, with the support primarily of President Enkhbayar as the leader of our party, Mr. Ganzorig became the party's favored candidate for EMC.   The SPC then nominated him, and the joint Russian-Mongolian board approved that nomination. Mr. Batbold had nothing whatsoever to do with any of this process.

4

*Mr. Batbold's Tenure as Prime Minister.*

12.    Mr. Batbold became prime minister in 2009.  His elevation was unexpected, occurring only after Prime Minister Bayar resigned abruptly due to health problems. Because of the unexpected nature of Mr. Batbold's elevation to Prime Minister, many of his ministers were holdovers from Prime Minister Bayar's tenure.  Mr. Batbold did not remove them to ensure continuity of government.  That included multiple ministers who were in the opposition party, whom Prime Minister Bayar and then Mr. Batbold believed were valued members of a divided and unified bipartisan Mongolian government.

13.    Given the fact that Mongolian government was divided, Mr. Batbold was not a politically powerful prime minister.  But his tenure was incredibly consequential for our country nonetheless.  More broadly, Mr. Batbold has long been known to be a pro-democratic, pro-western Prime Minister.  He was one of the main voices pushing Mongolia to form closer ties with the West.  For example, he pushed for the Mongolian Cambridge Education Initiative, which sought to improve the quality of education in Mongolia. Mr. Batbold also pushed pro-western policies, which led to a large economic boom.  Under Mr. Batbold's leadership, Mongolia saw significant economic growth in 2011 and 2012.  And in my opinion, this growth can be attributed to increasing foreign interest and investment—all of which Mr. Batbold promoted.  In fact, at the time, there were predictions that Mongolia might become the second Qatar in terms of economic growth and prosperity.

14.    Mr. Batbold was also an incredibly ethical Prime Minister.  During my time as Cabinet Secretariat, I never saw him exert political influence for personal benefit.  In

fact, it was quite the contrary. He went out of his way to ensure that his policies would *not* affect his businesses and to ensure his decisions were free of any conflicts of interest. One such example involved cashmere subsidies. In 2011, the government approved of subsidies to cashmere companies in the country to support that critical industry. At the time, cashmere was Mongolia's main export. In the early 2010s, in fact, nearly 30 percent of the world's supply of cashmere came from Mongolia. But widespread smuggling of raw cashmere had devalued the price of Mongolian cashmere and threatened the industry and economy. The government's subsidies were designed to protect against that problem. Mr. Batbold owned a cashmere company that would have received subsidies under the government's plan. But Mr. Batbold recognized this would be a clear conflict of interest and made sure that his company was not entitled to receive and did not ultimately receive any government subsidies.

15.     I understand the Plaintiff in this case has alleged that Mr. Batbold controlled or somehow interfered in the operations of EMC. In my experience, Mr. Batbold held little, if any, power over EMC during his tenure. As Cabinet Secretariat, I set the agenda for the government, coordinated with agencies like the SPC, and worked closely with the Prime Minister. At no time did Mr. Batbold exercise, seek to exercise, or even take a deep interest in the operations of EMC at any level.

16.     Nor did Mr. Batbold have any political influence over EMC's management. As I noted, Mr. Batbold had nothing to do with the appointment of General Director

Ganzorig. Nor would Mr. Ganzorig have any interest in helping Mr. Batbold in any way —I understand they had a contentious relationship and were in different factions within our party. If Mr. Batbold had asked Mr. Ganzorig for corrupt favors, it's more likely Mr. Ganzorig would have exposed that request rather than granted it.

17. My view is that the accusations against Mr. Batbold follow a long line of efforts to interfere in our democracy and harm independent, democratic statesmen like Mr. Batbold. Unfortunately, Mr. Batbold's pro-western and pro-democracy views are not uniformly held within Mongolia. Both historically and today, a bloc of anti-western and anti-democratic politicians oppose Western ideals and seek to maintain foreign influence in our country. Mr. Batbold is only one example of a pro-Western politician who has been damaged and had his career impacted due to increasing Russian influence, misinformation, and false allegations. I fear for the future of our country if these campaigns succeed.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: September 19, 2024
Ulaanbaatar, Mongolia

_____
Chimed Khurelbaatar

7

# EXHIBIT 15

## AGREEMENT BETWEEN GOVERNMENT OF MONGOLIA AND GOVERNMENT OF RUSSIAN FEDERATION ON OPERATIONS OF MONGOLIA-RUSSIAN "ERDENET UILDVER" LIMITED LIABILITY COMPANY

The Government of Mongolia and the Government of the Russian Federation /hereinafter referred to as "Contracting Parties",

Considering the mutual interest in the development of the mining industry in Mongolia and the creation of a highly efficient industry for the extraction and processing of copper- molybdenum ore,

The principle of equality and mutual benefit as management, the following was discussed and agreed upon. It includes:

### Article 1

Agreement of November 22, 1973 between the Government of the Mongolian People's Republic and the Government of the Soviet Socialist Republic on the Establishment of the Mongolian-Soviet Joint Mining and Concentration Plant "Erdenet", "Mongolian- Russian Joint Mountain Enrichment Plant "Erdenet", which was established and operated in accordance with the Agreement dated June 5, 1991 between the Government of the Mongolian People's Republic and the Government of the Soviet Socialist Federal Republic, hereinafter "Joint Factory" was reorganized into a Mongolian-Russian limited liability company (hereinafter referred to as "Factory") that will operate in accordance with this Agreement from July 1, 2003.

### Article 2

The plant is the successor of the Joint Plant and is a legal entity according to the laws of Mongolia. The Plant shall operate in accordance with the laws and regulations of Mongolia, this Agreement, and the provisions of the Plant Charter.

### Article 3

The Contracting Parties shall implement their cooperation within the framework of this Agreement through the shareholders of the Factory.

The shareholders of the factory are:

1

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Battsengel

From the Mongolian side - State Property Committee of Mongolia;

From the Russian side - the Ministry of Property Relations of the Russian Federation respectively.

The Contracting Parties shall have the right to replace their Shareholders with other competent state administrative bodies by notifying the other Contracting Party in writing without violating the terms stipulated in Article 17 of this Agreement.

### Article 4

The share capital of the Contracting Parties in the plant's equity shall be distributed as follows:

The share capital of Mongolian side - 51 percent;

The share capital of Russian side - 49 percent.

The procedure for forming the factory's own capital and its structure shall be determined by the Plant Charter.

Factory equity may be increased by additional capital contributed by the Contracting Parties upon mutual agreement.

### Article 5

The plant's buildings and facilities include production and auxiliary workshops and buildings as reflected in the joint plant's financial statements as of June 30, 2003. In accordance with the decision of the Plant Council, changes can be made to the composition of the factory buildings by adding additional buildings or removing them from the existing buildings by making changes to the financial statements.

### Article 6

The Factory shall not be liable for property for the obligations of the Shareholders and the Contracting Parties, and the Shareholders and the Contracting Parties shall not be liable for the obligations of the Factory.

### Article 7

2

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Batsengel

The relevant government agencies of the Contracting Parties shall take all necessary measures in accordance with their laws and regulations to simplify the administrative procedures related to the granting of licenses and certificates and obtaining permits for industrial, commercial activities of the Plant and to protect its interests.

## Article 8

Unless the Factory conducts activities that violate the laws of Mongolia and the provisions of this Agreement, the Factory's equipment and assets shall not be confiscated for state or public use, as well as confiscated or forcibly confiscated by administrative procedures.

## Article 9

The factory shall pay taxes in accordance with this Agreement and the laws of Mongolia, and then make contributions to its funds by the decision of the Plant Council.

The rest of the net profit obtained from the operation of the factory shall be distributed equally to the equity capital of the Contracting Parties in the equity of the factory /hereinafter referred to as "dividends".

The dividends of the Contracting Parties shall be transferred to the state budgets of the Contracting Parties, and the dividends of the Russian Party shall be converted into free currency at the rate of the Bank of Mongolia. Dividends from the Russian Party will not be taxed and will not be subject to any deductions.

## Article 10

Based on the requirements to create more efficient working conditions for the Plant, the Plant will conduct financial operations and sell its products according to the market principle. Under comparable price and commercial conditions, the Plant will sell its products on the territory of the Russian Federation.

## Article 11

3

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Battsengel

The management body of the plant is the Board of Directors (hereinafter referred to as the "Board") consisting of representatives of the Contracting Parties with a number determined by the Shareholders.

The Board shall consist of an equal number of representatives from the Contracting Parties. The General Director and his deputies are appointed by the Board.

The Board approves the Plant Charter and amendments thereto. Provisions of the Plant Charter shall be in accordance with the laws of Mongolia and this Agreement.

Until the adoption of the new Plant Charter, the laws of Mongolia and the provisions of this Agreement between the Government of the Mongolian People's Republic and the Government of the Soviet Socialist Republic on the operation of the joint Mongolian- Soviet mining and enrichment mineral processing Erdenet plant The Plant Charter, which were an integral part of the Agreement dated June 5, 1991, shall be temporarily applied.

The term of office of the General Director and his first deputy shall be determined by the Plant Charter.

In order to supervise the financial and business activities of the factory, the Plant Board shall establish a Review Board consisting of an equal number of representatives of the Shareholders.

## Article 12

Provide workforce to the Plant by hiring employees in accordance with the Plant Charter. The working conditions of factory workers, employees and executives shall be determined in accordance with the laws of Mongolia.

Items for personal use of Plant workers who do not permanently reside in Mongolia when coming to and returning to work in Mongolia will be EXEMPTED from customs duty in the AMOUNT determined in accordance with the customs laws of Mongolia.

## Article 13

The Plant has the right to establish branches and representative offices for the purposes of carrying out its production, business and commercial activities.

The operation mentioned in this article can be carried out according to the decision of the Plant Board.

4

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Battsengel

## Article 14

The Plant must take all relevant measures to maintain the balance of nature and protect the environment in accordance with the laws of Mongolia. Among them, planned measures will be implemented to rehabilitate and beautify areas damaged by industrial activities, as well as fully and comprehensively use natural resources. If the Plant does not take the above measures, it will be held acountable according to the laws of Mongolia.

## Article 15

Disputes between the owners of shares of the Plant in connection with the implementation of production, business, trade activities of the factory shall be resolved through negotiations.

If the dispute is not resolved within six months after the start of negotiations, the dispute shall be referred to the Negotiating Parties for resolution at the request of one of the Shareholders.

## Article 16

This Agreement shall enter into temporary force on the date of its signature, and shall enter into force upon final written notification to the other Contracting Party after one Contracting Party has completed the domestic procedures required for its entry into force.

This Agreement shall be valid for a period of 5 years, and if one of the Contracting Parties does not notify the other Party about the termination of the Agreement through diplomatic channels 6 months before the end of this period, the period shall be automatically extended for five years.

The Contracting Parties shall implement amendments to this Agreement by signing an intergovernmental document.

## Article 17

Either Contracting Party may withdraw from this Agreement before the expiration of the period specified in Article 16 of this Agreement by sending a written notice to the other Contracting Party. In such event, this Agreement shall be effective for a period of 12 months from the date of receipt of notice by the other Contracting Party.

Within this period, the Contracting Parties are obliged to regulate their mutual obligations regarding this Agreement and issues related to Plant operations, and to determine the terms and

5

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Battsengel

conditions for the sale or transfer of the equity in the other Contracting Party's assets to the other Contracting Party.

After the expiry of the term of validity of this Agreement, or earlier, the liquidation of the Plant shall be carried out by the liquidation commission established by the Contracting Parties. The Contracting Parties shall determine its working procedures and objectives.

One of the Contracting Parties may sell, collateralize or privatize its equity capital of the Plant to other States or legal entities in consultation with the other Contracting Party in accordance with appropriate procedures. In this case, the other Contracting Party has the priority rights to purchase.

This Agreement shall be void in the event that one of the Contracting Parties fully or partially privatizes or sells its equity in the Plant.

This Agreement was executed in Moscow on July 1, 2003 in two copies, each in the Mongolian and Russian languages, and the original copies are equally valid.

SIGNED: ON REPRESENTATION OF THE GOVERNMENT OF MONGOLIA

SIGNED: ON REPRESENTATION OF THE GOVERNMENT OF THE RUSSIAN FEDERATION

6

I declare that all my translation from Mongolian and English are done accurately and truthfully.
MMOXX Translation bureau, registration number:8024723
Translated and verified by a translator Ch.Batsengel



## МОНГОЛ-ОРОСЫН « ЭРДЭНЭТ ҮЙЛДВЭР » ХЯЗГААРЛАГДМАЛ ХАРИУЦЛАГАТАЙ КОМПАНИЙН ҮЙЛ АЖИЛЛАГААНЫ ТУХАЙ МОНГОЛ УЛСЫН ЗАСГИЙН ГАЗАР, ОРОСЫН ХОЛБООНЫ УЛСЫН ЗАСГИЙН ГАЗАР ХООРОНДЫН ХЭЛЭЛЦЭЭР

Монгол Улсын Засгийн газар, Оросын Холбооны Улсын Засгийн газар /цаашид «Хэлэлцэн тохирогч Талууд» гэж нэрлэх/,

Монгол Улсад уул уурхайн үйлдвэрлэл хөгжүүлэх, зэс-молибдений хүдрийг олборлох болон боловсруулах өндөр үр ашигтай үйлдвэрлэлийг бий болгох харилцан сонирхолыг харгалзан,

Тэгш эрх, харилцан ашигтай байх зарчмыг удирдлага болгон,

дор дурдсан зүйлийг хэлэлцэн тохиролцов. Үүнд:

### 1 дүгээр зүйл

Монгол-Зөвлөлтийн хамтарсан уул уурхайн баяжуулах «Эрдэнэт» үйлдвэрийг байгуулах тухай Бүгд Найрамдах Монгол Ард Улсын Засгийн газар, Зөвлөлт Социалист Бүгд Найрамдах Холбоот Улсын Засгийн газар хоорондын 1973 оны 11 дүгээр сарын 22-ны өдрийн Хэлэлцээр, Монгол-Зөвлөлтийн хамтарсан уул уурхайн баяжуулах «Эрдэнэт» үйлдвэрийн үйл ажиллагааны тухай Бүгд Найрамдах Монгол Ард Улсын Засгийн газар, Зөвлөлт Социалист Бүгд Найрамдах Холбоот Улсын Засгийн газар хоорондын 1991 оны 6 дугаар сарын 5-ны өдрийн Хэлэлцээрийн дагуу байгуулагдаж, үйл ажиллагаагаа явуулж байсан Монгол-Оросын хамтарсан уулын баяжуулах «Эрдэнэт» Үйлдвэр /цаашид «Хамтарсан Үйлдвэр» гэх/-ийг 2003 оны 7 дугаар сарын 1-ний өдрөөс эхлэн энэхүү Хэлэлцээрийн дагуу үйл ажиллагаагаа явуулах Монгол-Оросын хязгаардмал хариуцлагатай компани /цаашид «Үйлдвэр» гэх/ болгон өөрчлөн байгуулав.

### 2 дугаар зүйл

Үйлдвэр нь Хамтарсан Үйлдвэрийн эрх залгамжлагч бөгөөд Монгол Улсын хууль тогтоомжийн дагуу хуулийн этгээд байна. Үйлдвэр нь Монгол Улсын хууль тогтоомж, энэхүү Хэлэлцээр болон Үйлдвэрийн Дүрмийн заалтуудын дагуу үйл ажиллагаагаа явуулна.

### 3 дугаар зүйл

Хэлэлцэн тохирогч Талууд хамтын ажиллагаагаа энэхүү Хэлэлцээрийн хүрээнд Үйлдвэрийн хувьцаа эзэмшигчдээр дамжуулан хэрэгжүүлнэ.

Үйлдвэрийн хувьцаа эзэмшигчид нь :

Монголын талаас – Монгол Улсын Төрийн өмчийн Хороо;

Бүртгэлийн дугаар ₽₽₽

"ЭРДЭНЭТ ҮЙЛДВЭР" ТОҮПЫН ТӨРЛИЖСӨН АРХИВ

ХУУЛБАР ҮНЭН

2024 .05. 0 6

Оросын талаас – Оросын Холбооны Улсын Өмчийн Харилцааны Яам тус тус байна.

Хэлэлцэн тохирогч Талууд энэхүү Хэлэлцээрийн 17 дугаар зүйлд заасан нөхцлүүдийг зөрчилгүйгээр Хэлэлцэн тохирогч нөгөө Талдаа бичгээр мэдэгдэх замаар өөрийн талын Хувьцаа эзэмшигчээ эрх бүхий төрийн захиргааны бусад байгууллагаар солих эрхтэй.

### 4 дүгээр зүйл

Үйлдвэрийн өөрийн хөрөнгө дахь Хэлэлцэн тохирогч Талуудын хувь хөрөнгө нь дараахь байдлаар хуваарилагдана:

Монголын Талын хувь хөрөнгө - 51 хувь;
Оросын Талын хувь хөрөнгө -   49 хувь байна.

Үйлдвэрийн өөрийн хөрөнгийг бүрдүүлэх журам, түүний бүтцийг Үйлдвэрийн Дүрмээр тогтооно.

Үйлдвэрийн өөрийн хөрөнгө Хэлэлцэн тохирогч Талууд харилцан тохиролцсоны үндсэн дээр оруулсан нэмэлт хөрөнгөөр өсөж болно.

### 5 дугаар зүйл

Үйлдвэрийн барилга байгууламжийн бүрэлдэхүүнд 2003 оны 6 дугаар сарын 30-ны өдрийн байдлаар хамтарсан Үйлдвэрийн санхүүгийн тайланд тусгагдсан үйлдвэрлэлийн болон туслах цех, барилга байгууламжууд багтана. Үйлдвэрийн барилга байгууламжийн бүрэлдэхүүнд Үйлдвэрийн Зөвлөлийн шийдвэрийн дагуу санхүүгийн тайланд өөрчлөлт оруулах замаар нэмэгдэл барилга байгууламж оруулах буюу байгаа барилга байгууламжаас хасч өөрчлөлт оруулж болно.

### 6 дугаар зүйл

Үйлдвэр нь Хувьцаа эзэмшигчид болон Хэлэлцэн тохирогч Талуудын хүлээсэн үүргийн хувьд эд хөрөнгийн хариуцлага хүлээхгүй бөгөөд Хувьцаа эзэмшигчид болон Хэлэлцэн тохирогч Талууд нь Үйлдвэрийн хүлээсэн үүргийн хувьд хариуцлага хүлээхгүй.

### 7 дугаар зүйл

Хэлэлцэн тохирогч Талуудын Засгийн газрын холбогдох байгууллагууд нь Үйлдвэрийн үйлдвэрлэлэл-аж ахуй болон худалдааны үйл ажиллагаанд хамаарах лиценз, гэрчилгээ олгох, зөвшөөрөл авахтай

2

"ЭРДЭНЭТ ҮЙЛДВЭР" ТӨҮГЫН
ТӨРЭЛЖСӨН АРХИВ
ХУУЛБАР ҮНЭН

2024 .05 .0 8

холбогдсон засаг захиргааны ажиллагааг хялбаршуулах болон түүний эрх ашгийг хамгаалах талаар шаардлагатай бүх арга хэмжээг өөрийн хууль тогтоомжийн дагуу авна.

### 8 дугаар зүйл

Монгол Улсын хууль тогтоомж болон энэхүү Хэлэлцээрийн заалтыг зөрчсөн үйл ажиллагаа Үйлдвэр явуулахаас бусад тохиолдолд Үйлдвэрийн эд хогшил, хөрөнгийг төрийн буюу олон нийтийн хэрэгцээнд албадан авахгүй, түүнчлэн захиргааны журмаар хураан авах буюу албадан хураахгүй.

### 9 дүгээр зүйл

Үйлдвэр нь энэхүү Хэлэлцээр болон Монгол Улсын хууль тогтоомжийн дагуу татвар төлөх бөгөөд түүний дараа Үйлдвэрийн Зөвлөлийн шийдвэрээр өөрийн сангуудад шимтгэл хийнэ.

Үйлдвэрийн үйл ажиллагаанаас олсон цэвэр ашгийн үлдсэн хэсгийг Үйлдвэрийн өөрийн хөрөнгө дэх Хэлэлцэн тохирогч Талуудын хувь хөрөнгөд тэнцүүлж хуваарилна /цаашид «ногдол ашиг» гэж нэрлэх/.

Хэлэлцэн тохирогч Талуудын ногдол ашгийг Хэлэлцэн тохирогч Талуудын улсын төсөвт шилжүүлэх бөгөөд Оросын Талын ногдол ашгийг Монголбанкны ханшаар чөлөөт валютад хөрвүүлнэ. Оросын Талын ногдол ашгийн хувьд татвар ногдуулахгүй бөгөөд аливаа хасалт хийхгүй.

### 10 дугаар зүйл

Үйлдвэрийг илүү үр ашигтай ажиллах нөхцөл бүрдүүлэх шаардлагыг үндэслэн Үйлдвэр зах зээлийн зарчмын дагуу санхүүгийн үйл ажиллагаа явуулж бүтээгдэхүүнээ борлуулна. Жишиж болохуйц үнийн болон арилжааны адил нөхцөлд Үйлдвэр өөрийн бүтээгдэхүүнээ Оросын Холбооны Улсын нутаг дэвсгэр дээр борлуулах болно.

### 11 дүгээр зүйл

Үйлдвэрийн удирдах байгууллага нь Хувьцаа эзэмшигчдийн тогтоосон тоо бүхий Хэлэлцэн тохирогч Талуудын төлөөлөгчдөөс бүрдэх төлөөлөн удирдах Зөвлөл (цаашид "Зөвлөл" гэх) байна.

Зөвлөлд Хэлэлцэн тохирогч Талуудаас тэнцүү тооны төлөөлөгч орно.

3

Бүртгэлийн дугаар... А99
"ЭРДЭНЭТ ҮЙЛДВЭР" ТӨГ-ЫН
ТӨРӨЛЖСӨН АРХИВ
ХУУЛБАР ҮНЭН
Хуулбар олгосон

2024 .05. 08

Ерөнхий захирал, түүний орлогчдыг Зөвлөлөөс томилно.

Үйлдвэрийн Дүрэм болон түүнд оруулах нэмэлт, өөрчлөлтийг Зөвлөл баталнa. Үйлдвэрийн Дүрмийн заалтууд нь Монгол Улсын хууль тогтоомж, энэхүү Хэлэлцээртэй зөрчилдөөгүй байвал зохино.

Үйлдвэрийн шинэ Дүрэм батлах хүртэл Монгол Улсын хууль тогтоомж, энэхүү Хэлэлцээртэй зөрчилдөөгүй заалтуудын хувьд Монгол-Зөвлөлтийн хамтарсан уул уурхайн баяжуулах «Эрдэнэт» үйлдвэрийн үйл ажиллагааны тухай Бүгд Найрамдах Монгол Ард Улсын Засгийн газар, Зөвлөлт Социалист Бүгд Найрамдах Холбоот Улсын Засгийн газар хоорондын 1991 оны 6 дугаар сарын 5-ны өдрийн Хэлэлцээрийн салшгүй хэсэг байсан Үйлдвэрийн Дүрмийг түр хэрэглэнэ.

Ерөнхий захирал болон түүний нэгдүгээр орлогчийн үүрэг гүйцэтгэх хугацааг Үйлдвэрийн Дүрмээр тодорхойлно.

Үйлдвэрийн санхүүгийн болон аж ахуйн үйл ажиллагаанд хяналт тавих зорилгоор Үйлдвэрийн Зөвлөл нь Хувьцаа эзэмшигчдийн тэнцүү тооны төлөөлөгчдөөс бүрдэх Хянан Шалгах Зөвлөлийг байгуулна.

## 12 дугаар зүйл

Үйлдвэрийн Дүрэмд заасны дагуу ажилтан хөлслөх замаар Үйлдвэрийг ажиллах хүчээр хангана. Үйлдвэрийн ажилчид, албан хаагчид болон удирдах албан тушаалтнуудын хөдөлмөрийн нөхцлийг Монгол Улсын хууль тогтоомжийн дагуу тогтооно.

Монгол Улсад байнга оршин суудаггүй Үйлдвэрийн ажилчдын Монгол Улсад ажиллахаар ирэх, буцах үедээ Монгол Улсын нутаг дэвсгэрт оруулж, гаргах хувийн хэрэглээний эд зүйл нь Монгол Улсын гаалийн хууль тогтоомжийн дагуу тогтоосон тоо хэмжээгээр гаалийн албан татвараас чөлөөлөгдөнө.

## 13 дугаар зүйл

Үйлдвэр нь өөрийн үйлдвэрлэл, аж ахуйн болон арилжааны үйл ажиллагаагаа явуулах зорилгоор салбар, төлөөлөгчийн газрыг байгуулах эрхтэй.

Энэхүү зүйлд дурдсан ажиллагааг Үйлдвэрийн Зөвлөлийн шийдвэрийн дагуу гүйцэтгэж болно.

4

А99
"ЭРДЭНЭТ ҮЙЛДВЭР" ТӨУГ-ын
ТӨРӨЛХСӨН АРХИВ
ХҮУЛГАР УНШИХ
2024 .05. 0 8

## 14 дүгээр зүйл

Үйлдвэр нь Монгол Улсын хууль тогтоомжийн дагуу байгалийн тэнцвэрт байдлыг хадгалах болон хүрээлэн буй орчныг хамгаалах талаар холбогдох бүх арга хэмжээг авах ёстой. Түүний дотор үйлдвэрлэлийн үйл ажиллагааны улмаас гэмтсэн газрыг нөхөн сэргээх, тохижуулах, мөн байгалийн баялгийг бүрэн дүүрэн, цогц ашиглах арга хэмжээг төлөвлөгөөтэйгөөр авч хэрэгжүүлнэ.

Үйлдвэр нь дээрх арга хэмжээг аваагүй тохиолдолд Монгол Улсын хууль тогтоомжийн дагуу хариуцлага хүлээнэ.

## 15 дугаар зүйл

Үйлдвэрийн үйлдвэрлэл-аж ахуй, худалдааны үйл ажиллагааг хэрэгжүүлэхтэй холбогдон Үйлдвэрийн хувьцаа хувь эзэмшигчдийн хооронд гарсан маргааныг хэлэлцээний замаар шийдвэрлэнэ.

Хэрэв хэлэлцээ эхэлснээс хойш зургаан сарын хугацаанд маргаан шийдвэрлээгүй бол Хувьцаа эзэмшигчдийн аль нэгний шаардлагаар маргааныг шийдвэрлүүлэхээр Хэлэлцэн тохирогч Талуудад шилжүүлнэ.

## 16 дугаар зүйл

Энэхүү Хэлэлцээр нь гарын үсэг зурсан өдрөөс түр үйлчлэх бөгөөд Хэлэлцэн тохирогч нэг Тал нь түүнийг хүчин төгөлдөр болоход шаардагдах өөрийн улсын дотоодын журмыг гүйцэлдүүлсний дараа бичгээр сүүлчийн мэдэгдэл нөгөө Хэлэлцэн тохирогч Талдаа өгснөөр хүчин төгөлдөр болно.

Энэхүү Хэлэлцээр нь 5 жилийн хугацаанд үйлчлэх бөгөөд энэ хугацаа дуусахаас 6 сарын өмнө дипломат шугамаар Хэлэлцэн тохирогч Талуудын аль нэг нь нөгөө Талдаа Хэлэлцээрийг дуусгавар болгох талаар мэдэгдээгүй бол хугацаа нь тав таван жилээр аяндаа сунгагдана.

Хэлэлцэн тохирогч Талууд энэхүү Хэлэлцээрт оруулах нэмэлт, өөрчлөлтийг Засгийн газар хоорондын баримт бичигт гарын үсэг зурах замаар гүйцэтгэнэ.

## 17 дугаар зүйл

Хэлэлцэн тохирогч аль нэг Тал нь энэхүү Хэлэлцээрийн 16 дугаар зүйлд заасан хугацаа дуусахаас өмнө нөгөө Хэлэлцэн тохирогч Талдаа бичгээр мэдэгдэл илгээх замаар хугацаа дуусахаас өмнө энэхүү Хэлэлцээрээс гарч болно. Энэ тохиолдолд энэхүү Хэлэлцээр нь нөгөө Хэлэлцэн тохирогч Тал мэдэгдэл хүлээн авснаас хойш 12 сарын хугацаанд хүчин төгөлдөр үйлчилнэ.

5



Энэ хугацаанд багтааж Хэлэлцэн тохирогч Талууд энэхүү Хэлэлцээр болон үйлдвэрийн үйл ажиллагаатай холбогдсон асуудлаар харилцан хүлээсэн өөрсдийн үүргээ зохицуулж, Хэлэлцэн тохирогч нөгөө Талдаа өөрийн хөрөнгө дахь хувь хөрөнгийг худалдах буюу шилжүүлэх нөхцөл, хугацааг тодорхойлох үүрэгтэй.

Энэхүү Хэлэлцээрийн хүчин төгөлдөр байх хугацаа дууссаны дараа, эсхүл хугацаанаас өмнө Үйлдвэрийг татан буулгах ажлыг Хэлэлцэн тохирогч Талуудын байгуулсан татан буулгах комисс гүйцэтгэнэ. Хэлэлцэн тохирогч Талууд түүний ажлын журам болон зорилгыг тодорхойлно.

Хэлэлцэн тохирогч аль нэг Тал нь Үйлдвэрийн өөрийн хөрөнгө дахь хувь хөрөнгөө зохих журмын дагуу нөгөө Хэлэлцэн тохирогч талтайгаа зөвшилцсөнөөр бусад Улс, хуулийн этгээдэд худалдах, барьцаанд тавих эсхүл хувьчилж болно. Энэ тохиолдолд нөгөө Хэлэлцэн тохирогч Тал нь худалдан авах давуу эрхтэй байна.

Хэлэлцэн тохирогч Талуудын аль нэг нь Үйлдвэрийн өөрийн хөрөнгө дахь өөрийн хувь хөрөнгийг бүрэн болон хэсэгчлэн хувьчлах, эсхүл худалдсан тохиолдолд энэхүү Хэлэлцээр хүчингүй болно.

Энэхүү Хэлэлцээрийг 2003 оны 7 дугаар сарын 01-ны өдөр Москва хотноо монгол, орос хэл дээр тус бүр хоёр хувь үйлдсэн бөгөөд эх хувиуд нь адил хүчинтэй байна.

МОНГОЛ УЛСЫН
ЗАСГИЙН ГАЗРЫГ
ТӨЛӨӨЛЖ

ОРОСЫН ХОЛБООНЫ УЛСЫН
ЗАСГИЙН ГАЗРЫГ
ТӨЛӨӨЛЖ

6

# EXHIBIT 16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

                              Plaintiff,

                      v.

ANY AND ALL SHARES OF 21 EAST 61 STREET
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL
PROPERTY AND PREMISES LOCATED AT 21
EAST 61ST STREET, NEW YORK, NEW YORK
10065, AND ALL PROCEEDS TRACEABLE
THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS,
EASEMENTS AND FURNISHINGS, LOCATED
AT 230 WEST 56TH STREET, NEW YORK, NEW
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,

                    Defendants In Rem.

Civil Action No. 24-2147

**DECLARATION OF
BRIGADIER GENERAL RINCHINDORJ
CHINGIS**

---------------------------------------------------------------x

I, Brigadier General Rinchindorj Chingis, hereby declare as follows:

1. I am a Mongolian national and public servant who has spent the last three decades in law enforcement.

2. I graduated from Institute of Internal Affairs in Moscow in 1989 and later received a master's degree in criminal justice from the University of Colorado in Denver. I have also participated in numerous international training programs around the world, including in the United States and Europe, to receive training on economic and white collar crime, anti-money laundering, anti-terrorism, and international collaboration and task force management.

3. During my career, I have served in numerous public service roles, specializing in white-collar crime, anti-money laundering, and anti-corruption. For the bulk of my career, I served in the Mongolian police force, rising through the ranks ultimately to become the national Chief of Mongolia's General Police Authority. Among other roles, I have served as the Chief of Police, the First Deputy Chief of Police, the Chief of the Anti-Corruption Section at Central Police Department, and the Head of the Department Against Economic Crimes. Currently, I am Chief of Staff of the Internal Troops, Mongolia's national guard, where I have achieved the rank of Brigadier General.

4. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience in law enforcement.

5. Throughout my career, I have investigated multiple cases involving the Erdenet Mining Corporation ("EMC"). At one point, EMC and the City of Erdenet fell specifically within my investigative jurisdiction. I recall at least three different investigations in 1994, 1998, and 2001 involving EMC and various allegations of corruption and embezzlement. I have also investigated cases involving political officials, generally, and in the context of EMC. For that reason, I am very familiar with allegations of corruption about EMC and EMC's significance to our national economy.

6. Between 2007-2012, I was head of the economic crimes division at the national police. In 2012, I also was appointed as First Deputy Chief of the National Police Agency, in this capacity I was responsible for fighting crime at national level, and supervised intelligence gathering and investigations. That time corresponded with the premiership of Sukhbaatar Batbold. My duties at that time involved conducting large-scale investigations and overseeing economic and corruption-related crimes. I led investigations and intelligence gathering on a national level.

2

Given my high rank, I had a birds-eye view of corruption at a national level during this time frame. My duty in this role was uphold the principles of rule and law and due process. I was not a political appointee and had a duty to abstain from politics and remain neutral.

7.    Given my high rank in the National Police Authority between 2007-2012, I was keenly aware of any corruption investigations because corruption, money laundering, and other economic crimes fell within my jurisdiction. Indeed, although Mongolia has an anti-corruption agency—the Independent Authority of Anti-Corruption (IAAC)—the agency was established in 2007 and required the support of the police during those early years to investigate corruption matters. Accordingly, my department would handle corruption investigations and the associated intelligence work. We would then refer any legitimate allegations to IAAC for further investigation.

8.    I was not particularly familiar with Mr. Batbold before he became Prime Minister in 2009. But given my rank, I had multiple occasions to interact with him and found his engagement with me and my colleagues was highly professional and supportive. At no time did Mr. Batbold pressure me into investigating or declining to investigate anyone. At no time did he attempt to politically interfere in any police investigation. In fact, he made clear he had no interest in interfering with police activities at all—an approach that was, in my experience, somewhat uncommon among similarly high-ranking politicians.

9.    I have had the opportunity to work with many politicians in my career in law enforcement. Some *have* tried to interfere with police work or encourage the police into investigating political opponents, for instance. At no time did Mr. Batbold do any such thing. Instead, he encouraged the police to, when investigating, take into account the human rights, due process, and economic implications of police action—but to always follow the evidence and abide

3

by the law. In my many decades of law enforcement service, I cannot remember a more supportive partner for law enforcement and one so dedicated to ethics, human rights, due process, and the rule of law as Mr. Batbold demonstrated when he was Prime Minister.

10. During my time in the police department, I was aware of rumors about Mr. Batbold and his business dealings, including rumors that he had engaged in corruption with EMC. Unfortunately, in our system, political actors often spread rumors through the news or social media to try to damage their opponents or opposing political parties. Given my duties as a senior police official, however, I was duty-bound to look into these rumors about Mr. Batbold. I and my teams attempted to follow any and all leads. I had taken an oath to remain neutral, to commit to the rule of law, and to follow the evidence wherever it led. In doing so, I found that every one of the rumors about Mr. Batbold proved to be untrue and unsupported by any credible evidence. No investigation into any rumor about Mr. Batbold yielded any evidence of wrongdoing but rather confirmed that Mr. Batbold consistently acted within the requirements of the law. I came to the conclusion that the rumors about him were likely the product of political activities rather than legitimate criminal complaints.

11. I am generally aware of the litigation history against Mr. Batbold that was advanced both in Mongolia and around the world. That litigation was highly irregular and, I believe, was politically motivated. I am also aware that international actors claimed to be working with the IAAC to investigate Mr. Batbold in the context of these cases. While I do not know whether that is true, I believe the IAAC is unlikely to have acted neutrally or without political pressure if it was actually investigating Mr. Batbold.

12. In sum, given my thirty years of experience in law enforcement, if there had been any credible allegation or evidence that Mr. Batbold engaged in corruption with EMC, I would

4

have been aware of it. Neither I nor any police authority under my supervision ever uncovered such evidence—and in fact any investigation into Mr. Batbold only confirmed that he complied with, not violated the law.

13.    I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September **27**, 2024
       Ulaanbaatar, Mongolia

 

                              Brigadier General Richindorj Chingis

5

# EXHIBIT 17

THE CIVIL COURT ORDER OF FIRST INSTANCE
IN CHINGELTEI DISTRICT

Date: 21 October, 2022                182/SHSH2022/03018                Ulaanbaatar City

ON BEHALF OF MONGOLIA

At the closed court hearing of Chingeltei District Civil Court of First Instance presided by the judge of the court of first instance B.Tsolmon with judges Ts. Naranchimeg and U.Sainbileg on the panel and held at the courtroom in the Court, and heard a civil case, where

Plaintiff: Javzmaa Lkhagvasuren /ID:MYU73030501/

Address: Ulaanbaatar, Khan-Uul district, 15th khoroo, Khunnu-2222, 108th building, Apt.1704

Plaintiff: Batbold Sukhbaatar /ID: KHG63062478/

Address: Ulaanbaatar, Khan-Uul district, 11th khoroo, Bellavista AOS, Apt.13

Defendant: "Blue News" LLC /Registration number:6815251/

Address: Ulaanbaatar, Chingeltei district, 3rd khoroo, Peace Tower, Peace tower 54th building, Room 1404,

Defendant: Agency for Policy Coordination on State Property

Address: Ulaanbaatar, Bayanzurkh District, Peace Avenue, 16, Government Building 9.

Defendant: "Mining Corporation" State-Owned Enterprise

Address: Orkhon Aimag, Bayanundur sum, Friendship Square

Defendant: "Erdenes Oyu Tolgoi" LLC

Address: Ulaanbaatar, Sukhbaatar District, 1st Khoroo, Monnis Tower, Floor 14, Room 16.

The demand of the Claim:

1. To order "Blue News" LLC to remedy the material damage caused to L.Javzmaa's good name, honor, and business reputation due to their online libelous stories entitled "Javzmaa: Flying High on Offshore Money" published its website named www.politnews.mn on 17th of March, 2022 and to issue an apology statement through the method and means by which libelous stories were spread.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903939*

1

To order "Blue News" LLC to retract their online libelous stories on L.Javzmaa mentioned in libelous stories entitled "Su. Batbold, the Man Behind the Scenes" published on 07th of April, 2022 and "Su. Batbold, the Man Behind the Scenes-2" published on 10th of April, 2022.

2. To order "Blue News" LLC to retract their online libelous stories published its website named www.politnews.mn on 17th of March, 2022 and 07th of April, 2022, which imply that Mr.Batbold conducted illegal activities through his proxies that caused significant damage to the State Property Policy and Regulation Agency, Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC and,

To order the Agency for Policy Coordination on State Property, the "Erdenet Mining Corporation" State-Owned Enterprise and "Erdenes Oyu Tolgoi" LLC to put an end to the actions undertaken by certain parties that unlawfully use the names of the Agency for Policy Coordination on State Property, "Erdenet Mining Corporation" State-Owned Enterprise and "Erdenes Oyu Tolgoi" LLC.

Following authorized representatives and a court official appeared in person in the court hearing:

T.Gantulga, an authorized representative of the Plaintiff L.Javzmaa;

Z.Sukhbaatar and Kh.Jargalsaikhan, authorized representatives of the Plaintiff S.Batbold;

U.Saranchimeg, an authorized representative of the Dependant "Agency for Policy Coordination on State Property";

B.Battsengel, an authorized representative of the Dependant "Blue News" LLC;

J.Naranpurev, an authorized representative of Dependant "Erdenes Oyu Tolgoi" LLC;

Ts.Munkhtushig, an authorized representative of Dependant "Erdenet Mining Corporation" SOE;

T.Tsogzolmaa, a Secretary of Court Hearing;

E.Chinzorig, citizen's representative did not appear in court without a valid reason, and litigants of the civil case made a request to be held the court hearing in his absense.

IT IS DETERMINED:

*I declare that all my translation from Mongolian and English are done accurately and truthfully*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

2

1. The statement of claim filed by Plaintiff L.Javzmaa is determined in the following way:

"On March 17, 2022, the website www.politnews.mn posted a story entitled "Javzmaa: Flying High on Offshore Money" at the URL address http5//politnews.mn/?p=2479.  In this online piece L. Javzmaa was portrayed as someone who "enjoyed herself on the lavish money coming from oligarchs and stole opportunities from ordinary business folks," also as someone who "for many years has served as the money-launderer for the biggest of Mongolia's oligarchs." She was portrayed before the public as a criminal devoid of morality, a long-time money-launderer - thus inflicting damage to L. Javzmaa's name and dignity as well as her business reputation.

L.Javzmaa has worked as Executive Director at Altai Holding LLC overseeing the company's retail sales and wholesale purchases of foodstuffs and goods, and has, for many worked maintaining regular contacts with ordinary business people and has been supportive of their work.

In the meantime, the investigative reporters of the Defendant, politnews.mn website, have attempted to present her to the public as an individual devoid of morality who engaged in stealing opportunities from ordinary business people. This is inflicting damage to her name and dignity and is grounds for claim.

The story's allegation to the effect that L. Javzmaa has "for many years has served as the money-launderer for the biggest of Mongolia's oligarchs" is a defamation that presents her as a criminal who has for many engaged in money-laundering activities that are unlawful under the Criminal Code of Mongolia and thus inflicts damage to her name, dignity and business reputation.

Since Member of Parliament S. Batbold is a shareholder at Altai Trading LLC and L.Javzmaa is alleged to be the one who is laundering his money it then follows that Member of Parliament S. Batbold is equally engaged in criminal money-laundering and L.Javzmaa acts as his accomplice in this crime. This appears to be what this slander is all about. Member of Parliament S. Batbold has never been involved in any money-laundering crime, therefore the imputation against L.Javzmaa of serving as a money-launderer for him is strongly objected.

On April 7, 2022, a story entitled "Su. Batbold, the Man Behind the Scenes" was posted which was followed by the publication, on April 11, 2022, of a story entitled "Su. Batbold, the

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

3

Man Behind the Scenes-2." Both stories contained defamatory allegations that caused damage to his name, dignity and business reputation.

It is therefore asked that the webside that is disseminating false accusations posturing as investigative journalists be brought before court as Defendant and L.Javzmaa's name, dignity and business reputation be remedied by means of issuing an apology via the medium used to disseminate the story."

2. The statement of claim filed by Plaintiff L.Javzmaa is determined in the following way:

2. Plaintiff S.Batbold determined his cause of action as follows:

On the 7th and 10th of April, 2022, www.politnews.mn published stories entitled "Su. Batbold, the Man Behind the Scenes" and "Su. Batbold, the Man Behind the Scenes-2," respectively, that contained blatant lies and baseless libel against myself. Upon enquiry with Datacom LLC, it has been established that the domain name www.politnews.mn was registered and owned by "Blue News" LLC.

The website operator, the "Blue News" LLC, has posted intentionally libelous stories with respect to the positions I have held and the duties I have performed by wrongfully alleging that, through supposed proxies and companies under my direct and indirect control, I have purportedly conducted illegal activities at Erdenet Mining Corporation SOE and Oyu Tolgoi mines thus causing damage to the Agency for Policy Coordination on State Property, Erdenet Mining Corporation SOE and "Erdenes-Oyu Tolgoi" LLC all the while allegedly gaining unlawful profits. These defamatory statements were intended to inflict damage to my honor and dignity, do harm to my business reputation, and cause mental and physical distress.

The stories posted on www.politnews.mn are essentially replicas of the civil claim brought against me by then Deputy Prosecutor General of the Capital City Prosecutor's Office Mr. Ts. Nasanbat, which was dismissed on November 18, 2021, in the Civil Court of First Instance in Bayanzurkh Disrict in Ulaanbaatar by Ordinance No. 101/SH32021/20096, as well as of the civil claim filed before foreign courts in the misappropriated name of the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE and the "Erdenes-Oyu Tolgoi" LLC.

Notwithstanding the formal statements by the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE and the "Erdenes-Oyu Tolgoi" LLC each

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

4

denying the existence of any claim or claim filed in court with respect to Batbold Sukhbaatar and other defendants, the proceedings in the illegally misappropriated name of these entities continue nonetheless, which not only is inflicting major damage to my honor and dignity and business reputation, but also is exacting significant costs and creating considerable inconveniences.

Dependent "Blue news" LLC caused damage to my good name, honor, and business reputation by stating over 30 grounds in the libelous stories entitled "Su. Batbold, the Man Behind the Scenes" and "Su. Batbold, the Man Behind the Scenes-2," respectively, published to its website named www.politnews.mn on the 7th and 10th of April, 2022.

If structured into blocks, these falsehoods fall within four categories of overarching fabricated themes:

The story baseless and falsely that S.Batbold caused damage to the Agency for Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and the Erdenet Mining Corporation SOE, exerted influence on Erdenet Mining Corporation SOE, so it enters into contracts with designated companies and, as a result, he earned substantial personal gains; as regards Erdenes Oyu Tolgoi LLC, he abused his official position and took decisions that favored foreign shareholders and, as a result, he earned substantial personal gains; He possessed assets and legal persons in offshore zones, and hid there his illegally obtained money."

The following facts show in an abundantly clear manner that the above assertions are baseless, false, and defamatory:

Concerning the allegation to the effect that damage was caused to the Agency for Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and the Erdenet Mining Corporation SOE:

The story baseless and falsely that "Su. Batbold's wrongful acts, which are closely related to the issue of the utilization, possession and disposal of state property and the proper use of natural resources and provision of a favorable tax and investment regime to others, violate the public interest ... as a high-ranking and powerful Mongolian politician and, moreover, as an official who oversaw State property-related matters under his powers provided by law, S.Batbold exerted substantial control and/or influence over the decisions made by the State

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

5

Property Committee and EOT, as had done other high-ranking politicians" and it is baseless defamatory story.

Ts. Nasanbat, former Deputy Prosecutor General of the Capital City Prosecutor's Office, filed a claim with the Bayanzurkh district civil court of first instance on 14th of October 2020 by pretending the Capital City Prosecutor's Office is participating at "the request" of the Agency on Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and Erdenet Mining Corporation SOE, against Mongolian citizens S.Batbold, Ch.Ganzorig, U.Tuul, O.Nyamdalai, B.Battushig and South Korean citizens Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, Kang Eun Joo and Catrison Limited, Cliveden Trading AG, Genetrade Limited. The Bayanzurkh district civil court initiated a civil case based on the claim on 28th of October 2020.

The official letters No. A-1/2050 dated November 27, 2020, No. A-1/2199 dated December 15, 2020, No. A-1/2309 dated December 21, 2020 of the Agency for Policy Coordination on State Property, No. KhB-117-12/8337 dated November 27, 2020 of the Erdenet Mining Corporation SOE, No. 01/197 dated November 27, 2020 of Erdenes Oyu Tolgoi LLC, which were filed to the court, clearly state that no request to file claims or claims have been filed with the Capital City Prosecutor's Office regarding S.Batbold and other defendants in relation to claims registered at the court.

Furthermore, response letter No. 1/189 dated January 5, 2022 and response letter No. 1/330 dated January 31, 2022 of the Office of the Prosecutor General of Mongolia stated that it had not granted any rights to Ts. Nasanbat, former Deputy Prosecutor General of the Capital City Prosecutor's Office to file a claim to Mongolian court and Capital City Prosecutor's Office had not received any requests from Agency on Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and Erdenet Mining Corporation SOE to have it represent them at Mongolian court regarding matters which interest of the State and public have been violated.

Thus, it is proven that the Agency for Policy Coordination on State Property, Erdenet Mining Corporation SOE and Erdenes Oyu Tolgoi LLC, which were identified as Claimants in the lawsuit, haven't requested the Capital City Prosecutor's Office to file a lawsuit against S. Batbold et. al. and to involve a prosecutor in civil proceedings.

In addition, the Anti-Corruption Agency's official letter No. 03/1553 dated February 1, 2022 confirms that S.Batbold is not accused of any crimes related to matters of Agency for

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

6

Policy Coordination on State Property, Erdenet Mining Corporation SOEand Erdenes Oyu Tolgoi LLC.

The civil case which was initiated by the claim brought by Deputy Prosecutor General of the Capital City Prosecutor's Office Mr. Ts. Nasanbat was dismissed on November 18, 2021, in the Civil Court of First Instance in Bayanzurkh Disrict by Ordinance No. 101/SH32021/20096.

For these reasons the allegations to the effect that plaintiff S.Batbold caused damage to the Agency for Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and the Erdenet Mining Corporation SOE are baseless defamation:

Concerning the allegation to the effect that S.Batbold exerted influence on Erdenet Mining Corporation SOE, so it enters into contracts with designated companies and earned substantial personal gains:

The story baseless and falsely that "in 2019, the Agency and the EOT learned that Ganzorig, in breach of his duties and obligations, as imposed by law, followed Su. Batbold's instructions and conspired with other individuals and entities to conclude transactions with a number of foreign legal entities that caused damage to the Claimants and unlawfully enriched S.Batbold. With Ganzorig's signature, Erdenet Mining Corporation SOE was able to enter into valuable contracts for sale of minerals with three companies, namely Catrison Ltd,, Cliveden Trading AG, and Genetrade Ltd. Although these companies are incorporated and based, respectively, in Hong Kong, Switzerland and the British Virgin Islands ("BVI"), they are controlled and/or substantially influenced by a huS.Batboldand-and-wife duo who act as Batbold's proxies, Cheong Choo Young and Kim Hak Seon."

An official letter No. 119/23 dated February 17, 2022, from the Department of Exports and Sales of the Erdenet Mining Corporation SOE stated that plaintiff S.Batbold exerted no influence on Erdenet Mining Corporation SOE to have it sign contracts with the three companies named in the story, that the contracts did not violate any laws and regulations and that the Erdenet Mining Corporation SOE did not incur any losses as a result of these contracts.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

7

The letter stated that "... The issue of concluding an agreement on the supply of export products was regulated by the "Regulation on the conclusion of contracts by SP Erdenet Mining Corporation SOE for the supply of export products of " approved in 2001 in the Russian language, and the "Regulation of Erdenet Mining Corporation SOE on the conclusion of contract for supply of export products" amending the previous regulation and approved in 2014 in the Mongolian and Russian languages.

... The contract with Cliveden Trading Ag... was finished due to the full supply of copper concentrate under the contract. ... Entered into a concentrate sale and purchase agreement... with Catrison Limited. ... Since March 2013, no official letter or request has been received from Catrison Limited regarding the supply of concentrate... The terms of trade for the above agreements with Cliveden Trading Ag and Catrison Limited were the same as for the supply of concentrate to other acquiring companies in the same year...".

Since, as explained by the Erdenet Mining Corporation SOE, the sales terms for the contracts signed with the three companies referred to in the story were identical to the terms of the contracts on concentrate sales signed that same year with other companies the allegations that the SOE incurred losses because of these contracts is false.

Also, the plaintiff never exerted any influence in regard to the singing of these contracts and no personal profits were gained as a result of the signing of these contracts.

*Concerning* the assertion to the effect that in the case of Erdenes Oyu Tolgoi LLC, S.Batbold abused his official position and took decisions that favored foreign shareholders and, as a result, earned substantial personal gains:

The story baseless and falsely asserts that "S.Batbold engaged in securing advantages for others in relation to the ownership and management of Oyu Tolgoi LLC, the project company which controls the Oyu Tolgoi mine. In exchange for according favorable ownership, tax and investment terms he received unauthorized payments and other benefits from individuals and/or companies linked to Turquoise Hill Resources Limited (named Ivanhoe Mines Limited ("Ivanhoe") until June 2012)".

S.Batbold was the Prime Minister of Mongolia from October 29, 2009 to August 9, 2012, after the signing of the Oyu Tolgoi Investment Agreement and the Shareholder Agreement.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

8

During this period, no changes were made to the Investment Agreement between the Government of Mongolia and the investors. On June 8, 2011, the amendments made to the Shareholder Agreement that concluded in 2009 in relation to the Oyu Tolgoi deposit.

This amendment was made as a result of the negotiations on the agreement held by Erdenes Oyu Tolgoi LLC, the State Ikh Khural was apprised of it by government, and it made no changes to the Investment Agreement that contained tax provisions set by law.

Despite the allegations in the claims mentioned in the stories that the amendments to the agreement resulted in many advantages for investors, the stories do not mention any specific advantages except that the reduction of interest rates to be paid on the loans to investors were beneficial to the investor and reduced the amount of taxes withheld.

However, the amendment reduced the interest rate (loan interest) to be paid by the Mongolian side to investors from 9.6+LIBOR to 6.5+USTR. As a result, hundreds of millions of dollars (currently over $ 500 million) in interest payments on loans from Mongolia to investors have been saved, and by the same amount the revenue received by the investors has been reduced, therefore, the decision has not been beneficial to the investors, but rather has benefited Mongolia. It defies any sense and it is baseless to allege that the investor has received an advantage and, as a result, that a profit was obtained.

The government led by S. Batbold initiated and submitted to the Parliament in June 2012 a draft law to terminate double taxation agreements with some countries (for example, the Netherlands and Luxembourg) and by having this law approved the withholding tax on interest rate and other withholding tax rates were raised to 20 percent, which previously stood at 0-10 percent in accordance with the double taxation agreements concluded with some countries. This significantly increased Mongolia's benefits from the Oyu Tolgoi project (currently by about $ 400 million). As a result, from the accumulated funds placed in the treasury of the Ministry of Finance, in April 2021, the Government of Mongolia announced that 300,000 MNT was provided to every citizen of Mongolia to overcome the COVID-19 pandemic. It is a baseless libel to argue that he has been earning money from the Oyu Tolgoi project while he instead has been working to protect Mongolia's interests.

In brief, the effective benefits to Mongolia today of my actions are over a billion dollars, or about three trillion MNT, and will continue to grow.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

9

In the face of this reality, the allegations in the claims reproduced in full in the stories are based on a blatant false claim that advantages were obtained benefiting certain individuals in terms of the ownership and management Oyu Tolgoi LLC. However, as the only proof of these allegations, the Claimants attached the report of the research organization SOMO regarding the claims. A review of the report finds that the Claimants' arguments were not supported, but were rejected 100 percent. For example, the report does not mention any changes in the withholding tax as amended by the 2011 Shareholder Agreement, but rather emphasizes that it was in Mongolia's interest to cancel the double taxation treaties with the Netherlands and Luxembourg at the initiative of the Mongolian government and increase the withholding tax. This report does not prove the Claimants' argument, and the so-called evidence was attached in order to deliberately mislead the court.

Besides, this study explicitly said that in 2015, fully three years after I left my office as Prime Minister and when the government was led by the Democratic Party, a tax-related contention involving USD 232 million was resolved during the negotiations on the Oyu Tolgoi project. But the libelous story deceitfully asserts that a tax relief amounting to USD 232 million was granted in 2011, during the negotiations on the Shareholders' Agreement. It is public information that in 2015 I was not Prime Minister anymore and the libelous story is yet another proof that, from the very start, the story was a calculated persecution based on false evidence.

As mentioned above, it is a fact that S.Batbold increased withholding tax rate on interest rates and other items and the reduction in interest rates (loan interest rates) paid by the Mongolian side to the investors during his tenure as Prime Minister of Mongolia and it have had a positive impact on the Mongolian economy.

4. Concerning the allegations to the effect that "S.Batbold possessed assets and legal persons in offshore zones, and hid there his illegally obtained money:"

The story baselessly and falsely asserts that the plaintiff possesses assets and legal persons in offshore zones, and hides there his illegally obtained monies

It is a totally baseless defamation that the libelous story says that S.Batbold bought immovable properties by income and profits arising from following companies: Cliveden Trading, Ever Global Trading Limited, Genetrade Limited, Catrison Limited, Jazlyn Limited, Lorsch Limited, Midlink Pe Limited, Grand Oriental Holdings Limited, Grandcastle, Future

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

WESTGATE
TRANSLATION
BUREAU
5484235
XHT3578

10

Monson Holdings Limited, Infinite Properties Limited, Trident Trust, Bisley Development Limited, TMF Limited, Noxas Limited, Bophut Investments Limited, Jadepeace Group Limited, Ocean Partners, UK Limited, Lake view Group Holdings Limited, Winrock Invest Limited, Elmbridge Assets Limited, Batu Mining Limited, Ever Legend Engineering Limited, Minexmetal LLC, Bophut Ivanhoe Ulaan Pte, UB Entertainment Limited, CBM Mongolia Pte Limited, Capital World Development Limited, or Brightfuture. Also blatantly false information was published that I allegedly secretly own expensive real estate abroad through Lorsh Limited, Premier Edge Limited, Baloas Limited, Cyzycus Limited, Infinite Properties Limited, Infinite Properties Limited, Cosmatus Limited, Cherskiy Limited and Bynar Limited, Regula Limited.

The assets referred to the story have no connection at all to S. Batbold.

The grounds outlined above and the evidence gathered during the case prove that plaintiff S.Batbold does not own or possess any assets or legal persons in foreign countries. Therefore, there is every reason to qualify the accounts in the story as defamation.

Concerning the other items:

The Defendant asserted in his story that "Su. Batbold accepted illegal bribes from the Oyu Tolgoi mine." The Constitution of Mongolia stipulates in Article 16, Clause 14 that "Every person shall be presumed innocent until proved guilty by the court through the due process of law."

Article 1.8, Clause 1 of the Criminal Procedure Code of Mongolia says that "It shall be forbidden to subject any person to search, arrest, detention, persecution, deprivation of freedoms, violation of ownership rights, to bring as a defendant in a criminal case, pass a guilty verdict and charge of a criminal offence outside the grounds and regulations prescribed by this law."

There is no effective court decision proving that Plaintiff S.Batbold was guilty of a crime of corruption, and in a February 19, 2021 interview with the online medium www.eguur.mn former Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat stated that no criminal lawsuit had ever been brought against S.Batbold and no criminal proceedings were ongoing involving investigation against him as an accused.

In addition, official letters No. 03/1553 dated February 1, 2022 and No. 06/12414 dated September 20, 2022, issued by the Independent Agency Against Corruption (IAAC) confirmed that no criminal charges had been brought against S.Batbold.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

11

Furthermore, DCI Group, a U.S.-based media firm, acknowledged that it did circulate an account to the effect that S.Batbold had indeed committed a criminal offence for political reasons using false assertions, and communicated an appropriate rectification to the Plaintiff.

The Law on the Regulation of Public and Private Interests and Prevention of Conflict of Interest in Public Service was amended on April 13, 2017, to include an Article 101 entitled "Ban applied to the possession of bank accounts, ownership of movable and non-movable property, setting up of legal entities in offshore zones. Upon the entry into force of this amendment the activities regarding the possession of bank accounts, ownership of movable and non-movable property, setting up of legal entities in offshore zones were effectively banned.

Prior to this development there was no ground to view any possession of bank accounts, ownership of movable and non-movable property, setting up of legal entities in offshore zones as an illegal activity.

Therefore, all allegations to the effect that the Plaintiff received bribes from the Oyu Tolgoi mine and placed his illegally obtained funds in offshore zones and acquired assets there are pure defamation.

It has been established that those who prepared the defamatory allegations and handed them to then Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat were the so-called K2 Intelligence, a foreign for hire, for profit investigative firm. During the court hearings held in foreign jurisdictions it was established that those who hired them were Moyol Otgonjargal and Chuluunkhuu Ganbat. They were the ones who gave a start to the illegal, politically-motivated campaign of defamation leveled against a Mongolian national.

Ch. Ganbat was [at one time] employed as assistant to Kh.Battulga, Minister of Transportation and Urban Affairs, in 2018 he was assistant to the Minister of Food and Agriculture. ProPublica, an international magazine of investigative journalism, had run a detailed story on a crime involving the embezzlement a substantial amount of money during the implementation of the New Railway project.

In 2016, at a time when criminal investigation was under way with him as an accused party he flew to the U.S., and was included in an Interpol search database. Someone who was accused of a criminal offence back home and fled the country took, personally, charge of the campaign of defamation against S.Batbold. The court proceedings in the U.S. revealed the existence of over 650 defamatory emails written by him personally and communicated to K2

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar.*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903939*

12

Intelligence.

On December 8, 2020, a blogger named Richard Messick of https://globalanticorruptionblog.com posted the first online piece of defamation against S. Batbold. Thirty minutes later the piece popped up in a Mongolian online newsroom, falsely presented as a story in foreign press. As evidence presented in court hearings in the U.S. has proven, Richard Messick and Ch. Ganbat have maintained regular email communications with K2 Intelligence ever since 2018.

Moyle Otgonjargal was the one who, in 2017, signed the hire agreement on investigataing S. Batbold. She is a shareholder of Tumen Hishigten LLC owned by Kh. Battulga and has reportedly worked as his personal assistant. According to Mongolian and foreign investigative journalists, she is reported to have worked with particular officials from Belarus who were under international sanctions to set up a joint company which engaged in forcing upon Mongolian state-owned mining companies expensive Belaz trucks and other equipment thus causing damage to these companies.

The aforementioned facts were revealed when S.Batbold filed a discovery claim against K2 Intelligence in a U.S. court and the court ordered K2 Intelligence to disclose the information related to this case.

These materials prepared by these individuals involved in the organization of the illegal investigation against MP S. Batbold were later used by Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat as the basis for his lawsuit filed with the Bayanzurkh Disctrict Civil Court. On February 25, 2022, B.Saruul, deputy head of the Office of the President under former President Kh.Battulga spoke repeatedly via various media of this defamation, not proven in court and not investigated by Mongolian law enforcement, as of something that was absolute truth. Besides, it became apparent from an electronic registry of U.S. government agencies that some of the leaders of the Democratic Party signed an agreement with DCI Group, a lobby group in the U.S., to disseminate falsehoods about S. Batbold via various international media. DCI Group officially stated that it does not bear responsibility for what was published in media, that its agreement with the Democratic Party came to an end and that it no longer represented either the Democratic Party or Kh. Battulga.

It can be concluded from the above that the aforementioned defamatory statements were politically motivated and were intended for use in political campaigns.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

13

**2. On the statement of claim concerning the Defendants, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC:**

Plaintiff S.Batbold asked that Co-Defendants, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC, be ordered to put an end to the activities of those responsible for illegal activities on behalf of the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC.

Based on the evidence a judge's order was issued, and the court opened a civil case based on the claim filed, on October 14, 2020, by Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat representing the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC against S. Batbold. By Judge's Order dated November 18, 2021, and numbered No.101/Sh32021/20096 of the Bayanzurkh District Civil Court of First Instance and in accordance with Article 65, Clause 1.9 of the Law on Civil Procedure the case was dismissed on account of the ruling which read "defendant's address unknown."

Official letters No. A-1/2050 dated November 27, 2020 of the Agency for Policy Coordination on State Property, No. KhB-117-12/8337 dated November 27, 2020 of the Erdenet Mining Corporation SOE state-owned enterprise, No. 01/197 dated November 27, 2020 of Erdenes Oyu Tolgoi LLC stated that no requests to file claims in respect of the court case in question were sent to the Capital City Prosecutor's Office in respect of S. Batbold and other defendants.

In addition, response letters No. 1/189 dated January 5, 2022, and No. 1/330 dated January 31, 2022 of the Office of the Prosecutor General of Mongolia stated that no authorization was issued to Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat to file a lawsuit with Mongolian court, and no request was addressed to the Capital City Prosecutor's Office from the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC asking for a prosecutor's participation concerning matters of the violation of state and public interests.

Furthermore, it is coming to light that, in the absence of a request from the Agency for

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

14

Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC and without an authorized power of attorney, Deputy Prosecutor of the Capital City Prosecutor's Office Ts.Nasanbat proceeded with filing a claim in court.

On November 6, 2020, Capital City Prosecutor's Office sent an official letter No. MH/123 and entitled "On Delivery of Information" to Sarah Y. Walker, a Partner at King and Spalding International LLP informing that on October 28, 2020, the judge opened a civil case against S. Batbold. It advised to file with all possible courts so the assets owned or possessed by the defendants outside Mongolia are frozen and other measures are ordered. Ts. Nasanbat, Deputy Prosecutor General of the Capital City Prosecutor's Office issued guarantees on behalf of the plaintiffs that the plaintiff parties will be responsible for any future losses and sealed this with his signature.

Based on this official letter, King and Spalding International LLP filed lawsuits in the UK, U.S., the PRC Special Administrative Region Hongkong, Jersey, Singapore, the British Virgin Islands against the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC.

Response letter No. 1/189 of the Office of the Prosecutor General of Mongolia dated January 5, 2022 stated that no power and no authorization was granted to Ts. Nasanbat, Deputy Prosecutor General of the Capital City Prosecutor's Office to issue any guarantees on matters discussed in the official letter No. MH/123 dated November 3, 2020; that no power and authorization was granted to King and Spalding International LLP by a Mongolian prosecutor's office to open civil disputes or continue such disputes in foreign courts. Official letter No. 1/883 dated January 28, 2022, [of the Office of the Prosecutor General of Mongolia] instructed the Capital City Prosecutor's Office to revoke the illegally granted power and guarantees referred to in the abovementioned letter No. MH/123.

The plaintiffs have on more than one occasion lodged claims with the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC alerting them to their names being illegally used by a foreign entity, King and Spalding International LLP, and by Deputy Prosecutor General of the Capital City Prosecutor's Office Ts. Nasanbat.

As can be seen from the above, the court's ordinance refusing to accept the claim filed by the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE,

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

and Erdenes Oyu Tolgoi LLC and the Capital City Prosecutor's Office against myself, S.Batbold, has entered into force, and no further claims were filed on this matter unresolved by court.

Well after this happened the www.politnews.mn owned by the Defendant, Blue News LLC, published, on April 7, 2022, a story entitled "Su. Batbold, the Man Behind the Scenes" followed by the publication, on April 11, 2022, of a story entitled "Su. Batbold, the Man Behind the Scenes-2." The stories alleged that S. Batbold caused damages to the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC; that he influenced the signing of contracts by the Erdenet Mining Corporation SOE with the named companies and made substantial profits; that, in the case of Erdenes Oyu Tolgoi LLC, he abused his position to pass decisions favorable to foreign share-holders and thus gained substantial personal profits. These publications contained defamatory assertions that caused damage to my name, dignity and business reputation. In the face of this situation, neither the Agency for Policy Coordination on State Property, nor the Erdenet Mining Corporation SOE, nor Erdenes Oyu Tolgoi LLC have undertaken any [corrective] measures.

In other words, for these there legal entities the assertions referred to in those publications to the effect that [Batbold] "caused damages to the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC; influenced the signing of contracts by the Erdenet Mining Corporation SOE with the named companies and made substantial profits; in the case of Erdenes Oyu Tolgoi LLC, abused his position to pass decisions favorable to foreign share-holders and thus gained substantial personal profits" are apparently altogether non-existent. In a twist, these three agencies appear to be quite oblivious to the damages they had purportedly incurred and have remained quiet choosing inaction.

Also, the defendants, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC, have formally and repeatedly denied in their official letters any filing of claims against myself in Mongolian or foreign courts, neither civil courts nor criminal or administrative courts, on the grounds that myself "caused damage" to them, "influenced the signing of contracts by the Erdenet Mining Corporation SOE with the named companies and made substantial profits; in the case of Erdenes Oyu Tolgoi LLC, abused his position to pass decisions favorable to foreign share-holders and thus gained substantial personal profits." Nevertheless, these entities failed to publish their denials on the

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar,*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

16

www.politnews.mn electronic newsroom owned by Blue News LLC which posted a detailed account of such dealings.

The aforementioned details show that the defendants, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC, were aware of this case but, to this day, have not taken any measures to put an end to these activities. This claim before the court had necessarily to be filed because of the failure of these three entities to intervene and because these three entities are still plaintiffs in foreign courts and keep filing claims against S. Batbold despite the fact that the civil case in Mongolia [against S. Batbold on this matter] has long been dismissed.

The Civil Code of Mongolia states in Article 21.1, "In cases where a legal person who communicated stories defaming a citizen's name, honor, dignity and business reputation fails to prove their accuracy, at the request of the offended party s/he shall be liable to refute the defamatory stories via the media and the form these stories were originally communicated, or via any other media and forms." Furthermore, Article 497.1 stipulates, "A legal person who caused damage to other persons' rights, life, health, honor, dignity, business reputation or property deliberately or due to negligent action (inaction) shall compensate for the damage caused."

Therefore, the court is asked to issue an order that directs the defendant who, on April 7, 2022, published a story on a Blue News LLC-owned website www.politnews.mn entitled "Su. Batbold, the Man Behind the Scenes" and on April 11, 2022, published a story entitled "Su. Batbold, the Man Behind the Scenes-2" which both involved the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC and implicated S.Batbold in illegal dealings at Erdenet and Oyu Tolgoi mines that caused damage to the Agency for Policy Coordination on State Property, the "Erdenet Enterprise" state-owned enterprise, and Erdenes Oyu Tolgoi LLC to retract their defamatory publications.

Also, the court is asked to order the Agency for Policy Coordination on State Property, the "Erdenet Enterprise" state-owned enterprise, and Erdenes Oyu Tolgoi LLC to put an end to the activities of those individuals who illegally use their names," reads [the statement of claim by S. Batbold].

3. Blue News LLC (www.politnews.mn) presented the following grounds for rejection of claims:

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

17

The following statement is made in connection with the claim before this court by L. Javzmaa and S. Batbold who seek relief for the non-material damage caused to their honor, dignity and business reputation.

On March 17, 2022, Blue News LLC published on its website www.politnews.mn a story entitled "Javzmaa: Flying High on Offshore Money," on April 7, 2022, it published a story entitled "Su. Batbold, the Man Behind the Scenes," and on April 11, 2022, it published a story entitled "Su. Batbold, the Man Behind the Scenes-2."

These stories are based on truthful accounts and accurate evidence and are not, as alleged by the plaintiffs in their claim, false, defamatory stories. We reject the plaintiffs' claim and state that the following details recounted in our stories are accurate.

The details in our stories are based on the source materials from the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC and, therefore, are not defamation.

Regarding the statement of claim by L. Javzmaa:

As recounted in the story, L.Javzmaa was a defendant in court proceedings both in Bayanzurkh District Court and in a court in New-York and the case has been resolved. Besides, it was determined in court that L.Javzmaa connived with businesspeople from the Republic of Korea and influenced the signing of dubious contracts, and concluded contracts with foreign investment on terms unfavorable to Mongolia.

As Javzmaa's claim states, "the story's allegation to the effect that L. Javzmaa has "for many years served as the money-launderer for the biggest of Mongolia's oligarchs" is a defamation that presents her as a criminal who has for many engaged in money-laundering activities that are unlawful under the Criminal Code of Mongolia and thus inflicts damage to her name, dignity and business reputation."

In fact, this account is accurate and no documents or intimations can refute its truthfulness. We were also able, in our subsequent stories, to show that a big Mongolian oligarch stood behind L. Javzmaa's dealings.

Therefore, we reject L. Javzmaa's claims and do not see any grounds for any legal action against us and we are not prepared to retract our stories.

Regarding the statement of claim by S.Batbold:

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

18

S. Batbold's claim states that "since the above stories reproduce in their entirety the claim, both these claims and the publications that copy them constitute a libel damaging my honor, dignity and business reputation, the claims were filed in violation of law and constitute a politically motivated persecution based on fabricated charges and cause harm to the country's national interests."

The stories were written based on the materials from the Capital City Prosecutor's Office, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC as well as on the claims filed with the Bayanzurkh District Civil Court of First Instance and a court in the British Virgin Islands and, therefore, are by no means a libel but a reconstitution of facts.

As a matter of fact, the plaintiffs in the claims filed with the Bayanzurkh District Civil Court of First Instance and a court in the British Virgin Islands happen to be the Capital City Prosecutor's Office, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC.

As of today, neither the Agency for Policy Coordination on State Property, nor the Erdenet Mining Corporation SOE, nor Erdenes Oyu Tolgoi LLC have issued any denials concerning our publications. In addition, these entities never issued any statements indicating that the matters concerning S. Batbold were false. Therefore, there is every ground to believe that the facts detailed in the claims [against S.Batbold] are accurate.

Besides, the very fact that the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC are filing lawsuits in Mongolian and foreign courts indicates that the episodes recounted in our stories did indeed take place.

The fact that Deputy Prosecutor General of the Capital City Prosecutor's Office Ts. Nasanbat is suing in court on behalf of these entities seeking judicial relief for the damages they incurred and is participating in court proceedings also speaks of the veracity of the facts and details recounted in our stories. As stipulated in Article 56 of the Constitution of Mongolia, "Public prosecutors exercise supervision over the inquiry and investigation of cases and the execution of punishment, and participate in the court proceedings on behalf of the State."

As set forth in our stories, a civil case was opened against S.Batbold et al. as pursuant to the claim filed with court by the Capital City Prosecutor's Office, the Agency for Policy

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

19

Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC. The decision by a court to open a case based on a claim means that the defendants, S. Batbold et al., are certainly guilty.

The claims by the Plaintiff are refuted in the following way:

Regarding [Batbold's] point on "Concerning the libelous allegations to the effect that damage was caused to the Erdenet Mining Corporation SOE because of the directions given to sign contracts unfavorable to the mine:"

It has been established by the Agency for Policy Coordination on State Property and the Erdenet enterprise that when serving as Mongolia's Prime Minister S. Batbold granted copper and molybdenum sales contracts to Catrison Ltd, Cliveden Trading AG and Genetrade Ltd at a conspicuously low pricing unfavorable to Mongolia and gained substantial secret profits from the onward sale of these minerals, which led these entities to go to court. This is clear from the claims filed the Bayanzurkh District Civil Court of First Instance and a court in the British Virgin Islands filed by the Agency for Policy Coordination on State Property and the Erdenet Mining Corporation SOE.

This cannot then be called a baseless insinuation. The claims also clearly state that "The Chairman of the State Property Committee reports directly to the Minister in charge of the agency. S. Batbold exercised direct and/or indirect control over the State Property Committee and/or Erdenet Mining Corporation SOE and, in exercise of that control, had the authority to issue orders and decrees and grant permissions and oversaw the contracts concluded with Cliveden Trading, Catrison and Genetrade."

According to the claims, "the contracts with Catrison Limited, Genetrade Limited and Clive Trading AG were signed by Ch. Ganzorig, the CEO, on behalf of Erdenet Mining Corporation SOE; the value of a contract, as indicated in an official letter by the company itself, is established within the framework of company policy and is based on a specifically approved regulation." Had the contracts signed with these three companies been in conformity with the regulations in place at the Erdenet Mining Corporation SOE the latter would not have had to file a claim with court. Since the Erdenet Mining Corporation SOE has itself filed a lawsuit upon concluding that it has incurred damages as a consequence of these contracts then this cannot be ignored as [S. Batbold's] claim suggests.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 3, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

20

Batbold's claim further reads that contract prices for the supply of copper concentrate are set by the Erdenet Mining Corporation SOE based on the principle of freedom of international trade agreements in accordance with a special methodology set by the international market price as a benchmark. But no evidence [of any pricing] was presented at court which makes this statement unverifiable.

S. Batbold's claim also reads that, "I have never been an authorized official defined under Article 81.1 of the Company Law of 1999 and Article 84.1 of the Company Law of 2011 to influence any decision of the Erdenet Mining Corporation SOE specified in Article 81.1 of the Company Law of 1999, also Article 84.1 of the Company Law. Therefore, it was not possible for me to influence any commercial or business decisions made by Erdenet Mining Corporation SOE and I have never done so.

Yet, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC wrote in their claims filed with Mongolian and foreign courts,

"It was proved that when concluding the Erdenet Mining Corporation SOE Contracts with Catrison, Cliveden Trading and Genetrade Ganzorig and S.Batbold violated Mongolian Company Law and the Civil Code.

As per Article 84.1 of the Company Law of Mongolia of 6 October 2011 and Article 81.1of the Company Law of 2 July 1999, Ganzorig was an authorized official person at Erdenet Mining Corporation SOE.

With respect to his conduct after 21 November 2011, S.Batbold was also authorized official of Erdenet Mining Corporation SOE within the meaning of Article 84.1 of the 2011 Company Law because he was a "person who participate[d] directly or indirectly in the process of making official decisions of a company or concluding transactions or agreements." As Prime Minister of Mongolia, state property policy was within the affairs over which he had full authority.

On behalf of Erdenet Mining Corporation SOE, Ganzorig and S.Batbold concluded the Erdenet Mining Corporation SOE Contracts that had unfavorable terms, and they knew or should have known that those transactions had unfavorable terms. It has been established that by concluding such transactions,

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

they violated their duties as authorized officials to, among other things, act in good faith and in the best interests of the company (Article 81.2 of the 1999 Company Law and Articles 84.4.2-84.4.6 of the 2011 Company Law).

Ganzorig and S.Batbold concluded the Erdenet Mining Corporation SOE Contracts with affiliated parties and used their office as authorized officials of Erdenet Mining Corporation SOE. It was established that S.Batbold and Ganzorig's conduct constitutes a violation of Article 84. 4.1 of the 2011 Company Law read with Articles 6.3 and 11.1 of the Law on the Regulation of Public and Private Interests and Prevention of Conflict of Interest in Public Service."

This is a very clear statement that denies any ground to [S.Batbold's] claim.

Regarding the section "On the defamation in regard of Oyu Tolgoi-related contracts":

The assertion to the effect that as a result of the 2011 Agreement on the Oyu Tolgoi project "the effective benefits to Mongolia, as of today, stand at over a billion dollars, or about three trillion MNT, and in the future the benefits will only continue to grow" is false.

As a matter of fact, the plaintiff Oyu Tolgoi LLC discovered that [S.Batbold] engaged in securing advantages for others on matters concerning the ownership and management of Oyu Tolgoi LLC, the project company which operates the Oyu Tolgoi mine. In exchange for awarding favorable ownership, tax and investment terms he received unauthorized payments and other benefits from individuals and/or companies linked to Turquoise Hill Resources Limited (named Ivanhoe Mines Limited ("Ivanhoe") until June 2012). This was established by Oyu Tolgoi LLC which filed the lawsuit that eventually led to the case.

Therefore, since the facts referred to in the claim  and in the publications are a true, a claim was specifically filed with a court, and therefore the plaintiff[s] participate in court proceedings. This is an obvious and straightforward thing.

All the materials referred to in the publications are in their entirety based on the claims filed with Mongolian and foreign courts by  the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC ,and reference

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976 90903949*

the evidence presented in these claims. Therefore, since these are truthful materials based on evidence they cannot be seen as an attack on the plaintiff's dignity.

Batbold's claim further states, "In addition, the functions I had and the position I held at that time had no relation at all to the duties and responsibilities set forth in Articles 84.4.2-84.4.6 of the 2011 Company Law and Articles 89-93 mentioned in the defamatory stories and the claims cited in the story."

But the claim filed by the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC with Mongolian and foreign courts states the following:

"In regard to the Oyu Tolgoi mine, S.Batbold, by accepting illicit bribes, violated the July 2, 1999 Company Law and the October 6, 2011 Company Law as well as the Civil Code.

As per Article 84.1 of the 2011 Company Law, S.Batbold, in his capacity as a "person who participate[d] directly or indirectly in the process of making official decisions of a company or concluding transactions or agreements," was an authorized official as regards Erdenes Oyo Tolgoi LLC. As the Prime Minister of Mongolia, he also had full authority over the matters concerning policies on managing state property.

On behalf of S.Batbold, his appointees concluded beneficial transactions with individuals related to Ivanhoe with the ultimate goal of benefiting S.Batbold. In doing so, S.Batbold transgressed his duties as an authorized official to, among other things, act in good faith and in the best interests of the company (Articles 84.4.2-84.4.6 of the 2011 Company Law).

The transactions entered into by S.Batbold's proxies for personal gains with individuals related to Ivanhoe are invalid transactions since, according to Article 56.1.1 of the Civil Code, they were made in a breach of law and run counter to the generally accepted norms of morality" which a clear legally sound statement.

Regarding the section on "The libelous stories as a whole [being] politically motivated:"

These stories do not pursue any political goals and are solely based on the claims filed by the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC in Mongolian and foreign courts and present a media version of their contents.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

23

These claims were based on detailed evidence concerning S.Batbold and were filed with the express purpose to have the organizations losses remedied. Accordingly, they should not be misrepresented as a politically motivated move. A government agency and state-owned enterprises have worked to prepare pertinent materials and filed them for lawsuits, and this was done not for political purposes but for the purpose of asking the court to order remedy for the damages caused to their organizations.

Regarding the section "The claim upon which the defamatory story, that alleges that the court found me guilty is based, violated various procedures."

The plaintiff enumerates various grounds under this section. None of them, however, can provides solid ground for proving that they caused harm to S.Batbold's honor, dignity and business reputation.

In his claim filed with the Bayanzurkh District Civil Court of First Instance Deputy Prosecutor of the Capital City Prosecutor's Office Ts. Nasanbat states that the Capital City Prosecutor's Office shall participate in the [court] proceedings at the request of the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC in accordance with Article 31.1. of the Law on Civil Procedure and that "the request by the Agency for Policy Coordination on State Property before the Capital City Prosecutor's Office to participate in order to protect the state's interests" was attached under number three in the list of the attachments to the claim.

Therefore, the assertion to the effect that prosecutor Ts. Nasanbat filed claims in the absence of requests from a government agency proves to be incorrect.

Regarding the section on" Illegality of proceedings in foreign courts"

To prove this point, the plaintiff makes reference to various official letters he had received from state organizations and entities and claims that no authorization has been granted to file claims before foreign courts.

But we have learned that the court in the British Virgin Islands did register the claim filed by the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC and court proceedings are ongoing. Therefore, the plaintiff's assertion that no authorization was granted to file the claim appears to be incorrect.

*I declare that all my translation from Mongolian and English are done accurately and truthfully*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

24

Since any court before starting a court procedure reviews the authorization granted to those who bring a legal claim, there is every reason to believe that the court in the British Virgin Islands started the court proceedings upon determining that the authorization was valid.

The publications on our website do not in any way violate, as asserted by the plaintiffs, the provisions of the Constitution of Mongolia, the Civil Code, the Universal Declaration of Human Rights and therefore do not constitute an attack on the honor, dignity and business reputation of S.Batbold and L. Javzmaa.

Our organization reviewed the materials gathered by our investigative journalists, discussed them in a group of four to five staff, and the editor authorized the publication. Therefore, we don't see any reason to bear legal responsibility and retract our stories.

**4. The Agency for Policy Coordination on State Property presented the following grounds for rejection of claims:**

The following statement is made in connection with the civil claim filed by Su. Batbold asking the court to order the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC to put an end to the activities of those responsible for illegally using the names of Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC.

Plaintiff Su.Batbold and his certified representative have on more than one occasion communicated with the Agency for Policy Coordination on State Property and on each occasion the Agency duly communicated back its response. To wit,

- In the letter No. A-1/100 dated January 14, 2022, by the Agency for Policy Coordination on State Property the Agency stated that "… no foreign law firms or any other persons or entities have been granted authority, through the prosecutor's organization or a prosecutor, to file claims in foreign courts in connection with whatever issue concerning Su. Batbold et al. …"

- In the letter No. A-1/1251 dated July 6, 2020 by the Agency for Policy Coordination on State Property and in the letter A-1/2199 dated December 15, 2020 by the Agency for Policy Coordination on State Property it was stated that the Agency had no connection whatsoever to the civil case at the Bayanzurkh District Civil Court of First Instance opened pursuant to the claim filed by Deputy Prosecutor General of the Capital City Prosecutor's Ts.Nasanbat Office, and that neither did it have any connection to the defendants in the case (Member of Parliament

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline:*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

25

of Mongolia S.Batbold and other individuals and legal entities).

- In the letter No. A-1/2050 dated November 27, 2020 by the Agency for Policy Coordination on State Property and in the letter No. A-1/2309 dated December 4 2020 by the Agency for Policy Coordination on State Property, it is clearly stated that the Agency did not lodge any request with the Capital City Prosecutor's Office to file any claims as regards the legal dispute involving S.Batbold and other defendants in the case.

The Agency became only aware of the series of stories published by Blue News LLC concerning S.Batbold upon the service of the claim by S.Batbold.

In its multiple letters, the Agency made it known that it never filed any claims or claims before a Mongolian or foreign court in regard to what is referred to as damages caused to the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC nor did it grant any permission to anyone to file claims with a power of attorney to represent.

The above official correspondence demonstrates that the Agency did not provide any materials for evidence to Blue News LLC and this publishing episode is of no legal relevance to the Agency.

Since it is the function of a court to determine whether illegal activities have taken place via appropriation of someone other's name, under no circumstance can this entity, a defendant in this case, put an end to these doings. If the Agency deems it has incurred damages that need resolution in court, then our understanding is that any entity which deems its interests affected should act as befits it.

As of now, the Agency has not filed any claim with any competent authorities as to whether or not any damages have been caused concerning S.Batbold.

**5. Erdenet Mining Corporation SOE presented the following grounds for rejection of claims:**

The defendant Erdenet Mining Corporation SOE rejects the parts related to the SOE of the claim filed by L.Javzmaa and S.Batbold now before this court in a civil case against the website politnews.mn, the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC. Namely,

The Erdenet Mining Corporation SOE has no connection whatsoever with the website politnews.mn alleged to have caused harm to the plaintiffs. Neither has the SOE undertaken any

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

26

action or inaction affecting the legitimate interests of S.Batbold and L.Javzmaa.

The request referenced in the claim to "put an end to the activities of the individuals responsible for..." does not fall within the functions of the Erdenet Mining Corporation SOE. In Mongolia the question of whether a party is guilty or not of something is adjudicated in court and decisions are taken by court. Stopping illegal acts is the responsibility of law enforcement agencies to which the Erdenet Mining Corporation SOE does not have any connection.

The Erdenet Mining Corporation SOE gets plenty of coverage in media, but we do not think it is necessary to react to each and every piece of news. But in the event some concrete interests have been affected the decision to sue the responsible party lies with the [potential] claimant.

In its multiple letters, the Erdenet Mining Corporation SOE has made it known that it has not filed any claims before a Mongolian or foreign court in regard to S.Batbold, and never issued any authorization to a third party to represent us and file commmplaints in court.

The SOE's official correspondence demonstrates that the SOE did not provide any materials for evidence to Blue News LLC for their stories and the fact they published these stories is of no legal relevance to us.

The SOE became only aware of the series of stories published by Blue News LLC concerning S.Batbold upon the service of the claim by S.Batbold.

It is to be noted that the acquaintance with the materials of the case shows that no documents were found on whether the activities of former Deputy Prosecutor General of the Capital City Prosecutor's Office Ts. Nasanbat who filed the claim with the Bayanzurkh District Civil Court of First Instance were determined to be or not to be in compliance with law. For these reasons, the Erdenet Mining Corporation SOE is asking to dismiss those parts of the claim that concern the SOE.

**6. Erdenes Oyu Tolgoi LLC presented the following grounds for rejection of claims**

Upon being served the claim filed with this court by L.Javzmaa and S.Batbold, as well as the their amended claim, and in conformity with Articles 25, 26 and Article 72.2 of the Law on Civil Procedure the following statement is made before the court. Namely,

On March 31, 2022, plaintiff L.Javzmaa filed an initial claim with the Chingeltei District Civil Court of First Instance against the website politnews.mn and its owner, Blue News LLC, "On restoring honor and dignity, and business reputation and ordering to extend an apology via

*I declare that all my translation from Mongolian and English are done accurately and truthfully*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar.*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

the media and form used to spread the story" and on May 6, 2022, her certified representative filed an amended claim.

Erdenes Oyu Tolgoi LLC is a state-owned limited liability company which manages the shares of the Government of Mongolia in the Oyu Tolgoi LLC, a company that runs the operations of the strategic Oyu Tolgoi copper and gold mine.

The Company does not maintain any relations with the politnews.mn website and its owner Blue New LLC referred to in the claim - either based on legal grounds or any decisions or activities or communications stemming from such grounds, or based on share-holding or other interests, and no mutually binding commitments or contracts have been signed between the two – to conclude, the two legal entities have never entered in legal relationships.

In this sense, since Erdenes Oyu Tolgoi LLC, either from a legal point of view or from a practical point of view, never participated in the activities referred to in the facts that form the basis of the statement of claim and constitute its substance, there is no sound ground for the Company to be brought as "co-defendant" in a civil case that is irrelevant to it.

In addition, "Erdenes Oyu Tolgoi LLC did not provide to politnews.mn and its owner Blue New LLC any facts referred to in the substance of the claim, neither did the Company provide to it any requests, suggestions, or information referred to in the statement of claim. The fact that the claim contains no mention, reference or attachment pointing to records or other evidence to this effect shows that the Company can hardly be a co-defendant in this case. For these reasons, the Company rejects the plaintiffs' claims - in their entirety.

In his claim against the website politnews.mn and its owner, Blue News LLC, S. Batbold amended his claim to add the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LL as co-defendants in the case and asked that these entities Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC be ordered "to put an end to the activities of the individuals at fault for the illegal use of the names of the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC."

As regards S.Batbold's claim with the court, the Company's position on it is the same as outlined in paragraph 1 of my respond to the claim.

However, the substance of the amended claim which asks that "...Erdenes Oyu Tolgoi LLC be ordered to put an end to the activities of the individuals at fault for the illegal use of the

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khalium*
*Tel /office/: 76762112, mobile: 976-90903949*

name of ... Erdenes Oyu Tolgoi LLC " caught our attention. Erdenes Oyu Tolgoi LLC is not entrusted by law to determine or assess whether the actions by individuals or legal persons are 'at fault for" anything, therefore the Company rejects the claims outlines in the amended claim.

In its multiple letters, the Company has made it known that it has not filed any claims before a Mongolian or foreign court on the matter of S.Batbold causing damage to the Agency for Policy Coordination on State Property, the Erdenet Mining Corporation SOE, and Erdenes Oyu Tolgoi LLC, and never issued any authorization [to a third party] to represent us and file claims in court.

The Company's official correspondence demonstrates that it never provided any materials for evidence to Blue News LLC for their stories and the fact they published these stories is legally irrelevant to the Company.

The court had examined following all evidence:

Plaintiff L.Javmaa submitted following documents as evidence to the court: A claim, a letter dated April 06, 2022, photo of the website Politnews, stories entitled "Javzmaa, who use offshore money at will" dated March 17, 2022, Power of attorney, a copy of L.Javzmaa's ID, a claim dated May 06, 2022, stories entitled "Su. Batbold, the Man Behind the Scenes" dated on April 07, 2022 and stories entitled "Su. Batbold, the Man Behind the Scenes-2" dated on April 10, 2022. /1kh.kh 1-3, 3-10, 22, 25-27, 28-48, 49-86/

Plaintiff S.Batbold submitted following documents as evidence to the court: a claim dated May 05, 2022, stories entitled "Su. Batbold, the Man Behind the Scenes" dated on April 07, 2022 and stories entitled "Su. Batbold, the Man Behind the Scenes-2" dated on April 10, 2022, stories entitled "Javzmaa, who use offshore money at will" dated March 17, 2022, a copy of S.Batbold's ID, Power of attorney, amending the claim and adding co-defendants dated May 11, 2022, a copy of claim which was filed to the Civil court of First Instance in Bayanzurkh district dated October 14, 2022, a copy of dismissal order of Civil court of First Instance in Bayanzurkh district dated November 18, 2021, a copy of response letter from Cabinet Secretariat of Government of Mongolia dated November 27, 2020, a copy of response letter from Erdenet Mining Corporation SOE dated November 27, 2020, a copy of response letter No.01/197 from "Erdenes Oyu Tolgoi" LLC dated November 27, 2020, a copy of letter No. A-1/2050 from Agency for Policy Coordination of State Property dated November 27, 2020, a copy of letter No.A-1/2199 from Agency for Policy Coordination of State Property dated December 15, 2020,

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar.*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

29

a copy of letter No.A-1/100 from Agency for Policy Coordination of State Property dated January 14, 2022, a copy of response letter No.A-1/786 from Agency for Policy Coordination of State Property dated May 04, 2022, letter No.1/330 from General Prosecutor's Office of Mongolia dated January 31, 2022, letter No.1/823 from General Prosecutor's Office of Mongolia dated April 01, 2022, a copy of letter No.1/635 from General Prosecutor's Office of Mongolia dated March 10, 2022, a copy of letter No. 01/143 from Erdenes Oyu Tolgoi LLC dated May 17, 2022, a copy of response letter No. 01/26 from Erdenes Oyu Tolgoi LLC dated February 01, 2021, a copy of letter No. 01/204 from Erdenes Oyu Tolgoi LLC dated December 04, 2020, a copy of response letter No.DU-117-12/1972 from Erdenet Mining Corporation SOE dated May 02, 2022, Law on the invalidity of the law on the ratification of the agreement, a copy of response letter No.119/23 from Erdenet Mining Corporation SOE dated February 17, 2020, a copy of letter No.06/12141 of Investigation Division of Independent Authority against Corruption dated September 20, 2022, a copy of response letter No.03/1553 of Independent Authority against Corruption dated February 01, 2022, a copy of letter No.627 from Administration Department of Civil court of First Instance in Bayanzurkh district dated September 20, 2022, Legal entity reference of Altai Holding LLC, Income statement, a copy of response letter No.1/330 from General Prosecutor' Office of Mongolia dated January 31, 2022, a copy of letter No.1/804 from General Prosecutor' Office of Mongolia dated January 24, 2022, a copy of letter on prosecutor's decision No.1/883 from General Prosecutor' Office of Mongolia dated January 28, 2022, a copy of letter on respond to claim No.1/823 from General Prosecutor' Office of Mongolia dated April 01, 2022, a copy of letter No.MH/123 from Capital City Prosecutor' Office dated November 06, 2020 /1st file 87-250, 2nd file 1-8, 23-115, 3rd file 1-56, 61-67, 66-78, 84-89, 92-99, 153-154, 4th file 5-6, 11-23, 38-42/

Dependent "Blue news" LLC submitted following documents as evidence to the court: Reference letter No.22/24 dated April 29, 2022, Certificate of State Registration, Certificate of State Registration on Legal entity, response to the claim /file 1: 15-18, file 2 13-19/

Dependent Agency for Policy Coordination of State Property submitted following documents: as evidence to the court: Response to the claim dated June 10, 2022, a copy of letter No.A-1/787 from Agency for Policy Coordination of State Property dated May 04, 2022, Power of attorney /file 2 120-121, 126-127, file 4 7-8, 43/

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

Dependent "Erdenet Mining Corporation" SOE submitted following documents: Power of Attorney, response to the claim /file 2 128, 130-131/

Dependent "Erdenes Oyu Tolgoi" LLC submitted following documents: Power of attorney, a response to the claim dated June 20, 2022, a response to the claim dated July 18, 2022, a copy of letter No. 01/197 dated November 27, 2020, a copy of letter No. 01/204 dated December 04, 2020, a copy of response letter No. 01/26 dated February 01, 2021 /file 2: 132, 139, 146-147, 148-150, file 4: 2-3/

Evidences that collected by the court: a record of the court examination that was undertaken in September 12, 2022 by the court order No 182/Sh32022/11266 dated September 09, 2022 to stories entitled "Javzmaa, who use offshore money at will" published on 17th of March, 2022, stories entitled "Su. Batbold, the Man Behind the Scenes" published on 07th of April, 2022 and stories entitled "Su. Batbold, the Man Behind the Scenes-2" published on 10th of April, 2022 respectively on website named www.politnews.mn. As well as a record of the court examination that was undertaken in October 05, 2022 by the court order No 182/SHT2022/11266 dated September 22, 2022 and copied evidence by the court examination.

## BASED ON THE FOLLOWING GROUNDS:

1. The plaintiff L. Javzmaa demands the defendant "Blue News" LLC to issue a statement of apology in the same manner and means used for spreading the news through public media, to restore the name, honor, dignity and business reputation of L. Javzmaa, in relation to the story titled "Javzmaa: Flying High on Offshore Money" which were published in the website: www.politnews.mn, on March 17, 2022 that has discredited and defamed the name, honor, dignity and business reputation of L. Javzmaa,

1.1. The lawsuit has been filed to refute the allegations and slanders against L. Javzmaa in the story published on April 7, 2022 titled "Su. Batbold, the Man Behind the Scenes" and on April 10, 2022 titled "Su. Batbold, the Man Behind the Scenes 2".

During the court proceeding, the plaintiff L. Javzmaa petitioned for Su. Batbold to be co-plaintiff in the lawsuit, and the judge has granted it by the order no: 182/Ш32022/06179, dated May 10, 2022. /2x.x 9-11/

2. Mr.Batbold filed following claims:

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

31

to order "Blue News" LLC to retract their online libelous stories published its website named www.politnews.mn on 17th of March, 2022 and 07th of April, 2022, which imply that Mr.Batbold conducted illegal activities through his proxies that caused significant damage to the State Property Policy and Regulation Agency, Erdenet Mining Corporation SOE SOE, and Erdenes Oyu Tolgoi LLC and,

to order the Agency for Policy Coordination on State Property, the "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC to put an end to the actions undertaken by certain parties that unlawfully use the names of the Agency for Policy Coordination on State Property, Erdenet Mining Corporation SOE and "Erdenes Oyu Tolgoi" LLC.

3. The evidence gathered during the case prove following facts:

3.1. A civil case was initiated by the order of the judge of the Bayanzurkh Disctric Civil Cort of First Instance dated October 28, 2020 based on the claim filed by the Agency for Policy Coordination on State Property, Erdenes Oyu Tolgoi LLC and the Erdenet Mining Corporation SOE and the Capital City Prosector's Office.

Dependants of the civil case were S.Batbold, Ch. Ganzorig, U.Tuul, O. Naymdalai, B. Battushig, Cheong Choo-Young, Kim Hak-Seon, Kim Yoon-jung, Lee Yu-jeong, Rhee Byung-Wuk, Kang Eon-Juu (nationals of the Republic of Korea), Catrison Limited (incorporated in Hongkong), Cliveden Trading AG (incorporated in Switzerland) and Genetrade Limited (incorporated in British Virgin Islands).

Statement of claims of the civil case were as follows:

A. To declare, with respect to the Erdenet Mining Corporation SOE Contracts, that:-

S.BATBOLD and Ganzorig's conclusion of contracts (on behalf of Erdenet Mining Corporation SOE) with Catrison, Cliveden Trading, Genetrade are in violation of Article 81.2 of the 1999 Company Law and Articles 84.4.2-84.4.6 of the 2011 Company Law. Those contracts are.

1)    Contract № E-2011/01-Cu dated on February 14, 2011,

2)    Amendment №1 thereto dated on April 14, 2011,

3)    Contract № E-2012/04-Cu dated on December 14, 2011,

4)    Amendment №1 thereto dated on April 27, 2012,

5)    Amendment №2 thereto dated on May 29, 2012.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

32

6)    Contract №E-2012/06-Cu dated on December 14, 2011,

7)    Contract №E-2016/04-Cu dated on September 07, 2016,

8)    Amendment №1 thereto dated on October 05, 2016,

9)    Amendment №2 thereto dated on February 01, 2017,

10)   Amendment №3 thereto dated on February 28, 2018.

As for contracts between Genetrade and Erdenet Mining Corporation SOE:

11)   Contract №E-2011/01-Mo dated on December 24, 2010,

12)   Contract №E-2012/01 -Mo dated on December 06, 2011.

Further or alternatively, S.Batbold and Ganzorig's conclusion of contracts (on behalf of Erdenet Mining Corporation SOE) with Catrison, Cliveden Trading, and Genetrade are in violation of Articles 86-90 of the 1999 Company Law and Articles 89-93 of the 2011 Company Law;

S.Batbold and Ganzorig are personally liable pursuant to Article 82.1.5 of the 1999 Company Law and Article 84.6 of the 2011 Company Law and S.Batbold is an accessory to Ganzorig's wrongdoing and is liable under Article 497.3 of the Civil Code;

Second to Eleventh Defendants are liable under Article 497.3 of the Civil Code and the Erdenet Mining Corporation SOE Contracts are void in their entirely void pursuant to Article 56.1 of the Civil Code;

To declare, with respect to the transactions concerning Oyu Tolgoi, that:-

The transactions listed in the Appendix (which concern S.Batbold's proxies and Ivanhoe-related individuals and entities) (the "Oyu Tolgoi Transactions") are contrary to Articles 84.4.1-84.4.6 and 89.1 of the 2011 Company Law:

a. Further or alternatively, the Oyu Tolgoi Transactionsare in violation of Articles 89-93 of the 2011 Company Law;

b. S.Batbold is personally liable pursuant to Article 84.6 of the 2011 Company Law;

c. In the alternative, the Oyu Tolgoi Transactions are void pursuant to Article 56.1 of the Civil Code;

d. Second to Eleventh Defendants are liable under Article 497.3 of the Civil Code.

To order that-

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

33

a. S.Batbold and his proxies (including Ganzorig) pay and account to the Claimants for all gains, revenues, and profits that have accrued through or as a result of their wrongdoing (pursuant to Articles 492 and 493 of the Civil Code of Mongolia);

b. Alternatively, Ganzorig and/or S.Batbold account to the Claimants for all "monetary profits realized" in respect of their breach of the conflict-of- interest provisions pursuant to Article 90.1 of the 1999 Company Law and Articles 93.1 and 93.2 of the 2011 Company Law;

c. The Defendants compensate the Claimants' losses pursuant to Articles 228.1,497.1 and 510.1 of the Civil Code.

d. S.Batbold and his proxies pay to the Claimants all of its costs associated with this proceeding, including the fees and expenses of attorneys, experts and consultants.

To order that-

a. S.Batbold and his proxies (including Ganzorig) pay and account to the Claimants for all gains, revenues, and profits that have accrued through or as a result of their wrongdoing (pursuant to Articles 492 and 493 of the Civil Code of Mongolia)

b. Ganzorig and/or S.Batbold pay gains, revenues, and profits that have accrued through or as a result of their wrongdoing to the Claimants in respect of their breach of the conflict-of-interest provisions in the company laws, pursuant to Article 90.1 of the 1999 Company Law and Articles 93.1 and 93.2 of the 2011 Company Law

c. The minimum amount of losses 250 million USD, or 713,575,000,000 MNT (seven hundred thirteen billion and five hundred seventy five million) at the Mongol Bank rate.

d. S.Batbold and his proxies pay to the Claimants all of its costs associated with this proceeding, including the fees and expenses of attorneys, experts and consultants.

During this period, foreign law firms representing "Government Agency For Policy Coordination On State Property", Erdenet Mining Corporation SOE and "Erdenes Oyu Tolgoi" LLC have filed lawsuits in the foreign courts, and the purposes of those foreign court proceedings are to support the lawsuits filed in the "Bayanzurkh District Civil Court of First Instance" and it is confirmed by the statements from the participants of the case and the notes and records from examining the email addresses by the foreign courts. /3xx 167-250, 4xx 1/

As stated in the court order no: 101/III32021/10096 dated November 18, 2021, from the Bayanzurkh District Civil Court of First Instance, the judge rejected the claim made by "Government Agency For Policy Coordination On State Property", "Erdenet Mining

*I declare that all my translation from Mongolian and English are done accurately and truthfully*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

34

Corporations" SOE and "Erdenes Oyu Tolgoi" LLC due to the uncertainty of the residing address of the defendants: individual or legal entity, and therefore dismissed the civil cases against S.Batbold, Ch.Ganzorig, U.Tuul, O.Nyamdalai, B.Battushig, Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, and Kang Eun Joo, Catrison Limited and Cliveden Trading AG and Genetrade Limited./file 3: 28-86 pages/

It is confirmed by the litigants, their representatives and attorneys of this case and also by the official letter no: 627 dated September 20, 2022 from the Office of Bayanzurkh District Civil Court of First Instance, that the litigants and participants of this case did not file claims against the court order no: 101/III32021/10096 dated November 18, 2021 and have not filed lawsuit regarding the same issue since then. /file 1: 87 pages/

3.2. It is confirmed by the examination notes and records during court proceedings and statements from the litigants, their representatives and attorneys that the defendant "Blue News" LLC has published the following stories through public media website www.politnews.mn, titled "Javzmaa: Flying High on Offshore Money" dated March 17, 2022, "Su. Batbold, the Man Behind the Scenes" dated April 7, 2022 and "Su. Batbold, the Man Behind the Scenes" dated April 10, 2022 respectively. /file2: 174-244 pages/

The plaintiffs have based their claims on the stories that were published in the public media website www.politnews.mn, titled "Javzmaa: Flying High on Offshore Money" dated March 17, 2022, "Su. Batbold, the Man Behind the Scenes" dated April 7, 2022 and "Su. Batbold, the Man Behind the Scenes 2" dated April 10, 2022 respectively, however the defendants have argued that the related stories published on their website were sourced from the information obtained from "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporations" SOE and"Erdenes Oyu Tolgoi" LLC and the related matter was resolved in Bayanzurkh District Court and New York City Court, therefore the information stated in stories are true and accurate.

3.3. Article 17.1 of The Constitution of Mongolia stated: The citizens of Mongolia shall uphold justice and humanity, and shall discharge in good faith the following basic duties, and in Clause 1.2 stated: Respect the dignity, reputation, rights and legitimate interests of human beings, and therefore a citizen's name, reputation and business reputation is protected under the Civil Code of Mongolia to fulfill the declarations in the Constitution.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

35

Civil code prohibits the illegal use of a citizen's name to protect the name, honor, dignity and business reputation of a citizen, and the person responsible for spreading news that has defamed the name, honor, dignity and business reputation of a citizen, shall be held responsible to refute such information in the same manner that the news were spread at the request from the citizen whose rights were violated and be obligated to compensate for the damages caused, in the event that the information cannot be proved to be true and accurate.

Defamation of a person's name, honor, dignity and business reputation is determined as the act of communicating the untrue, false statements about a person to other person or parties other than himself/herself.

The court has decided the claims by the plaintiffs as stated as below:

4. Regarding the claims made by the plaintiff L.Javzmaa:

4.1. The defendant "Blue News" LLC to issue a statement of apology in the same manner and means used for spreading the news through the public media, to restore the defamed name, honor, dignity and business reputation in relation to the story titled "Javzmaa: Flying High on Offshore Money" which were published in the website: www.politnews.mn, on March 17, 2022, and regarding the lawsuit that has claimed to refute the allegations and slanders against L. Javzmaa in the stories published on April 7, 2022 titled "Su. Batbold, the Man Behind the Scenes" and on April 10, 2022 titled "Su. Batbold, the Man Behind the Scenes 2", some parts of this claims were dismissed.

The plaintiff L.Javzmaa has claimed that:

the story published on the website www.politnews.mn dated March 17, 2022, titled "Javzmaa: Flying High on Offshore Money" is entirely related to the position held by the plaintiff L.Javzmaa and some of the quotes from the stories were: "playing with immeasurable amounts of oligarchy money, and stealing the opportunities from the common business owners", "L.Javzmaa is the one who launders money for the biggest oligarchy in Mongolia ";

the story published on April 7, 2022, titled "Su. Batbold, the Man Behind the Scenes" quoted as "between May 2010 to August 2010, L.Javzmaa, who is the representative of Su.Batbold, has begun receiving funds to the accounts under the direct authority and control of L.Javzmaa from the offshore region company under the transactions written as payments to Su.Batbold";

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

36

"during December 2010, L.Javzmaa, who is representative of Su.Batbold, has transferred a large amount of assets from individuals and legal entities related to Ivanhoe... as of now, it has been confirmed by the legal authorities and decided by the court orders that L.Javzmaa, who is representative of Su.Batbold, controls and holds a main role at the management level of the huge transnational network which consists of bank accounts, companies, real estates, and other types of assets...";

"Parliament Member Su.Batbold commits money laundering crimes, L.Javzmaa is the accomplice in that crimes and is a criminal who has been commitiing illegal money laundering for many years" stated in these stories which were published in the defendants' public media website, are based on false information and therefore, has damaged and defamed my name, honor, dignity and business reputation.

However, the defendants "Blue News" LLC has rejected the claim entirely based on the grounds that the related stories published on their website were sourced from the information obtained from "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporations" SOE and "Erdenes Oyu Tolgoi" LLC and the related matter was resolved in Bayanzurkh District Court and New York City Court, therefore the information stated in the stories are true and accurate.

Article 21.2 of The Civil Code of Mongolia stated: "if the person, who defamed the citizen's name, honor, dignity and business reputation, fails to prove the defamation accuracy, s/he shall be liable to refute the defamation via media and in the form, it was originally disseminated, or in other forms", and the Article 3.1 of the Law on Freedom of Media stated: "The media shall be responsible for what it broadcasts" respectively.

Article 16.14 of the Constitution of Mongolia stated that: "... every person shall be presumed innocent until proven guilty by the court through the due process of law".

The plaintiff L.Javzmaa has been working as the executive director of "Altai Holding" LLC since 2011, and has never been involved in any crime and it was confirmed by the statements from the plaintiff and other documents submitted in this case.

It is reasonable to believe that the defendant "Blue News" LLC has defamed the name, honor, dignity and business reputation of the plaintiff when publishing the stories on March 17, 2022 an April 7, 2022 to the public, which had statements such as: "L.Javzmaa is the accomplice in the money laundering crimes and is a criminal who has been commitiing illegal money

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

37

laundering for many years", and "playing with immeasurable amounts of oligarchy money, and stealing the opportunities from the common business owners"; because the defendant did not compile all the relevant documents from the legal authorities regarding the decision of this matter, and based only on the matters stated in the court order "Dismissal of the case" dated November 18, 2021 of the Bayanzurkh District Civil Court of First Instance, did not verify the accuracy of the information, used only one-sided information as the source and did not adhere to the principles of delivering balanced information.

Moreover, the defendant did not prove his refusal as stated in Article 25.1.1 of the Law on Civil Procedure and did not provide any evidence to refute the claims and explanations made by the plaintiff.

The evidences collected in this case confirms that the defendant "Blue News" LLC did not prove the accuracy of the information in the entire story titled "Javzmaa: Flying High on Offshore Money" dated March 17, 2022, and the information related to L.Javzmaa in the story titled "Su. Batbold, the Man Behind the Scenes" dated April 7, 2022, which were published in the defendant's own website www.politnews.mn, as required by the law, and therefore shall be held liable to restore the name, honor, dignity and business reputation of L.Javzmaa.

4.2. However, the plaintiff L.Javzmaa's name is not mentioned in the story titled "Su. Batbold, the Man Behind the Scenes" dated 10 April, 2022 which was published on the defendant's website www.politnews.mn, therefore this part of the claim should be dismissed.

5. Regarding the claims made by the plaintiff Su.Batbold:

The plaintiff S.Batbolds demands the defendant "Blue News" LLC, the owner of the website www.politnews.mn, to refute the accusations and slanders against S.Batbold, which has involved S.Batbold and others being engaged in illegal activitied in relation to the Erdenet Mining Corporation and Oyu tolgoi deposits that has caused damages to "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC,

In connection with "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC, the plaintiff S.Batbold requests "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC to cease the actions of the wrongdoers who are illegally using the names of these organisations.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

38

5.1. Regarding the claims made against the defendant "Blue News" LLC:

The plaintiff S.Batbold filed a claim to order the defendant "Blue News" LLC to refute the slanders and accusations made against S.Batbold which has stated the plaintiff committing illegal activities in relation to the Erdenet Mining Corporation SOE and Oyu tolgoi deposits, and has caused damages to "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC.

The defendant has disagreed with the claims based on the grounds that the information in the stories were sourced from "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC and were also based on the lawsuits filed in the Bayanzurkh Disctrict Court and foreign courts, and the defendant argues that the information mentioned in the stories are true and accurate.

"Blue News" LLC has published the following information in the stories titled "Su. Batbold, the Man Behind the Scenes" dated April 7, 2022 and "Su. Batbold, the Man Behind the Scenes" dated April 10, 2022, through their own public media website www.politnews.mn:

"During his tenure as Prime Minister, Su.Batbold has signed contracts with foreign companies such as Catrison Limited, Cliveden Trading AG and Genetrade Limited for the sale of copper and molybdenum concentrates from the Erdenet mine of Erdenet Mining Corporation SOE and it was later found by the State Property Committee and Erdenet Mining Corporation that the contract was not beneficial for the country and the large amount of hidden profit was made by setting up the price unreasonably low and by resell terms, all of which were prohibited by the law, and these organisations have filed lawsuits since then";

"Few people were given favorable conditions for issues related to ownership and management of "Oyu Tolgoi" LLC, which operates in Oyu tolgoi mine. Thus, in return for providing favorable conditions for ownership, taxation, and investment, he received capital assets and other benefits from individuals or companies related to "Turquoise Hill Resources Limited" (which was named "Ivanhoe Mines Limited" (a.k.a "Ivanhoe") until June, 2012) and "Erdenes Oyu Tolgoi" LLC has found out about this and filed a case in court";

"At that time, journalists had discovered and disclosed to the public that Su.Batbold and their people had been hiding the assets and money gained from their illegal activities by creating complex structure of offshore companies in overseas and locally registered companies and appointing their representatives through complex scheme"; and

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

"...has caused damages to "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC..." – this information from the stories were confirmed by the inspection reports conducted by the website which is operated by the defendant and the stories copied during the inspection to be determined as evidence, and by the statements from the litigants. /2xx174-244/

Article 3.1 of the Law on Freedom of Media stated: "The media shall be responsible for what it broadcasts", and Article 21.2 of The Civil Code of Mongolia stated: "if the person, who defamed the citizen's name, honor, dignity and business reputation, fails to prove the defamation accuracy, s/he shall be liable to refute the defamation via media and in the form, it was originally disseminated, or in other forms", respectively.

Article 38.1 of the Law on Civil Procedure stated that: "the litigant, third party, their representatives or lawyers are obliged to provide and collect their own evidence to support the basis of their claims and refusals".

The defendant "Blue News" LLC did not provide evidence to the court to confirm the accuracy of the information mentioned in the stories, however, the evidence presented in the court to prove the basis of the claims refutes the information mentioned in the story, therefore it was concluded that it is reasonable to fulfill the demands of the plaintiff.

5.1.1. Regarding the issues related to "Erdenet Mining Corporation" SOE:

Quoted from the story dated 7 April, 2022... "In 2019, State Property Committee and Erdenes Oyu Tolgoi LLC found out that Ch.Ganzorig, following the orders from Su.Batbold, has violated his legal obligations and conspired with others to enter into harmful deals for Mongolia with several foreign legal entities and giving him the opportunity to get wealthy illegally. Signed and authorized by Ch.Ganzorig, Erdenet Mining Corporation SOE was made able to trade minerals and enter into economically valuable contracts with the following three companies: Catrison, Cliveden Trading and Genetrade. Although these companies were incorporated in Hong Kong, Switzerland and Biritish Virgin Island, these companies were controlled and owned by Cheong Choo Young and Kim Hak Seon, husband and wife, representatives appointed by Su.Batbold.

In the offical letter no:119/23 dated February 17, 2020 from the Department of Export Sales of "Erdenet Mining Corporation" SOE":

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khalitun*
*Tel /office/: 76762112, mobile: 976-90903949*

40

"…The agreements related to supply of export products were governed by the "Положение о заключении контрактов на поставку экспортной продукции СП Эрдэнэт" ("Regulations on Export Product Contracts of Erdenet Mining Corporation"), which was approved in russian language in 2001, and "Regulations on Contracts for the Supply of Export Products of Erdenet Mining Corporation" SOE which is the amended version of the previous regulation and approved in both Russian and Mongolian languages in 2014.

…The contract with Cliveden Trading AG… has been terminated due to the supply of copper concentrates was fulfilled. …entered into agreement with Catrison Limited … for the sale and purchase of concentrates. Since March 2013 until now, Catrison Limited has not sent any official letter or request regarding the supply of concentrates. The terms of trade for the above contracts with Cliveden Trading AG and Catrison Limited were the same as those for the supply of concentrate to other purchasing companies in the same year. …"

Based on the above official letter no:119/23, it is reasonable to say that any and all settlement regarding the contracts between "Erdenet Mining Corporation" SOE and the above-mentioned foreign legal entities, have been concluded, and it is considered that those contracts were made in accordance with the standards established by "Erdenet Mining Corporation" SOE, when entering into agreements with other individuals and legal entities.

In addition, according to the statements from the authorised representative of "Erdenet Mining Corporation" LLC and the official letter no:119/23, there was no evidence found to support the statements mentioned in the story dated April 7, 2022, saying: "Su.Batbold had personally influenced "Erdenet Mining Corportation" SOE to sign the contracts with foreign companies Catrison, Cliveden Trading AG and Genetrade Limited, personally gained profits, conspired with others, and had caused damages to Erdenet Mining Corporation SOE", and no legal authority had proven any facts regarding this matter.

5.1.2. Regarding the issues related to Oyu tolgoi deposits:

The story dated April 7, 2022 has written: "Su.Batbold has given priority to others for issues related to ownership and management of "Oyu Tolgoi" LLC, which he controls, and in return for providing favorable conditions and procedures for ownership, taxation, and investment, he received cash payments and other benefits from individuals or companies related to "Turquoise Hill Resources Limited"

The plaintiff's statement in his claim is as follows:

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

41

"I worked as the Prime Minister of Mongolia from October 29, 2009 to August 9, 2012, which is after the Oyu tolgoi Investment Agreement and Shareholders' Agreement were signed. During this period, there were no amendments to the Investment Agreement signed between the Government of Mongolia and the investors. On June 8, 2011, amendments pertaining to Oyu tolgoi deposit were made to the Shareholders' Agreement, which was signed in 2009. "Erdenes Oyu Tolgoi" LLC made such amendments to the contract that they had initially signed based on thorough discussion, and no amendments were made to the Investment Agreement submitted by the Government to the Parliament, pertaining to the tax issues and its legal framework. However, the Shareholders' Agreement was amended in relation to the Oyu tolgoi deposit on June 8, 2011 and according to these amendments, the interest rate on financing (loan interest) to be paid to investors by the Government of Mongolia has reduced from 9.6+LIBOR percent to 6.5+USTR percent."

"While I was working as the Prime Minister of Mongolia, I introduced a bill to cancel double tax treaty signed by the Government of Mongolia with certain countries and submitted the bill to the State Great Hural in June 2012. As a result of this bill, State Great Hural cancelled the "Convention between the Kingdom of the Netherlands and Mongolia for the avoidance of double taxation and the prevention of ficsal evasion with respect to taxes on income and asset" which was approved on October 31, 2002. Thus, as a result of the resolution of the State Great Hural, the interest payments to be paid by the government of Mongolia to the investors were saved by hundred of millions of US dollars (equivalent to over 500 million US dollars at current rate), which means the investor lost that amount of income, therefore it was not beneficial to the investors, in opposite, it was beneficial to the government of Mongolia.

Article 42.1 of the Law on Civil Procedure stated: "the statements given by the litigant to the court shall be true and accurate" and also Article 107.3 of the said Law stated: "...the person participates in the defendant's defense shall prove the basis of his rejection for the claim and provide his evidence to the court".

The defendant did not deny the above statements made by the plaintiff, therefore, the statements made by the plaintiff is considered to be reasonable.

In addition, the defendant did not provide factual evidence to support the issues with regards to Oyu tolgoi deposit mentioned in the above story, and the basis of their source being true and accurate, is because it was obtained from the lawsuits filed by the former Deputy

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

42

Prosecutor General of the Capital City Prosecutor's Office, to the Bayanzurkh District Civil Court of First Instance and the lawsuits filed to other foreign courts such as England and Singapore, all of which are not deemed to be reasonable.

Article 16.14 of the Constitution of Mongolia stated that: "… every person shall be presumed innocent until proven guilty by the court through the due process of law".

It should be highlighted that there is no valid court order that has found S.Batbold guilty of issues mentioned in the defendant's story.

5.1.3. Regarding the issues related to hiding illegal profits in the offshore region, gained from Oyu tolgoi project and Erdenet Mining Corporation SOE, and the ownership of assets and legal entities acquired therefrom:

Articles dated April 7, 2022 and April 10, 2022 stated: "Su.Batbold has gone a great lenghts of effort to conceal his illegal activities, and wide network of assets, with the help of his representatives and a complex corporate structure. Therefore, below-mentioned evidence will become more detailed and clearer, and his guilty activities and income and other benefits gained through illegal activities shall be discovered through due process by the state registration office and hundreds of companies that did not declare their assets and income shall be revealed".

The story also states that the plaintiff purchased and owned high-priced real estates through foreign legal entities and so-called representatives from the illegal profits gained from Oyu tolgoi project and Erdenet Mining Corporation SOE.

Although it is mentioned in the above story that S.Batbold illegally buys and owns real estates through foreign legal entities from the illegal income gained from the Oyu tolgoi project and Erdenet Mining Corporation SOE and manages those companies through his representatives, these allegations are found to be not true based on the statements from the plaintiff, evidences provided from the plaintiff which includes declaration of personal interests and declaration of assets and income, and also the official letter from the Anti-Corruption Agency, therefore such allegations defamed the plaintiff's name, honor, dignity and business reputation.

The story is said to be based on the lawsuits filed in the Bayanzurkh District Civil Court of First Instance, and foreign courts, but the defendant did not verify the accuracy of the information in their stories, used only one-sided information as their source and did not adhere to the principles of delivering balanced information, therefore it is reasonable to say that above information has defamed the name, honor, dignity and business reputation of the plaintiff.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

43

5.1.4. Regarding the issues related to damages caused to "Government Agency For Policy Coordination On State Property", "Erdenes Oyu Tolgoi" LLC and "Erdenet Mining Corporation" SOE:

Quotes from the stories dated April 7, 2022 and 10 April, 2022: "Su.Batbold's illegal activities include perplexing the procedures of usage, ownership and management of the state property, misusage of natural resources by providing favorable tax and investment conditions and therefore violated the public interest... Su.Batbold, as a politician with high level of influence in Mongolia, furthermore, given his legislative rights and power, exercised substantive control and influence on the decisions made by the State Property Committee and EOT, such as matters pertaining to hiring and firing, same as other politicians who held high positions ..." these statement has accused the plaintiff falsely as if the plaintiff influenced the above-mentioned 3 organisations and benefited himself.

The defendant disagrees with the plaintiff's claim and argues that the story is based on sources obtained from "Government Agency For Policy Coordination On State Property", "Erdenes Oyu Tolgoi" LLC, and "Erdenet Mining Corporation" SOE, as well as lawsuits filed in Bayanzurkh District Court and claims filed in foreign courts.

However, the statements from the authorised representatives of the Government Agency For Policy Coordination On State Property, "Erdenes Oyu Tolgoi" LLC, and "Erdenet Mining Corporation" SOE at the court hearing has argued as follows: "In relation to S.Batbold, we have not filed any lawsuit against S.Batbold, and did not give any right to file a lawsuit to the Capital City Prosecutor's Office on our behalf, did not submit any request to be represented by the prosecutor in the civil court procedure to the Capital City Prosecutor's Office, T.Nasanbat, former deputy general prosecutor who worked in that office, no power of attorney was given to the said office, and currently no claim has been filed to Mongolian or foreign courts on this issue, as no damage has occurred, and whether or not to file a claim is a matter of the plaintiff's rights"."

The plaintiff has provided following documents to support the basis of his claims mentioned above: official letter no: A-1/2050 dated November 27, 2020, official letter no: A-1/2199 dated December 15, 2020, and official letter no: A-1/2309 dated December 21, 2020 of the Government Agency For Policy Coordination On State Property; official letter no: ХБ-117-12/8337 dated November 27, 2020 of the "Erdenet Mining Corporation" SOE; and official letter

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

44

no: 01/197 dated November 27, 2020 of the "Erdenes Oyu Tolgoi" LLC, all of these official letters clearly stated that they have not submitted any request to the Capital City Prosecutor's Office to file claims or claims with respect to S.Batbold and other defendants.

Furthermore, Response letter no: 1/189 dated January 5, 2022, and no: 1/330 dated January 31, 2022 of the General Prosecutor's Office of Mongolia, has stated that Ts.Nasanbat, who worked as deputy prosecutor general of the Capital City Prosecutor's Office, was not given any right to file a claim to the Mongolian court, and no request to be represented by the prosecutor with respect to violation of state and public interest, was submitted to the Capital City Prosecutor's Office from Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC.

In addition, State Great Hural of Mongolia has amended Article 31.1 of the Law on Civil Procedure, allowing the prosecutor to participate in the civil court procedure on his own initiative, if he believes the state or public interest have been violated. This amendment was made on January 15, 2021 and shall take effect from July 1, 2022. In other words, if the prosecutor believes that the state or public interest have been violated, he shall participate in the civil court procedure on his own initiative, starting from July 1, 2022.

Based on the evidence and statements from the concerning parties, it is proven that, Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC, did not file a lawsuit against S.Batbold, did not submit any request to be represented by the prosecutor in the civil court procedure to the Capital City Prosecutor's Office, no power of attorney was given to the said office, and did not file a lawsuit in connection with damages caused to Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC.

Ts.Nasanbat, deputy prosecutor general of the Capital City Prosecutor's Office, had created the impression that he was representing Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC, and filed a lawsuit on their behalf to the Bayanzurkh District Civil Court of First Instance against following individuals and companies: citizens of Mongolia – S.Batbold, Ch.Ganzorig, U.Tuul, O.Nyamdalai, B.Battushig, citizens of Republic of Korea - Cheong Choo Young, Kim Hak Seon, Kim Yoonjung, Lee Yu Jeong, Rhee Byung Wook, and Kang Eun Joo, Catrison Limited

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

Company, Cliveden Trading AG Company, and Genetrade Limited Company, on October 14, 2020, and the court opened a civil case on October 28, 2020 accordingly.

Following documents were submitted as evidence in this case: official letter no: A-1/2050 dated November 27, 2020 of the Government Agency For Policy Coordination On State Property, official letter no: ХБ-117-12/8337 dated November 27, 2020 of the "Erdenet Mining Corporation" SOE, official letter no: 01/197 dated November 27, 2020 of the "Erdenes Oyu Tolgoi" LLC, official letter no: A-1/2199 dated December 15, 2020 and official letter no: A-1/2309 dated December 21, 2020 of the Government Agency For Policy Coordination On State Property, and in these official letters, it was clearly stated that they did not file any claims or claims with the Capital City Prosecutor's Office against S.Batbold and other defendants.

In addition, State Great Hural of Mongolia has amended Article 31.1 of the Law on Civil Procedure, allowing the prosecutor to participate in the civil court procedure on his own initiative, if he believes the state or public interest have been violated. This amendment was made on January 15, 2021 and shall take effect from July 1, 2022. In other words, if the prosecutor believes that the state or public interest have been violated, he shall participate in the civil court procedure on his own initiative, starting from July 1, 2022.

Also, Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC have not filed a claim for damages against the plaintiff.

Based on the evidence and statements from the concerning parties, it is proven that, Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC, did not file a lawsuit against S.Batbold, did not submit any request to be represented by the prosecutor in the civil court procedure to the Capital City Prosecutor's Office, no power of attorney was given to the said office, and did not file a lawsuit in connection with damages caused to Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC.

Therefore, it is reasonable to believe that the stories stating: "S.Batbold had caused damages to Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC" had defamed the plaintiff's name, honor, dignity and business reputation.

5.1.5. Regarding the issues related to involvement in bribery

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

46

In the stories dated April 7, 2022 and April 10, 2022, it was mentioned that "Su.Batbold received illegal bribes in connection with the Oyu Tolgoi mine".

Article 16.14 of the Constitution of Mongolia stated that: "… every person shall be presumed innocent until proven guilty by the court through the due process of law", and Article 1.8.1 of the Law on Criminal Procedure stated that: "it is prohibited to perform body search, arrest, imprison, investigate, restrict freedom, infringe on property rights, prosecute, incriminate or impose criminal responsibility on anyone other than the grounds and procedures stated in the law".

The official letter no: 03/1553 dated February 1, 2022 and official letter no: 06/12414 dated September 20, 2022 of the Anti-Corruption Agency, have declared that S.Batbold has not been investigated in a criminal case, and it should be mentioned that there is no guilty verdict court order regarding crimes for bribery and abuse of power, and also there is no investigation conducted on this matter as required by the law.

Therefore, the court has concluded that above information in the stories, which were the basis of the claim, have violated the Law on Freedom of Media, defamed the name, honor, dignity and business reputation of the plaintiff S.Batbold due to dissemination of inaccurate and false information, thus, granted the claim which shall be consistent with the Article 21.2 of the Civil Code.

5.2. Regarding the claims related to the defendants – Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC:

In connection with the co-defendants - "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC, the plaintiff S.Batbold requests "Government Agency For Policy Coordination On State Property", "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC to cease the actions of the wrongdoers who are illegally using the names of these organisations.

The plaintiff had claimed that the defendants are at fault for not ceasing the actions of the wrongdoers, who filed lawsuits against S.Batbold on behalf of "Erdenes Oyu Tolgoi" LLC, "Erdenet Mining Corporation" SOE, and Government Agency For Policy Coordination On State Property, and those who published the stories;

However, the defendants had rejected the claims based on the following reasons:

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

47

"We were only made aware of the stories about S.Batbold when the lawsuit about this case was filed; our organisations did not provide these information to Blue News LLC; and did not have any legal engagement with this company; and did not request the prosecutor's office to file claim; and we have repeatedly informed about these through official letters, therefore, our organisations do not have any reason to be involved in the stories and the lawsuit. Also, the court determines the guilty actions of the person, thus, our organisation has no basis to cease the operation of anyone".

According to the evidence collected in this case, it was confirmed by the court that, during the civil proceedings against S.Batbold filed by the defendants – "Government Agency For Policy Coordination On State Property", "Erdenes Oyu Tolgoi" LLC, "Erdenet Mining Corporation" SOE, and Capital City Prosecutor's Office, a lawsuit was filed to the foreign court, and after the judge's order to dismiss the case came into force, Blue News LLC published the stories through public media regarding the issues mentioned in the case which were dismissed by the court.

When the court proceedings commenced for the lawsuit filed by the plaintiffs – "Government Agency For Policy Coordination On State Property", "Erdenes Oyu Tolgoi" LLC, "Erdenet Mining Corporation" SOE, and Capital City Prosecutor's Office, the defendants have responded through official letters with the contents being: "no request was made to the Capital City Prosecutor's Office to file lawsuit against S.Batbold and other defendants, no lawsuit was filed to the Mongolian or foreign courts against S.Batbold, and no right to represent in court was given to the prosecutor's office, deputy prosecutor general of the Capital City Prosecutor's Office, and King&Spalding International Law Firm", and these official letters are as follows:

"Government Agency for Policy Coordination On State Property" - official letter no: A-1/2050 dated November 27, 2020, official letter no: A-1/2199 dated December 15, 2020, official letter no: A-1/2309 dated December 21, 2020, and official letter no: A-1/100 dated January 14, 2022;

"Erdenet Mining Corporation" SOE – ХБ-117- 12/8337 dated November 27, 2020; and

"Erdenes Oyu Tolgoi" LLC – official letter no: 01/197 dated November 27, 2020.

Furthermore, Capital City Prosecutor's Office sent an official letter no: MH/123 dated November 6, 2020 addressed to Sarah Y. Walker, partner of King&Spalding LLP, informing about the civil case opened against S.Batbold and others on October 28, 2020, and had requested

I declare that all my translation from Mongolian and English are done accurately and truthfully.

Translated and verified translation center of "Westgate translation Bureau" LLC
State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.
Registered with: General authority of state registration, Mongolia
Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar
Translator: E.Khaliun
Tel /office/: 76762112, mobile; 976-90903949

48

to seal all and every assets and property owned by the defendants in overseas; to take other necessary measures to go to respective courts; and had informed that any damages caused in due process shall be rectified by the plaintiffs, and this official letter was approved and signed by Ts.Nasanbat, deputy prosecutor general of Capital City Prosecutor's Office, on behalf of the Plaintiffs. /4xx 42/

Official letter no: 1/189 dated January 5, 2022, official letter no: 1/330 dated January 31, 2022, and official letter no: 1/823 dated April 1, 2022 of the General Prosecutor's Office of Mongolia, has stated that Ts.Nasanbat, who worked as deputy prosecutor general of the Capital City Prosecutor's Office, was not given the right or permission to issue a guarantee on the issues mentioned in the official letter no: MH/123 dated November 3, 2020, "King&Spalding International" law firm was not granted the right or permission to file civil dispute and conduct litigations in foreign courts by the prosecutor's office of Mongolia. /3xx 54-56, 3xx61/

Official letter no: 1/883 dated January 28, 2022 of the General Prosecutor's Office of Mongolia, has revoked the permission and guarantee issued by the official letter no: MH/123 dated November 6, 2020 of the Capital City Prosecutor's Office, also the evidence collected in this case has confirmed that the Government Agency For Policy Coordination On State Property sent an official letter no: A-1/787 dated May 4, 2022, addressed to Sarah Walker, partner in King&Spalding International LLP, demanding them to stop their illegal activities.

According to the Section 1, Article $9^1$ of the Law on State and Local Property, Government Agency is the body in charge of ownership, utilisation, and protection of the state property. "Erdenet Mining Corporation" SOE is a 100 percent state-owned legal entity and "Erdenes Oyu Tolgoi" LLC is a legal entity with participation of state property.

Government Agency For Policy Coordination On State Property, being the representative in charge of exercising management role over state property, has sent a notice letter to King&Spalding International LLP and their lawyers, regarding the claims filed to Mongolian and foreign courts on behalf of "Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC, therefore, its affiliates ("Erdenet Mining Corporation" SOE and "Erdenes Oyu Tolgoi" LLC) are not required to notify again.

According to the official letters of the above organisations and statements from the defendants, it is considered that the defendants have stopped the process of filing claims or publishing stories on their behalf, therefore it is appropriate to dismiss the claims.

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

49

6. If the citizen's representative appointed in Article 100.8 of the Law on Civil Procedure, does not appear in court without a valid reason, despite being notified in accordance with Article 76.1.2 of this Law, then the court may be held in his absence with the consent of the litigant.

E.Chinzorig, a citizen's representative appointed to the court hearing, did not appear at the court hearing without valid reasons, however the litigants of the case have agreed to request the court to resolve the case without participation of the citizen's representative, therefore, the case was resolved in his absence, as stated in the law.

7. Stamp duty will be distributed as stated in the law.Pursuant to Articles 115.2.2, 116, and 118 of the Law on Civil Procedure

## IT IS ORDERED THAT:

1. The defendant "Blue News" LLC to refute the information in the stories that was published through public media website www.politnews.mn, titled "Javzmaa: Flying High on Offshore Money" dated March 17, 2022, "Su. Batbold, the Man Behind the Scenes" dated April 7, 2022, and "Su. Batbold, the Man Behind the Scenes 2" dated April 10, 2022; to restore the name, honor, dignity and business reputation of the plaintiffs S.Batbold and L.Javzmaa, pursuant to Articles 21.2, 497.1, 511.1 of the Civil Code,

To dismiss the claims related to stories titled "Su. Batbold, the Man Behind the Scenes 2" dated April 10, 2022 from the claims of L.Javzmaa,

To dismiss the claims related to demanding the defendants to cease the actions of the wrongdoers for using the names Government Agency For Policy Coordination On State Property, "Erdenet Mining Corporation" SOE, and "Erdenes Oyu Tolgoi" LLC from the claims of S.Batbold.

2. Pursuant to Articles 56.2, and 60.1 of the Law on Civil Procedure, 140,400 MNT paid in advance by the plaintiff L.Javzmaa for stamp duty, and 140,400 MNT paid in advance by the defendant S.Batbold for stamp duty, shall remain as state revenue respectively, and 70,200 MNT shall be paid by the defendant "Blue News" LLC to the plaintiff L.Javzmaa, 140,400 MNT shall be paid by the defendant "Blue News" LLC to the plaintiff S.Batbold respectively.

3. Pursuant to Articles 119.2, 119.7, and 120.2 of the Law on Civil Procedure, this decision shall become effective as soon as presented and heard. If the litigants, third party, their representatives and attorneys disagree with this decision, they may appeal to Civil Court of

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar.*
*Translator: E.Khaliun*
*Tel /office/: 76762112, mobile: 976-90903949*

50

Appeal of the Capital City within 14 days from receiving the decision, and the failure to receive the decision by the litigants within the period specified by the law, shall not prevent the counting of the period for filing a claim.

|                |                |
|----------------|----------------|
| HEAD JUDGE     | B.TSOLMON      |
| JUDGE          | TS.NARANCHIMEG |
|                | U.SAINBILEG    |

/signed and stamped/

*I declare that all my translation from Mongolian and English are done accurately and truthfully.*

*Translated and verified translation center of "Westgate translation Bureau" LLC*
*State registration number: 9011500047. Register number: 5484235. Valid period: without a deadline.*
*Registered with: General authority of state registration, Mongolia*
*Address: "Unen sonin" building 2, Prime Minister Amar's street, Sukhbaatar district, Ulaanbaatar*
*Translator: E.Khaliun*
*Tel /office/: 76762110, mobile: 976-90903949*

# EXHIBIT 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,      :

            :

        Plaintiff, :

            :

    v.        :

            :

ANY AND ALL SHARES OF 21 EAST 61 STREET :
APARTMENT CORP. HELD IN THE NAME OF
LOVITAS, INC., TOGETHER WITH THE   :
APPURTENANT PROPRIETARY LEASE FOR
COOPERATIVE UNIT 12E WITHIN THE REAL :  Civil Action No. 24-2147
PROPERTY AND PREMISES LOCATED AT 21 :
EAST 61ST STREET, NEW YORK, NEW YORK  **DECLARATION OF**
10065, AND ALL PROCEEDS TRACEABLE  : **BAZ CHULUNBAATAR**
THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH :
ITS RESPECTIVE APPURTENANCES,
IMPROVEMENTS, FIXTURES, ATTACHMENTS, :
EASEMENTS AND FURNISHINGS, LOCATED
AT 230 WEST 56TH STREET, NEW YORK, NEW :
YORK 10019, AND ALL PROCEEDS
TRACEABLE THERETO,       :

            :

    Defendants <u>In</u> <u>Rem</u>.

-------------------------------------------------------------------x

I, Baz Chulunbaatar, hereby declare as follows:

1. I am a Mongolian national and businessman. I am the founder, President, and Chairman of Monnis International LLC ("Monnis"), one of Mongolia's largest companies. Monnis has 1,800 employees and 12 portfolio companies. Monnis's portfolio companies span several different sectors, including construction, logistics, real estate, mining, aviation, automotive, and energy. For example, Monnis Mining conducts mining operations and works with distributors of mining machinery, and Monnis's longest-standing subsidiary, Monnis Motors, has been the official representative of Nissan Motors in Mongolia since 1998.

2.      Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the private sector.

### The Tavan Tolgoi Coal Mine and My Experience with Sukhbaatar Batbold

3.      One of my early business ventures involved Tavan Tolgoi—a large deposit in Mongolia and one of the largest untaped coal deposits in the world. Today, the Tavan Tolgoi mine is one of the largest mines operating in Mongolia and one of the largest sources of revenue for the government. I became involved in the deposit in the early 2000s as part of a consortium of investors along with Sukhbaatar Batbold. Mr. Batbold led our consortium.

4.      In 1998, the Australian BHP company obtained the license for the Tavan Tolgoi deposit based on the principle of first come first get, in accordance with the mineral laws at that time. During the global economic crisis BHP exited projects in Mongolia and consequently relinquished its license back to the government.

5.      Afterward, the Mongolian company Mine Info, which held the Tavan Tolgoi license since 1999, encountered substantial financial difficulties and could not afford the necessary license fees. In response, they proposed a partnership with Batbold Sukhbaatar, one of the leading businessmen of the time, hoping to secure assistance and resources to meet their financial obligations regarding the license. At that time, Batbold Sukhbaatar and his companies were active in several key sectors in Mongolia, including telecommunications, cashmere, hospitality, and mining. Batbold Sukhbaatar accepted Mine Info's proposal and provided financial support, resulting in his affiliated company acquiring majority interest in the Tavan Tolgoi license.

6.      Mr. Batbold's Tavan Tolgoi investment ultimately turned out to be a smart investment, as over the course of the late 1990s and early 2000s both coal prices and Chinese demand for coal began to dramatically increase. These economic shifts meant the Tavan Tolgoi

2

site went from an economic sink to a highly lucrative deposit with huge potential for growth. Eventually, Mr. Batbold brought in additional investment from both within Mongolia and from foreign companies to assist in the development of the mine. I was a part of the consortium of companies that invested in the deposit at that time.

7.      Over the next several years, the full value of the deposit became apparent. The ever-increasing demand for coal from China and the continued exploration of the reserves at the site drew the attention of investors from around the globe as well as the Mongolia government. The consortium received many offers to acquire the rights to the mine—including from foreign actors from countries like Russia. Ultimately, Mr. Batbold as the lead of our investor group as well as the consortium decided to transact only with the Mongolian government. We decided that the Tavan Tolgoi resource was too valuable to be left in the hands of non-Mongolian entities and that it would be best for the country and all Mongolians if the mine's resources and resultant wealth remained with our country. In the mid-2000s, we entered into an agreement with the Mongolian government under which a small portion of the mine and its resources remained in the hands of our group of private investors—which included me and Mr. Batbold—while the vast majority of the mine and its resources be returned to the state for the benefit of the Mongolian people.

8.      Our agreement was not in the best economic interests of the individual investors and owners—including Mr. Batbold. Rather, the transaction was instead in the interests of the Mongolian government and its people. Our group debated this decision heavily, and certain members of the group wanted to seek a deal that was more economically beneficial. Mr. Batbold, however, was one of the leading voices in our group suggesting that the mine should remain in Mongolian hands—and that it was in Mongolia's strategic interest to ensure that our country keep control over this strategic asset. Mr. Batbold's position ultimately won out and over 90% of the

3

rights to the Tavan Tolgoi mine were transferred out of private hands and back to the public. Mr. Batbold exited the project too. He transferred control of the Tavan Tolgoi deposit back to the government of Mongolia. Subsequently, as Prime Minister, he played a crucial role in organizing the allocation of shares in the Tavan Tolgoi deposit to every citizen, ensuring that the financial benefits from the deposit would reach all Mongolian citizens.

### *Mr. Cheong's Work in Mongolia and My Work with Mr. Cheong*

9. Although the Mongolian economy has grown substantially, it remains relatively small. Decades ago, it was smaller still, meaning significant members of the Mongolian business community generally came to know the other significant players. To that end, I have a longstanding relationship with Chooyoung "Nicholas" Cheong as a contracting counterparty and, since 2007, as a business partner.

10. I first met Mr. Cheong in or around 1998. Mr. Cheong already had extensive experience in the mining industry. At that time, Cheong was at Samsung, and I was negotiating contracts with Samsung on Monnis's behalf. Samsung was known to be a prominent trading company in Asia, and I knew Mr. Cheong to be its head in Mongolia. My understanding is that Mr. Cheong handled, among other things, all of Samsung's mining-related work, including procurement and trading, in that role. Given his role and the prominence of Samsung at the time, Mr. Cheong became known throughout the Mongolian mining and broader business communities. The same is true today; Mr. Cheong remains a well-known businessman in Mongolia, particularly within the mining community.

11. After Mr. Cheong left Samsung, he and I began working together. Our business partnership continues through today. Currently, for example, we are developing a new mine together including conducting testing on the scope of the deposit, raising money, and preparing to

4

capture and sell the ore we ultimately mine.  In my experience, Mr. Cheong is a reliable partner with deep knowledge and experience in mining and a strong reputation as a successful businessman in Mongolia.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 25, 2024
       Ulaanbaatar, Mongolia

_____
Baz Chulunbaatar

5

# EXHIBIT 19

*2nd, 3rd and 7th Defendants; Cheong Choo Yeong; 2nd;* **2021.01.12**

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 1145/2020

Between

1. THE AGENCY FOR POLICY COORDINATION ON STATE
   PROPERTY OF MONGOLIA
   (Mongolia Registration No. 6098169)

2. ERDENET MINING CORPORATION LLC
   (Mongolia Registration No. 2074192)

3. ERDENES OYU TOLGOI LLC
   (Mongolia Registration No. 5548721)

...Plaintiffs

And

1. BATBOLD SUKHBAATAR
   (ID Unknown)

2. CHEONG CHOO YOUNG
   (Korea, South Passport No. M35416565)

3. KIM HAK SEON
   (Korea, South Passport No. M68578356)

4. CLIVEDEN TRADING AG
   (Switzerland Registration No. CHE-320.434.509)

5. EOIN BARRY SAADIEN
   (NRIC No. 7169540I)

6. EVEREST VC PTE. LTD.
   (Singapore UEN No. 201601292G)

7. PONDUVER PTE. LIMITED
   (Singapore UEN No. 201316971C)

...Defendants

## 2nd AFFIDAVIT OF CHEONG CHOO YOUNG

I, **CHEONG CHOO YOUNG** (Korea, South Passport No. M35416565) of Flat A, 35th

floor, Westminster Terrace, No. 2A Yau Lai Road, Tsuen Wan, New Territories, Hong Kong,

2

Hong Kong SAR, do solemnly affirm and say as follows:

1.  I am the 2nd Defendant in HC/S 1145/2020 (the "**Singapore Action**") and the sole shareholder of the 7th Defendant, Ponduver Pte. Limited ("**Ponduver**"). The 3rd Defendant, Kim Hak Seon ("**Kim**") is my wife. I am duly authorised to make this affidavit on behalf of Ponduver and my wife.

2.  Unless stated to the contrary, the matters deposed herein are within my personal knowledge and/or are derived from documents and records in my possession. Insofar as they are within my personal knowledge, they are true. Insofar as they are not within my personal knowledge and/or are derived from documents and records in my possession, I believe them to be true.

3.  I make this affidavit in support of the present application to, amongst others, set aside service of the Writ in the Singapore Action on Kim and myself, or alternatively, to stay the Singapore Action as Singapore is not the proper forum. The present application also seeks to set aside the *ex-parte* Singapore freezing order made by Judicial Commissioner Tan Puay Boon in HC/ORC 6507/2020 dated 27 November 2020 (the "**Singapore Mareva Injunction**").

I.  **BACKGROUND**

4.  The Plaintiffs commenced a claim against 14 individual defendants (which included Kim and me) in Mongolia on 14 October 2020 in respect of alleged wrongdoings relating to the Erdenet and Oyu Tolgoi mines in Mongolia (the "**Mongolian Claim**"). By the Plaintiffs' own concession, the claims in the Singapore Action arise out of the

3

"*same factual matrix*" of the Mongolian Claim.[1]

5.   My wife and I strongly refute the allegations and aspersions cast against us in the Mongolian Claim, and will defend our position vigorously. The connecting factors point overwhelmingly to Mongolia as the more appropriate or proper forum to determine the dispute between the parties. In fact, there are no real connecting factors to Singapore at all, other than artificial constructs tenuously engineered by the Plaintiffs to give the illusion that the Singapore Courts have jurisdiction and/or is a proper forum, when that is clearly not the case. The Singapore Action, in any event, leads to multiplicity of proceedings and the risk of potentially conflicting decisions, not to mention the wholly unnecessary incurrence of time and costs for parallel proceedings.

6.   My wife and I are South Korean nationals living in Hong Kong. My wife has no assets or any connections at all to Singapore. My only asset in Singapore is my shares in Ponduver. There is no allegation at all of any involvement of Ponduver in the alleged wrongdoings in the Singapore Action. By the Plaintiffs' own concession, they do not even assert a substantive cause of action against Ponduver in the Singapore Action,[2] and appear to have joined Ponduver purely for the purposes of execution of judgment or the Singapore Mareva Injunction.

7.   As to the purported merits, although the Plaintiffs have filed three lengthy affidavits[3] in support of their *ex-parte* application for the Singapore Mareva Injunction, it is apparent that they are comprised substantially of conjectures and

---

[1] 1st Affidavit of Sarah Walker dated 26 November 2020 ("**1st Walker**") at [35].
[2] 1st Walker at [67].
[3] 1st Walker, 1st and 2nd Affidavits of Jules B Kroll ("**1st Kroll**" and "**2nd Kroll**" respectively).

4

unsubstantiated assertions (many of which, as will be shown below, are predicated upon false or fanciful assumptions) designed to find fault with the 1st Defendant ("**Batbold**"). Importantly, the Plaintiffs have also failed to give full and frank disclosure of material facts to this Court in obtaining the Singapore Mareva Injunction.

8.  Indeed, there is no evidence that any of the contracts entered into with alleged wrongdoers was a sale at an undervalue or was otherwise not commercial. A key non-disclosure by the Plaintiffs in this respect is the fact that the sale contracts involving the Erdenet and Oyu Tolgoi mines were based on standard terms. If a buyer wanted to purchase the metals from either mine, they would need to adhere to the standard terms put in place. The pricing of the metal supplied was based on public pricing published in the London Metal Bulletin and the London Metal Exchange. These are all aboveboard and transparent and pegged to internationally traded prices.

9.  Instead, the Plaintiffs embarked on a reverse engineering exercise where they first tried to find connections between the contracting parties with Batbold, no matter how tenuous, in order to allege and label and them as Batbold's proxies (which included Kim and I). Notably, however, there is no real or concrete evidence of such proxy relationship other than self-serving assumptions and conjectures by the Plaintiffs. After labelling anyone with connections as Batbold's "proxies", the Plaintiffs then allege that Batbold had engaged in "related" transactions, and must have profited through secret commissions – again, no evidence or quantification of any such secret commissions has been adduced.

5

10. My wife and I strongly refute any allegation that we act as Batbold's proxies. I have known Batbold for more than 20 years, before he was even involved in politics. We are friends and have had various business dealings. Our families are also close – my two sons, Cheong Jun Woo (born in 1995) and Cheong Min Woo (born in 1997) are around the same age as Batbold's children, Badamkhand (who was born in 1994) and Tserendulam (who was born in 1999), and they had all attended the International School of Ulaanbaatar in Mongolia at around the same time. It is therefore unsurprising that K2 has identified close links between our families such as my family attending Battushig's wedding, that Battushig bought basketball game tickets for me and my son, or that my son is a Facebook friend of Batbold's daughter.

11. However, just because we are close to Batbold does not make us his proxies. I am a businessman in my own right. As identified by the Plaintiffs, I had previously worked at Samsung for about 20 years from 1987 to 2007. During that period, I was posted to Mongolia to manage Samsung's interest in a copper joint venture between Erdenet and Samsung. It was at a reception in 1997, organized when the CEO of Samsung Construction & Trading Corporation ("**Samsung C&T**") visited Mongolia, that I met Batbold for the first time. At that point, he was not involved in politics yet. He was the owner and founder of Altai Holding, which was one of the few 10-figure companies in Mongolia at the time. The Altai Holding Group owned a diverse range of successful businesses, ranging from hospitality chains, to supermarkets, and telecommunications operating services. Over the years, we and our families forged a close relationship, as mentioned above.

6

12. Over the years, I have been involved in a wide range of businesses, such as those involving the cashmere industry, the mining and metals industry, as well as in the telecommunications industry. I have been particularly involved in the mining and metals industry given my experience and familiarity with the business from my years of working in Samsung C&T. Currently, I am the owner and CEO of Midlink International Limited ("**Midlink**"), a Hong Kong company holding businesses in the mining and metals trading industry as well as in the import and export of chili peppers.

13. During these years, Kim has been involved in a number of my business and investment activities, particularly as my business portfolio grew. I trust her personally and trust in her ability, and we work together on businesses that I am involved in. This was how Kim was involved in the companies such as Catrison, Cliveden and Ever Global. It has nothing to do with her being a proxy of Batbold. At present, Kim is also a director of Midlink, a company that is owned by me.

14. My wife and I have also had a particular interest in investing our family money in real estate. Since our first home in South Korea (which was a gift from my wife's father), we have bought and sold properties over the years for rental and capital gain. We would usually look to purchase properties in major cities or capitals, often through offshore companies (where we would buy and sell shares in the companies owning the properties) to save on tax.

15. Indeed, the Plaintiffs' "evidence" of us being Batbold's proxies appears to be based primarily on searches on databases / credit bureaus showing that Batbold's children had "*connections*" with apartments owned by my wife and I in London and Boston.

7

16. The Plaintiffs, however, do not explain what these "connections" were. The alleged supporting documents (showing the credit bureau searches) similarly do not shed further light.

17. These "connections" are clearly tenuous, and certainly a leap of logic for the Plaintiffs to suggest that these "connections" were "evidence" of my wife and I being proxies of Batbold. This allegation is simply unfounded. My wife and I reiterate that we were never and are not proxies for Batbold. We have our own businesses and means, and do not hold any property on behalf of Batbold.

18. The Plaintiffs have also claimed to have undertaken a "GreyList" analysis to show that my wife and I had communicated with Batbold and his children through their personal emails. This is, again, unsurprising given our personal relationships. Notably, despite what appeared to be rather extensive email analysis done, the Plaintiffs appear to be unable to speak to the actual contents of these emails – by the Plaintiffs own admission, the "GreyList" analysis can only attest to the possibility that *"two email accounts have corresponded with each other before"*,[4] but not the actual contents of the emails exchanged. Unsurprisingly, the Plaintiffs have thus been unable to point to a single email which suggests that my wife and I were proxies for Batbold or were involved in any alleged wrongdoings.

19. We also note that the Plaintiffs have not adduced any evidence of Batbold being involved in the negotiations or award of any of the contracts involving the two mines. Instead, there is just a bare sweeping assertion that Batbold is *"an influential*

---

[4] 1st Kroll at [34].

8

*Mongolian businessman and politician"*[5] and that it was *"likely that Batbold controlled Erdenet and/or directed Chimeddorj Ganzorig... to sign contracts with companies that Batbold beneficially owned".*[6]

20. These are of course matters involving Batbold, and better answered by him substantively. However, we wish to point out that it is perhaps public knowledge that Batbold is the likely candidate for the Mongolia People's Party ("**MPP**") for the upcoming Presidential elections, as the Plaintiffs themselves have acknowledged. Earlier this year in June, Mongolia held their most recent parliamentary elections, and MPP won a super majority of 62 out of the 76 seats in the State Great Khural, Mongolia's parliament. A copy of a news article reporting the MPP's win in the parliamentary election is annexed hereto and marked exhibit "**CCY-1**". Needless to say, it would not be surprising if the Mongolian Claim and related proceedings are motivated or driven by other agendas. My wife and I believe that we have, unfortunately, been caught up in this as collateral.

21. Other than the Mongolian Claim, the Plaintiffs have also commenced ancillary proceedings in New York, the United Kingdom and Hong Kong for freezing injunctions against my wife and me. This has imposed significant stress on us personally, and placed a strain on our finances and time. In this affidavit, I will seek to address the salient points necessary for the application, and to the best of information and knowledge available to either my wife or myself. For the avoidance of doubt, we should not be deemed to have accepted any allegation or assertion,

---

[5] 1st Kroll at [8].
[6] 1st Kroll at [40].

9

which has not been expressly dealt with in this affidavit.

## II.    THE 6ᵀᴴ AND 7ᵀᴴ DEFENDANTS

22.    Before dealing with the substantive matters for the application, it would also be helpful to set the background of the 6th and 7th Defendants as it would also provide a clear example of how the Plaintiffs' conjectures and bare assertions are incorrect and mischaracterized the facts.

23.    The Plaintiffs have described the 6th Defendant, Everest VC Pte Limited ("**Everest**") as being one of *"numerous assets"* to which *"Batbold's proxies once were or remain linked"*.[7] They have also sought to suggest that Everest's assets are held *"on behalf of Batbold"*[8] – the Plaintiffs allege that the 5th Defendant, Eoin Barry Saadien ("**Saadien**") *"likely holds assets on behalf of Batbold"*, and cite the example that he is a shareholder and director of Everest *"together with other Batbold proxies"*, myself and Lee Changho.[9]

24.    It is quite absurd for the Plaintiffs to suggest that Everest has anything to do with Batbold. Everest came about sometime in 2016 after I had attended a conference on stem cell research and therapy in Singapore and had met Professor Seeram Ramakrishna, a professor of mechanical engineering from the National University of Singapore ("**NUS**") who is presently the co-director of NUS' Nanoscience and Nanotechnology Initiative and whose research interests include biomaterials. Following the conference, I suggested to Saadien and Professor Seeram that we

---

[7] 1st Kroll at [107]-[108]
[8] 1st Kroll at p.376.
[9] see also 2nd Kroll at [13].

10

incorporate a company with a view to exploring investments in stem cell research and therapies.

25. A copy of Professor Seeram's profile from NUS' website is annexed hereto and marked Exhibit "**CCY-2**". As the "Incorporation of Local Company" document from ACRA Bizfile exhibited at 1st Kroll affidavit shows,[10] Professor Seeram (whom the Plaintiffs do not suggest to be a 'Batbold Proxy', and to the best of my knowledge does not know and has never met Batbold) was a founding director and shareholder of the company. Saadien, Professor Seeram and I each held a share.

26. Approximately two years after its incorporation, as Everest had not made much headway in stem cell research and therapies, Professor Seeram decided to leave the company and transferred his shares to me sometime around August 2017. By February this year, Everest had or more less become a dormant company, with no business or assets under its name. At that time, a close friend of mine, Lee Changho ("**Lee**"), had just retired from a senior role in Samsung's metals trading division. I felt that since we had already incorporated Everest, it could instead be used by Lee to invest in a metals trading business which would capitalize on Lee's professional experience. Accordingly, after informing Saadien of my intentions to do so, I transferred my shares to Lee for nominal consideration. To the best of my knowledge, Everest has remained inactive since then.

27. Everest was set up for the purpose of exploring investments in stem cell therapies and research, and is clearly not as a corporate vehicle to hide assets or carry out

---

[10] See 1st Kroll at JK-1 / p.6108.

11

any illicit business activities on behalf of Batbold. This is evidenced by Professor Seeram's involvement in establishing the company. Yet somehow Professor Seeram's involvement is not highlighted anywhere in the Plaintiffs' affidavits, pleadings or submissions, likely because it did not fit into the Plaintiffs' narrative that Everest was being used by "Batbold proxies" (with rather uncalled for insinuations that any South Korean or Mongolian involved is a Batbold proxy) to hold assets on behalf of Batbold. Instead the Plaintiffs have irresponsibly and without any credible evidence whatsoever asserted that it is "*controlled for and on behalf of Batbold*" just because myself, Saadien and Lee were involved in the company. This is just one example of the Plaintiffs' use of vague and sensationalist terminology, and selective disclosure of information, to twist the facts and mislead the Honourable Court.

28.    Similarly, with the 7th Defendant, Ponduver, the Plaintiffs have made a baseless assertion that "*there is good reason to believe that Batbold currently beneficially owns, controls and/or exercises material influence over* [Ponduver] *through his Proxies*".[11] In 1st Walker, the Plaintiffs' solicitor, Ms Sarah Walker, suggests that the evidence in support of this is "*explained in further detail in* [2[nd] Kroll]". However, the 2nd Kroll affidavit contains <u>nothing</u> but an assertion that "*Batbold also controls a second Singapore Company, Ponduver, the 7[th] Defendant*".[12] In other words, the only evidence that the Plaintiffs have of Ponduver being a proxy for Batbold (if it can be called "evidence" at all) is the fact that I, an alleged "Batbold Proxy", own and control Ponduver. The Plaintiffs will clearly say anything to suit their purposes

---

[11] 1st Walker at [52].
[12] 2nd Kroll at [14].

12

with no basis whatsoever.

29.  I set up Ponduver in or around 2013 with the idea that I may possibly wish to start making certain investments in Singapore using a Singapore-incorporated entity. It is not, and has never been, used as a vehicle to hold assets for the benefit of Batbold. Eventually, nothing much came of my plans. One investment that I did undertake under Ponduver was a purchase of 5 preference shares of Jinma Global Partners Limited ("**Jinma Global**"), a Hong Kong Company. For context, Jinma Global's business revolved around the provision of e-payment software services to users whom were in the Guangdong province of China. I was personally invited to invest in the company by its director, Ian Harvey, after I had relocated to Hong Kong. Unfortunately, due to the Covid-19 pandemic, Jinma Global's business has failed, and it has retired all of its former staff. As of today, the company no longer conducts business, and have no valuable assets. The shares in Jinma Global which are held under Ponduver are therefore worthless. In this regard, a letter from Ian Harvey confirming the foregoing matters is annexed hereto and labelled "**CCY-3**". This letter was issued to Ponduver in response to an enquiry I had arranged to be sent, in order to assist me in complying with my asset disclosure obligations after having been served with the Singapore Mareva Injunction.

13

### III.    THE JURISDICTIONAL GATEWAYS WERE NOT MET

30.    The Plaintiffs claim that the jurisdictional gateways in Order 11, Rules 1(a) and 1(f) of the Rules of Court are met against Kim and I because:[13]

(a)    Kim and I own assets in Singapore, thereby satisfying Order 11, Rule 1(a); and

(b)    the claims against Kim and myself (among others) were founded on the tort of unlawful means conspiracy, which tort was likely to be constituted at least in part by an act or omission occurring in Singapore, thereby satisfying Order 11, Rule 1(f).

31.    As mentioned above, Kim has no assets at all in Singapore. She has confirmed this in first affidavit filed on 15 December 2020. As for myself, my only asset in Singapore are my shares in Ponduver.

32.    The Plaintiffs, however, glossed over the issue of assets in Singapore by simply stating in their written submissions that *"as set out in (the 2nd Kroll affidavit), there is reason to believe that the First to Fourth Defendants own assets in Singapore, thereby satisfying O 11 r 1(a)"*.[14] However, 2nd Kroll contains nothing to suggest that Kim holds any assets in Singapore. On the contrary, it would have been evident from the company search on Ponduver that I was the sole shareholder, and that Kim had no assets in Singapore.

33.    Not only do I believe that this failure to highlight Kim's lack of assets in Singapore to be a breach of the Plaintiffs' duty of full and frank disclosure, it would appear

---

[13] see Plaintiff's Skeleton Submissions dated 26 November 2020 (**"Plaintiff's Skeleton Submissions"**) at [64].
[14] see [64(a)].

14

that the Plaintiffs were deliberately misleading the Court with their vagueness.

34. As for the Plaintiffs' allegation that the alleged conspiracy was *"constituted at least in part by acts or omissions occurring in Singapore"*,[15] this is similarly unfounded.

35. The Cliveden Contracts had no connection to Singapore at all. The Cliveden Contracts were for the sale and purchase of metals from a Mongolia mine, entered into between a Mongolian and Swiss entity. The contracts were signed by Mr Mark Forsyth (**"Forsyth"**) (a British citizen) on behalf of Cliveden with two Mongolians, Chimeddorj Ganzorig, and Tserevsamba Davaatseren on the other side for the First and Second Cliveden Contracts respectively. There is absolutely nothing (and no reason for me to believe) that any part of the negotiations or performance of the Cliveden Contracts took place in Singapore.

36. The only alleged "Singapore connection" contrived by the Plaintiffs is set out at paragraphs 36 to 37 of the 1st Walker Affidavit:

> *"Cliveden is controlled by [Kim] and Saadien (both Batbold Proxies). Saadien is a Singapore resident. After Kim resigned as a director of Cliveden, Saadien became director the next day and served from 14 February 2013 and 28 June 2018. He has also been director of Cliveden's parent company, Ever Global, since January 2013. During Saadien's term as director, the Second Cliveden Contract was signed...".*

37. In other words, the only "Singapore connection" is that one of Cliveden's directors, Saadien, is a Singapore resident.

---

[15] See Plaintiff's Skeleton Submissions at [64(c)].

15

38. This, however, is an egregious misrepresentation of the facts and of Saadien's involvement given that:

(a) Saadien was not a director of Cliveden at the time that the First Cliveden Contract was signed in December 2011. Saadien was only a non-executive director of Cliveden from 14 February 2013 to 28 June 2018; and

(b) there is no evidence that Saadien had any involvement in the negotiation or decision to enter into the First or Second Cliveden Contracts, which were both signed by Forsyth who was the CEO. In fact, this was expressly noted in a letter issued by the 2nd Plaintiff to the Mongolian Independent Authority Against Corrupted dated 21 April 2020, in which the 2nd Plaintiff stated definitively that "Kim Hak Seon and Eoin Barry Saadien, mentioned in your official letter, have not signed a contract to buy or sell concentrate from Erdenet Mining Corporation".[16]

39. It is quite unbelievable that the Plaintiffs could even begin to assert with any reasonable or honest belief that any part of the alleged conspiracy was constituted through an act or omission occurring in Singapore.

---

[16] 1st Kroll at JK-75 / p.1326.

16

## IV.    THE PLAINTIFFS' CLAIMS ARE OF INSUFFICIENT MERIT

### A.    *Alleged Erdenet Mine Scheme*

40.    The Plaintiffs have asserted the following claims against Kim and me arising out of the "Erdenet Mine Scheme" and, specifically, the First and Second Cliveden Contracts:

(a)    that we were allegedly part of a conspiracy in which the 1st to 5th Defendants combined to use unlawful means (being the breach of duties owed by Batbold and/or the payment of secret profits to Cliveden) which injured the First and/or Second Plaintiffs;[17] and

(b)    that in making arrangements to receive, retain, or distribute the alleged "secret profits" from the First and Second Cliveden Contracts, we allegedly provided dishonest assistance to Batbold in breach of the duties which he owed as a public official and/or to the Plaintiffs.[18]

41.    It is a clear indication of the Plaintiffs' agenda that they have asserted the above claims against me despite having no concrete evidence of my involvement in the Cliveden Contracts whatsoever. The full extent of the Plaintiffs' evidence of my involvement is apparently set out in the 1st Kroll affidavit at paragraph 55, where Mr Kroll states, *"While Cheong was not publicly involved in Cliveden Trading, in practice, he may well have been."* Mr Kroll goes on to cite his so-called "GreyList analysis" which allegedly revealed that I had been communicating with Saadien and

---

[17] Statement of Claim at [30].
[18] Statement of Claim at [34].

17

Forsyth using various email addresses.

42.    Tellingly, however, Mr Kroll is completely unable to point to the contents of any email communications between myself with Saadien and Forsyth. In any event, there is nothing surprising about me having email communications with Forsyth and Saadien. They are both directors of Cliveden (Saadien was a non-executive director and Forsyth was an executive director), which my wife and I had invested in through Ever Global, a Hong Kong company (where Kim was the sole shareholder). Kim was also one of the non-executive directors of Cliveden for a short period from around 26 January 2012 to 13 February 2013.

43.    Similarly, the Plaintiffs' allegation of Kim's involvement was just as speculative:[19]

> "Although, on paper, it appeared that Kim (the 3rd Defendant) was not involved in Cliveden Trading for the first six weeks of its existence (i.e. between 9 December 2011 and 26 January 2012), in reality, she likely was. On 13 December 2011, just two business days after Cliveden Trading was incorporated, Kim became director and sole shareholder of Ever Global."

44.    At this juncture, I would like to provide a further explanation into our investment and involvement in Cliveden.

45.    Cliveden was a company set up by Forsyth. Forysth, as the Plaintiffs have acknowledged, is a well-known name in the industry, having worked as a trader first at Marc Rich & Co Investment AG from 1996 to April 2009, before joining Trafigura from 2009 to 2010.

---

[19] see 1st Kroll at [53].

18

46.    Sometime in late 2011 or early 2012, Forysth had approached me to invest in Cliveden, which my wife and I did, as mentioned above. As part of our investment, we also extended a US$5 million loan to the company. This US$5 million loan, together with a US$30m credit line which Cliveden obtained from UBS, were used to finance the purchase of copper concentrates under the First Cliveden Contract. For the avoidance of doubt, although my wife was a non-executive director of Cliveden and we were a majority shareholder, the operations of Cliveden remained at all times with Forsyth as CEO, particularly given his expertise in the matter. Of course, from time to time, Forsyth would also consult us on certain business strategies or issues as the majority shareholder.

47.    My wife and I wish to categorically state that neither of us were involved in the negotiations or decision to enter into the First and Second Cliveden Contracts, which was handled by Forsyth. In fact, as the Plaintiffs are well aware, my wife was not even an executive director of Cliveden at the time that both the First and Second Cliveden Contracts were signed.

48.    Similarly, it was Forsyth who handled the process of on-selling the copper concentrates to third parties. Neither my wife nor I were involved or aware of the precise terms or negotiations of these on-sales, although we were aware that they were sold generally to China.

49.    At this juncture, it is also apposite to point out that my wife and I exited and divested from Cliveden on or around 22 September 2016 by selling Ever Global's minority shareholding to Forsyth. Documents evidencing Ever Global's sale of its shares in Cliveden to Forsyth are annexed hereto and labelled "CCY-4".

19

50.   The Plaintiffs are therefore wrong in suggesting that *"Ever Global owns 56% of the Fourth Defendant Cliveden Trading AG"*.[20] More importantly, this fact of divestment in September 2016 runs counter to the Plaintiffs' case that the Second Cliveden Contract was part of an alleged scheme to benefit Batbold through my wife and I as alleged proxies. If the Second Cliveden Contract was intended to benefit either Batbold or my wife and I, why would we divest at the time when the Second Cliveden Contract was entered into? The sale of copper concentrates under the Second Cliveden Contract took place between late 2016 and 2019, during which time Ever Global was no longer a shareholder in Cliveden.[21] Any profits from an alleged undervalued Second Cliveden Contract would accrue only to Forsyth as the 100% shareholder(whom the Plaintiffs have not alleged to be Batbold proxy).

51.   It is also difficult to appreciate the Plaintiffs' allegation that Batbold would have been involved in the Second Cliveden Contract given that Batbold had ceased to be Prime Minister of Mongolia in 2012 – 4 years before the Second Cliveden Contract.

52.   I wish to also highlight two points. First, other than a bare assertion in the Statement of Claim that the Cliveden Contracts were *"awarded at a significant undervalue"*, there is absolutely no evidence put forward by the Plaintiffs to substantiate this, bearing in mind that the contract was pegged to internationally trades prices published in the London "Metal Bulletin" and the London Metal Exchange.[22] In fact, the three supporting affidavits filed by the Plaintiffs do not even assert that the Cliveden Contracts were at an undervalue.

---

[20] 1st Walker at [10.6].
[21] 1st Kroll at [60]-[61].
[22] See 1st Kroll at pp.1021-1023.

20

53.   Second, the Plaintiffs have also not adduced any evidence of alleged secret profits or any quantification thereof. Indeed, as the Plaintiffs themselves have admitted, they do not know whom the copper concentrates were sold to and at what price they were sold.[23]

54.   In fact, it seems that the entire premise of the Plaintiffs' case of alleged wrongdoing with regard the Cliveden Contracts is that: [24]

> "the First Cliveden Contract was entered into less than one week after Cliveden had been incorporated. Cliveden had no track record in trading minerals and no obvious source of funding. Cliveden was merely an intermediary company...which was interposed between Erdenet and the ultimate purchase of copper concentrates in order to extract profits via a resale margin".

55.   There is, however, nothing surprising about Cliveden entering into the First Cliveden Contract soon after incorporation. As mentioned above, Cliveden was set up and run by Forsyth, who is a well-known name in the industry for over 25 years. He had means, capabilities and expertise to perform such a contract.

56.   For completeness, I wish to emphasise that the Second Cliveden Contract was entered into to resolve disputes arising from the First Cliveden Contract relating to non-delivery of the copper concentrates. This key fact was inconspicuously parked under a footnote in the 1st Kroll affidavit.[25] The referenced document is a

---

[23] see Statement of Claim at [25]; see also 1st Walker at [142.2].
[24] See Statement of Claim at [24].
[25] See footnote 56 of the 1st Kroll.

21

Settlement Agreement whose recitals record that disputes had arisen *"between Erdenet and Cliveden Trading AG regarding non delivery which were referred to the Commercial Dispute Mediation Centre of the Mongolian National Chamber of Commerce and Industry in accordance with the Clause 22 of the Contract E-2012/06-Cu"*.[26] The parties then agreed that they would sign *"the new Contract E-2016/04-Cu and Amendment No 1 with previously agreed terms"*. The fact that there were disputes between Cliveden and the Second Plaintiff, which the parties even referred to third party mediation, clearly shows that Cliveden was a commercial party dealing at arms' length with the Second Plaintiff.

### B.  The Plaintiffs' claims against me under the Oyu Tolgoi Mine Scheme

57.  The Plaintiffs have asserted the following claims against me arising out of the "Oyu Tolgoi Mine Scheme":

(a)  first, that I was allegedly part of a conspiracy in which I combined with Batbold to use unlawful means (being the breach of duties owed by Batbold and/or the payment of secret profits to Bophut Investments Limited (**"Bophut"**, of which the Plaintiffs say I was a shareholder)), which injured the 1st and/or 3rd Plaintiffs;[27] and

(b)  that in making arrangements to receive the alleged secret profits and/or receiving them and/or retaining them, I allegedly provided dishonest assistance to Batbold in breach of the duties which he owed as a public

---

[26] 1st Kroll at Exhibit JK-1 / p.970.
[27] Statement of Claim at [54].

22

official.[28]

58.   The alleged "secret profits" or "gratuities" which I am alleged to have received (through Bophut) are:

(a)   That Bophut entered into a shareholders' agreement with Ivanhoe Ulaan Pte Ltd ("**Ivanhoe Ulaan**") in November 2010, which provided Bophut with the option (the "**Kharmagtai Option**") to become the majority owner of the rights to exploit the Kharmagtai Mine for US$20 million (the so-called "**Kharmagtai Gratuity**"); [29] and

(b)   That equity in a company called CBM Mongolia Pte Ltd ("**CBM**") was transferred to Bophut in 2010 and I was appointed as a director of CBM (the "**CBM Gratuity**").

59.   To begin with, the Plaintiffs' case in relation to the Oyu Tolgoi Mine Scheme is vague and difficult to make sense of. The Plaintiffs appear to suggest that I (through Bophut) received the alleged Kharmagtai Gratuity and CMB Gratuity from Ivanhoe-related entities as kickbacks, in consideration for favourable negotiations taking place between Rio Tinto and Ivanhoe vis-a-vis the Mongolian government, in relation to a completely separate and unrelated project, the Oyu Tolgoi Project. Yet it is not even clear how these negotiations were allegedly favourable in outcome to Ivanhoe. Confusingly, the Plaintiffs appear to suggest that the favourable result of the 2010 contractual negotiations was the "Heads of Agreement" between Ivanhoe

---

[28] Statement of Claim at [56].
[29] See 1st Kroll at [94.2].

23

and Rio Tinto pursuant to which Rio Tinto secured a substantial increase in ownership in Ivanhoe (which then owned 66% of Oyu Tolgoi LLC, according to the Plaintiffs), and secured a primary role in the management of the building and operation of the Oyu Tolgoi complex.[30] Yet as far as I can tell, the only party who appeared to benefit from this Heads of Agreement was Rio Tinto, not Ivanhoe.[31]

60.    In any event, even if it were assumed that Ivanhoe benefited from the outcome of the 2010 contractual negotiations, the more fundamental problem with the Plaintiffs' case is that the alleged "gratuities" received by Bophut in relation to the Kharmagtai mine had **no connection with the allegedly favourable outcome of the Oyu Tolgoi negotiations whatsoever**. The alleged "connection" relied upon by the Plaintiffs is that they occurred around the same time – this is preposterous, and really shows the degree at which the Plaintiffs are clutching at straws in order to manufacture some connection. It should be borne in mind that I was and remain an active investor in the mining and metals industry and was residing in Mongolia at the time. There is nothing surprising about the fact that I had some involvement in a project (the Kharmagtai Project) which, incidentally, was also undergoing negotiations in late 2010, around the same time that negotiations were ongoing in respect of the Oyu Tolgoi Mine (which I had no involvement in whatsoever).

61.    Another deliberate attempt by the Plaintiffs to mischaracterise the situation was to paint Andrew Mooney, a business associate who had asked me to be part of the Kharmagtai Project, as an "Ivanhoe-linked individual". As the Plaintiffs are aware,[32]

---

[30] Statement of Claim at [50].
[31] See 1st Kroll at [93]. See also 1st Kroll at [95], involving further alleged benefits accrued by Rio Tinto.
[32] see 1st Kroll at p.1473.

24

Mooney was an ex-director of Ivanhoe Capital Corporation, but he had parted ways with the Ivanhoe group of companies for around a decade by that time, and had established his own businesses in the mining and metals industry. It is misleading for the Plaintiffs to portray Mooney as an "Ivanhoe-linked individual".

62. In any case, **the fundamental issue with the Plaintiffs' case against me is the fact that I am not, and have never been, a shareholder of Bophut**. Accordingly, I did not and could not have received any secret profits or benefits on behalf of Batbold through Bophut, as the Plaintiffs have alleged. This appears to be yet another instance in which the Plaintiffs have intentionally misled this Honourable Court. I note that the only "evidence" that the Plaintiffs have put forth to substantiate their claim that I was a shareholder of Bophut, was a BVI Companies Search Report of Bophut that is exhibited under the 1st Kroll affidavit.[33] However, the report does not even provide any information as to the shareholders of Bophut, much less demonstrate that I was a shareholder of Bophut. The fundamental premise of the Plaintiffs' claim against me is false.

63. That aside, the Plaintiffs' allegations that secret profits were made by Bophut off the back of the "Oyu Tolgoi Mine Scheme" are also incorrect.

64. Although the Plaintiffs have asserted or insinuated that the Kharmagtai Option was granted at an undervalue,[34] they do not, however, even appear to know the terms of the Kharmagtai Option to begin with. During my review of the affidavits filed by

---

[33] See 1st Kroll at JK-1 / Tab 453.
[34] see Statement of Claim at [51], where the Plaintiffs note that the Kharmagtai Project was independently valued at US$173.6m in 2019; see also 1st Kroll at [94.2], where it states that by granting the Option to Bophut, Ivanhoe "*gifted Batbold the right to acquire a potentially highly lucrative project*".

25

the Plaintiffs, I noted that they have described the Kharmagtai Option in very vague terms.[35] Amongst the exhibits, I was also unable to locate a single document setting out the terms of the Kharmagtai Option. In the premises, it is unclear on what basis the Plaintiffs are asserting that the price of USD 20m was too low.

65.    In this regard, it is crucial to bear in mind that at the time the Kharmagtai Option was granted, no exploration exercise had been undertaken to provide an assessment of the value of the project. The value of the project was a complete unknown, and an investment in the project represented an extremely risky endeavor. An investor would be taking the risk that exploration efforts may reveal that the mines do not contain valuable materials at all, or that the materials may be found at depths which make it uneconomical to exploit them. In this context, there is no basis for the Plaintiffs to suggest that the US$20m Kharmagtai Option was granted to Bophut at an undervalue or on terms which were unusually favourable to Bophut (a suggestion which they make only with the benefit of hindsight just because more recent exploration efforts have suggested that the Kharmagtai Mine is worth far more). Indeed, the Plaintiffs themselves have said that the rights to the Kharmagtai Project were eventually awarded to a third party, Xanadu Mines (which they do not suggest to be a "Batbold Proxy"), in 2014 for a much lower price of **USD 14m**.[36] How could Bophut have obtained any kind of gratuity or benefit by acquiring an option to acquire the same rights for the price of USD 20m?

---

[35] See 1st Kroll at [94.2].
[36] See 1st Kroll at [94.2].

26

66.    As things transpired, the Kharmagtai Option was in fact of no benefit to Bophut at all. As the Plaintiffs are aware, Bophut only paid a sum of USD 6m to Ivanhoe Ulaan[37] and ultimately did not exercise the option to acquire a stake in Ivanhoe Ulaan LLC.[38] After USD 6m had been expended on the exploration exercise, the exercise yielded disappointing results, and it appeared that the Kharmagtai project was economically unviable. The exploration exercise was then called off, and Bophut elected against committing further funds to the endeavor. In the premises, it is hard to see how the Plaintiffs could describe this as a gratuity or benefit to Bophut when the final result was that Bophut effectively wasted a sum of USD 6m before walking away from the Kharmagtai Project.

67.    The Plaintiffs have also alleged that the transfer of CBM to Bophut in 2010 and my appointment as director of CBM constituted further gratuities that were made to the ultimate benefit of Batbold. This is false. As far as I am aware, CBM bore absolutely no relation to Batbold. In any event, neither the transfer of CBM to Bophut, nor my appointment as director in CBM had enriched me in any way. I received no remuneration in my role as director of CBM. While I was to receive a discretionary "bonus" if the Kharmagtai Project turned out to be successful, this never materialized. As I have also highlighted above, I am not a shareholder of Bophut, and so the transfer of CBM to Bophut could not have enriched me either.

---

[37] see 1st Kroll at [94.2].
[38] see 1st Walker at [143].

27

C.    *The lack of authority to commence legal proceedings on behalf of the Plaintiffs*

68.    I understand from my New York lawyers that there is also an issue as to whether there is even proper authority to bring the legal proceedings in Mongolia, Singapore and elsewhere in the first place. This is because the three Plaintiffs have confirmed in writing that they have *not* authorised such legal proceedings.

69.    This issue was expressly raised by Batbold's lawyers before the Supreme Court of the State of New York on 2 December 2020, which was attended by my New York lawyers. A copy of the transcript for the hearing is annexed hereto and marked Exhibit "**CCY-5**".

70.    As stated by Batbold's lawyers at the hearing, *"the leaders of the State Agency and the two State owned mining companies that counsel purports to represent here and confirmed to our clients in writing that they did not authorize this case."*[39]

71.    And whilst the Plaintiffs' counsel claimed to have an affidavit from the Deputy Prosecutor of Mongolia, Mr Tseepil, stating that the office(s) that he represents has the requisite authority to bring actions behalf of the named Plaintiffs,[40] no such affidavit had been filed in New York, and the Court expressly noted that *"[n]owhere in the many feet of documents that were presented to Justice Masley hours before the end of the day before Thanksgiving is there a piece of paper that demonstrates your good-faith assertion that you're acting on behalf of the State of Mongolia is in fact the case."*[41]

---

[39] See Exhibit "CCY-5" at p.5 / lines 2-6.
[40] See Exhibit "CCY-5" at p.26 / lines 17-23.
[41] See Exhibit "CCY-5" at p.29 / lines 7-11.

28

72. Shortly following the hearing, the Plaintiffs discontinued the New York proceedings against Batbold and several other defendants on 9 December 2020, without any explanations given. As my UK lawyers have noted in their letter dated 11 December 2020 to the Plaintiffs' UK lawyers, this appears to be an attempt to avoid scrutiny of the issue as to authority.[42]

73. My lawyers have since obtained copies of the letters issued by the officers of each of the three named Plaintiffs dated between 27 November 2020 to 22 December 2020, which confirm that the Plaintiffs have neither provided instructions for the commencement of the Mongolian Claim (much less the Singapore Action), nor requested any other governmental authority to do so on their behalves. Copies of these letters, and my UK solicitor's letter dated 11 December 2020, are annexed hereto and labelled Exhibit "**CCY-6**".

74. This appears to be one further aspect for which the Plaintiffs have failed to comply with their duty of full and frank disclosure. As alluded to in the preceding paragraph, the Plaintiffs had confirmed as early as 27 November 2020 that they did not authorize or otherwise request for the commencement of the various legal proceedings. This means that the Plaintiffs themselves would have been alive to the issue as to authority by the time of the hearing of the Plaintiffs' *ex-parte* application for the Singapore Mareva Injunction on the same day, 27 November 2020, before the Honorable Judicial Commissioner Tan Puay Boon. This potential

---

[42] See Exhibit "CCY-6".

29

issue as to the proper authority to commence these legal proceedings was not drawn to this Honourable Court's attention.

## V.    SINGAPORE IS NOT THE NATURAL OR APPROPRIATE FORUM

75.    It is difficult to see how the Plaintiffs can honestly maintain an argument that Singapore is the natural or appropriate forum for dispute in the Singapore Action.

76.    The dispute arises out of contracts involving two mines in Mongolia. The Plaintiffs are all Mongolian entities, and the primary alleged wrongdoer is a Mongolian, Batbold. The alleged wrongdoing by Batbold relate to his role and duties as Mongolian Prime Minister, and by the Plaintiffs' own concession, are matters of Mongolian law. There is no evidence that the negotiations and performance of any of the alleged impinged contracts or any wrong alleged has any Singapore element, other than Saadien (whose connection, as explained above, is tenuously peripheral and an artificial construct), no other witnesses or potential witnesses are based in Singapore, other than Saadien.

77.    Quite clearly, Mongolia is the natural, and certainly more appropriate forum to determine the dispute as opposed to Singapore, which is not even an appropriate forum to begin with. The Plaintiffs know this, and have in fact commenced proceedings relating to *the same factual matrix* in the Mongolian Claim. The Mongolian Claim is brought against 14 individual defendants, and includes the very same claims relating to the Cliveden Contracts and the Oyu Tolgoi contracts in the Singapore Action. In fact, the Mongolian Claim covers a much wider scope as there are other contracts involving the two mines that are not part of the action in

30

Singapore. In other words, the Singapore Action is a much smaller subset of the Mongolian Claim. Needless to say, the parallel proceedings commenced by the Plaintiffs in Mongolia and in Singapore have led and will lead to multiplicity of proceedings and raises the potential of conflicting decisions. It also adds unnecessarily to time and costs for duplication of proceedings.

78.    Furthermore, as pointed out, there are serious issues as to the Plaintiff's locus to pursue these proceedings, issues that I am advised are clearly governed by Mongolian law.

79.    I believe the real motive of the Plaintiffs in commencing the Singapore Action is not to pursue the matter substantively in Singapore. Rather, the Plaintiffs' hope to seek a backdoor freezing and disclosure orders in aid of their primary claim in Mongolia, so as to 'fish' for information as to our assets in Singapore. This is not appropriate, and certainly reflects poorly on the Plaintiffs' agenda and motives in these proceedings.

## VI.    THE SINGAPORE MAREVA INJUNCTION OUGHT TO BE DISCHARGED

80.    The Singapore Action should never have been commenced or permitted in Singapore as the requirements for service out were not even met in the first place. In consequence, the Singapore Mareva Injunction ought to be discharged on that basis.

81.    As explained above, the Plaintiffs' claim is predicated on conjectures and unsubstantiated assertions. There are no real or concrete evidence either of Batbold's actual involvement in the various contracts or that my wife and I acted as

31

his proxy. I believe the Plaintiffs have not even shown a good arguable case against my wife and I – not to mention Ponduver, which the Plaintiffs admittedly do not even have a cause of action against.

82. I also believe that the Plaintiffs have utterly failed to show any real risk of dissipation of assets in Singapore. To begin, Kim does not even have any assets in Singapore.

83. As for myself, my only asset in Singapore is my shares in Ponduver. Ponduver is an inactive private limited company. I do not see what risk there is in me attempting to sell these shares or anyone even wanting these shares. Ponduver has no assets of value other than cash of less than US$40,000 in a bank account.

84. In any event, there is also no credible evidence that I would dissipate my assets in Singapore before any judgment is given. The Plaintiffs say that the alleged risk of dissipation *"arises primarily form the nature of the allegations against the Defendants"* and from the fact that, by their case, I had conspired with others to defraud the Plaintiffs, and then *"subsequently transferred, disguised and hid the ownership of the fruits of their wrongdoing"*.[43]

85. As I hope is apparent by now, there is no substance to these assertions whatsoever. It follows that there is also no credible evidence of a real risk of dissipation.

---

[43] 1st Walker at [54].

32

## VII.    THE PLAINTIFFS' LACK OF FULL AND FRANK DISCLOSURE

86.    I understand the Plaintiffs were under an obligation to make full and frank disclosure to the Court in applying for the Service Out Order and the Singapore Mareva Injunction on an *ex parte* basis. I understand also that a failure to provide full and frank disclosure of the material facts is a ground for these orders now to be set aside.

87.    As I have explained above, there were several matters having a material bearing on the Plaintiffs' entitlement to the Service Out Order and the Singapore Mareva Injunction which they failed to disclose or highlight adequately to the Court's attention, in breach of their duty. These include:-

(a)    in relation to the fulfilment of the jurisdictional gateways, that the Plaintiffs never had any evidence whatsoever to support their allegation that my wife Kim had any assets in Singapore, and the absence of any proper basis for the Singapore Courts to be vested with jurisdiction;

(b)    in relation to the "Erdenet Mine Scheme", the fact that the Cliveden Contracts were awarded to Cliveden on a standard pricing mechanism which was applicable to all contracts entered into between the 2nd Plaintiff and purchasers of copper concentrate;

(c)    in relation to the "Erdenet Mine Scheme", that Batbold was not even the Prime Minister at the time the Second Cliveden Contract was concluded;

(d)    in relation to the "Oyu Tolgoi Mine Scheme", that the Plaintiffs had no

33

evidence whatsoever to support their baseless assertion that I had been a shareholder of Bophut;

(e)    despite acknowledging that there was a close personal familial relationship between my family and that of Batbold's, the Plaintiffs failed to highlight that there were many possible and, indeed likely, explanations for the purported tenuous "connections" which they raised. Instead, they jumped to the conclusion that my wife and I were Batbold's proxies and were holding his assets; and

(f)    the Plaintiffs omitted to disclose the issue as to whether there is proper authority to commence the various legal proceedings on behalf of the Plaintiffs.

88.    These were all facts which would have been material for the Court's consideration in deciding whether the Plaintiffs were entitled to the Service Out Order and the Singapore Mareva Injunction. The Plaintiffs failed to draw these matters to the Court's attention, and this alone provides an additional reason why both orders should be set aside.

## VIII.   CONCLUSION

89.    I will leave it to my lawyers to address the Honourable Court further by way of legal submissions at the hearing of the application. In view of the foregoing, Ponduver, Kim, and I pray that the application be granted, with costs to be paid by the Plaintiffs forthwith.

34

90.  Alternatively, if this Honourable Court does not set aside the Service Out Order or stay the action herein, Ponduver, Kim, and I respectfully pray for an extension of time to file our Defence(s) and Counterclaim(s), if any, pending the final disposal of this application herein, including any appeal therefrom.

| | |
|---|---|
| Affirmed in Hong Kong SAR | ) |
| By the above named | ) |
| **CHEONG CHOO YOUNG** | ) |
| On this 5th day of January 2021 | ) |

Before Me



A NOTARY PUBLIC

This Affidavit is filed on behalf of the 2nd, 3rd and 7th Defendants.

JP Woon Shun
Notary Public, Hong Kong SAR
2308, Two Lippo Centre
89 Queensway,
Hong Kong

# EXHIBIT 20



## КОНТРАКТ № Е-2007/02-Cu

### г. Эрдэнэт, Монголия

Настоящий Контракт заключён 22 –ого Марта 2007 года между **Монголо-Российским Совместным Предприятием «Эрдэнэт»**, СП «Эрдэнэт», г. Эрдэнэт, Монголия (**Продавец**) и

**LIDEX HOLDINGS LTD** ., Room B,13/F Sun Ying Industrial Centre, 2-9 Tin Wan Close, Tin Wan, Hong Kong (**Покупатель**)

### ПРЕДМЕТ КОНТРАКТА

Покупатель согласился купить, а Продавец согласился продать медный флотационный концентрат производства СП «Эрдэнэт» (в дальнейшем «концентрат») на нижеприведенных условиях.

### 1. ОПРЕДЕЛЕНИЯ

1.1. Указанные ниже термины будут иметь следующие значения:

- Термин "метрическая тонна" (МТ) означает 2204,62 фунта или 1000 килограмм влажной или сухой основы;

- Термины "СМТ" (сухая метрическая тонна) и "ВМТ" (влажная метрическая тонна) означают 2204,62 фунта или 1000 килограмм сухой и влажной основы соответственно;

- Термин "единица" означает 1% (один процент) нетто сухого веса;

- «Год» означает 12 месячный период начинающийся 1 января и заканчивающийся 31 декабря;

- Термин "унция" (oz) означает тройскую унцию, эквивалентную 31,1035 граммам

- "гр./МТ" означает одну миллионную часть или 1 грамм на 1 метрическую тонну;

- Термин "фунт" (lb) означает один фунт, или вес, эквивалентный 453,593 граммам.

1.2. Суммы денег, указанные в долларах и центах США (доллары и центы) соответствуют официальным денежным единицам Соединенных Штатов Америки.

### 2. СРОК ДЕЙСТВИЯ

Настоящий Контракт вступает в силу с момента его подписания и действует до тех пор, пока Стороны не выполнят всех принятых по нему обязательств.

## CONTRACT   № Е-2007/02-Cu

### Erdenet, Mongolia

This Contract is made on the 22nd of March, 2007 between the **Mongolian–Russian Joint Venture "Erdenet"**, JV "Erdenet", Erdenet City, Mongolia (**"Seller"**)
and

**LIDEX HOLDINGS LTD** ., Room B,13/F Sun Ying Industrial Centre, 2-9 Tin Wan Close, Tin Wan, Hong Kong (**"Buyer"**)

### WHEREAS

Buyer agrees to buy and Seller agrees to sell copper flotation concentrate production of JV "Erdenet" ("Concentrate") on the terms and conditions hereinafter contained.

### 1. DEFINITIONS

1.1. The following expressions shall have the meanings set out below:

- "Tonne" and "Metric Ton" each mean 2204.62 Pounds or 1000 kilograms, wet or dry basis as specified;

- "DMT" and "WMT" mean Dry Metric Ton and Wet Metric Ton respectively;

- "Unit" means 1% of the net dry weight;

- "Year" means a period of 12 consecutive months commencing 1 January and ending 31 December;

- "Ounce" or "oz" means a troy ounce of 31.1035 grams;

- "PPM" or "g/MT" means part per million or 1 gram per Metric Ton;

- "Pound" or "lb" means a pound of 453.593 grams.

1.2. Amounts of money stated in $ and ¢ (Dollars and Cents) are references to the currency of the United States of America.

### 2. DURATION

This Contract shall enter into full force from the date of signing and shall remain in force until completion of the Parties' obligations herein.

1





## 3. КОЛИЧЕСТВО

Количество концентрата, поставляемого по настоящему Контракту, составляет 20 000 ВМТ плюс или минус 10% по выбору Продавца.

## 4. КАЧЕСТВО И ОПИСАНИЕ

Концентрат, поставляемый по настоящему Контракту, будет флотационным медным концентратом производства СП «Эрдэнэт» в соответствии с нижеприведенным химическим составом:

Cu:     23-25 %/СМТ
Ag:     50-80 гр./МТ
As:     0.25-0.3 %
Fe:     23-28 %
S:      32-35 %
Pb:     0.03-0.04 %
Zn:     0.04 %
Sb:     0.03-0.08 %
Ni:     0.006 %
Bi:     до 0.01 %
$SiO_2$: 5-8 %
Mo:     до 0.15 %
Te:     6.5–8.5 гр./МТ
Se:     50-80 гр./МТ
Au:     0.2-0.3 гр./МТ
Mg:     0.3-1 %
Ca:     0.4-0.9 %
Cd:     0.001 %
Влага:      8-11 %

Материал будет текучим, свободным от вредных примесей и радиоактивных элементов для процесса плавления и должен быть свободен от посторонних твердых включений.

При обнаружении покупателем других вредных примесей, обе стороны должны обсуждать данный вопрос и принимать решение. Однако,Покупатель не имеет право отказаться от поставки концентрата.

## 5. ПОСТАВКА

5.1. Концентрат будет поставляться на условиях DAF Монголо-Китайская граница, ж/д станция Эрлянь, от Монголо- Русская граница (в соответствии с Инкотермс 2000 или любыми соответствующими дополнениями к ним) в ж/д вагонах.

5.2. Концентрат будет поставляться в невозвратных мешках типа "big bag" вместимостью по 2.5-3 МТ каждый.

## 3. QUANTITY

The quantity of Concentrate to be delivered shall be 20 000 WMT plus or minus 10 % in Seller's option.

## 4. QUALITY AND DESCRIPTION

The Concentrate to be delivered under this Contract shall be flotation copper concentrate produced by the Erdenet mine in Mongolia with the following typical assays:

Cu:     23-25 %/DMT
Ag:     50-80 g/MT
As:     0.25-0.3 %
Fe:     23-28 %
S:      32-35 %
Pb:     0.03-0.04 %
Zn:     0.04 %
Sb:     0.03-0.08 %
Ni:     0.006 %
Bi:     up to 0.01 %
$SiO_2$: 5-8 %
Mo:     up to 0.15 %
Te:     6.5–8.5 g/MT
Se:     50-80 g/MT
Au:     0.2-0.3 g/MT
Mg:     0.3-1 %
Ca:     0.4-0.9 %
Cd:     0.001 %
Moisture:      8-11 %

Materials to be free flowing and free of impurities deleterious to the smelting process (including radioactive elements) and shall be free of extraneous solids.

In case of disclosure of any other excessive impurity noticed, the both parties shall have discussion and resolve the matter, However, Buyer can not refuse to deliver the concentrate .

## 5. DELIVERY

5.1. The Concentrate shall be delivered DAF (Incoterms 2000 or any amendments thereto) on rail cars Mongolian/Chinese border (Erlian) or Mongolian / Russian border

5.2. The Concentrate shall be delivered in non-returnable big bags of 2.5-3 metric tons each.



## 6. ОТГРУЗКА

6.1 Отгрузка концентрата будет производиться в соответствии со следующим графиком:

6.2. График отгрузки:

| | |
|---|---|
| май | 3000- BMT |
| июнь | 4000- BMT |
| июль | 3000- BMT |
| август | 4000- BMT |
| сентябрь | 3000- BMT |
| октябрь | 3000- BMT |

6.3 График отгрузки должен учитывать план производства Продавца и должен быть равномерно по месячно в течение года.

6.4. Продавец гарантирует, что соответствующее количество концентрата будет поставлено не позднее 7 дней с момента предварительного платежа в соответствии с разделом 11.2(а).

6.5. Покупатель не позднее 15 дней до начала месяца отгрузки в письменной форме предоставляет Продавцу инструкции по заполнению ж.д. накладных и подтверждает готовность получающего завода к приему соответствующей партии.

В противном случае, Продавец оставляет за собой право исключить предназначенную для отгрузки месячную партию из общего количества концентрата, поставляемого по настоящему Контракту.

## 7. ЦЕНА

7.1. Цена на концентрат будет эквивалентна сумме платежей за металлы в соответствии с разделом 8, за вычетом стоимости переработки, рафинирования и штрафов в соответствии с разделом 9.

7.2. Продавец выставляет Покупателю счет по каждой отгружаемой партии, а Покупатель оплачивает его в соответствии с разделом 11.

## 8. ОПЛАТА МЕТАЛЛОВ
8.1. Медь.

После вычитания 1.12 единицы от согласованного содержания меди, Покупатель оплатит оставшийся баланс по котировке "Daily London Metal Exchange US$ Copper Grade A Settlement", опубликованной в Лондонском "Metal Bulletin", усредненной за котировальный период в соответствии с разделом 10.
8.2. Серебро.

## 6. DISPATCH

6.1. Dispatch of the Concentrate shall take place in accordance with shipping schedule.

6.2. Shipping schedule:

| | |
|---|---|
| May, | 3000 - WMT |
| June, | 4000 - WMT |
| July, | 3000 - WMT |
| August, | 4000 - WMT |
| September, | 3000- WMT |
| October, | 3000- WMT |

6.3 Shipping schedule shall reflect Seller's production plan for year and to be spread monthly over the year.

6.4. Seller guarantees that the above quantities shall all have been delivered to Buyer not later than 7 days after the date of Buyer's initial payment advance made in accordance with Clause 11.2 (a).

6.5. Buyer has to advise the Seller in writing within first 15 days of the month prior to the scheduled month of dispatch, Railway Bill Instructions and the readiness of material receipt by receiving smelter.

Otherwise, Seller have the right to exclude the subjected quantity of material consigned to Buyer from total quantity of copper concentrates to be delivered under present contract.

## 7. PURCHASE PRICE
7.1. The purchase price for the Concentrate shall be the equivalent of the sum of the metal payments calculated in accordance with Clause 8., less the deductions calculated in accordance with Clause 9.

7.2. The purchase price for each dispatched lot shall be invoiced by Seller and paid by Buyer in accordance with Clause 11. below.

## 8. METAL PAYMENTS
8.1. Copper.

After a deduction of 1.12 unit from the agreed copper content, Buyer shall pay for the remaining balance at the daily London Metal Exchange US$ Copper Grade A Settlement quotation, as published in the London "Metal Bulletin", averaged over the Quotational Period in accordance with Clause 10.
8.2. Silver.

3





| | |
|---|---|
| Если согласованное содержание серебра равно или ниже 30 грамм на 1 СМТ – оплата серебра не производится. | If the agreed silver content is equal to or below 30 (thirty) grams per DMT there shall be no payment for silver. |
| Если согласованное содержание серебра выше 30 грамм на 1 СМТ, Покупатель оплатит 90% содержания серебра по котировке "Daily US$ London Spot", опубликованной в Лондонском "Metal Bulletin", усредненной за котировальный период в соответствии с разделом 10. | If the agreed silver content exceeds 30 (thirty) grams per DMT, Buyer shall pay for 90% of the silver content at the daily US$ London Spot quotation for Silver, as published in the London "Metal Bulletin", averaged over the Quotational Period in accordance with Clause 10. |

| | |
|---|---|
| **9. ВЫЧЕТЫ** | **9. DEDUCTIONS** |
| 9.1. Продавец подтверждает Покупателю стоимость переработки меди в размере $ 93 на 1 СМТ. | 9.1. Seller shall allow Buyer a treatment charge of 93 US$ per DMT, fractions pro rata. |
| 9.2. Продавец подтверждает Покупателю стоимость рафинирования меди в размере US¢ 9.3 за 1 фунт оплачиваемой меди. | 9.2. Seller shall allow Buyer a copper refining charge of US¢ 9.3 per pound of payable copper, fractions pro rata. |
| 9.3. Продавец подтверждает Покупателю стоимость рафинирования серебра US¢ 35 за тройскую унцию оплачиваемого серебра. | 9.3. Seller shall allow Buyer a silver refining charge of US¢35 per troy ounce of payable silver, fractions pro rata. |
| 9.4. Продавец подтверждает Покупателю вычитание за превышение содержания мышьяка в концентрате в размере US$ 2 за каждые 0,1% превышения сверх 0,3% на 1 СМТ. | 9.4. Seller shall allow Buyer an arsenic deduction of US$ 2 per DMT for each 0.1% that the agreed arsenic content exceeds 0.3%, fractions pro rata. |

| | |
|---|---|
| **10. КОТИРОВАЛЬНЫЙ ПЕРИОД** | **10. QUOTATIONAL PERIOD** |
| 10.1Котировальный период при расчете оплат за металлы по пункту 8 устанавливается по выбору Покупателя, как любой календарный месяц, в т.ч. месяц фактической отгрузки (М), или месяц, следующий за месяцем фактической отгрузки (М+1) или второй месяц, следующий за месяцем фактической отгрузки.( М+2). | 10.1 The Quotational Period for the calculation of the metal payments in Clause 8. shall be, at Buyer's option, any calendar month including the month of actual dispatch (M), the month following the month of actual dispatch (M+1) or second month , following the month of actual dispatch.( M+2) |
| 10.2 Этот выбор должен быть декларирован Покупателем не позднее последнего дня месяца следующего за месяцем отгрузки (М+1). | 10.2 Buyer shall declare this option not later than the last day of the month following the month of actual dispatch. (M+1) |
| Месяцем отгрузки по каждой партий концентрата будеть считаться тот месяц, в пределах которого будет отгружено больше половины общего количества концентрата предназначенного для такой партии . | For the purpose of this agreement, the month of the actual dispatch shall be the month in which the majority of the respective month's parcel were shipped as evidenced by the railway bill dates |
| 10.3Котировальный период для меди и серебра должен быть одиноковым месяцем. | 10.3 Quotational Period for copper and silver shall be the same month . |
| 10.4 В случае если Покупатель не объявит свой выбор в указанный срок, Продавец оставляет за собой право выбрать котировальный месяц по собственному усмотрению. | 10.4 If Buyer does not declare this option at the day above then Seller shall have the right to declare this option in its own choice. |
| **11. ПЛАТЕЖИ** | **11. PAYMENT** |
| 11.1. Все счета или иные платежные документы должны быть составлены в Долларах и Центах США, а все платежи должны быть выполнены телеграфным | 11.1. All invoices or credit notes shall be in Dollars and Cents, and all payments shall be made by telegraphic transfer in Dollars and Cents with same value fund . |

4




переводом в Долларах и Центах с тем же самым фондом ценности.

11.2. Предварительный платеж.

a) По каждой партии, в соответствии с графиком отгрузки, Покупатель выполнит предварительный платеж Продавцу в течение 5 банковских дней, считая с даты предварительного счета Продавца (посылается Покупателю по факсу);

В случае неоплаты в указанный срок Продавец имеет право в одностороннем порядке исключить соответсвующую партию из общего количества концентрата по настоящему Контракту.

b) Сумма предварительного платежа будет эквивалентна 95% от ожидаемой стоимости отгружаемой партии, рассчитанной в соответствии с разделом 7, и базирующейся на:
- предполагаемом весе партии концентрата;
- 24% содержания меди в концентрате;
- 10% содержания влаги в концентрате;
- 70 гр./СМТ содержания серебра в концентрате;
- ценах на металлы на ЛБМ в среднем за неделю, предшествующую дате выставления предварительного счета Продавца.

11.3. В течение 10 рабочих дней, следующих за датой отгрузки, Продавец пошлет экспресс-почтой Покупателю оригиналы следующих документов:
- предварительный счет Продавца;
- ж.д. реестр, включающий номера ж/д накладных и вес каждого вагона;
- ж.д. накладные;
- Сертификат качества и количества на отгруженную партию концентрата;

11.4. Окончательный платеж.

a) Продавец подготовит окончательный счет, базирующийся на окончательно согласованном весе, определяемом в соответствии с разделом 14, согласованных химических анализах концентрата, в соответствии с разделом 15, и условиями, изложенными в разделе 7 настоящего Контракта.

б) Платеж должен быть выполнен в течение 5 банковских дней Покупателем Продавцу или Продавцом Покупателю в соответствии с окончательным счетом.

11.5. Частичные или полные потери:

a) В случае если какая-либо часть отгруженной партии будет потеряна или повреждена по причине страхового случая после поставки концентрата, но

---

11.2. Provisional payment

a) For each lot in accordance with shipment schedule, Buyer shall make a provisional payment to Seller within 5 banking days from the date of Seller's provisional invoice (to be sent to Buyer by fax);

In the case of delay of the payment within above-mentioned period, Seller shall have the right to exclude the subjected quantity of material from total quantity of the Concentrate to be delivered under this Contract.

b) The provisional payment(s) shall be equivalent to 95% of the estimated net value of each lot to be shipped, calculated in accordance with clause 7. and based on following:
- Provisional weight of the Concentrate;
- Copper content in the Concentrate at 24%;
- Moisture content in the Concentrate at 10%;
- Silver content in the Concentrate at 70gr/dmt;
- LME weekly average price for metals preceding the date of Seller's provisional invoice.

11.3. Within 10 working days following the date of dispatch, Seller shall forward to Buyer, the originals of the following documents:
- Seller's Provisional Invoice;
- Shipping details including r/w bill numbers and weight of each railway wagon;
- Railway bills;
- Quality and quantity certificate on the dispatched Concentrate;

11.4. Final Payment.

a) Seller shall prepare a Final Invoice based on final weights as determined under Clause 14., the agreed assays as determined under Clause 15., and the terms provided in Clause 7. hereof.

b) Payment shall be made within 5 banking days by Buyer to Seller in accordance with the Final Invoice or by Seller to Buyer in accordance with Payment Instruction.

11.5. Partial and Total Loss.

a) Should any part of a dispatched lot be lost or damaged due to insured perils after delivery of the concentrates but before weighing, sampling and

5




до определения веса и влажности и отбора проб на заводе-получателе, то окончательные взаиморасчеты будут выполнены, как только будут известны все необходимые детали, базирующиеся на оригиналах ж/д накладных и согласованных результатах химических анализов, выполненных в соответствии с разделом 15., на уцелевшую часть отгруженной партии в соответствии с условиями настоящего Контракта.

б) В случае если произойдет полная потеря концентрата или полное его загрязнение после поставки, окончательный платеж должен быть выполнен, как если бы партия была поставлена без потерь и загрязнения. Оплачиваемая сумма будет базироваться на весе, указанном в ж/д накладных, предварительных химических анализах Продавца и условиях раздела 7. настоящего Контракта.

## 12. ПРАВО СОБСТВЕННОСТИ И РИСКИ

12.1. Право собственности на Концентрат переходит от Продавца к Покупателю после осуществления Покупателем предварительного платежа, в соответствии с разделом 11.2. настоящего Контракта.

12.2. Все риски переходят от Продавца к Покупателю во время пересечения Монголо-Китайской границы ж/д вагонами с концентратом.

## 13. СТРАХОВАНИЕ

Страхование до пункта поставки в соответствии с п. 5.1 настоящего Контракта находится в ответственности Продавца, а после пункта поставки – в ответственности Покупателя.

## 14. ВЗВЕШИВАНИЕ, ОТБОР ПРОБ И ОПРЕДЕЛЕНИЕ ВЛАЖНОСТИ

14.1. Взвешивание и определение влажности производятся на складе Продавца согласно установленной международной практике под контролем одной из нейтральных организаций: «Alex Stewart (Assayers) Ltd.» и «Alfred H. Knight Ltd.» в соотношении 50% на 50%.

14.2. Каждая партия концентрата взвешивается и делится на лоты приблизительно по 500 ВМТ. Для определения влажности из каждого лота отбирается проба. Отбор проб и определение влажности производятся согласно установленной международной практике.

14.3. Окончательный сухой вес концентрата определяется как результат взвешивания и определения влажности на складе Продавца, полученный нейтральной организацией, и служит

moisture determination on receiving smelter can be made, then final settlement shall be made as soon as all the necessary details are available, based on the original rail waybill weights and the agreed assays as determined under Clause 15. on the remaining part of the dispatched lot, and otherwise in accordance with the terms of this Contract.

b) Should there be a complete loss or total contamination after delivery of the Concentrates, then final payment shall be made as if the dispatched Concentrates have been delivered. The amount payable shall be calculated based on the railway bill weights, Seller's provisional assays and the terms provided in Clause 7. hereof.

## 12. TITLE AND RISK

12.1. Title to the Concentrate shall pass from Seller to Buyer upon payment by Buyer of the Payment Advance in accordance with Clause 11.2.

12.2. Risk shall pass to the Buyer at the time when rail cars with the Concentrates cross Mongolian/Chinese (Russian) border.

## 13. INSURANCE

Insurance up to the point of delivery in accordance with Clause 5.1. of this Contract shall be the responsibility of the Seller. Insurance after the point of delivery shall be the responsibility of the Buyer.

## 14. WEIGHING, SAMPLING AND DETERMINATION OF MOISTURE

14.1. Weighing and moisture determination shall be made at Seller's warehouse according to established international practice under the control of one of the controlling organizations "Alex Stewart (Assayers) Ltd" and "Alfred H. Knight Ltd" on 50-50 basis.

14.2. Weighing and determination of moisture of the Concentrate shall be carried out in lots of approximately 500 WMT according to standard international practice. Each lot shall comprise a separate and complete delivery for the purpose of this Contract.

14.3. The final dry weight of the Concentrate will be determined as the results of weighing and moisture determination at Seller's warehouse determined by controlling organization and shall be final for settlement

6





основой для окончательных взаиморасчетов между Сторонами.

14.4. В работе по взвешиванию и определению влажности на складе Продавца может участвовать представитель Покупателя за счет Покупателя.

14.5. Оплата услуг нейтральной организации по взвешиванию и определению влажности на складе Продавца производится Продавцом . 50:50

### 15. ХИМИЧЕСКИЙ АНАЛИЗ

15.1. На складе Продавца каждая партия концентрата делится на лоты приблизительно по 500 ВМТ . Для химического анализа концентрата из каждого лота отбирается проба согласно установленной международной практике одной из нейтральных организаций "Alex Steward ( Assayers ) Ltd" и Alfred H. Knoght Ltd " в соотношении 50% на 50%.

.

Адресса лаброториев следует :
**Alfred H. Knight International Ltd.**

Eccleston Grange
Prescot Road, St,Helens
Merseyside WA10 2BQ
UK or

**Alex Stewart (Assayers) LTD.**
Caddik Road
Knowsley Industrial Estate
Merseyside L34 9ER   UK

15.2 Каждая проба концентрата делится на 4 (четыре) равных частей: две части для Продавца; две части (одна –для Покупателя и одни для Конрольную организацию соответствуюшим образом упакованы и опечатаны и резервируются для возможного арбитражного анализа.

15.3. Результаты которых должны представлять собой процентное содержание в чистом сухом весе: меди и мышьяка - с точностью до двух знаков после целого числа и серебра - в виде содержания в граммах без десятых для каждой сухой метрической тонны, произведенного нейтральной организацией на складе Продавца, являются окончательными и служат основной для окончательных взаиморасчётов между Сторонами.

15.4 Результаты химического анализа передаются нейтральной организацией Продавцу и Покупателю

and binding for both Parties.

14.4. A Buyer's representative may take part in such weighing and moisture determination at Seller's warehouse at Buyer's expense.

14.5. The cost for such service of controlling organization on weighing and moisture determination at the Seller's warehouse shall be wholly paid by Seller .

### 15. ASSAYS

15.1. Sampling for assay of the Concentrate shall be carried out in lots of approximately 500 WMT at seller's warehouse according to established international practice by one of the controlling organization " Alex Steward ( Assayers ) Ltd" and  Alfred H. Knight Ltd "on 50-50 basis

Detail Lab address is as follows ;
 **Alfred H. Knight International Ltd.**

Eccleston Grange
Prescot Road, St,Helens
Merseyside WA10 2BQ
UK or

**Alex Stewart (Assayers) LTD.**
Caddik Road
Knowsley Industrial Estate
Merseyside L34 9ER   UK

15.2 The sample for each lot shall be divided into 4 (four) equal portions: two for Seller; two portions to be properly packed and sealed , of which one is to be retained by the Buyer and one by the Controlling Organization as reserve samples for analysis by umpires if required.

15.3 Assay results made by controlling organization at Seller's warehouse shall be be expressed as a percentage of the net dry weight to 2 decimal places in the case of copper and arsenic and as the content in grams in each DMT, no decimal place required, in the case of silver and shall be final for final settlement and binding for both Parties .

15.4 Assay results shall be forwarded by controlling organization to Seller and Buyer by express mail or




срочной почтой или курьером. Датой получения считается дата доставкой срочной почты или дата расписки о получении в случае с курьером.

15.5. В работе по отбору проб для химического анализа концентрата на складе Продавца может участвовать представитель Покупателя за счёт Покупателя.

15.6. Оплата услуг нейтральной организации по химическому анализу производится Покупателем и Продавцом в соотношении 50% на 50%.

## 16. ЗАКРЫТИЕ КОНТРАКТА

В течение 15 рабочих дней, считая с даты получения результатов химического анализа по последней партии концентрата по настоящему Контракту, когда известны окончательные цены Стороны составляют протокол закрытия Контракта и производят окончательные взаиморасчеты в течение 5 банковских дней, считая с даты подписания обеими Сторонами указанного Протокола.

## 17. ФОРС-МАЖОР

17.1 В случае чрезвычайных обстоятельств, таких как война, революция, стихийные бедствия, наводнения, землетрясения, пожары, взрывы, забастовки, локауты, вмешательство профсоюзов, акты Правительств или Правительственных агентов, блокирование железных дорог, блокирование железнодорожных перевозок по причине механических повреждений, ограничение или прекращение подачи электричества или других причин, выходящих за рамки возможного контроля со стороны Продавца или Покупателя (любые такие причины будут называться «Форс-Мажор»), приводящих к невозможности надлежащего выполнения Сторонами своих обязательств, то Сторона, которая оказывается в состоянии Форс-Мажор, может приостановить поставки или получение концентрата, в письменном виде уведомив другую Сторону в течение 10 рабочих дней о деталях произошедшего.

Уведомление должно быть заверено подписью и печатью местной Торгово-Промышленной Палаты или аналогичной Правительственной организации.

17.2 В случае если обстоятельства Форс-Мажор длятся более 3 месяцев, то Сторона, которая не находится в условиях Форс-Мажор, будет освобождена от своих обязательств, письменно уведомив другую Сторону об аннулировании количества концентрата, который должен был быть

courier. Seller's receipt date of assay results shall be the date of delivery by express mail.

15.5 A Buyer's representative may take part in sampling at Seller's warehouse at Buyer's expense.

15.6 The cost for such service of controlling organization on assaying should be born equally between Buyer and Seller. /on 50-50 basis/

## 16. FINALIZATION OF THE CONTRACT

Within 15 working days from the date of Seller's receipt of assay results for last lot of the Concentrates under this Contract when the final price is known, Parties shall sign an offset agreement and make final settlements within 5 banking days from the date of signing above mentioned offset Protocol.

## 17. FORCE MAJEURE

17.1. In the event of any war, revolution, act of God, flood, storm, earthquake, fire, explosion, strike, lockout, combination of workmen, interference of Trade Unions, act of Government or Government appointed agents, obstruction or blockage of railway or delays en route whether due to mechanical fault or to action of the elements, or restriction or termination of submission of an electricity, in the event of any other disabling causes whatsoever beyond the reasonable control of Seller or Buyer (any such cause being hereinafter called "Force Majeure") preventing or hindering Seller or Buyer from performing its obligations in this Contract, the Party affected by a Force Majeure may suspend delivering or accepting the Concentrate hereunder by giving prompt written notice to the other Party of the details of such cause within 10 working days.

Said declaration to be countersigned and stamped by a local Chamber of Commerce or similar Government organisation.

17.2. Should the duration of Force Majeure exceed three (3) months, the Party who did not declare Force Majeure shall be entitled, by notice in writing to the other Party, to cancel the tonnage of the Concentrate, which would have been delivered during the period of Force Majeure.



8



поставлен в течение периода Форс Мажор.

17.3. В случае продолжения обстоятельств Форс-Мажор более 12 месяцев, любая из Сторон имеет право прекратить действие настоящего Контракта соответствующим письменным уведомлением другой Стороне.

17.4. Сторона, декларировавшая Форс-Мажор, должна дать незамедлительное уведомление другой Стороне по выходу из состояния Форс-Мажор.

17.5. В случае декларации Форс-Мажор Продавцом выплаченные авансовые платежи Продавцу за неотгруженный концентрат должны быть незамедлительно возвращены Продавцом Покупателю.

17.6 Стороны договорилось о том, что не имеет право обьявить Форс-мажор для концентратов, уже загруженных на железнодорожные вагоны для отправки.

17.7. Обстоятельства Форс-Мажор не освобождают ни одну из Сторон от окончательных взаиморасчетов за предыдущие поставки.

### 18. ТАРИФЫ И ПОШЛИНЫ

18.1. Все налоги и пошлины, действующие или которые могут возникнуть в будущем на территории Монголии, под действие которых подпадают концентрат или документы, связанные с настоящим Контрактом, будут оплачены Продавцом.

18.2. Все налоги и пошлины, действующие или которые могут возникнуть в будущем вне Монголии под действие которых подпадают концентрат или документы, связанные с настоящим Контрактом, будут оплачены Покупателем.

### 19. ЛИЦЕНЗИИ

19.1. Продавец гарантирует своевременное получение всех необходимых экспортных лицензий, если требуется.

19.2. Покупатель гарантирует своевременное получение всех необходимых импортных лицензий, если требуется.

### 20. ОСОБАЯ ОГОВОРКА

В случае если цены на металлы, определяемые в соответствии с разделом 8. настоящего Контракта, перестают существовать, публиковаться и/или перестают быть репрезентативной базой для главных продаж медного концентрата в международной торговле , Стороны проведут немедленные консультации по согласованию базиса

17.3. Should the duration of Force Majeure exceed twelve (12) months, either Party shall have the right to terminate this Contract by notice in writing to the other Party.

17.4. The Party declaring Force Majeure shall give prompt written notice to the other Party once the cause of such Force Majeure has been resolved.

17.5. In the event that Seller declares Force Majeure, then any outstanding Payment Advance, at Buyer's option, shall be immediately repaid by Seller to Buyer.

17.6 The parties agree that in respect of concentrates which have already been loaded on the railway wagons for dispatch Buyer may not declare Force Majeure.

17.7. Force Majeure shall not free both Parties from final settlement and binding on previous deliveries.

### 18. TARIFFS AND DUTIES

18.1. All tariffs and duties whether currently existing or imposed after the date of this Contract, within jurisdiction on concentrate and commercial documents relating thereto, in the territory of Mongolia shall be borne by Seller.

18.2. All tariffs or duties whether currently existing or imposed after the date of this Contract, within jurisdiction on concentrate and commercial documents relating thereto, outside of Mongolia shall be borne by Buyer.

### 19. LICENCES

19.1. Seller guarantees the timely issuance of any export license(s), if required.

19.2. Buyer guarantees the timely issuance of any import license(s), if required.

### 20. SPECIAL CLAUSE

In the event of the metal prices specified in Clause 8. of this Contract, ceasing to exist, ceasing to be published and/or ceasing to be the representative basis on which the majority of sales of copper Concentrate in the international trade are made, both Buyer and Seller will immediately consult together to agree on a pricing basis acceptable to both parties in order to secure the continuance of this Contract.

9





для определения цены, приемлемого для обеих Сторон, для обеспечения дальнейшего действия настоящего Контракта.

### 21. ПЕРЕУСТУПКА ПРАВ И ОБЯЗАТЕЛЬСТВ
Настоящий Контракт и все его положения являются обязательными для преемников Сторон. Ни одна из Сторон не будет передавать свои обязательства третьей стороне без письменного согласия другой Стороны, а данное согласие не должно отвергаться без весомых мотивов.

### 22. АРБИТРАЖ
Любой спор, разногласие или претензия в связи с настоящим Контрактом, либо его нарушением, прекращением или недействительностью будут окончательно разрешены путем арбитража в соответствии с Регламентом Лондонской биржи металлов.

Решение данного арбитража будет окончательным для обеих Сторон и может быть исполнено в любом суде, имеющем юридические полномочия.

Место проведения арбитража – г. Лондон, Великобритания.

Языком арбитражного разбирательства будет английский язык.

### 23. ПРИМЕНИМОЕ ПРАВО
Настоящий Контракт регулируется нормами права Англии.

### 24. ИЗВЕЩЕНИЯ И ПЕРЕПИСКА
24.1. Все извещения и переписка с Продавцом, в связи с настоящим Контрактом должны направляться:

**JV "Erdenet"**
Erdenet City
Mongolia

Tel: +976 1352 73791
Fax: +976 1352 23002

24.2. Все извещения и переписка с Покупателем в связи с настоящим Контрактом должны направляться:

### 21. SUCCESSORS AND ASSIGNS
This Contract and all its provisions shall be binding upon and ensure to the benefit of the successors and assigns of the respective Parties hereto. Neither Party shall assign this Contract without the written consent of the other Party, such consent not to be unreasonably withheld.

### 22. ARBITRATION
All disputes arising in connection with this Contract which cannot be settled by a mutual accord between Buyer and Seller shall be settled by arbitration to be conducted in accordance with the rules and regulations of the London Metal Exchange.

The award of such arbitration shall be finally binding upon the Parties and may be entered in any court having jurisdiction.
The place of arbitration shall be London, Great Britain.

The language to be used in the arbitral proceedings shall be English language.

### 23. GOVERNING LAW
This Contract shall be governed by the laws of England.

### 24. NOTICES AND CORRESPONDENCE
24.1. All notices and correspondence to Seller in connection with this Contract shall be sent to:

**JV "Erdenet"**
Erdenet City
Mongolia

Tel: +976 1352 73791
Fax: +976 1352 23002

24.2. All notices and correspondence to Buyer in connection with this Contract shall be sent to:



10



**LIDEX HOLDINGS LTD**

Room B,13/F
Sun Ying Industrial Centre,
2-9 Tin Wan Close,
Tin Wan, Hong Kong

Tell ;  + (852) 2868 1888
Fax ; + (822)  2179 9599

24.3. Все извещения или запросы по настоящему Контракту будут иметь силу, если они будут сделаны в письменной форме и посланы по факсу, заказными письмами, по кабельной связи или доставлены в руки Стороны, которой было направлено извещение по приведенному выше адресу. Об изменении адресов Стороны немедленно извещают друг друга.

24.4. Любые такие извещения предполагают, что они получены в течение 24 часов, считая с даты отправки (в случае факса или кабельной связи), в течение 20 дней, считая с даты отправки (в случае почтового отправления), и в момент доставки (в случае передачи в руки).

## 25. ПРЕДЫДУЩИЕ ДОГОВОРЕННОСТИ

Настоящий Контракт заключает в себе все договоренности между Сторонами и заменяет все предшествующие договоренности и соглашения, как в письменной, так и в устной форме, касающиеся предмета и условий настоящего Контракта.

## 26. КОНФИДЕНЦИАЛЬНОСТЬ

Ни одна из Сторон не имеет право разглашать предмет и условия настоящего Контракта третьей стороне без письменного согласия другой Стороны.

## 27. ИЗМЕНЕНИЕ СИТУАЦИИ

В случае любого фактического или потенциального изменения в организации, руководства Продавца, включая, но не ограничиваясь сменой мажоритарного собственника, Приватизацией или аналогичным процессом Продавца, данный контракт не будет изменен никоим образом и будет сохранять полную юридическую силу.

---

**LIDEX HOLDINGS LTD**

Room B,13/F
Sun Ying Industrial Centre,
2-9 Tin Wan Close,
Tin Wan, Hong Kong

Tell ;  + (852) 2868 1888
Fax ; + (822)  2179 9599

24.3. Any .notice permitted or required to be given hereunder shall be validly given if in writing and sent by fax, prepaid registered first class mail, cable or delivered by hand to the Party to which the notice is directed at the above address or, in either case, such other address as may be notified immediately by the relevant Party to the other.

24.4. Any such notice shall be deemed to have been given in 24 hours after despatch (if by fax or cable), in 20 days after posting (if by mail) or at the time of delivery (if by hand).

## 25. PRIOR AGREEMENTS

This Contract shall constitute the entire agreement between the Parties hereto and supersedes all prior agreements and understandings, whether oral or written, in relation to the subject matter hereof.

## 26. CONFIDENTIALITY

The Parties have agreed not to disclose details of the present  Contract to third party without prior written consent of the other Party.

## 27. CHANGE OF EVENT

In the event of any actual or prospective change in the organization, control or management of the Seller, including without limitation, a change of the majority shareholding or privatization or equivalent process of the Seller, this Contract will not be changed or modified and shall continue in full force.



11

**28. ПРОЧИЕ УСЛОВИЯ**

Настоящий Контракт подписан в 2 оригинальных экземплярах. Каждый экземпляр составлен на двух языках - русском и английском: один экземпляр – для Покупателя и один экземпляр – для Продавца, причем оба экземпляра имеют равную юридическую силу.

В случае возникновения спора английская версия будет иметь преимущество.

Подписано:

От имени и по поручению СП «Эрдэнэт»:

Х. Наранхуу,
Генеральный директор

«22» Марта 2007 года

Д.Ганбат
Директор по коммерческим вопросам

«22» Марта 2007 года

От имени и по поручению " Lidex Holdings Ltd"

W. K Yoon
Директор

«22» Mar 2007 года

**28. OTHER TERMS**

This Contract will be signed in 2 copies. Each copy shall be executed in two languages – in Russian and in English: one copy for Seller and one copy for Buyer. Both copies have equal juridical force.

In the event of any dispute or contradiction, the English version shall prevail.

Signed by:

For and on behalf of JV "Erdenet":

Kh. Narankhuu
General Director

March 22, 2007

D.Ganbat
Commercial Director

March 22, 2007

For and on behalf of " Lidex Holdings Ltd "

W. K Yoon
Director

22 Mar, 2007

12