UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

ANY AND ALL SHARES OF 21 EAST 61
STREET APARTMENT CORP., *et al.*,

             Defendants *in rem*.

Case No. 24-cv-2147 (RPK) (JAM)

Oral Argument Requested

**MEMORANDUM OF LAW IN SUPPORT OF SUKHBAATAR BATBOLD'S
MOTION TO INTERVENE PURSUANT TO FEDERAL RULE 24**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 5

    I.     Sukhbaatar Batbold has been one of Mongolia's leading statesmen and public servants for close to four decades. ................................ 5

    II.    Between 2020 and 2023, Mr. Batbold's political opponents orchestrate a global litigation campaign falsely accusing him of corruption. ............................ 6

    III.   The litigation campaign against Mr. Batbold is exposed as a sham, and the lawsuits quickly fall apart one-by-one. .................................. 8

    IV.   The SDNY grants Mr. Batbold discovery from K2 that proves the litigations against him were a sham covertly instigated by his political opponents. ........................................................................ 9

    V.    A Mongolian court holds the allegations against Mr. Batbold are "not true."................................................................................ 11

    VI.   In 2024, the government brings this action premised on the same theory the Mongolian court rejected, and Mr. Batbold attempts to engage with and fully cooperate with the government to resolve this case. ............................ 12

    VII.  The government abandons its ill-fated effort to strike Claimants' demand after Claimants produce reams of discovery establishing their ownership; delays in opposing Claimants' motion to dismiss; and on the day its opposition brief to that motion is due proposes a feckless and futile amended complaint. ............................................... 14

LEGAL STANDARD............................................................................................................ 16

ARGUMENT ........................................................................................................................ 17

    I.     Mr. Batbold is entitled to intervene under Rule 24(a)(2)..................................... 17

        A.    The motion is timely. ............................................................. 18

        B.    Mr. Batbold has material interests in this action.................................... 19

        C.    Mr. Batbold's interests are not adequately represented. ........................... 21

    II.    Mr. Batbold should be permitted to intervene under Rule 24(b)(1). .................... 22

    III.   Rule 24 governs this motion, not Supplemental Rule G....................................... 24

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*,
  2025 WL 2238226 (E.D.N.Y. Aug. 6, 2025)...............................................................17

*ACORN (The New York Ass'n of Cmty. Organizations for Reform Now) v. County of Nassau*,
  270 F.R.D. 123 (E.D.N.Y. 2010) ...........................................................................17

*Agency for Pol'y Coordination on State Prop. v. Batbold*,
  No. 656507/2020 (N.Y. Sup. Ct.) ..........................................................................13

*Agency for Pol'y Coordination on State Prop. v. JPMorgan Chase Bank, N.A.*,
  No. 1:21-mc-178 (S.D.N.Y.) .................................................................................13

*In re Batbold*,
  No. 1:21-mc-218 (S.D.N.Y.) .................................................................................13

*Brennan v. NYC Bd. of Educ.*,
  260 F.3d 123 (2d Cir. 2001)........................................................... 16, 17, 19, 21, 22

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
  2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020) ........................................................16

*Citizens for an Orderly Energy Pol'y v. Suffolk County*, 101 F.R.D. 497
  (E.D.N.Y. 1984)....................................................................................................18

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
  170 F.R.D. 93 (E.D.N.Y. 1996).........................................................................17, 23

*L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of NYC*,
  2018 WL 1782709 (E.D.N.Y. Apr. 12, 2018) ........................................................20

*Martell Strategic Funding, LLC v. Am. Hosp. Acad.*,
  2013 WL 12562179 (S.D.N.Y. Sept. 4, 2013)........................................................18

*Miller v. Silbermann*,
  832 F. Supp. 663 (S.D.N.Y. 1993)......................................................................17, 23

*N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*,
  2015 WL 777248 (E.D.N.Y. Feb. 13, 2015), *R&R adopted*, 2015 WL
  1345814 (E.D.N.Y. Mar. 25, 2015) ................................................................... 22-23

*N.Y. News, Inc. v. Kheel*,
  972 F.2d 482 (2d Cir. 1992)...................................................................................23

*N.Y. Pub. Int. Rsch. Group, Inc. v. Regents of Univ. of State of N.Y.*,
  516 F.2d 350 (2d Cir. 1975)...............................................................................20, 22

*NAACP v. New York*,
    413 U.S. 345 (1973)..................................................................................................18

*In re New York City Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) ....................................................................16, 19, 20, 21

*New York v. United States Dep't of Health & Hum. Servs.*,
    2019 WL 3531960 (S.D.N.Y. Aug. 2, 2019)...........................................................24

*Nunley v. Pioneer Pleasant Vale School District No. 56*,
    149 F. Supp. 2d 1283 (W.D. Okla. 2001)................................................................19

*Oneida Indian Nation of Wis. v. New York*,
    732 F.2d 261 (2d Cir. 1984).....................................................................................20

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
    663 F.2d 371 (2d Cir. 1981)...............................................................................19, 20

*Sackman v. Liggett Group, Inc.*,
    167 F.R.D. 6 (E.D.N.Y. 1996)...........................................................................19, 20

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972).............................................................................................16, 21

*In re Trib. Co. Fraudulent Conv. Litig.*,
    291 F.R.D. 38 (S.D.N.Y. 2013) ...............................................................................18

*Turkmen v. Ashcroft*,
    2010 WL 3398965 (E.D.N.Y. June 30, 2010), *report and recommendation
    adopted,* 2010 WL 3398968 (E.D.N.Y. Aug. 26, 2010)..........................................18

*United States v. 8 Gilcrease Lane, Quincy Fla. 32351*,
    641 F. Supp. 2d 1 (D.D.C. 2009).............................................................................25

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
    743 F. Supp. 3d 204 (D.D.C. 2024)..........................................................................25

*United States v. New York City Hous. Auth.*,
    326 F.R.D. 411 (S.D.N.Y. 2018) ........................................................................17, 23

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank
    Acct. L7N01967*,
    731 F.3d 189 (2d Cir. 2013).....................................................................................22

**Statutes**

18 U.S.C. § 981..............................................................................................................21, 22

18 U.S.C. § 983...................................................................................................................22

18 U.S.C. § 1956............................................................................................................21, 22

**Rules**

Fed. R. Civ. P. 24 .................................................................................16, 17, 19, 23, 25

Fed. R. Civ. P. Supp. R. A ....................................................................................24

Fed. R. Civ. P. Supp. R. G ................................................................................ 24-25

**INTRODUCTION**

In this civil forfeiture action, filed in 2024, the government asks this Court to strip two Manhattan apartments (the "NY Apartments") from their rightful owners, the Claimants in this action. What the government does not tell this Court is that the factual allegations underlying that request originate from a discredited dossier created by the private investigative firm K2 Integrity (the "Kroll Dossier") secretly commissioned by foreign political operatives for a malicious purpose: to destroy the 2021 presidential candidacy of former Prime Minister of Mongolia Sukhbaatar Batbold, the proposed intervenor here.

The operative Complaint, and now the government's proposed amended complaint, also fail to disclose another critical fact: the government's central allegations have been the subject of prior litigations in courts across three continents. The government's pleadings do not mention that a three-judge Mongolian court unanimously ruled in 2022 that the central corruption theory at the heart of the government's case is "not true." And the government does not tell the Court that undersigned counsel for Mr. Batbold has voluntarily produced hundreds of contemporaneous documents, seventeen sworn witness statements, and a judicial ruling demonstrating that this case has no good-faith basis in law or fact—and that the corruption allegations at the heart of this case are simply untrue. As the centerpiece of this case, Mr. Batbold has an obvious and compelling interest in its outcome. Rule 24 intervention exists for a case like this one. *See* Fed. R. Civ. P. 24.

The government's theory is this: Mongolia's former Prime Minister allegedly steered two 2011 copper trading contracts from the Mongolian state-owned Erdenet Mining Corporation ("EMC") to Claimant Hak Seon Kim, Ph.D., and her husband Choo Young Cheong. The Complaint alleges that Dr. Kim and Mr. Cheong then used those proceeds to purchase the NY Apartments as proxies for Mr. Batbold—allegedly in violation of Mongolian law.

That theory did not originate in this case or with federal investigators. It originated years

1

ago in the Kroll Dossier and is now being recycled by the government in this action. K2 had a potent incentive to manufacture its fake dossier. By the terms of its engagement, K2 stands to receive an up-to-$50 million "success fee" in the event the NY Apartments (or other properties) are recovered. K2 is the progenitor of the operative corruption theory at the center of this case and was hired by shadowy foreign figures for the purpose of interfering in foreign democratic elections. And yet, K2 may have a significant financial interest in the outcome of this forfeiture action brought by the United States.

On the merits, the undisputed evidence—seventeen sworn statements and dozens of contemporaneous commercial, government, and judicial documents—establishes that Prime Minister Batbold did not corruptly steer contracts to anyone. The copper trading contracts were lawful and legitimate, awarded in accordance with EMC's own established standards. No Mongolian law was violated. The corruption narrative is, in its entirety, a political fabrication.

Mr. Batbold has defeated these same allegations repeatedly. In November 2020, the Kroll Dossier was deployed as the centerpiece of coordinated civil lawsuits filed against Mr. Batbold around the world purportedly on behalf of EMC and two other entities. These were not legitimate proceedings. They were a weapon. The political operatives who secretly commissioned the Kroll Dossier deliberately timed the filings to generate a media campaign designed to force Mr. Batbold from Mongolia's 2021 presidential race before any court could rule on the merits.

It worked—initially. The media coverage drove Mr. Batbold from the presidential election. But after years of litigation, the cases collapsed entirely. It emerged, in a case that undersigned counsel litigated in the New York Supreme Court, that the entities named as plaintiffs had never authorized the filings made in their names. The global law firm that had appeared as counsel for the named plaintiffs later withdrew from every proceeding. The 2020 lawsuits disintegrated.

To identify who had orchestrated the campaign, the undersigned counsel filed a proceeding in 2022 on behalf of Mr. Batbold in the Southern District of New York under 28 U.S.C. § 1782, seeking discovery from K2. K2 fought that discovery aggressively, refusing even to produce a privilege log. The Honorable Ona T. Wang rejected K2's stonewalling, characterizing its tactics as holding discovery "hostage." The documents the court ultimately compelled K2 to produce confirmed the Kroll Dossier and the 2020 lawsuits were funded in secret by proxies of Mr. Batbold's political opponents.

In 2022, Mr. Batbold brought a defamation action in Mongolia to disprove the corruption allegations in the Kroll Dossier on their merits. A three-judge panel unanimously held that the theory underlying the Dossier—recycled in this action—was "not true." Ex. 50 at 43. Directly in conflict with the allegations in this case, the Mongolian court found specifically that EMC's contracts with Mr. Cheong's company were awarded "in accordance with the standards established by [EMC]"; there was "no evidence" Mr. Batbold had "personally influenced [EMC] to sign the contracts with foreign companies"; and no evidence supported that he "personally gained profits, conspired with others, [or] caused damages to [EMC]." *Id.* at 50. The court ordered a Mongolian news outlet to retract its stories premised on those false allegations.

By 2024, every private lawsuit premised on the Kroll Dossier had been dismissed or withdrawn. Not a single court had accepted the corruption theory. One court expressly held it was false. That should have ended the matter.

In March 2024—weeks before upcoming Mongolian elections in which Mr. Batbold was widely expected to win reelection to his twenty-first year in Parliament—the U.S. government, without any prior notice or warning, filed this action.

Mr. Batbold's counsel contacted the government immediately after the filing. In the

3

meeting that followed, prosecutors acknowledged they had not fully reviewed the public litigation record, including the Section 1782 proceeding in the SDNY, and were unaware that the Mongolian court had ruled in Mr. Batbold's favor. Counsel reasonably assumed the government would dismiss the case once it understood this prior history and that the Complaint could not be reconciled with it.

But the government refused to withdraw the case. Instead, it is litigating an action whose factual foundation is contradicted by hundreds of private emails, official government records, contemporaneous commercial documents, interviews with senior Mongolian government officials and mining executives, seventeen sworn witness statements, and a report from a Harvard-trained expert in Mongolian politics and economics. Even now the government's proposed amended complaint fails to comply with its essential duty of candor, concealing the Kroll Dossier, the Mongolian court's ruling, and the extensive prior litigation record.

Mr. Batbold now moves to intervene in this case to protect his direct, substantial, and legally protectable interests in his reputation, professional opportunities, and avoidance of adverse precedent by opposing the government's motion for leave to amend; moving to dismiss the operative complaint; and moving for summary judgment as a matter of law. He moves to intervene as of right under Rule 24(a)(2), or alternatively, under Rule 24(b)(1). No existing party can adequately represent his interests, which are unique to him. And the government's case turns on a single proposition—that Mr. Batbold committed corruption by steering copper-trading contracts in 2011—which he is uniquely positioned to disprove. Rule 24 exists for precisely this circumstance.

This motion presents an extraordinary issue: whether the government's allegations that a former Prime Minister of a sovereign nation committed crimes halfway around the world over a

decade ago should proceed without ever allowing him to defend himself. The fundamental purpose of Rule 24 intervention does not permit that result. The Court should grant this motion to intervene.

**BACKGROUND**

**I.      Sukhbaatar Batbold has been one of Mongolia's leading statesmen and public servants for close to four decades.**

Sukhbaatar Batbold served as Mongolia's twenty-sixth Prime Minister from 2009 to 2012 and as a member of Mongolia's Parliament from 2004 to 2024—when his party removed him from the 2024 parliamentary slate as a direct result of the government filing this lawsuit. Ex. 1; Ex. 7 ¶ 21. Throughout his career, Mr. Batbold has consistently championed democracy and transparency. As a Member of Parliament, government minister, and Prime Minister, Mr. Batbold long supported Mongolia's "Third Neighbor Policy," which emphasizes ties to the West as Mongolia's "third neighbor" to balance Mongolia's two geographic neighbors Russia and China. Ex. 2 ¶ 22; Ex. 3.

Prior to entering politics, Mr. Batbold was a successful businessman and philanthropist. After earning his MBA from Middlesex University London—one of the first MBAs ever earned by a Mongolian—Mr. Batbold returned home, where he witnessed his country's peaceful transition from communism to a free-market economy. Ex. 2 ¶¶ 49-50; Ex. 4 ¶ 2; Ex. 5 ¶ 8; Ex. 8 ¶ 9. In the 1990s, Mr. Batbold founded a series of successful companies in a variety of industries, including cashmere, tourism, mining, and telecommunications. Ex. 4 ¶¶ 2, 4; Ex. 5 ¶ 8.

In 2000, Mr. Batbold entered public service at the request of the country's leaders. *See* Ex. 2 ¶¶ 50-51; Ex. 6 ¶ 4. Over the next two decades, Mr. Batbold dedicated his career to serving the Mongolian people, becoming a member of Parliament, Minister of Trade and Industry, Minister of Foreign Affairs, and Prime Minister. Ex. 2 ¶ 51; Ex. 7 ¶¶ 4, 6. In each role, Mr. Batbold sought

to promote ties with the West, attract foreign investment, and encourage reform.  Ex. 6 ¶ 9; Ex. 7 ¶ 4.  He introduced Western educational reforms.  Ex. 8.  He balanced pro-business policies with initiatives to ensure equal opportunity, working to subsidize university tuition, close tax loopholes for foreign corporations, and outlaw sex discrimination.  Ex. 8; Ex. 9.

Mr. Batbold also worked tirelessly to prevent corruption from harming Mongolia's fledgling democracy.  With respect to Mongolia's booming mining industry, Mr. Batbold promoted transparency and international corporate governance and anti-corruption standards.  As Prime Minister, he introduced EU transparency, accounting, and governance standards.  Ex. 3.  During his time in public service, Mr. Batbold ceded control of his private enterprises and barred his companies from contracting with the government to avoid any possible conflicts of interest.  Ex. 6 ¶ 18; Ex. 10 ¶ 7.  He even gave up his private interest in a valuable coal mine, returning the mine to the State and allocating shares in the mine to every Mongolian citizen.  Ex. 5 ¶¶ 8-9.

## II.     Between 2020 and 2023, Mr. Batbold's political opponents orchestrate a global litigation campaign falsely accusing him of corruption.

By the end of 2020, Mongolia was facing multiple constitutional crises.  Ex. 2 ¶¶ 83-84; Ex. 11 ¶ 20.  The President then in office was Khaltmaagiin Battulga—a self-described mafia-style boss who has been implicated in corruption, financial misconduct, and even murder.  Ex. 2 ¶ 67; Ex. 12; Ex. 13; *see also* Ex. 2 ¶¶ 74-83; Ex. 14 ¶ 7.  During his tenure, Mr. Battulga attacked judicial and prosecutorial independence.  Ex. 2 ¶¶ 76-83; Ex. 15.  He tried to defy term limits that required him to leave office in 2021.  Ex. 2 ¶ 83; Ex. 16.  He even went so far as to purportedly outlaw the opposition party (Mr. Batbold's) to try to stay in power.  Ex. 2 ¶ 83; Ex. 14 ¶ 7; Ex. 17.

On the eve of Mongolia's critical May 2021 presidential election, Mr. Batbold was considered a leading candidate.  Ex. 11 ¶ 20; Ex. 7 ¶ 21.  He was seen as the type of pro-democracy statesman who could ensure Mongolia's fragile democracy survived Mr. Battulga's attacks.  But

in 2020, Mr. Batbold's campaign faltered after two Mongolian state-owned mining companies, including EMC, and a state agency apparently sued him in Mongolia, falsely alleging he had engaged in corruption as Prime Minister. Ex. 18. Within days of that lawsuit, a coordinated campaign of identical lawsuits commenced in jurisdictions around the globe, including in London, Jersey, Hong Kong, Singapore, and here in New York. Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23. The plaintiffs later filed another identical lawsuit in the British Virgin Islands. Ex. 52.

These lawsuits were all premised on the same theory the government later adopted in this case: that Mr. Batbold improperly diverted contracts from EMC to companies controlled by supposed proxies of Mr. Batbold—including Choo Young Cheong and his wife, Claimant Dr. Hak Seon Kim. The lawsuits alleged that these "proxies" used the proceeds from those contracts to purchase properties around the world for Mr. Batbold's benefit, including the NY Apartments. Each lawsuit relied on the Kroll Dossier, which was littered with flimsy, conclusory, and circumstantial assertions and misleading evidence purportedly supporting the plaintiffs' claims against Mr. Batbold. Ex. 24; Ex. 61.[1] The civil suit in Mongolia was particularly suspicious. It was filed under seal on behalf of the three state-owned "plaintiffs" by a low-level municipal prosecutor who did not even have the authority to initiate a civil suit. Ex. 25 ¶¶ 5, 8.

The lawsuits were designed to (and did) unleash a barrage of negative publicity against Mr. Batbold in the heat of campaign season. Several of the cases sought temporary restraining and asset freezing orders *ex parte*—before Mr. Batbold had any opportunity to defend himself. Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23. When courts issued these *ex parte* orders based on the one-sided and misleading record, Mr. Batbold's opponents (predictably) used them against him in Mongolia.

---

[1] As one example, the plaintiffs in the New York Supreme Court case attached an untranslated Mongolian-language-only letter from an EMC official as purported evidence of Mr. Batbold's wrongdoing. Yet once translated, the letter was *exculpatory*: it confirmed that the contracts between EMC and Mr. Cheong and Dr. Kim's companies were completed without issue and pursuant to industry standard terms. *Compare* Ex. 55 at 3, *with* Ex. 55 at 6.

Waves of news reports about rulings from the "Supreme Court" of New York and the "High Court" of London swept Mongolian airwaves and captivated the public—with Mr. Batbold's opponents telling Mongolians that these prestigious foreign courts had *already* determined that Mr. Batbold was corrupt.[2] Ex. 2 ¶ 84; Ex. 14 ¶ 9. Mr. Battulga himself made these cases and allegations against Mr. Batbold a central focus of his public statements during election season. Ex. 14 ¶¶ 7, 9.

The attacks on Mr. Batbold were successful. Although Mr. Batbold later defeated every case filed against him after years of litigation, the quick-hitting filings and press assault eliminated any opportunity he had to run for high office. Ex. 11 ¶ 20.

**III.  The litigation campaign against Mr. Batbold is exposed as a sham, and the lawsuits quickly fall apart one-by-one.**

The cases against Mr. Batbold started to collapse within days after he got the opportunity to defend himself. Right from the start, it became apparent that none of the three named "plaintiffs" in these cases ever authorized any lawsuits against Mr. Batbold—*i.e.*, the cases were a sham. In proceedings before the New York Supreme Court on Mr. Batbold's motion to vacate one of the *ex parte* orders entered against him, all three of the "plaintiffs"—including EMC—confirmed in writing that they never authorized any case against him. Ex. 27; Ex. 28; Ex. 29. When faced with the fact that its purported "clients" never approved the cases it brought against Mr. Batbold, King & Spalding—global counsel for the purported plaintiffs—shifted its story. Without any evidence, it claimed to represent not the three named plaintiffs in whose names suit was brought, but rather the entire "State of Mongolia." Ex. 30 at 29:6-13. In response, Justice Barry Ostrager excoriated plaintiffs' counsel, stating: "I understand that you're representing that but you don't come into the

---

[2] Certain judges took a closer look at the *ex parte* filings. In Hong Kong, for example, a judge initially denied the *ex parte* asset freezing injunction application, finding that the allegations that Mr. Cheong and Dr. Kim "are the puppet of the former prime minister" based on "certain email communication and [] social occasion" were "speculati[ve]." Ex. 26 at 2-3. The case was later transferred to a different judge who granted the *ex parte* application.

courthouse and file several feet of documents before some judge on the day before Thanksgiving acting on behalf of the State of Mongolia without even demonstrating to the Court that the State of Mongolia has authorized you to act on their behalf." *Id.* at 27:18-24. Justice Ostrager vacated an *ex parte* temporary restraining order that a duty judge had entered right before Thanksgiving and scheduled an evidentiary hearing. Ex. 31. Rather than face further judicial scrutiny of the sham litigation, King & Spalding promptly dismissed the case. Ex. 32.

After the New York Supreme Court case concluded, King & Spalding's story shifted again. Rather than claim it represented the entire Mongolian state, it next claimed that the Mongolian Office of the Prosecutor General ("OPG") was its client. Ex. 33. Mr. Batbold debunked that claim, too. The Deputy Prosecutor General rejected King & Spalding's claim, stating in writing that the OPG had *never* authorized the cases against Mr. Batbold. Ex. 34; *see also* Ex. 59. The Deputy Prosecutor General then fired the firm and directed it to terminate all cases against Mr. Batbold. *Id.* After months of correspondence between Mr. Batbold's counsel and King & Spalding, the firm finally withdrew from the global litigations against Mr. Batbold. *See, e.g.*, Ex. 35; Ex. 36; Ex. 49 ¶ 2; Ex. 63 at 5; Ex. 64. But as a parting shot, the firm defied the directive of its latest purported "client" and did not dismiss the cases against Mr. Batbold, requiring him instead to undertake the expense of filing applications around the world to have the cases thrown out—all of which were granted.

**IV.** **The SDNY grants Mr. Batbold discovery from K2 that proves the litigations against him were a sham covertly instigated by his political opponents.**

In 2021, Mr. Batbold filed proceedings under 28 U.S.C. § 1782 against K2 in the SDNY seeking to unmask the identity of the actors behind the litigation campaign against him. Ex. 37. Judge Ona T. Wang granted his petition, and Judge Ronnie Abrams affirmed. Ex. 38; Ex. 39. After Judge Wang granted Mr. Batbold's subsequent motion to compel K2 to produce discovery,

Ex. 40—noting along the way that K2 was holding "pieces [of discovery] hostage," Ex. 41 at 37:18-22—K2 produced a privilege log and other documents, including its engagement letters, Ex. 42.

K2's compelled production undermined the entire litigation effort against Mr. Batbold. It revealed that the investigative firm had not been retained by any of the three "plaintiffs" or the Mongolian state, as King & Spalding had claimed. Rather, discovery showed that K2 had been secretly engaged and instructed by two known associates of then-President Battulga of Mongolia. Ex. 42 at 13 (Otgonjargal Moyle & Chuluunkhuu Ganbat); Ex. 45 at 2 (noting association between Moyle, Ganbat, and Battulga); Ex. 58. K2's privilege log revealed *hundreds* of emails between the firm and those individuals as they developed a coordinated campaign to destroy Mr. Batbold's public service career. Ex. 42; Ex. 43; Ex. 44. Discovery also showed that K2 was not a neutral investigator as it had told courts around the world in *ex parte* submissions. K2 secretly had been promised a massive financial stake in the accusations it peddled—entitling it to up to $50 million if the lawsuits against Mr. Batbold succeeded. Ex. 60 at 8.

By 2023, once Mr. Batbold was finally able to present his findings around the world, he won or secured dismissal of each suit filed against him. Ex. 46; Ex. 47; Ex. 48; Ex. 49; Ex. 53; Ex. 54; Ex. 57. He forced King & Spalding to withdraw from the proceedings. Ex. 35; Ex. 36. And he proved that Jules Kroll and K2 had misled courts around the world. The final case to conclude was in the Royal Court of Jersey, which discharged asset freezing injunctions and dismissed the action on jurisdictional grounds. Ex. 49. The Court emphasized the "extensive" defense record and left open the possibility of damages for the plaintiffs' lack of "full and frank disclosure" in bringing the originally fraudulent *ex parte* application. *Id.* ¶ 3. None of the cases brought against Mr. Batbold was ever re-filed and none of the dismissals was appealed.

**V.      A Mongolian court holds the allegations against Mr. Batbold are "not true."**

Alongside Mr. Batbold's defense of the lawsuits against him, he took legal action of his own to defend his reputation.  In 2022, Mr. Batbold filed a defamation action in Mongolia against the three purported plaintiffs in the civil litigation against him—including EMC—and a media company, Blue News LLC, that published stories repeating the false corruption allegations.  Blue News had reported that Mr. Batbold had "exerted influence" on EMC so that it would "enter[] into contracts with designated companies" for Mr. Batbold's benefit—*i.e.*, the same core allegations underpinning the government's present forfeiture action.  Ex. 50 at 5.  According to Blue News, Mr. Batbold had caused EMC "to enter into valuable contracts for [the] sale of minerals with three companies" "controlled and/or substantially influenced by" Mr. Cheong and Dr. Kim.  *Id.* at 7.

Mr. Batbold prevailed on the merits in a full and fair adversarial proceeding in Mongolia, presided over by a three-judge panel, in which all parties (including EMC itself) were represented and had the opportunity to present evidence.  *Id.* at 1.  The case resulted in a thorough written opinion that unanimously granted Mr. Batbold relief, finding the corruption allegations were "not true."  *Id.* at 43.  The Mongolian court specifically held that the contracts between EMC and Mr. Cheong's companies were made "in accordance with the standards established by [EMC]."  *Id*. at 41.  It found "no evidence" to support statements that "Batbold had personally influenced [EMC] to sign the contracts with foreign companies" and that there was also "no evidence" that Mr. Batbold "personally gained profits, conspired with others, and had caused damages to [EMC.]"  *Id.* The Court ordered Blue News to delete the stories.  *Id.* at 50.

**VI.** **In 2024, the government brings this action premised on the same theory the Mongolian court rejected, and Mr. Batbold attempts to engage with and fully cooperate with the government to resolve this case.**

By mid-2023, the cases against Mr. Batbold had ended. He had prevailed. With litigation behind him, Mr. Batbold turned his focus back to his public service and critical national elections in June 2024. His new focus would be short lived.

In March 2024, the government filed this case, adopting the discredited narrative in the Kroll Dossier—a corruption theory identical to that which the Mongolian court rejected in 2023. Like the 2020 lawsuits, the Complaint alleged that Mr. Batbold steered EMC copper contracts to "proxies" who in turn purchased the NY Apartments as kickbacks. The NY Apartments were the exact same properties that had been the subject of the New York Supreme Court proceedings filed against Mr. Batbold four years ago—the case King & Spalding had withdrawn rather than face an evidentiary hearing on its allegations. With its filing, the government issued a prominent press release that revived public attention on the long-since-debunked corruption allegations against Mr. Batbold. Ex. 51. As in 2020, the government's March 2024 filing triggered a media onslaught in Mongolia against Mr. Batbold. Ex. 7 ¶ 21. His opponents leveraged the government's suit for maximum political advantage. And his party was forced reluctantly to remove him from its 2024 parliamentary slate. Ex. 11 ¶ 21.

After seeing news of the filing, Mr. Batbold diligently took action. His counsel contacted the EDNY USAO. Crain Decl. ¶ 14. Counsel informed EDNY USAO that the filing, if not withdrawn and corrected, would likely interfere with Mr. Batbold's parliamentary candidacy and the integrity of the upcoming Mongolian election—just as occurred in the 2021 presidential election. *Id.* Mr. Batbold's counsel told the government about the prior successful global litigation campaign and directed them to the hundreds of documents that had been filed publicly in those cases. *Id.* ¶¶ 14-15. In response, government prosecutors acknowledged they had not reviewed

the full prior public litigation record—even though hundreds of directly relevant filings, including Mr. Batbold's successful litigation against K2 and the public record that the Kroll Dossier had been created at the behest of Battulga, had been sitting on the public docket for years in multiple New York state and federal proceedings. Crain Decl. ¶ 14.[3]

During the course of the next year and a half, Mr. Batbold's counsel continued to engage with the government. Crain Decl. ¶¶ 14-21. In the weeks immediately following the filing of the Complaint, counsel for Mr. Batbold met with the EDNY USAO in Brooklyn, presenting a 128-slide presentation detailing Mr. Batbold's victories around the world and the publicly available evidence disproving the same theory of corruption set forth in the Complaint. *Id.* ¶ 15. The government never responded substantively to this submission. *Id.* ¶ 17.

Mr. Batbold's counsel even traveled to Mongolia to conduct an extensive investigation to identify for the government the witness statements and contemporaneous documents in Mongolia that should have been a part of any prosecutorial diligence effort. *Id.* ¶ 18. Mr. Batbold's counsel interviewed over 40 witnesses from government, industry, and academia—including the percipient witnesses on the ground in Mongolia in 2009-2012 who had direct participation in and knowledge of the material events; secured 17 sworn declarations; reviewed over 10,000 documents, including nonpublic EMC contracts and auditing materials; and retained a Harvard-trained economist and expert in Mongolian politics. *Id.* ¶¶ 18-19. Mr. Batbold and his counsel presented this evidence to the government in a 276-slide presentation in November 2024, producing over 150 documents totaling nearly 3,000 pages. *Id.* ¶ 19.

---

[3] *In re Batbold*, No. 1:21-mc-218 (S.D.N.Y.); *Agency for Pol'y Coordination on State Prop. v. JPMorgan Chase Bank, N.A.*, No. 1:21-mc-178 (S.D.N.Y.); *Agency for Pol'y Coordination on State Prop. v. Batbold*, No. 656507/2020 (N.Y. Sup. Ct.).

Over two years, Mr. Batbold presented the government conclusive evidence of his innocence and identified multiple obvious and material misstatements the government had made in the original Complaint. Crain Decl. ¶¶ 14-21. As one example, the Complaint had alleged that Mr. Cheong had no "background or expertise in commodities trading or mining." Compl. ¶ 22. That allegation was a lynchpin of the government's claim that Mr. Cheong's company Catrison could not have possibly procured copper-trading contracts from EMC without then-Prime Minister Batbold's corrupt interference. Compl. ¶¶ 21–23. But that allegation was an outright and material falsehood. Mr. Cheong had *decades* of experience in commodities trading and mining as Samsung's lead representative in Mongolia—including working directly with EMC on Samsung's behalf. *See* Ex. 65 ¶ 11, Ex. 5 ¶¶ 9-11

**VII. The government abandons its ill-fated effort to strike Claimants' demand after Claimants produce reams of discovery establishing their ownership; delays in opposing Claimants' motion to dismiss; and on the day its opposition brief to that motion is due proposes a feckless and futile amended complaint.**

In June 2024, the entities that own the NY Apartments and their ultimate beneficial owner Dr. Kim ("Claimants"), filed a verified claim to the NY Apartments. ECF No. 10. Between June 14, 2024 and September 10, 2025, the government served dozens of special interrogatories on Claimants to determine whether they had standing to assert ownership interests over the NY Apartments. *See* ECF Nos. 21, 41. During that time, the government repeatedly contended Claimants lacked standing and that it intended to move to strike their claim. ECF Nos. 19, 22, 26.

Over many months, Claimants provided substantial discovery. *See* ECF Nos. 21, 41 (summarizing discovery produced). Following that discovery, the government abruptly about-faced. It told the Court that it would now *not* move to strike any claimant for lack of standing— effectively conceding the robustness of the evidence Claimants had produced. ECF No. 41.

On December 19, 2025, Claimants moved to dismiss. ECF Nos. 46, 47. The government's

deadline to amend the Complaint as of right was January 9, 2026.  *See* Fed. R. Civ. P. 15(a)(1)(B).  The government did not amend but rather sought two lengthy adjournments, totaling over eight weeks, to respond to the motion.  In its second extension request, the government requested a six-week adjournment to "consult[] its own Mongolian law expert to evaluate and respond to Claimants' legal arguments" and because the government was experiencing "delays in obtaining source materials from Mongolian authorities . . . ."  ECF No. 88.

On April 2, 2026—the evening the government's opposition brief was due—the government instead requested a pre-motion conference to move for leave to file a Proposed First Amended Complaint ("PFAC"), which it attached as an exhibit.  ECF. Nos. 49, 49-1.  The PFAC does not materially change the allegations in the original complaint.  It provides no new factual allegations concerning the corruption it (falsely) alleges Mr. Batbold engaged in in 2011.  Instead, the Complaint abandons the materially false allegation that Mr. Cheong lacked "background or expertise in commodities trading or mining"—a belated acknowledgment that the original Complaint was filed at best with negligent or reckless disregard of the truth.  Ex. 66 ¶ 22 (redline comparison).  But the PFAC's core theory remains the same: Mr. Batbold as Prime Minister "had effective control of the country's resources," PFAC ¶ 18, and that Catrison could only have procured its 2011 copper contracts from EMC if Prime Minister Batbold had engaged in corruption.  *See, e.g.*, PFAC ¶¶ 21, 23.

The PFAC continues to materially misstate the facts.  It does not disclose to this Court that the theory underlying the government's claims originated from the Kroll Dossier.  It does not disclose that K2 Integrity, the firm that authored the Dossier, was promised up to $50 million if lawsuits against Mr. Batbold succeeded—giving K2 a massive financial stake in manufacturing evidence of wrongdoing.  It does not disclose that Mr. Batbold defeated every lawsuit filed against

him on these same allegations.  It does not disclose that a Mongolian court, after full adversarial proceedings in which EMC participated, unanimously held the corruption allegations were "not true" and found "no evidence" that then-Prime Minister Batbold influenced EMC's contracting. And it does not disclose that over the past two years, Mr. Batbold has produced to the government seventeen sworn witness statements—including from the relevant officials at EMC in 2011— which all attest that the government's allegations of corruption never happened and its theory is fundamentally improbable if not impossible.

The Court has directed Claimants to respond to the government's letter by April 10, 2026.  Other than the special interrogatories on standing, discovery has not commenced.

## LEGAL STANDARD

A court "must permit anyone to intervene" who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).  Intervention by right requires: (1) a timely application; (2) an interest in the action; (3) demonstration that the interest may be impaired by disposition of the action; and (4) that the interest is not adequately protected by the parties to the action. *Brennan v. NYC Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001).  The movant need not "identify a narrow interest amounting to a legal entitlement" to intervene as of right. *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 801 (2d Cir. 2022).  Rather, he must identify only an interest that is both "direct, substantial, and legally protectable" and sufficiently related to the subject of the underlying action. *Brennan*, 260 F.3d at 129 (cleaned up).  The burden on the movant to demonstrate interests are not adequately protected is "minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

A court has broad discretion to permit a non-party to intervene where the movant "has a

claim or defense that shares with the main action a common question of law or fact" and intervention would not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3); *ACORN (The New York Ass'n of Cmty. Organizations for Reform Now) v. County of Nassau*, 270 F.R.D. 123, 125 (E.D.N.Y. 2010). Permissive intervention under Rule 24(b)(1) is more flexible than intervention as of right under Rule 24(a), and should be "liberally granted." *Miller v. Silbermann*, 832 F. Supp. 663, 673 (S.D.N.Y. 1993). There need only be "a single common question of law or fact" for a court to permit a non-party to intervene under Rule 24(b)(1), *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996), especially where the "addition of the intervenor[] will assist in the just and equitable adjudication of any of the issues between the parties," *United States v. New York City Hous. Auth.*, 326 F.R.D. 411, 418 (S.D.N.Y. 2018) (citations and quotation marks omitted).[4]

### ARGUMENT

Mr. Batbold is entitled to intervene under Federal Rule of Civil Procedure 24(a)(2) to participate in all aspects of this proceeding, including to oppose amendment, move to dismiss, and move for summary judgment. In the alternative, the Court should exercise its discretion and permit Mr. Batbold to intervene under Rule 24(b)(1).

**I.      Mr. Batbold is entitled to intervene under Rule 24(a)(2).**

A successful motion for intervention as of right requires the movant to show that: (1) his motion is timely; (2) he has an interest in the action; (3) his interest may be impaired by disposition of the action; and (4) his interest is not adequately protected by the parties to the action. *Brennan*,

---

[4] The requirement under Rule 24(c) that a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought" is "flexibl[e]" and routinely waived. *See, e.g.*, *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2025 WL 2238226, at *7 (E.D.N.Y. Aug. 6, 2025) (cleaned up). In any event, this motion is accompanied by Mr. Batbold's anticipated motion for summary judgment along with supporting papers—an extensive submission which more than satisfies any obligation in Rule 24(c).

260 F.3d at 128-29.  Mr. Batbold satisfies all four requirements.[5]

### A.     The motion is timely.

Courts use their "sound discretion" to determine, after consideration of "all the circumstances," whether a motion to intervene is timely.  *Turkmen v. Ashcroft,* 2010 WL 3398965, at *4 (E.D.N.Y. June 30, 2010), *report and recommendation adopted,* 2010 WL 3398968 (E.D.N.Y. Aug. 26, 2010) (*quoting NAACP v. New York,* 413 U.S. 345, 366 (1973)); *see also Martell Strategic Funding, LLC v. Am. Hosp. Acad.,* 2013 WL 12562179, at *6 (S.D.N.Y. Sept. 4, 2013).  Here, consideration of "all the circumstances" demonstrates this motion's timeliness.  Since the government filed the Complaint, Mr. Batbold has taken an active role in seeking to resolve the case short of formal intervention.  For almost two years, he has engaged with the government through formal written submissions, calls, meetings, and presentations.  *See supra* at 12-13.  His extensive "good faith discussions" with the government in his case confirm that Mr. Batbold "cannot be said to have slept on [his] rights."  *In re Trib. Co. Fraudulent Conv. Litig.*, 291 F.R.D. 38, 41 (S.D.N.Y. 2013).

Having now exhausted those channels, Mr. Batbold seeks to intervene in a timely manner before the pleadings have settled, before any substantive motions have been decided or even opposed, and before service of any merits discovery.  Intervention in such circumstances is timely: untimeliness arguments "carr[y] little force when . . . discovery has yet to commence" and no motions have been decided.  *Citizens for an Orderly Energy Pol'y v. Suffolk County*, 101 F.R.D. 497, 501 (E.D.N.Y. 1984).

---

[5] Because Mr. Batbold does not request new forms of relief, he need not establish Article III standing.  *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 2020 WL 1432213, at *3 n.2 (S.D.N.Y. Mar. 24, 2020).

### B. Mr. Batbold has material interests in this action.

In assessing mandatory intervention, courts routinely merge the second and third elements because "the same reasons" often underscore both factors. *Brennan*, 260 F.3d at 132. These elements require the movant to "identif[y] a direct, substantial, and legally protectable interest . . . that may be impaired" absent intervention. *In re New York City Policing*, 27 F.4th at 799. That interest must be sufficiently "relat[ed] to the property or transaction which is the subject of the action." *Brennan*, 260 F.3d at 130 (quoting Fed. R. Civ. P. 24(a)(2)). Here, Mr. Batbold has at least two interests at stake: (1) his reputation and related professional opportunities; and (2) avoiding potentially negative legal precedents and decisions regarding his alleged corruption.

### 1. Mr. Batbold's reputational and professional interests

Mr. Batbold has a clear interest in this action because the government's allegations will continue to impact his reputation and professional prospects adversely unless and until the Court rejects conclusively the government's allegations on the merits. Injury to a movant's reputation, particularly his professional reputation, presents an impairment of a cognizable interest sufficient to justify intervention. For example, the Second Circuit permitted a party's lawyer to intervene on appeal to challenge an "opinion condemning his conduct as trial counsel" where the opinion "adversely affected his professional reputation." *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 373 (2d Cir. 1981). In *Sackman v. Liggett Group, Inc.*, another court in this district recognized that "injury to reputation" is "[a]mong the interests that satisfy" Rule 24's second and third requirements. 167 F.R.D. 6, 20 (E.D.N.Y. 1996). And in *Nunley v. Pioneer Pleasant Vale School District No. 56*, the district court held that a teacher was entitled to intervene in an action brought against the school district where the litigation involved allegations that the teacher had sexually assaulted a student; the litigation plainly could have impaired the teacher's employability and reputation. 149 F. Supp. 2d 1283, 1284 (W.D. Okla. 2001). Where, as here, a lawsuit

19

"tarnishe[s]" a movant's "career[]," *In re New York City Policing*, 27 F.4th at 802 (quotation omitted), or "could affect [a movant's] financial and other job-related interests" based on reputational harms, the movant "has a cognizable interest in the underlying litigation," *L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of NYC*, 2018 WL 1782709, at \*3 (E.D.N.Y. Apr. 12, 2018).

As explained above, the filing of the Complaint has already harmed Mr. Batbold's reputation and professional prospects on a geopolitical scale. It caused Mr. Batbold's party to remove him from its 2024 parliamentary slate and put an immediate end to his public service career, at a moment of significant consequence for Mongolia and Asia more broadly. *Id*. The claims asserted by the government have "adversely affected" the professional reputation Mr. Batbold spent almost two and a half decades cultivating. *Penthouse Int'l*, 663 F.2d at 373. His reputational and professional interests are cognizable.

### 2. Mr. Batbold's interest in combatting adverse precedent

Mr. Batbold also has a cognizable interest in combatting the potentially negative precedential impact of a decision in the government's favor. The "possible stare decisis effect of an adverse decision" justifies intervention. *N.Y. Pub. Int. Rsch. Group, Inc. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975); *see also Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265-66 (2d Cir. 1984). Where, as here, the movant has been involved in "other litigations regarding" the subject matter of the current suit, the movant has a cognizable interest in intervening to prevent the case from becoming negative "persuasive authority." *Sackman*, 167 F.R.D. at 21.

Mr. Batbold has defended himself against lawsuits instigated by political rivals across the globe on the same core allegations raised in the Complaint. *Supra* at 6-10. He has won every case. But those victories were not enough to prevent the government from bringing yet another action based on the debunked allegations in the Kroll Dossier. Mr. Batbold is best suited to address the

underlying merits of the government's faulty allegations. And if the Court denies Mr. Batbold's motion to intervene and the government ultimately proves the allegations, this case would breathe new life into a weaponized litigation campaign that Mr. Batbold previously put to rest. For that reason, too, Mr. Batbold has a protectable interest in this litigation.

### 3. Mr. Batbold's interests are sufficiently related to the action because his defenses are the "mirror image" of the government's claims.

Mr. Batbold's interests are also sufficiently related to this action to justify intervention. This standard is met when a proposed intervenor asserts interests involving claims or defenses "that are the mirror image of the claims asserted by" the existing parties. *Brennan*, 260 F.3d at 130. For example, in *NYC Policing*, the Second Circuit vacated the denial of a motion to intervene because the proposed intervenor's defenses and interests were the "mirror image[s]" of the plaintiffs' claims, giving the movant an "interest [that] justifies its intervention." 27 F.4th at 802.

Here, too, Mr. Batbold's defenses are a "mirror image" of the government's claims. To prevail, the government must establish that Mr. Batbold committed a "specified unlawful activity" that violated Mongolian law and that proceeds of that activity were used to purchase the NY Apartments. 18 U.S.C. §§ 981(a)(1)(A), (B), (C); *see also* 18 U.S.C. § 1956(c)(7). To protect his interests, Mr. Batbold's defenses hinge on the government's inability to satisfy its burden to prove he engaged in any wrongdoing in light of the undisputed material facts establishing his innocence.

### C. Mr. Batbold's interests are not adequately represented.

Finally, no present party to this suit will adequately protect Mr. Batbold's interests. This element presents only a "minimal" burden and "is satisfied if the [movant] shows that representation of his interest 'may be' inadequate." *New York City Policing*, 27 F.4th at 803 (quoting *Trbovich,* 404 U.S. at 538 n.10). An intervenor's interests are protected adequately only if an existing party's "interests [a]re so similar to those of [the proposed intervenor] that adequacy

of representation [i]s assured." *Brennan*, 260 F.3d at 133.

Here, although Claimants have appeared to protect their interest in the NY Apartments, "adequacy of representation" of Mr. Batbold's interests is hardly "assured." *Id.* Mr. Batbold has one goal in this case: clearing his name, as he has in all prior cases, and defending against the government's allegations on the merits. By contrast, Claimants' primary interest is maintaining Dr. Kim's ownership of apartments. To achieve that goal, Claimants may seek to "bring[] [the] litigation to an end" through "settlements" that fail to protect Mr. Batbold's interest in defeating the government's claims on the merits and clearing his name. *See id.*

Further, Claimants do not necessarily need to absolve Mr. Batbold of wrongdoing to retain the NY Apartments. The government has the burden to establish forfeitability by a preponderance of the evidence. *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 196 (2d Cir. 2013). To do so, the government is required to prove that Mr. Batbold committed a crime. 18 U.S.C. §§ 981(a)(1)(A), (B), (C); *see also* 18 U.S.C. § 1956(c)(7). Claimants, however, may choose to concede the forfeitability of the NY Apartments and instead pursue the affirmative defense that Dr. Kim is an "innocent owner." *See* 18 U.S.C. § 983(d). And even if the Claimants do contest forfeitability, Mr. Batbold would "make a more vigorous presentation" of the argument against forfeitability because he has the stronger interest in establishing that he committed no crime. *See N.Y. Pub. Int. Rsch. Group*, 516 F.2d at 352.

## II. Mr. Batbold should be permitted to intervene under Rule 24(b)(1).

In the alternative, the Court should exercise its discretion to permit Mr. Batbold to intervene under Rule 24(b)(1). "[T]he standard for permissive intervention is more liberal than that for intervention as of right" and requires only that the proposed intervenor has "'a claim or defense that shares with the main action a common question of law or fact.'" *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 2015 WL 777248, at *24 (E.D.N.Y. Feb. 13, 2015),

*R&R adopted*, 2015 WL 1345814 (E.D.N.Y. Mar. 25, 2015) (quoting Fed. R. Civ. P. 24(b)(1)(B)). "[A] single common question of law or fact" is enough to permit intervention so long as granting intervention would not "unduly delay or prejudice the rights of the existing parties." *Commack Self-Serv. Kosher Meats*, 170 F.R.D. at 106; *New York City Hous. Auth.*, 326 F.R.D. at 418 (intervention appropriate if the addition of the intervenor would "assist in the just and equitable adjudication of . . . the issues between the parties").

Permitting Mr. Batbold to intervene would satisfy the liberal standards of Rule 24(b)(1). This case bears unique international and geopolitical consequences, and Mr. Batbold's well-investigated and established defenses in this case turn on the very same nucleus of facts and legal theories that will decide whether the government would be entitled to forfeiture. And those defenses would not "inject collateral issues into [the] existing action" which would delay or prejudice the rights of the existing parties. *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992). Rather, Mr. Batbold's intervention in this action would "assist in the just and equitable adjudication of . . . the issues between the parties" through his presentation of uncontroverted evidence that will dismantle the government's forfeiture case and protect his legally cognizable interests. *New York City Hous. Auth.*, 326 F.R.D. at 418.

Further, "considerations of fairness strongly weigh in favor" of permitting Mr. Batbold to intervene. *Miller*, 832 F. Supp. at 674. Mr. Batbold's name appears throughout the pleadings as the person who purportedly orchestrated a scheme to acquire the NY Apartments. *See* Compl. ¶¶ 18-19, 21-23, 25(a)-(c), 27, 43-44; PFAC ¶¶ 18-19, 21-23, 29(a)-(c), 32, 35, 37(a)-(b), 38-39, 64-65. The government's claims hinge on proving that Mr. Batbold committed crimes. It would be fundamentally unfair for the government to attempt to make that showing in Mr. Batbold's

absence, especially given that Mr. Batbold has succeeded in all prior actions, both offensive and defensive, involving the same core questions and issues.

The unfairness in proceeding without Mr. Batbold is particularly acute given that the government's factual allegations are derived from a tainted dossier commissioned and directed by foreign political opponents. *See supra* at 8-9. Courts across the world have dismissed those same claims premised on the Kroll Dossier and one Mongolian court—after adversarial proceedings—found the allegations of corruption against Mr. Batbold were "not true." *Supra* at 11; Ex. 50. Nevertheless, the government pressed forward with this quasi-criminal action without so much as contacting Mr. Batbold, just months before crucial parliamentary elections in Mongolia.

Mr. Batbold's participation in this action will give the Court access to critical evidence, including legal declarations from Mongolian counsel, declarations from the percipient individuals in Mongolia, nonpublic contracts, and thousands of other documents and emails. This evidence will be important to building a complete record and will assist the Court in resolving the core merits of the government's claims fairly and accurately. *New York v. United States Dep't of Health & Hum. Servs.*, 2019 WL 3531960, at *6 (S.D.N.Y. Aug. 2, 2019) (permissive intervention appropriate where intervenor "will assist the Court in resolving issues before it").

## III. Rule 24 governs this motion, not Supplemental Rule G.

To the extent the government argues that Rule 24 does not apply in civil forfeiture proceedings, the government is wrong. The Federal Rules of Civil Procedure apply to forfeiture actions arising from a federal statute "except to the extent that they are inconsistent with" the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Fed. R. Civ. P. Supp. R. A(1)(B), (2). Supplemental Rule G(5), which addresses civil forfeiture actions, provides that when the government files a complaint for forfeiture "[a] person ***who asserts an interest in the defendant property*** may contest the forfeiture by filing a claim in the court where

the action is pending." Fed. R. Civ. P. Supp. R. G(5)(a)(i) (emphasis added). In turn, the Rule establishes specific pleading requirements for intervening on that unique basis. *Id.*

Here, there is no inconsistency between Rule 24 and Supplemental Rule G(5). Supplemental Rule G(5) provides supplemental requirements and instructions for persons who "assert[] an interest in the defendant property." Mr. Batbold asserts no interest in the NY Apartments because they are not his properties;[6] rather, he seeks to defend himself against the spurious charges that those apartments were purchased for his benefit through sham transactions. Thus, Mr. Batbold has a broader interest protectable under Rule 24 "*relating* to the . . . *transaction[s]*" that are the subject of this litigation. Fed. R. Civ. P. 24(a) (emphases added). Those alleged transactions supposedly implicate Mr. Batbold in a criminal scheme to divert mining contracts for personal enrichment, launder the resulting proceeds through shell companies and international financial institutions, and conceal the origin of illicit funds used to acquire the NY Apartments. Under Rule 24, Mr. Batbold has a cognizable interest in refuting those allegations.[7]

## CONCLUSION

This Court should grant Mr. Batbold's motion to intervene pursuant to Rule 24(a)(2) or, in the alternative, pursuant to Rule 24(b)(1).

---

[6] Case in point: The PFAC alleges Mr. Batbold failed to include the NY Apartments in asset disclosures Mongolian law requires public officials to provide. PFAC ¶¶ 34-35. That is true. He did not include the apartments on his disclosures for the obvious reason that he does not own them.

[7] In *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, the court stated "[t]he only way for a third party to intervene in a civil forfeiture case is to file a claim to the property and an answer to the Government's complaint pursuant to [Supplemental] Rule G(5)." 743 F. Supp. 3d 204, 217 (D.D.C. 2024) (cleaned up). But that dicta applies only to someone who claims an actual interest in the property (i.e. a *claimant*). Such a person can intervene only as specified in Supplemental Rule G(5). *See United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 641 F. Supp. 2d 1, 4-6 (D.D.C. 2009) (putative claimants to defendant property lacked separate right to intervene under Rule 24 of the Federal Rules of Civil Procedure). But where, as here, an intervenor makes no claim to the property the government is seeking to forfeit at all—and, in fact, expressly *disclaims* any ownership in the property—Rule 24 applies.

Dated: April 9, 2026
New York, New York

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Orin Snyder*
Orin Snyder
Lee R. Crain
Sam Raymond
Trevor Bondy Gopnik
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-2400
osnyder@gibsondunn.com
lcrain@gibsondunn.com
sraymond@gibsondunn.com
tgopnik@gibsondunn.com

Stephanie Brooker*
Helgi C. Walker*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 887-3502
sbrooker@gibsondunn.com
hwalker@gibsondunn.com

* *pro hac vice* forthcoming

*Attorneys for Proposed Intervenor
Sukhbaatar Batbold*