# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANY AND ALL SHARES OF 21 EAST 61 STREET APARTMENT CORP. HELD IN THE NAME OF LOVITAS, INC., TOGETHER WITH THE APPURTENANT PROPRIETARY LEASE FOR COOPERATIVE UNIT 12E WITHIN THE REAL PROPERTY AND PREMISES LOCATED AT 21 EAST 61ST STREET, NEW YORK, NEW YORK 10065, AND ALL PROCEEDS TRACEABLE THERETO, and
CONDOMINIUM UNIT 58D, TOGETHER WITH ITS RESPECTIVE APPURTENANCES, IMPROVEMENTS, FIXTURES, ATTACHMENTS, EASEMENTS AND FURNISHINGS, LOCATED AT 230 WEST 56TH STREET, NEW YORK, NEW YORK 10019, AND ALL PROCEEDS TRACEABLE THERETO,

Defendants In Rem.

----------------------------------------------------------------x

Civil Action No. 24-2147

**DECLARATION OF WILLIAM BIKALES**

I, William Bikales, hereby declare as follows:

1. I was retained by Gibson, Dunn & Crutcher, LLP ("Counsel") on behalf of Sukhbaatar and Battushig Batbold in connection with the above-captioned matter, to which neither is a party. Counsel asked me to prepare an expert report on Mongolian history, government, politics, and business. My expert report covers the following topics:

- Recent Mongolian history;
- The constitutional structure of Mongolia's government;

- The current Mongolian political landscape;
- The Mongolian mining industry.

2. I personally prepared this report; no additional individuals worked with me on it. I am being compensated at a rate of $1,200 per hour for my work on this engagement. The compensation I receive for my services is not dependent upon the outcome in the above-captioned matter or any other existing or potential matter.

3. A list of information relied upon is attached as Attachment A: Documents Relied Upon. Counsel provided me some of this information. Should I become aware of additional information through additional documentation, reports, or testimony relevant to my work in this matter, I may supplement or amend my findings and opinions.

4. Unless otherwise stated, all facts set forth in this Declaration are based upon my personal knowledge and my years of experience working in the Mongolian government and private sector.

## I. <u>Summary of Opinions</u>

5. I am a development economist who has spent nearly four decades studying economic conditions in developing nations, including Mongolia. From 1993-1995, I lived in Mongolia and served as Chief of Party of a team of economic advisors from the Harvard Institute for Economic Development. In this role, I worked directly and extensively with the Mongolian National Development Board, the Ministry of Finance, and the Central Bank. In 1995, I was recruited to lead a new USAID-funded technical assistance project attached to the Office of the Prime Minister of Mongolia. I served in that role for six years during which time I worked directly with several Prime Ministers, Cabinet members, Central Bank management, parliamentarians, private businesses, and others. Since 2001, I have maintained close professional and personal

relationships in Mongolia. In writing this report I have drawn on a combination of publicly available sources and my personal experience over the past nearly four decades.

6. I have read the Complaint in the civil forfeiture case, Case No. 24-cv-02147 (the "Complaint"), as well as certain filings from the prior cases against Sukhbaatar Batbold, including those filed in New York, Singapore, and Mongolia. The Complaint and these cases rest on assumptions about Batbold's ability as Prime Minister to control the operations of the Erdenet Mining Corporation ("EMC"), one of Mongolia's largest state-owned mines. The cases accuse Batbold of acquiring certain properties around the world with funds obtained from alleged corruption in Mongolia related to EMC copper contracts. The Complaint contains assumptions about the Prime Minister's authority that, based upon my knowledge of Mongolian politics and my personal experience in the Prime Minister's Office from 1995 to 2001, are inconsistent with the structure of and practice surrounding Mongolian government and institutions, including during the period of 2009 through 2012. I make this assessment for three reasons:

- *First*, under Mongolia's constitutional structure, the Prime Minister did not, and to my knowledge today still does not, have formal legal authority to exercise control over the country's natural resources;
- *Second*, as a matter of practical politics, no Prime Minister would have been able to wield effective control over EMC's contracting during the relevant period;
- *Third*, it is particularly unlikely that Batbold had any meaningful control over EMC during his Prime Ministry, because the General Director of EMC throughout his Prime Ministry was Ch. Ganzorig, an independent figure who served a lengthy tenure as General Director under three different prime ministers, from both major Mongolian parties.

7. Additionally, there are troubling indications that the allegations against Batbold were based on a campaign by former president Khaltmaagiin Battulga for nefarious political purposes. Battulga has a disturbing history of persecution of political opponents. Battulga and Batbold are political rivals, representing opposite parties in Parliament. Litigation against former Prime Minister Batbold began being filed around the world between 2017 and 2021, during Battulga's presidency and when Batbold was widely viewed as a potential opponent to Battulga in Battulga's anticipated reelection campaign. However, no charges of corruption were ever filed against Batbold in Mongolia. These factors suggest that the allegations are politically motivated.

## II. Qualifications

8. I am a development economist who has spent nearly four decades studying and working to improve economic conditions in developing nations. I have a B.A. in East Asian Studies from Princeton University, an M.A. from Tufts University's Fletcher School of Law and Diplomacy, and an ABD ("completed all PhD requirements except dissertation") in Economics from Harvard University. In 1991, while working on my dissertation, I was unexpectedly invited to spend six months in Mongolia as co-leader of a team of Harvard economics and business graduate students who were providing training and advice to several newly established government organizations. In 1991, with the fall of the Soviet Union, Mongolia began to transition to democracy and a market economy. Following this assignment, I dedicated much of my career to Mongolia, including living in Ulaanbaatar, Mongolia's capital, for nearly ten years. I have remained involved in Mongolian policy work to this day.

9. From 1993-1995, I lived in Mongolia and served as Chief of Party of a team of three economic advisors from the Harvard Institute for Economic Development. In this role, I worked directly and extensively with the Mongolian National Development Board (the former planning commission), the Ministry of Finance, and the Central Bank. In 1995, I was recruited to

lead a new USAID-funded technical assistance project in Mongolia called "The Economic Policy Support Project." This project was attached to the Office of the Prime Minister of Mongolia and involved recruiting a team of Mongolian economists with whom I provided policy advice and analysis to the Prime Minister. I served in that role for six years, from 1995-2001, during which time I worked directly with several Prime Ministers and with other Cabinet members, Central Bank management, parliamentarians, private businesses, and others.

10. In June 1996, the opposition Democratic Party won a surprise victory in Parliamentary elections and formed the first government in 70 years that was not run by the ruling and dominant Mongolian People's Revolutionary Party ("MPRP"). The new Democratic Prime Minister, Mendsaikhany Enkhsaikhan, was eager to pursue ambitious economic reforms. The Democrats knew me well from the six months I spent working closely with them in 1991, and from the contacts I maintained with them after I returned in 1993. My connections at Harvard and MIT gave them access to higher quality economic resources than were otherwise available in the country at that time. Based on my prior experience, the new Prime Minister asked me and my Mongolian team to serve as his personal economic advisors. During my tenure, I helped draft the government's initial economic reform agenda, which focused particularly on addressing a looming banking sector crisis, power sector pricing reforms, housing and other quick privatization opportunities, as well as attracting new Foreign Direct Investment ("FDI"), particularly in the mining sector.

11. Between 1995 and 2001, I was an observer of, and direct participant in, some of the policy decisions that the Mongolian government confronted during the arduous decade following the collapse of the Soviet Union and the Soviet bloc economic arrangements into which Mongolia had been fully integrated. At the request of the Prime Minister and with USAID's full support,

our project expanded to include several key reform areas. I was personally involved in problem bank resolution and banking sector restructuring, privatization strategy, power sector restructuring, and pension reform. I regularly participated (on the Mongolian side) in negotiations with international aid agencies. Our group assisted with the drafting of the 1997 Minerals Law.

12. In 2000, the ruling DP lost the elections, and the MPRP returned to power. Despite this change in regime, I continued to work closely with the new government. My priorities under the new MPRP administration were the turnaround of the insolvent Agricultural Bank of Mongolia with external management recruited through my project, and the drafting and approval of a new energy sector unbundling law, a major step toward creating a market-oriented power and heat sector in Mongolia. Both of these reforms encountered stiff resistance from more conservative interests, which we successfully overcame.

13. Since leaving Mongolia in 2001, I have kept in close contact with former Mongolian colleagues from my project, one of whom went on to serve as a Deputy Prime Minister, one as Minister of Defense, one as Parliament Speaker, and two as Ministers of Finance, some representing the MPP, some the DP, and some smaller political parties. Since 2001, I have served in various roles in Ukraine, the Philippines, and China, and continue to have close professional and personal relationships in Mongolia.

14. I have since served as an expert witness in an arbitration involving the Mongolian mining sector, and have given presentations on Mongolian economic and political development at the University of Pennsylvania, the London School of Economics, and the American Center for Mongolian Studies in Ulaanbaatar.

15. I have authored pieces on the Mongolian economy in the Wall Street Journal and other publications. I am currently an Associate at the London School of Economics IDEAS Foreign Policy think tank.

16. In writing this report I have drawn on a combination of publicly available sources and my personal experience over the past nearly four decades. Doing online research on post-Communist developments in Mongolia is nearly impossible without firsthand knowledge of sources of news and analysis. Due in part to the lack of reliable sources, there has sadly been a large amount of inaccurate information reported as fact in unreliable news outlets. My experience and personal relationships with many of analysts I cite provide me with clear guidelines regarding the selection of reliable sources.

## III. Relevant Background

### *a. Recent Mongolian Constitutional History*

17. As of 1989, Mongolia was a Communist Party-run Soviet satellite state. Although nominally independent, and a member of the United Nations, Mongolia's government and economy were closely connected to Moscow. In fact, one Mongolian leader proposed to Stalin that Mongolia become the "16th Soviet Republic."[1] As of 1989, Mongolia's "hard currency" exports to non-Counsel for Mutual Economic Assistance ("Comecon") countries were less than 1% of GDP.[2] Between 1985 and 1989, Soviet aid to Mongolia averaged 30% of GDP per year.

18. In 1990, following demonstrations in Ulaanbaatar, Mongolia began a peaceful transition towards democracy and a market economy. In March of 1990, the entire politburo of the Mongolian People's Revolutionary Party ("MPRP") resigned to allow new leaders to oversee

---

[1] S. Radchenko, "Mongolian Politics in the Shadow of the Cold War". *Journal of Cold War Studies* (2005) 8 (1): 95–119, https://doi.org/10.1162/152039706775212021.

[2] "Council for Mutual Economic Assistance" or CMEA, which included the USSR and Communist party-led countries in Central and Eastern Europe. Source of data is International Monetary Fund, 1992.

the transition. Whatever the motivations, the peaceful ceding of power by Mongolia's communist leaders was truly remarkable considering this took place within a year of the now-infamous 1989 forceful suppression of protesters in China's Tiananmen Square. The democratic election in July 1990 represented the first multiparty election in Mongolian history and led to the creation of a new government.[3]

19. In 1992, the Mongolian parliament approved a new Constitution. The new Constitution laid out the framework for Mongolia's future democracy and called for a directly elected President, a unicameral parliament with 76 members elected by a majoritarian first past the post rule,[4] and a Prime Minister. The first parliamentary election under this constitution took place in 1992. The MPRP won 70 out of the 76 seats, due both to its strong organization and to the division of opposition votes among a variety of newly formed opposition parties. The non-MPRP parties formed a so-called democratic alliance, to consolidate all non-MPRP opposition votes. This democratic alliance won the first presidential election in 1993 and the 1996 parliamentary elections.

***b. The Mongolian Economy***

20. In 1991, Mongolia began its transition to a market economy. The abrupt loss of Soviet aid, and the collapse of Soviet bloc "soft currency" trade led to a sharp decline in GDP and surge in inflation, as occurred in many post-Soviet economies. Many Mongolian industries collapsed when access to Comecon import and export markets ended in 1991. The search for new hard currency exports was the most urgent economic policy challenge.

---

[3] There are many accounts of these events. I have drawn primarily on the work of Professor Thomas Ginsburg of the University of Chicago Law School, who was in Mongolia advising on legal matters as I was advising on economic. *See* Ginsburg, Enkhbaatar et al., "Assessment of the Performance of the 1992 Constitution of Mongolia," UNDP, Mongolia 2016.

[4] Under this arrangement each Member of Parliament represented a constituency and the candidate(s) who received the most votes, even if less than a majority, were elected.

21. In the 1990s, Mongolian GDP and exports were led by the mining industry, which was dominated by Soviet era joint ventures like EMC, Mongolrostsvetmet[5] fluorspar, and a number of smaller coal mines. It was not until 1995 that GDP growth was restored, and not until 1996 that annual inflation fell below 10%. After the 1997 passage of a more-liberalized Law on Minerals, western mining companies entered Mongolia, leading eventually to the emergence of major mines at Oyu Tolgoi (copper and gold) and Tavan Tolgoi (coal), along with new tin, iron, uranium, and oil production sites. Mongolian dependence on mineral exports became greater than ever. In a dramatic change from Soviet-era trade patterns, almost all of Mongolia's mineral exports were now sold to China.

***c. Mongolian International Relations***

22. Mongolian foreign policy has undergone a similar transition since 1990. Mongolia shares a border with only two countries: Russia and China. Mongolian attitudes toward Russia and China are shaped by centuries of interactions.[6] Through most of the 20th century, Mongolia's primary foreign policy endeavors related to its one-sided alliance with the USSR and, after 1991, Russia. To this day, Russia is generally viewed favorably by the Mongolian people because Soviet aid played such a large role in Mongolian development in the post-WWII era and, without Soviet support for its sovereignty, it is likely that Mongolia would have been absorbed by China after the establishment of the People's Republic in 1949. Many Mongolians still speak Russian and have personal connections with Russian people. Attitudes toward China have been characterized by suspicion and even hostility. Since 1990, Mongolia has followed a new "Third Neighbor" policy that emphasizes maintaining close ties with both Russia and China, while also cultivating close ties with other countries, such as Japan, the U.S., India, South Korea, France, and others, to provide

[5] https://www.mongolros.mn/p/21?locale=en.
[6] *See* San Maral public opinion polls.

further balance. The resource sector has played a central role in attracting "third neighbors," with Australian, Canadian, Indian, French, and other foreign companies actively investing in the country. However, resource nationalism and lack of familiarity with market-based interactions with other nations have led to lingering distrust of these new partners on the part of many Mongolians.

***d. The Domestic Political Landscape***

23. Mongolian politics has been largely dominated by two parties for the past three decades: the Mongolian People's Party (the "MPP," the successor to the MPRP) and the Democratic Party (the "DP," comprised of the former members of the "democratic alliance"). Third parties have occasionally won a handful of seats in Parliament and have even entered as minority partners in coalition governments at times, but Mongolia, like the U.S., has still essentially a two-party system.[7]

24. Since 1992, Mongolia has had a hybrid parliamentary system. Both Parliament and the President are elected by the voters, and the Parliament selects the Prime Minister.

25. ***Prime Ministry.*** Parliamentary elections are held every four years in Mongolia. The party (or, in a coalition, the parties) that has a majority of seats selects a Prime Minister and the Speaker of the Parliament. Parliament selects the Prime Minister and the President approves.

26. The Parliament and the Prime Minister it selects have overall operational control of the government. Key government functions—such as the budget, social services, economic development, and infrastructure development—fall under the Cabinet and Parliament. In Mongolia, the term "the Government" refers to the Prime Minister and his Cabinet, and this is more than a semantic idiosyncrasy.

[7] No leader of any third-party has ever served as either President or Prime Minister.

27. The Speaker, or 'Chair' of the Parliament, convenes and presides over sessions of Parliament, oversees the agenda, and has administrative control over the Parliament's offices and committees. He is one of the most powerful members of the government, and represents the Parliament in the National Security Council, in discussions with the Constitutional Court, and in international Parliamentary gatherings.

28. The Speaker negotiates the membership and leadership of Parliamentary committees and subcommittees, where most of the actual work of the Parliament takes place. In my time working with the Prime Minister, the chairs of the standing committees on Budget, State Structure, Social Policy, and Economic Policy were key stakeholders with considerable power over policy decisions. Over the years, I have frequently worked with standing committee chairs, and they are directly engaged in shaping key policy-setting legislation. For example, the pension reform that my project helped design in 1998 was prepared at the request of the Chair of the Standing Committee on Social Policy.

29. Since the 2019 Constitutional Amendments, the powers held by these Committees vis-à-vis the Government have been slightly reduced, as one purpose of the amendments was increasing the efficiency of the Government. The Prime Minister is nominated by the Parliament and approved by the President. If the President rejects the nominee, the Parliament can overrule his veto by a two-thirds majority, negotiate with the President, and resubmit, or change to a different candidate. In 1998, three different individuals nominated by the DP to replace the sitting Prime Minister, who had lost a vote of no confidence, were vetoed by President N. Bagabandi, who was from the MPRP (the predecessor of today's MPP). This led to an extended period of political uncertainty, before the fourth candidate was finally accepted. This was the only case to date in which the nomination of a Prime Minister was successfully vetoed by the President.

30. Prime Ministers serve for up to four years, the period of one Parliamentary term. The Parliament can vote them out at any point during those four years. When the Prime Minister is selected, a decision is also reached whether to appoint Deputy Prime Ministers, and how many. This post is not mandated by the Constitution, and the number has ranged from zero to three, which is the current number since the June 2024 parliamentary elections. Coalition governments have frequently had Deputy PMs from different parties than the PM himself. Occasionally, when no party has a majority, the two main parties have reached power-sharing agreements, under which Prime Ministers rotate.

31. The Prime Minister, in consultation with his own party and, if necessary, with other parties in his coalition, forms a Cabinet of Ministers. Prior to the Constitutional Amendments of 2019 that were meant to streamline government operations, the Prime Minister's discretion in selecting ministers was more constrained, and Parliament had the lead role in approving all members of the cabinet. Now the Prime Minister appoints ministers, and the Parliament swears them in.

32. The number of ministries and their responsibilities have changed repeatedly over the years, following each parliamentary election, and occasionally during the term of one set of MPs. The location of vital government functions such as investment planning, foreign trade, mining, environment, transport infrastructure, and others, has been reassigned frequently over the years. This instability, and the common phenomenon of large changes in ministry staff when a new minister takes over, even in the midst of one parliamentary term, has often undermined governing capacity.

33. Notably, while the Prime Minister is the leader of the government, he does not in any sense control the actions/decisions of the Ministers in his Cabinet, nor does he have legal

power to make decisions regarding the work of their ministries. The Prime Minister runs the government and has the lead voice in Cabinet discussions and in shaping government policy, but the Cabinet as a whole ultimately sets the policy that ministers are then tasked with implementing. Prior to the 2019 Constitutional amendments, Ministers were appointed by the Parliament. Strong Prime Ministers have at times been able to bend their Cabinets to their will more easily, while many have ruled by consensus, and have often had difficulty controlling Ministers who had strong power bases of their own. One result of this situation is that the actual effectiveness of government rule is often weaker than it appears on the surface.

34. ***Presidency.*** Unlike the Prime Minister, the President is elected by direct popular vote. Until Constitutional Amendments took effect in December 2019, the term of the presidency was four years, and no individual could serve more than two terms. Since the amendments took effect, presidents now serve for one six-year term, with no possibility of reelection. The Presidency was designed to be an apolitical post directly representing the majority of Mongolian people, unlike Members of Parliament, who represent districts. Although nominally an apolitical post, presidents are nominated by political parties, and every president to date has been a former member of parliament. Three presidents, including the current one, have been former prime ministers, and thus took office with existing political alliances and rivalries, which (in theory) they are expected to transcend once they assume office. Although that is not an entirely realistic expectation, Mongolia has elected six presidents since 1992, and most managed to maintain popularity and rise above overt partisanship. Three of them were reelected to second terms.[8]

35. The President has powers and responsibilities in fields pertaining to broader national interests: international representation, national defense, and oversight of the judicial

[8] Including the first, P. Ochirbat, whose first term began under the previous Communist regime, and who was reelected in the first post-Communist election in 1993.

system. The President serves as Head of State and Commander-in-Chief of the Armed Forces, undertakes high-level state visits, and receives visiting foreign heads of state.

36. In terms of governance, the president has broad powers to veto laws and nominations by the Prime Minister. Controversially, the President also has the power to veto most actions of the Parliament, subject to override by a two-thirds vote. The president is even empowered to call for the dissolution of the Parliament under certain conditions.

37. As is most relevant to this report, the President has significant, and by international standards quite unusual, powers in appointing key officials in the judicial and policy systems.

38. The 1992 Constitution, and the later Laws on the Courts, included measures to encourage judicial independence. The most important measure was the creation of a General Judicial Council responsible for recommending judicial appointments and dismissals for defined causes. However, all of the measures were primarily aimed at reducing the potential influence of parliamentarians on the court system, as the drafters believed that Parliament would be the most likely source of attempts to exert political influence. Accordingly, the President's powers included the appointment of members of the General Judicial Council, along with the authority for actually making all judicial appointments, from the Supreme Court down to the local level, with Parliamentary review. This arrangement worked reasonably well, but such presidential influence over the court system poses obvious risks if the President is inclined to utilize the judicial system as a tool in pursuing a private agenda.

39. The Mongolian Constitutional Court has nine members, and the Presidency has considerable influence over its makeup. Three members of the Court are reserved for selection by the President; three reserved for selection by the Supreme Court; three reserved for the Parliament. Members of the Constitutional Court are appointed for terms of six years in total. Since the

President has authority to select members of the Supreme Court, upon recommendation by the General Judicial Council, the sitting President could have considerably more influence on the membership of the Mongolian Constitutional Court.

40. The President also appoints the Prosecutor General and the Director General of the Independent Authority Against Corruption. The position of the Prosecutor General has no equivalent in the United States. The Prosecutor General is a political appointee who is not under the jurisdiction of the Ministry of Justice, an arrangement which is intended to allow greater independence from political interference. The Minister of Justice, like all cabinet members, is nominated by the Prime Minister and approved by Parliament and is therefore considered to be more subject to day-to-day political pressures. The Prosecutor General has central responsibilities in the functioning of the legal system, including deciding when to prosecute criminal cases, prosecuting a case, supervising all legal proceedings and law enforcement to ensure that they are conducted in accordance with the Constitution, overseeing the penal system, and protecting human rights, among others.[9]

41. Since 1992, the power to appoint the Prosecutor General has rested with the President. Although Parliamentary approval is required, it is generally given automatically. To allow a certain degree of independence from politics, the term of the Prosecutor General is six years, which historically meant that any appointment would carry over into the following presidential term. Historically, Prosecutor Generals have never served their full terms, always being dismissed for various reasons.

42. In 1996, Mongolia passed its first Anti-Corruption Law, which was amended in 2006, leading to the creation in 2007 of the Independent Authority Against Corruption ("IAAC").

---

[9] *See* the Mongolian "Law on the Prosecutor," first approved in 1993 and amended several times.

The IAAC is the government body tasked with leading the fight against corruption, "investigating, collecting asset declarations and organizing education and prevention programmes."[10] Notably, the IAAC does not have prosecutorial powers; it can only refer cases to the office of the Prosecutor General. The Director of the IAAC is appointed by the President, and by law has a term of office of six years. The current incumbent, Z. Dashdavaa, appointed in 2019, seems likely to be the first to actually serve out a full six-year term.

43. Overall, the president's power over these key governmental institutions, particularly the judicial system, gives him great power to check the actions of Prime Ministers and those of opposing parties. As discussed in Paragraph 47, and in more detail in Paragraphs 74-82, these powers were abruptly and drastically expanded in 2019 at the initiative of then-President Kh. Battulga, who for a period wielded virtually unchecked power over appointment and dismissal of judges, the Prosecutor General, and the Director of the IAAC.

44. ***Relationship Between Prime Minister and President.*** There is a fundamental difference in the nature of posts of President and Prime Minister. The President, as Head of State, is directly elected by the entire population and is answerable to no one other than the courts. In theory the President can be impeached, but Parliament cannot do so without the concurrence of the Constitutional Court, which as described above the President maintains considerable influence over. The Prime Minister is selected by Parliament and is the leader of the government but is subject to removal at any time by a majority vote of the Parliament, with whom he is in constant negotiations. Since 1992, Mongolia has had six presidents and 15 prime ministers. There is thus inherent tension between the Parliament and its Prime Minister, on the one hand, and the President,

[10] Transparency International, 2018, "Mongolia: Overview of Corruption and Anti-Corruption," https://knowledgehub.transparency.org/assets/uploads/kproducts/Country-Profile-Mongolia_2018.pdf.

on the other. This is particularly true when the President and Prime Minister belong to different political parties.[11]

45. Throughout the post-Communist era there has been healthy debate about the proper balance of power between the President and the Prime Minister/Parliament, with occasional calls for a stronger president,[12] and occasional calls for a weaker president. There have been frequent attempts, some successful, to amend the Constitution to alter the balance of power. The overall trend has been to ensure, and gradually reinforce, the primacy of Parliament's power in running the government.

46. Since 1992, the principal area of constitutional contention has been the balance of power between the President and the Parliament (and the Prime Minister it selects). Mongolia's location between Russia and China serves as a constant reminder of the dangers of allowing any one leader to accrue too much power. As Mongolia's political system was designed to give the Parliament and its Prime Minister leading responsibility for governing the country, conflicts between the Prime Minister and the President have tended to take the form of attempts by the President to assert or acquire greater power than his office properly allows. This has generally entailed use of his constitutional rights, especially veto power and control over the judiciary and prosecutors, to weaken the government. Over the years, Presidents have attempted to acquire the power to appoint the head of the IAAC, the head of the intelligence service and the members of the Judicial General Council, who nominate judges for Presidential approval.[13]

---

[11] Although the Mongolian President is required to end his membership in any political party upon taking office, presidential elections feature candidates nominated by political parties, and every Mongolian president since 1992, without exception, has previously served in the Parliament as a representative of a political party.

[12] *E.g.*, a speech by former Prime Minister M. Enkhsaikhan at a Constitutional Reform workshop in 2018. https://sonin.mn/news/politics-economy/35566.

[13] *See* D. Zorigt, "Political culture and constitutional reform in Mongolia," GIS Advisory Services, Aug. 27, 2019, https://www.gisreportsonline.com/r/mongolia-constitutional-reform/.

47. There have been two particularly serious instances of presidential power grabs. The first was in 1998 when MPRP President Bagabandi vetoed three consecutive DP candidates for Prime Minister, all of whom were seemingly well qualified. The second was the 2017-2021 presidency of Kh. Battulga, when the President was able to greatly expand his already considerable controls over the judicial system to attack his political and business rivals. In response, the Parliament has regularly approved constitutional amendments to realign presidential powers with the clear intent of the original Constitution, strengthening the role of Parliament and the Prime Minister.

48. Based on my years of close engagement in Mongolian economics and politics, the main hope for combating authoritarianism or corruption rests in the thriving multi-party hybrid political system. While Mongolia's democracy may not be up to Western standards, it is deeply rooted and vibrant.

***e. S. Batbold's Career***

49. Sukhbaatar Batbold was born in 1963 in Western Mongolia, to a family of doctors, and received an elite education, including undergraduate studies at the prestigious Moscow State University School of International Relations. After taking a position at the state-owned Mongolimpex trading company, he was one of the first Mongolians to be offered a chance to study in the UK and eventually attended and graduated from Middlesex University's London School of Business.

50. After the collapse of Communism, Batbold established a private company, Altai Trading. In 1994, Altai Trading attracted particular attention when it purchased at auction the half-completed Chinggis Khaan Hotel, which had been abandoned by the original owners, who ran out of funds before completion. As an Ulaanbaatar resident at the time, I recall what an eyesore and

symbol of economic collapse the half-built hotel had been. Altai Trading completed and opened the hotel in 1995 and later opened a large supermarket next to it, which was the foundation for a chain of supermarkets. Batbold's business steadily expanded into other sectors. By the end of the 1990s, Batbold had established himself as one of Mongolia's wealthiest individuals. All of this predated Batbold's involvement in politics.

51. In 2000, Batbold was appointed Deputy Minister of Foreign Affairs. Batbold was part of a generational shift in the MPP (still called MPRP then) in response to the party's surprise defeat in the 1996 parliamentary elections. This shift cultivated younger leaders with the ability to engage with Western organizations and nations.[14] In 2004, Batbold was elected to Parliament and, until he was left off the slate in the 2024 elections, was reelected in every parliamentary election. In 2008, he was appointed as Minister of Foreign Affairs.

52. In 2009, when Prime Minister S. Bayar resigned because of poor health, Batbold was selected by the Parliament to replace him, and served as Prime Minister until 2012. During Batbold's premiership, Mongolia's economy soared, with GDP growth peaking at 17.3% in 2011, the highest in the world, and averaging 12.3% for the three years of Batbold's term. This was, in part, a result of the milestone Oyu Tolgoi Copper mine agreement, which led to a very large influx of FDI during Batbold's term. That economic growth was sustained for the entirety of Batbold's term. This first large mining agreement with a Western firm stirred a nationalistic reaction from some Mongolians, including some politicians, and Batbold was a strong proponent of openness to these new partners, consistent with Mongolia's Third Neighbor Strategy, and with attracting the FDI that Mongolia needed so urgently. During this time, he highlighted Mongolia as a foreign

---

[14]Other examples were Deputy Minister of Justice Ts. Monkh-Orgil, who was trained at Harvard Law School and later served as both Minister of Foreign Affairs and Minister of Justice, and Ch. Khurelbaatar, who was trained in Economics in Australia and served as Minister of Finance and Minister of Economy.

investment destination[15] both abroad and internally. This welcoming approach to Western investment was reversed after a new DP-led government took office in 2012 and FDI and Mongolian economic growth quickly faltered. In addition, Batbold oversaw the start of a serious dialogue within Mongolia, and with external partners, regarding how to allow the Mongolian people to benefit from mining-driven economic growth. Several concrete steps were taken, including the creation of a Human Development Fund and steps to mitigate environmental harm caused by mining.[16]

53. My experience in Mongolia throughout this period affords me the opportunity to make some observations regarding Batbold's activities, both in business and in office. Unlike other individuals who earned great wealth, Batbold did not make money from the privatization of state-owned businesses at low prices. Instead, he identified opportunities and utilized his business skills to create new startups that have grown and lasted to this day. For example, by 1995 he had built one of the three main hotels in Ulaanbaatar. Batbold was known as a competent and serious leader, not flashy, but professional. He dealt well with internal and external challenges, both economic and political. This is likely the reason that until 2024, he was the longest-serving sitting member of Mongolia's parliament, having been reelected in every election since his first term in 2004-2008.

54. However, Batbold was not a politically strong Prime Minister. Because of the unique circumstances of his selection, he did not enter office with any electoral mandate. His Cabinet also contained multiple members of the opposition party in key ministries, and the President at the time was a member of the Democratic Party as well. Given the President's broad

[15] *See, e.g.*, https://www.biv.com/news/archives/mongolian-prime-minister-renews-pitch-for-resource-8228956.
[16] Alicia Campi "Mongolia's Quest to Balance Human Development in its Booming Mineral-Based Economy," *Brookings*, January 2012, https://www.brookings.edu/articles/mongolias-quest-to-balance-human-development-in-its-booming-mineral-based-economy/#_ftnref11.

powers, the President at that time would have had influence over the Office of the Prosecutor General, the national police, the IAAC, and the judiciary. That would have given the President significant power to use against Batbold—and an incentive to try to weaken him politically—had Batbold been accused of any untoward conduct.

## IV. The Complaint Misunderstands Mongolian Government and Institutions

55. The government's Complaint makes a series of assertions about Mongolian law and politics. Two of the primary assertions are that:

- "As Prime Minister, Batbold had effective control of the country's natural resources." Paragraph 18.
- "Under Mongolian law, the Chairman of the State Property Committee reported directly to the Prime Minister, who had ultimate responsibility for and authority over Mongolian state property." Paragraph 20.

56. But these assertions are wrong, and I believe it is very unlikely that Batbold could have exercised any control over EMC during his tenure as Prime Minister. *First*, under Mongolia's constitution, the Prime Minister does not have formal legal authority over the country's natural resources. *Second*, no Prime Minister would have been able to wield effective control over EMC as a matter of practical political reality. *Third*, Batbold himself was particularly ill-suited to improperly steer contracts involving EMC, given that throughout his Prime Ministry, the General Director of EMC was Ch. Ganzorig, who had been appointed in January 2008, and who served during the tenures of three different prime ministers, from both major Mongolian parties.

### *a. Mongolian Prime Ministers Do Not Have Formal Legal Authority Over the Country's Natural Resources*

57. As described above, since 1992, Mongolian has had a hybrid parliamentary system.

58. As mentioned above, while the Prime Minister as head of government leads Cabinet meetings and has a key voice in setting policy, he does not have complete authority or responsibility for the work done by the ministries or agencies that report to the Cabinet, such as

the State Property Committee. Instead, as a practical matter, there are multiple layers of bureaucracy between the government in Ulaanbaatar and events on the ground across Mongolia. Based on my knowledge and experience, I am not aware of anything in the Mongolian constitution or laws that authorizes the Prime Minister to exercise direct legal authority over Mongolia's natural resources. Therefore, the implication that the Prime Minister has some formal legal responsibility for natural resources is mistaken.

***b. As a Matter of Political Reality, Mongolian Prime Ministers Did Not Have the Ability to Control EMC***

59. Mongolian Prime Ministers were also constrained from controlling EMC by the political realities during the relevant period. EMC has always been of central importance to Mongolia, and during the relevant period, Russia partially owned the corporation. The city of Erdenet, which became the second largest in Mongolia in the 1990s, did not exist before the copper enterprise launched in 1974; it was entirely a creation of the Soviet-Mongolian joint venture, and had a unique identity. Throughout my personal service to Mongolia's Prime Ministers, my impression was that EMC acted as a virtual independent fiefdom within Mongolia.

60. The General Director of EMC from 1988 to 1998 is a case in point. That General Director, Sh. Otgonbileg, was so powerful he remained in this post after the fall of Communism and the collapse of Soviet aid to Mongolia, and through the terms of four Prime Ministers. The two Prime Ministers with whom I worked during Otgonbileg's time, Jasrai and Enkhsaikhan, had no control over him and had no access to information about Erdenet operations beyond that which Otgonbileg's advisers provided.

61. Otgonbileg, the General Director, had so much power for two primary reasons. First, Otgonbileg's power rested, in part, on Erdenet's central importance to the otherwise shaky national economy. In the 1990s, Erdenet's shipments of copper concentrate accounted for 30-40%

of Mongolian exports.[17] Second, Erdenet was a joint venture with Russia, which still owned 49%, and who had provided the engineering and financial inputs that constructed the mine and the whole city in which the processing took place. Otgonbileg had strong links to Russian joint venture partners and the Russian government, whose goodwill had always been one key pillar of Mongolian foreign policy.

62. Based on my personal experience with Otgonbileg's tenure, my understanding of Mongolian politics, and the fact that Russia continued to own 49% of EMC until 2015, I believe that during the period of 2009 to 2012 prime ministers did not have the ability to control EMC or its contracting.

### *c. Batbold in Particular Had Little Ability to Control EMC*

63. Beyond the generally limited powers of Mongolian Prime Ministers to control EMC, Batbold in particular had less control than most. When Batbold became Prime Minister, he inherited a Cabinet that had been selected and approved under Prime Minister Bayar and Parliament Speaker D. Demberel, and he replaced only one Cabinet Minister in the entire administration. All other Cabinet Ministers were thus less likely to be directly accountable or loyal to him.

64. During Batbold's term as Prime Minister, the General Director of EMC was Ch. Ganzorig. Ganzorig had been appointed in September 2007 under Prime Minister Bayar, two years before Batbold became Prime Minister, and went on to serve for a total of six years, spanning three different prime ministers total from both parties. Ganzorig's long tenure shows that he was independent of Batbold's direct control, and indicates how implausible the suggestion is that Batbold gained personal control over EMC by virtue of his appointment as Prime Minister.

---

[17] Author's calculations based on Mongolian trade data.

## V. There Are Reasons to Believe that Khaltmaagiin Battulga Has Propagated the Allegations in the Complaint

65. Based on my review of the relevant materials, there are reasons to believe that the allegations against Batbold, including those in the Complaint, were generated by Batbold's political rival, former President Khaltmaagiin Battulga, who has a long history of persecuting political opponents. Besides this history of persecution, it is particularly notable that no charges of corruption were ever filed against Batbold in Mongolia by the Prosecutor General.

66. ***Background on Battulga.*** Khaltmaagiin Battulga has been a public figure for more than three decades, and there are many rumors and press stories about him. Some basic facts are clear. He was born in Ulaanbaatar in 1963 and has a high school education. As a student he demonstrated great talent as a wrestler, the Mongolian national sport, and in 1983 he won a gold medal in the world Sambo championships in the USSR.[18]

67. While biographies say that Battulga originally supported himself by selling paintings to tourists, I am skeptical this was anything more than a hobby; a young champion wrestler would have had many local and international doors opened for him. In 1991, Battulga purchased the Bayangol Hotel in Ulaanbaatar when it was privatized through the mass voucher privatization program. Around that time, he launched his business enterprise, Genco, which he named after the corrupt, mafia-owned olive oil front company in *The Godfather*. Genco expanded rapidly into important spheres, including taxis, foodstuffs, and tourism.

68. In 1991, I began to hear about Battulga's active financial support of what eventually became the Democratic Party from those within the movement. Despite this financial support, Battulga stayed in the background and did not get publicly involved in politics in that period. I

[18] https://en.wikipedia.org/wiki/1983_World_Sambo_Championships. Sambo is a martial art that was created in the USSR in the 1920s and is recognized by the United World Wrestling governing body and the International Olympic Committee, but is not an Olympic sport.

believe Battulga remained in the background because he had already developed a reputation for ruthlessness in his business activities by this time and was widely perceived as a frightening individual. After the chaotic period immediately following the collapse of the socialist era, Battulga emerged as one of Mongolia's richest individuals. In 2018 he was listed by *Forbes* as the third-richest man in the country.[19]

69. In 2004, Battulga turned to direct engagement in politics and was elected as a Democratic Party member of Parliament. After his reelection in 2008, he was selected as Minister of Roads, Transport, Construction and Urban Development in the 'Grand Coalition' government established by the MPRP and DP. He served in that post under Prime Minister S. Bayar, until Bayar resigned for health reasons in October 2009, after which he continued to serve under Prime Minister Batbold. In that role Battulga oversaw most of the government's biggest investment projects. During this time, he was implicated and charged in one corruption scandal.[20] He also advocated for construction of rail lines to export coal from the Tavan Tolgoi mine, which lies near Mongolia's border with China, to Russia.[21] Battulga supported these exports to Russia rather than directly across the border to China, even though demand for coal was much greater in China and would have had lower shipping costs.

70. In 2012, Battulga was named Minister of Industry and Agriculture in the new DP-led coalition government, from which the MPP was excluded and which was dominated by DP owners of large business groups, a marked change from all previous Mongolian governments.[22]

---

[19] http://www.mongolianbusinessdatabase.com/base/newsdetials?id=14555.
[20] Ian MacDougall and Anand Tumurtogoo, May 24, 2019, "The Country That Exiled McKinsey," https://www.propublica.org/article/the-country-that-exiled-mckinsey.
[21] https://www.coalspot.com/news/1186/mongolia-coal-railway-to-link-with-russia/41.
[22] "[T]he new DP-led cabinet features extremely powerful business interests—only three out of its 19 members are public servants while the rest are well-known successful business entrepreneurs." J. Mendee, "A New Mongolian Government is Finally Formed", Jamestown Foundation Eurasia Daily Monitor, 9/11/2012. https://jamestown.org/program/a-new-mongolian-government-is-finally-formed/.

He held that post from 2012-2014, during which time he continued to be a strong advocate for constructing the first Tavan Tolgoi rail lines east and north to Russia and for major investment of state funds in establishment of an industrial park in Sainshand, the hub where coal from Tavan Tolgoi would pass on the way to Russia.[23]

71. ***2017 Presidential Election.*** In 2017, Battulga became the first and still the only wealthy businessman to be elected as Mongolia's president. The presidential election between Battulga, MPP Parliament Speaker M. Enkhbold, and S. Ganbaatar of the MPRP was a historic election featuring three unpopular candidates, each tainted by corruption allegations.[24] It was the only presidential election in Mongolian history in which no candidate received a majority of votes on the first ballot, forcing a runoff between Battulga and Enkhbold. Enkhbold was weakened by a corruption scandal of his own, after a whistleblower released tapes of conversations from 2016 that suggested Enkhbold was involved in selling positions in the government.

72. Prior to the runoff, a 'white ballot' movement—i.e., cast a vote but do not support either of the offered choices—gained momentum. However, this movement was hindered by the election law's stipulation that no campaigning could take place for the runoff, and the white ballot movement had to be entirely informal, spread by word of mouth. Nevertheless, 8.2% of ballots cast were blank, and Battulga won the runoff with 50.6% of the votes. If his votes had fallen below 50%, a new election with new candidates would have been required.

73. Battulga portrayed himself as a populist anti-corruption champion, speaking for voters who were angry about corruption in the mining sector and China. Observers noted the irony

[23] I visited those never completed and gradually deteriorating facilities in 2022 in my work as team leader on a World Bank transport and logistics improvement technical assistance project.
[24] https://sg.news.yahoo.com/corruption-scandals-muddy-mongolias-presidential-vote-224551888.html.

of this posturing by a notoriously corrupt business figure; one who was just barely elected because his main opponent was also notoriously corrupt.

74. ***Battulga's Presidency.*** Mongolian politicians and scholars have worked to build government institutions that can protect against and withstand political corruption—a problem that can threaten any developing nation. While Mongolia has made great strides in combatting corruption, following the election of Battulga as President in 2017, the scope and the nature of sham prosecutions of leading figures were orders of magnitude greater than had ever occurred before. Relatedly, until Battulga's time in office, the relationship between the President and the government had occasionally been tarnished by partisanship, particularly in the President's use of veto powers. But Battulga's weaponization of his strong influence over the justice system in pursuit of rivals and his efforts to expand his control over the judicial system were unprecedented.

75. Battulga utilized two main tools in this campaign against his rivals. *First*, he exploited popular discontent over the perception that Mongolia's mineral resources were benefiting foreigners and Mongolian insiders, rather than the Mongolian people. *Second*, Battulga leveraged two scandals that occurred during this period to force members of Parliament to accede to his wishes. The first was the M. Enkhbold scandal regarding sale of government positions, already mentioned above. Then, in 2017, it was revealed that a government fund that was meant to provide low-interest loans to small- and medium-sized enterprises had apparently been tapped by several Members of Parliament for their own businesses. These incidents were both widely publicized and provided Battulga with sticks and carrots to use in dealing with the Parliament, allowing him to threaten prosecution of those who stood up against him and to promise the dropping of cases against those who allied with him.

76. During Battulga's four years as President, four former Prime Ministers were prosecuted for crimes alleged to have occurred as far back as 2009: S. Bayar, M. Enkhsaikhan, Ch. Saikhanbileg, and J. Erdenebat. A number of former cabinet ministers were also prosecuted, including former Finance Minister Bayartsogt. B. Byambasaikhan and Ts. Tumentsogt, two former CEOs of the state-owned holding company Erdenes Mongol, were jailed at the same time as Bayartsogt. The charges revolved around the 2009 Oyu Tolgoi Investment Agreement with Rio Tinto and Ivanhoe Mines, the 2015 Oyu Tolgoi Underground Mining Plan agreement with Rio Tinto, and the 2016 purchase by a private Mongolian business of Russia's 49% stake in Erdenet Copper Corporation. However, the alleged crimes did not involve corruption as it is normally understood. Instead, the charges broadly alleged the former political leaders entered into contracts that did not protect Mongolia's best interests. The charges did not include any allegations that the individuals personally benefited from the contracts, as would normally be expected in a corruption case. These are actions that for the political leaders involved would usually have been resolved at the ballot box, and for the CEOs involved may have been considered grounds for dismissal, but not crimes as the term is normally understood. Some of the charges seemed even more unreasonable and political in nature; one extreme example was the sentencing to four years in prison of former PM Enkhsaikhan for allegedly overbilling the government 60 million Mongolian tugrik, approximately USD $30,000, for the purchase of a vehicle in 2015.[25] At the same time, the outstanding corruption charges against Battulga from his term as Minister of Transportation were dropped when he took office as President.[26] Despite all of these aggressive criminal prosecutions against *other* politicians, Batbold was never charged with any crimes.

[25] https://www.pressreader.com/mongolia/the-ub-post/20200508/281505048390378.
[26] https://www.propublica.org/article/the-country-that-exiled-mckinsey.

77. On October 29, 2018, Battulga attempted to dissolve the Parliament, the only time a President has taken such a step.[27] When the Speaker rejected this proposal, Battulga threatened to go on a hunger strike.[28] In spring 2019, there were widespread reports that Battulga was pressing the Prosecutor General to file corruption charges against his predecessor, Ts. Elbegdorj.[29] When the Prosecutor General refused to file charges, Battulga intensified his efforts to seize control of the judicial system, leading to a constitutional crisis in Mongolia.

78. On March 27, 2019, 'as ordered by the President,' Parliament narrowly passed after only one day of review amendments to the Law on the Legal Status of Judges, the Law of the Public Prosecutor's Office and the Anti-Corruption Law. The main impact of these amendments was that the National Security Council, chaired by the President, was granted much greater discretion for dismissal of key figures in the judicial system without any cause other than the Council's judgment that dismissal was appropriate. The practical impact of these amendments was that Battulga seized these powers basically for himself alone even though, on paper, the power to remove judges was granted to the National Security Council, and the Judicial General Council still had a role to play in judicial appointments and dismissals.

79. These events provoked widespread condemnation from Mongolian and international observers. The well-respected and scrupulously nonpartisan University of British Columbia professor Julian Dierkes and a colleague published a piece on Battulga's power grab entitled "The Beginning of the End of Democracy?"[30] Dierkes report notes that "Mongolian

---

[27] https://president.mn/en/2018/10/29/official-letter-sent-to-parliament-speaker-m-enkhbold-on-proposal-to-consult-on-self-dissolution-of-the-parliament/.

[28] https://www.bloomberg.com/news/articles/2018-10-30/mongolia-president-may-go-on-hunger-strike-to-protest-parliament?sref=mcaQHNnQ.

[29] *See* https://www.pressreader.com/mongolia/the-ub-post/20190320/281505047552814 and https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.

[30] https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.

lawyers were nearly unanimous in their condemnation of the amendments with some even calling them a soft coup."

80. In May 2019, the United Nations Office of the High Commissioner for Human Rights Special Rapporteur on the Independence of Judges and Lawyers issued a report on these developments.[31] I have read many such reports from Mongolia, China, and other countries. They are generally quite diplomatic and moderate in their tone in discussing the situation in UN member states, even when the underlying messages are critical. This particular report is quite remarkable and worth reading in full. I will highlight selected passages:

- "[W]e are concerned that the recent amendments to national legislation on the judiciary and prosecution service fall short of international standards relating to the independence of the judiciary, the autonomy of the prosecution service and the separation of powers. We are also worried at the wide discretionary powers that the Head of State retains in the appointment of judges, heads of the prosecution service, members and president of the Judicial General Council, and members and president of the Judicial Ethics Committee."
- "We consider that the involvement of the National Security Council in the procedure for the dismissal of judges constitutes a serious breach of the principles of independence of the judiciary and separation of powers."
- "We consider that the wide powers entrusted to the Head of State in the appointment of judges undermines the independence of the judiciary and the separation of powers."

[31] https://www.ohchr.org/sites/default/files/Documents/Issues/IJudiciary/Communications/OL_MNG_14.05.19_1.2019.pdf.

- "[W]e note with concern that the wide powers entrusted to the President with regard to the formal appointment of the [Judicial General] Council members risk hampering the independence of the Council and the judicial system as a whole."

81. The report concludes with remarkably blunt recommendations, the first of which is: "Repeal the amendments to the Law on the Legal Status of Judges and the Law on the Public Prosecutor's Office, in order to eliminate any interference by the National Security Council with the independence of the judiciary and the prosecution service."

82. These fears came to pass. Immediately after the passage of these amendments, President Battulga fired the Chief Justice of Mongolia's Supreme Court, the Prosecutor General, the Deputy Prosecutor General, and the head of the IAAC. He appointed his hand-picked replacements to the key positions involved in investigating and prosecuting corruption cases. Shortly thereafter, another 17 judges were suspended.[32]

83. In the aftermath of these events, Parliament drafted, and in December 2019 approved, Constitutional amendments that created new constraints on presidential control over the justice system. However, Battulga's handpicked judges and officials remained in place. The length of service of the President was newly limited to a single six-year term. This change had immediate political consequences given the looming 2021 presidential election in which Battulga had been expected to run for reelection. In 2021, after a case was brought by Battulga's supporters, the Constitutional Court ruled that based on the amendments he could not run for reelection, a ruling which Parliament accepted.[33] On April 18, 2021, Battulga issued a shocking decree ordering the dissolution of the MPP—his rival political party. There was no legal basis for such a

[32] US Department of State Mongolia 2019 Human Rights Report https://www.state.gov/wp-content/uploads/2020/02/MONGOLIA-2019-HUMAN-RIGHTS-REPORT.pdf.
[33] One unusual feature of the Constitutional Court's authority is that Parliament must approve its rulings.

decree, and it was not obeyed: the MPP called for Mongolians to reject any such attempt to "overthrow the democratic system of parliament, seize state power by unconstitutional means and establish a dictatorship by dissolving any political party."[34]

84. ***Battulga's Rivalry with Batbold.*** In November 2020, news sources began to report that former Prime Minister Batbold was considered a potential candidate for president for the MPP in the next year's election.[35] It was soon thereafter, and during this period of political and constitutional tumult, that legal cases against Batbold began to be filed. The cases against Mr. Batbold rested on accusations that he had acquired property outside Mongolia using funds in overseas accounts that had been obtained illicitly from sales of copper concentrate in 2010-2012 by EMC.

85. These lawsuits were particularly unusual. No criminal charges were ever filed against Batbold in Mongolia. I understand that a Mongolian court even found that there was no evidence an investigation had even been initiated by the IAAC. I understand that a short-lived civil suit was initially filed in Mongolia, before being quickly dismissed and never re-filed in any forum.

86. These facts indicate to me that rather than being brought in good faith, the allegations against Batbold were potentially generated on false pretenses based on a campaign by Battulga for nefarious political purposes, as part of his systematic targeting of political rivals and potential opponents in the upcoming presidential election.

34 https://thediplomat.com/2021/04/grappling-with-parliament-limiting-his-powers-mongolian-president-moves-to-dissolve-ruling-party/.

35 https://www.pressreader.com/mongolia/the-ub-post/ 20201111/ 281492163842512?srsltid=AfmBOooJMK6cr02pBMIhe_y3Lq3501trKi6MiRRiOnIEy88VAhNYx09E.

civil suit was initially filed in Mongolia, before being quickly dismissed and never re-filed in any forum.

86. These facts indicate to me that rather than being brought in good faith, the allegations against Batbold were potentially generated on false pretenses based on a campaign by Battulga for nefarious political purposes, as part of his systematic targeting of political rivals and potential opponents in the upcoming presidential election.

## V. Conclusion

87. Given my four decades of professional and personal experience in Mongolia, it is my opinion that the accusations involving Batbold are based on a fundamental misunderstanding of the Mongolian constitutional and political structure, and may have been improperly generated by his rival, former President Battulga.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2026, in Skillman, New Jersey.

[signature]

William Bikales

**Attachment A: Documents Relied Upon**


- Asian Development Bank, 2021 "Decentralization, Local Governance, and Local Economic Development in Mongolia", https://dx.doi.org/10.22617/TCS210319-2.
- Bittner, Peter. 2019. "Mongolia's Crisis of Democracy Continues." The Diplomat. January 31. https://thediplomat.com/2019/01/mongolias-crisis-of-democracy-continues/.
- BIV Business Intelligence for British Columbia, October 11, 2010 "Mongolian prime minister renews pitch for resource opportunities amid Vancouver tour" https://www.biv.com/news/archives/mongolian-prime-minister-renews-pitch-for-resource-8228956.
- Boldsaikhan, S. and Menard, A. "Here's How Democracy is Eroding in Mongolia", Washington Post, April 3, 2019 https://www.washingtonpost.com/politics/2019/04/03/heres-how-democracy-is-eroding-mongolia/.
- Campi, A. "Mongolia's Quest to Balance Human Development in its Booming Mineral-Based Economy," Brookings, January 2012, https://www.brookings.edu/articles/mongolias-quest-to-balance-human-development-in-its-booming-mineral-based-economy/#_ftnref11.
- Chimid, Enkhbaatar. 2017. 'The Development of Judicial Independence and the Birth of Administrative Review in Mongolia'. Academia Sinica Law Journal, Comparative Administrative Law in Asia, no. 21 (September): 155–219.
- Chimid, Enhbaatar, Tom Ginsburg, Amarjargal Peljid, Batchimeg Migeddorj, Davaadulam Tsegmed, Munkhsaikhan Odonkhuu, and Solongo Damdinsuren. 2016. "Assessment of the Performance of the 1992 Constitution of Mongolia." United Nations Development Programme. https://www.undp.org/mongolia/publications/assessment-performance-1992-constitution-mongolia.
- Dierkes, Julian and Boldsaikhan, S. 2019. "The Beginning of the End of Democracy?" Mongolia Focus (blog). March 27. https://blogs.ubc.ca/mongolia/2019/judicial-appointments-national-security-council/.
- Ginsburg, T. (1995). Political reform in Mongolia: Between Russia and C, hina. Asian Survey, 35(5), 459–471.
- Ginsburg, T., & Gombosuren, G. (1996). Constitutionalism and Human Rights. In O. Bruun & O. Odgaard (Eds.), Mongolia in transition: Old patterns, new challenges (pp. 103–134). Routledge.
- Law on Anti-Corruption [Авлигын эсрэг хууль] (2006). https://legalinfo.mn/.
- Law on State Audit [Төрийн аудитын хууль] (2020). https://legalinfo.mn/.
- Law on the Cabinet [Засгийн газрын тухай хууль] (1993). https://legalinfo.mn/.
- Law on the Legal Status of Judges [Шүүгчийн эрх зүйн байдлын тухай хууль] (2019). https://legalinfo.mn/.

- Law on the Prosecution Service in Mongolia (2017) (English translation) /https://track.unodc.org/uploads/documents/BRI-legal-resources/Mongolia/24_-Law_on_Prosecution_service.pdf.
- Macdougall, Ian and Anand, Tumortogoo, "The Country That Exiled McKinsey", Propublica May 14, 2019, https://www.propublica.org/article/the-country-that-exiled-mckinsey.
- McAfee, Connor Semi-Presidentialism: A Pathway to Democratic Backslide, 11 PENN. ST. J.L. & INT'L AFF. 184 (2023). https://elibrary.law.psu.edu/jlia/vol11/iss2/8.
- Mendee, J. "A New Mongolian Government is Finally Formed", Jamestown Foundation Eurasia Daily Monitor, September 11, 2012 https://jamestown.org/program/a-new-mongolian-government-is-finally-formed/.
- Munkh-Erdene, L. (2010). The transformation of Mongolia's political system: From semi-parliamentary to parliamentary? Asian Survey, 50(2), 311–334.
- Radchenko, S., "Mongolian Politics in the Shadow of the Cold War". Journal of Cold War Studies (2005) 8 (1): 95–119, https://doi.org/10.1162/152039706775212021.
- Sonin News Service, "M. Enkhsaikhan: Proposing a Parliamentary Government with a Strong President" (in Mongolian) October 1, 2018 https://sonin.mn/news/politics-economy/35566.
- Transparency International, 2018, "Mongolia: Overview of Corruption and Anti-Corruption," https://knowledgehub.transparency.org/assets/uploads/kproducts/Country-Profile-Mongolia_2018.pdf.
- Transparency International, 2019, "Parliament of Mongolia Should Uphold the Independence of the Judiciary and Anti-Corruption Agency" https://www.transparency.org/news/pressrelease/parliament_of_mongolia_should_uphold_the_independence_of_the_judiciary.
- UNOHCR, Forst, Michel and Garcia-Sayan, Diego, Office of the High Commissioner on Human Rights, United Nations, May 14, 2019, "Amendments to the Law on the Legal Status of Judges and the Law on Public Prosecutor's Office " OL MNG 1/2019, https://www.ohchr.org/sites/default/files/Documents/Issues/IJudiciary/Communications/OL_MNG_14.05.19_1.2019.pdf.
- UNOHCR, Sattherwaite, Margaret, Office of the High Commissioner on Human Rights, United Nations, A/HRC/56/62/Add.2: Visit to Mongolia - Report of the Special Rapporteur on the independence of judges and lawyers https://www.ohchr.org/en/documents/country-reports/ahrc5662add2-visit-mongolia-report-special-rapporteur-independence-judges.
- VIP76 News Website, "The First Five Ministries of Mongolia Celebrated Their 100th Anniversary" 12/19/2011, https://vip76.mn/content/12065.
- Wang, Y and Bayartsogt, Kh., "Corruption Scandals Muddy Mongolia's Presidential Vote", June 22, 2017 accessed at https://sg.news.yahoo.com/corruption-scandals-muddy-mongolias-presidential-vote-224551888.html.

- Zorigt, D., "Political culture and constitutional reform in Mongolia," GIS Advisory Services, Aug. 27, 2019, https://www.gisreportsonline.com/r/mongolia-constitutional-reform/.